3:21 cv1474

# EXHIBIT C

# First Judicial District of Pennsylvania

*51CR00034302009*
*Johnathan Robins*

*Trial (Jury) Volume 3*
*March 11, 2010*



*First Judicial District of Pennsylvania*
*100 South Broad Street, Second Floor*
*Philadelphia, PA 19110*
*(215) 683-8000   FAX:(215) 683-8005*

*Original File ROBINS3.V1, 273 Pages*
*CRS Catalog ID: 10041277*

Page 1

[1]
[2]  IN THE COURT OF COMMON PLEAS OF PHILADELPHIA
[3]    FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
[4]        CRIMINAL TRIAL DIVISION
[5]              - - -
[6]  COMMONWEALTH
[7]  VS.
[8]  JOHNATHAN ROBINS   : CP-51-CR-0003430-2009
[9]
[10]
[11]     Courtroom 901 Justice Center
           Philadelphia, Pennsylvania
[12]     Thursday, March 11, 2010
[13]             - - -
[14] BEFORE:  HONORABLE CHARLES J. CUNNINGHAM, III
              AND A JURY
[15]
[16]             - - -
         CASE IN CHIEF
[17]
[18]
[19]       (VOLUME I)
[20]
[21]
[22]
[23]
[24]
[25]

           Carl G. Sokolski
        Official Court Reporter
          (215) 683-8060

Page 2

[1]
[2]  APPEARANCES:
[3]
[4]    MICHAEL STACKOW, ESQ.
          Assistant District Attorney
[5]       Counsel for the Commonwealth
[6]    JOHNATHAN ROBINS, Pro Se
       THOMAS L. McGILL, JR., ESQ.
[7]       Counsel for the defendant
[8]             - - -
[9]  COMMONWEALTH'S EVIDENCE  DIRECT CR REDR RECR
[10] Ericka Johnson        39   97
     Lucille Freeman      170  189
[11] Officer Brian Mort   222  235
[12] DEFENDANT'S EVIDENCE
[13] Michael M. Ward       240  255 259 260
                            261
[14]
[15]        E X H I B I T S
[16] NO.                    MARKED
[17] C-1. Statement of Ericka Johnson      95
     C-2. Statement of Lucille Freeman     184
[18] C-3. Police Form 75-48               228
     C-4. Police Form 75-229             232
[19]
[20]
[21]
[22]
[23]
[24]
[25]

           Carl G. Sokolski
        Official Court Reporter
          (215) 683-8060

Page 3

[1]
[2]      P R O C E E D I N G S.
[3]      THE COURT:  Mr. DeFino, are all
[4] our jurors here in the back?
[5]      COURT CRIER:  Yes.  Do you want
[6] me to line them up?
[7]      THE COURT:  What have you got?
[8]      COURT CRIER:  Your Honor,
[9] defense has a motion.
[10]     THE COURT:  Okay.
[11]     THE DEFENDANT:  To allow prior
[12] sexual contact.
[13]     THE COURT:  We haven't started
[14] the case yet.
[15]     THE DEFENDANT:  I just wanted
[16] to make sure.
[17]     THE COURT:  We haven't started
[18] the case yet.
[19]     THE DEFENDANT:  Sorry, sir.
[20]     THE COURT:  We can go on the
[21] record.  In Commonwealth versus Johnathan
[22] Robins, Mr. Robins handed up a motion to the
[23] Court.  Does the Commonwealth have a copy of
[24] this?
[25]     MR. STACKOW:  I do.

           Carl G. Sokolski
        Official Court Reporter
          (215) 683-8060

Page 4

[1]
[2]      THE COURT:  Mr. McGill, have
[3] you seen your client's motion?
[4]      MR. McGILL:  I have, Your
[5] Honor.
[6]      THE COURT:  What's the
[7] Commonwealth's position?
[8]      MR. STACKOW:  Your Honor, our
[9] position is this is improper rape shield
[10] evidence that the defendant is trying to
[11] introduce, that this is evidence of other
[12] sexual activity just for the purpose of
[13] showing that she was having or purportedly
[14] having a history —
[15]     THE COURT:  I don't know
[16] anything about this case so far except for the
[17] thumbnail sketch that you gave the panel.
[18]     MR. STACKOW:  Right.
[19]     THE COURT:  But some of the
[20] offenses, maybe all of the offenses, I don't
[21] know, hinge on age, right?
[22]     MR. STACKOW:  Correct.
[23]     THE COURT:  There was a baby
[24] born?
[25]     MR. STACKOW:  There was.

           Carl G. Sokolski
        Official Court Reporter
          (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 5

[1]
[2]     THE COURT: Are you going to
[3] have DNA?
[4]     MR. STACKOW: There is no DNA
[5] evidence.
[6]     THE COURT: Why not?
[7]     MR. STACKOW: Because there's
[8] going to be substantial evidence that the
[9] defendant at every step has acknowledged that
[10] the baby was his.
[11]     THE COURT: So you have
[12] statements by the defense as far as the
[13] identity of the child's father.
[14]     MR. STACKOW: The father,
[15] that's right.
[16]     THE COURT: And for proof of
[17] the child's mother, what do you have for that?
[18]     MR. STACKOW: Well, the mother
[19] is going to testify.
[20]     THE COURT: Okay.
[21]     MR. STACKOW: She's going to
[22] testify about the birth and the relationship
[23] that she had with the defendant prior to the
[24] birth and after.
[25]     THE COURT: I'm just trying to
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 6

[1]
[2] understand how any of this is relevant to the
[3] issue in this case. In some cases, some
[4] sexual assault cases, there may be other
[5] issues. In this case, is there any charge
[6] before this jury that is not going to be
[7] determined simply by the age of the two
[8] parties and sexual contact?
[9]     MR. STACKOW: No. The only
[10] tangent to that is a potential mistake of age
[11] defense that the defendant may have under two
[12] of the charges, at least, the statutory sexual
[13] assault and the involuntary deviate sexual
[14] intercourse. The subsection of those charges
[15] is that the defendant or that the complaining
[16] witness was less than sixteen.
[17]     THE COURT: Let's just for my
[18] benefit go through these.
[19]     MR. STACKOW: Yes.
[20]     THE COURT: You have five
[21] charges specified, counts one, two, three,
[22] four and five. Is that what those —
[23]     MR. STACKOW: That's right.
[24]     THE COURT: They refer to the
[25] counts on the bill?
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 7

[1]
[2]     MR. STACKOW: Yes.
[3]     THE COURT: All right. So
[4] involuntary deviate sexual intercourse. You
[5] don't have to show forcible compulsion if the
[6] ages are what?
[7]     MR. STACKOW: If the ages are,
[8] and tailored to this case, the child was less
[9] than sixteen years of age and the defendant
[10] was four or more years older than her.
[11]     THE COURT: And is there a
[12] defense of age available under that statute?
[13]     MR. STACKOW: There is. It's
[14] the defendant's burden to prove that he
[15] reasonably believed that the child was sixteen
[16] or older.
[17]     THE COURT: Okay. And then
[18] unlawful contact with a minor. What's the
[19] age?
[20]     MR. STACKOW: That's just an
[21] adult having contact for a particular purpose
[22] with a person less than eighteen. There is no
[23] mistake of age defense for that.
[24]     THE COURT: Statutory sexual
[25] assault.
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 8

[1]
[2]     MR. STACKOW: The same ages
[3] apply as in involuntary deviate sexual
[4] intercourse.
[5]     THE COURT: So it's under
[6] sixteen. And is mistake of age a defense?
[7]     MR. STACKOW: It is in that
[8] case.
[9]     THE COURT: Corrupting morals
[10] of a minor is also what? Under eighteen?
[11]     MR. STACKOW: It is.
[12]     THE COURT: And there's no
[13] mistake of age there either, is there?
[14]     MR. STACKOW: That's right,
[15] there is not.
[16]     THE COURT: And interference
[17] with the custody of a child.
[18]     MR. STACKOW: That's right.
[19]     THE COURT: You're also moving
[20] on that?
[21]     MR. STACKOW: Yes.
[22]     THE COURT: And is there an age
[23] in there?
[24]     MR. STACKOW: No, not as far as
[25] a mistake of age defense would go, Your Honor.
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

51CR00034302009                                   Trial (Jury) Volume 3
Johnathan Robins                                       March 11, 2010

Page 9

[1]
[2]         THE COURT:  So if you interfere
[3] with the custody of anyone under the age of
[4] eighteen?
[5]         MR. STACKOW:  What we would
[6] have to show is that the defendant took or
[7] enticed the child from the lawful custody of a
[8] parent.
[9]         THE COURT:  What's the
[10] definition of a child?
[11]         MR. STACKOW:  Less than
[12] eighteen.
[13]         THE COURT:  Okay.  I'll hear
[14] from the defense, Mr. Robins, if you want to
[15] make argument.  How is any of this relevant?
[16] I mean what is —
[17]         THE DEFENDANT:  Because when I
[18] first met her she was dating adult males to
[19] begin with.
[20]         THE COURT:  Yes?
[21]         THE DEFENDANT:  And also while
[22] we were together and married, she had an
[23] affair with another adult male, you know,
[24] which, you know, the marriage really, you
[25] know, fell apart once I found out how old she

         Carl G. Sokolski
         Official Court Reporter
         (215) 683-8060

Page 10

[1]
[2] was and she wanted to basically go and have
[3] other sexual relationships outside the
[4] marriage, you know.  The marriage just really
[5] fell apart.
[6]         So the reason why I want to say
[7] evidence of other sexual history is because,
[8] like I said, I'm trying to show that mistake
[9] of age, that if she goes out with other adult
[10] males, I have other proof that she purportedly
[11] put herself as above, as basically when we
[12] first met she said she was nineteen.  So I met
[13] her on an adult phone line, you know, so, and
[14] she was on a dating adult phone line for
[15] eighteen and up, you know, that I just
[16] happened to call on a humbug and met her.  And
[17] showing that she tried to go out and date
[18] adult men is I think part of my defense that,
[19] you know, I mistook her age.
[20]         THE COURT:  Well, if he does
[21] not ask her any questions about sexual
[22] activity, if he only asks her questions about
[23] being in the company of adult males and
[24] representing her age to those adult males,
[25] being on the telephone service, whatever it

         Carl G. Sokolski
         Official Court Reporter
         (215) 683-8060

Page 11

[1]
[2] was, for eighteen and up and representing to
[3] people that she was older than eighteen, if he
[4] does not ask any questions or attempt to
[5] introduce any evidence about sexual activity,
[6] how is it precluded by the rape shield law?
[7]         MR. STACKOW:  Well, I don't
[8] think that would be precluded by the rape
[9] shield law but then we get into, what it
[10] sounds like is just hearsay and essentially
[11] rumor or suspicion on behalf of the defendant
[12] unless he —
[13]         THE COURT:  No.  He's saying
[14] that he has a good faith —
[15]         MR. STACKOW:  Unless he has
[16] some firsthand knowledge.
[17]         THE COURT:  — that he has a
[18] good faith basis to ask questions on cross
[19] examination:  Isn't it true that we met on an
[20] adult date line?
[21]         MR. STACKOW:  Right.
[22]         THE COURT:  Yes.  Isn't it true
[23] that you have to represent that you're over
[24] eighteen to get on that line?  Yes.  Did you
[25] represent you were over eighteen?  Yes, I did.

         Carl G. Sokolski
         Official Court Reporter
         (215) 683-8060

Page 12

[1]
[2] You go out with other adult men too, don't
[3] you?  Yes, I do.  Don't you tell them that
[4] you're eighteen, nineteen, twenty years old?
[5]         MR. STACKOW:  See, I think that
[6] would be improper.
[7]         THE COURT:  It's dating.  It's
[8] not sexual contact.
[9]         MR. STACKOW:  Unless there's
[10] some.  First of all, I think that it should be
[11] limited to the time frame.  It doesn't matter
[12] what she's doing now, certainly.  But if he's
[13] saying that at the time that he was having a
[14] sexual relationship with her that she was also
[15] having intimate relationships or —
[16]         THE COURT:  He's not going to
[17] say anything about intimate relationships or
[18] sexual conduct.  He's going to ask her
[19] questions and maybe introduce evidence.  I
[20] don't know what his witnesses are going to
[21] say, but produce evidence that she tells
[22] everybody that she's nineteen years old.
[23]         THE DEFENDANT:  Because, like,
[24] I showed him a paper of when I got out of
[25] prison in August.  I made a copy of her

         Carl G. Sokolski
         Official Court Reporter
         (215) 683-8060

Page 13

[1]
[2] MySpace page, which she's on there for dating.
[3] She's now on MySpace. She says she's nineteen
[4] on her MySpace page.
[5]        THE COURT: Well, that gets
[6] into other issues of, you know, whether that's
[7] admissible for other reasons. You should
[8] discuss that with your lawyer and he'll help
[9] you find a way to get that into evidence. But
[10] as long as he's not asking her questions about
[11] or trying to introduce evidence of sexual
[12] activity, then anything that goes to her
[13] misrepresenting her age is admissible, I
[14] believe.
[15]        MR. STACKOW: Very good. Very
[16] well.
[17]        THE COURT: Do you understand
[18] the Court's order?
[19]        THE DEFENDANT: Yes.
[20]        THE COURT: Anything you want
[21] to ask her about misrepresenting her age, if
[22] you have a good faith basis to ask it, you can
[23] ask it. You are not to ask her any questions
[24] about sexual history or activity. There's a
[25] specific exclusion for that kind of evidence.
                Carl G. Sokolski
                Official Court Reporter
                (215) 683-8060

Page 14

[1]
[2] It's called the rape shield law. And really
[3] what your defense in this case is, what I hear
[4] you saying, is it's a mistake of age case and
[5] you want to be able to show that not only did
[6] she tell me she was nineteen, everybody
[7] thought she was nineteen. Anybody who wanted
[8] to know her age, she said she was nineteen.
[9]        THE DEFENDANT: I introduced
[10] her to all of my friends, everybody.
[11]        THE COURT: Okay.
[12]        THE DEFENDANT: One other
[13] thing. A few other things. I also want to
[14] introduce like when she first came to me, when
[15] she first came to me she was telling me about
[16] like how bad a life she had, the abuse from
[17] her mom, the abuse from her dad. And I was
[18] thinking that some of that might have been the
[19] reason why she tried to get away from that
[20] type of lifestyle, because --
[21]        THE COURT: Mr. Robins, in
[22] terms of what you want to present as a
[23] defense, you should really be talking to Mr.
[24] McGill. The only reason any of this came up
[25] was because you had a motion and I had to see
                Carl G. Sokolski
                Official Court Reporter
                (215) 683-8060

Page 15

[1]
[2] if any of this was relevant to the crimes
[3] charged and possible defenses.
[4]        THE DEFENDANT: Okay.
[5]        THE COURT: But anything you
[6] want to introduce, that's why Mr. McGill is
[7] there to help you do that.
[8]        THE DEFENDANT: Okay. Yes,
[9] sir.
[10]        THE COURT: Anything else
[11] before we bring in the jury?
[12]        MR. STACKOW: Can I just
[13] finish, have thirty seconds to finish talking
[14] to the complaining witness since she knows that
[15] she's going to be testifying in about five or
[16] ten minutes?
[17]        THE COURT: Okay. Yeah, go
[18] ahead.
[19]        MR. STACKOW: Thank you.
[20]        (A brief recess was taken.)
[21]        MR. STACKOW: Thank you, Your
[22] Honor. We're ready.
[23]        THE COURT: Okay. So my
[24] understanding is you're going to open to the
[25] jury now. Mr. Robins, you are not going to
                Carl G. Sokolski
                Official Court Reporter
                (215) 683-8060

Page 16

[1]
[2] open until you present your case, right?
[3]        THE DEFENDANT: Yes.
[4]        THE COURT: All right.
[5]        MR. McGILL: Judge, with regard
[6] to that, I don't know if Your Honor feels a
[7] record is necessary. Mr. Robins and I have
[8] discussed certain strategies and I made
[9] certain suggestions, some of which Mr. Robins
[10] has followed, some of which he's decided not
[11] to follow. So I don't know if it's going to
[12] be necessary to make any sort of record, if
[13] Your Honor feels that should be something that
[14] we should anticipate for down the road or.
[15]        THE COURT: What kind of a
[16] record do you want to make? Yesterday he
[17] indicated his choice. I told him he could
[18] discuss that with you and I recommended that
[19] he do discuss things like trial strategy with
[20] you. So it's one of those decisions that some
[21] people would open at the beginning and others
[22] would open at the beginning of the defense.
[23] It's a strategy. There is no right or wrong
[24] way to do it.
[25]        When I was doing defense work I
                Carl G. Sokolski
                Official Court Reporter
                (215) 683-8060

Page 17

[1]
[2] would always open at the beginning of a trial
[3] for two reasons:  Number one, I didn't know if
[4] I was going to put on a defense and, number
[5] two, I wanted to make sure the jury knew that
[6] there was something coming, that they weren't
[7] just listening to the Commonwealth's case and
[8] thinking that there was no defense.
[9]         On the other hand, if you open
[10] at the beginning of the trial, by the time you
[11] put your defense on, you might wish you could
[12] say things differently or present things
[13] differently.
[14]         So it's strictly up to you.
[15] There's no right or wrong way to do it.
[16]         MR. McGILL:  Thank you, Your
[17] Honor.
[18]         THE COURT:  But the plan
[19] currently is Mr. Stackow will open and defense
[20] will open at the beginning of the defense; is
[21] that right?
[22]         THE DEFENDANT:  Yes.
[23]         THE COURT:  Okay.  Any reason
[24] we can't bring in the jury?
[25]         MR. STACKOW:  No, Your Honor.
Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 18

[1]
[2]         THE DEFENDANT:  No.
[3]         COURT CRIER:  Please remain
[4] seated as the jury enters the courtroom.
[5]         (Jury summoned.)
[6]         COURT CRIER:  All present, Your
[7] Honor.  Your Honor, may I swear in the jury?
[8]         THE COURT:  Sure.
[9]         COURT CRIER:  Jurors, please
[10] all rise.  Please raise your right hands.
[11]         You do solemnly swear by
[12] almighty God and those who affirm do declare
[13] and affirm that you will well and truly try
[14] the issue tried between the Commonwealth and
[15] the defendant, Johnathan Robins, and a true
[16] verdict render according to the evidence?  You
[17] do?
[18]         JURY COLLECTIVELY:  Yes.
[19]         THE COURT:  You can have a
[20] seat.  Mr. Robins, please stand up.  Sir,
[21] please state your name.  Spell your last name
[22] for us.
[23]         THE DEFENDANT:  Johnathan
[24] Robins.  R-O-B-I-N-S.
[25]         (Defendant sworn.)
Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 19

[1]
[2]         COURT CRIER:  Johnathan Robins,
[3] to this Common Pleas docket number CP-51-CR-
[4] 0003430-2009, charging you with involuntary
[5] deviate sexual intercourse, how do you plead?
[6]         THE DEFENDANT:  Innocent.
[7]         COURT CRIER:  To the same
[8] Common Pleas docket number, charging you with
[9] unlawful contact with minor, how do you plead?
[10]         THE DEFENDANT:  Not guilty.
[11]         COURT CRIER:  To the same
[12] Common Pleas docket number, charging you with
[13] statutory sexual assault, how do you plead?
[14]         THE DEFENDANT:  Not guilty.
[15]         COURT CRIER:  To the same
[16] Common Pleas docket number, charging you with
[17] interference with custody of child, how do you
[18] plead?
[19]         THE DEFENDANT:  Not guilty.
[20]         COURT CRIER:  To the same
[21] Common Pleas docket number, charging you with
[22] corruption of a minor, how do you plead?
[23]         THE DEFENDANT:  Not guilty.
[24]         COURT CRIER:  How do you wish
[25] to be tried?  By judge or jury?
Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 20

[1]
[2]         THE DEFENDANT:  By jury.
[3]         COURT CRIER:  Your Honor, Mr.
[4] Robins pleads not guilty to all charges and
[5] wishes to be tried by this jury.  You may have
[6] a seat.
[7]         THE COURT:  Good morning,
[8] ladies and gentlemen.
[9]         JURY COLLECTIVELY:  Good
[10] morning.
[11]         THE COURT:  This is the
[12] beginning of the process and there are just a
[13] few things I want to tell you now that you
[14] have been selected for the jury and you are
[15] the fourteen who are actually now sitting in
[16] the box.
[17]         We're going to begin this
[18] morning with opening speeches.  Mr. Robins has
[19] chosen not to give an opening statement, which
[20] is the defense choice.  They can either open
[21] at the very beginning of the trial or they can
[22] wait until it's time for the defense case and
[23] then they can open at the beginning of that
[24] case.  So the only opening you'll hear this
[25] morning is from the District Attorney.
Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009                                                                    Trial (Jury) Volume 3
Johnathan Robins                                                                    March 11, 2010

**Page 21**

[1]
[2]         Any time a lawyer speaks to
[3] you, what they're telling you is not evidence.
[4] It's only evidence when you hear it from the
[5] witness stand.  And if any lawyer in speaking
[6] to you were to touch upon the law, -- and when
[7] I say lawyer I'm also including Mr. Robins
[8] because he's acting as his own lawyer in this
[9] case -- if a lawyer touches upon the law, says
[10] anything about the law and it disagrees with
[11] what I tell you, well, they're wrong and I'm
[12] right.
[13]         So if they can't give you the
[14] evidence and if they can't give you the law,
[15] why are they talking to you?  Well, they're
[16] talking to you for a very good reason, and you
[17] should listen to the speeches of counsel
[18] because what they can do for you at this point
[19] is give you an overview of what's coming in
[20] this trial. So Mr. Stackow can explain to you
[21] what the Commonwealth's case is about.
[22]         Sometimes when witnesses are
[23] presented, they're not presented in the most
[24] logical order or you have to wait until you
[25] hear the second witness to understand the
              Carl G. Sokolski
              Official Court Reporter
              (215) 683-8060

**Page 22**

[1]
[2] first witness, or.  Well, that's what he's
[3] going to try to resolve this morning.  He's
[4] going to strive to give you an overview of his
[5] case and let you know where the Commonwealth
[6] is going in this trial.  And it can be very
[7] helpful in that regard and so you should pay
[8] attention to what he has to say.
[9]         After the opening address by
[10] the District Attorney, we'll begin with the
[11] evidence.  The Commonwealth will call a
[12] witness or more.  The District Attorney will
[13] ask questions.  Defense counsel will have an
[14] opportunity to cross examine.  While a witness
[15] is testifying, you should be listening to what
[16] that witness says and looking at the witness,
[17] because ultimately you have to judge the
[18] credibility, the reliability of what that
[19] witness is testifying to.
[20]         I think that this layout of
[21] this courtroom speaks volumes as to what your
[22] role is and my role.  Your role is to find
[23] facts, and that depends on the witnesses,
[24] which is why you have the best seat in the
[25] house.  You're right there in front of the
              Carl G. Sokolski
              Official Court Reporter
              (215) 683-8060

**Page 23**

[1]
[2] witness and have an opportunity to not only
[3] hear everything the witnesses says but to
[4] observe the witnesses as they testify.  I on
[5] the other hand, most of the time I'm looking
[6] at somebody's bald spot.  I don't have a real
[7] good look at the witness.  But that's not my
[8] job.  I'm not here to judge credibility.
[9] Instead, I have this big desk with a lot of
[10] law books on it because my job has to do with
[11] the law.
[12]         In Pennsylvania, jurors are
[13] allowed to take notes.  In this case we're not
[14] going to do that because the evidence is not
[15] going to be that long or that complicated.
[16] And from your experience in school, you know
[17] what can happen.  You know that if you're
[18] taking notes sometimes your head is down,
[19] you're writing away, you're not looking at the
[20] teacher because you want to get down what the
[21] teacher is saying.  If you're doing that,
[22] you're not doing your job as a juror.  You
[23] need to listen to and also look at the
[24] witness.
[25]         After you've heard all the
              Carl G. Sokolski
              Official Court Reporter
              (215) 683-8060

**Page 24**

[1]
[2] evidence, whatever evidence is going to be
[3] presented in this case, the lawyers will have
[4] an opportunity to speak to you again at the
[5] end of the trial and then I will address you
[6] on the law, give you final instructions on it,
[7] on the law of this case.  Until you get the
[8] whole package, you have to keep an open mind.
[9]         I'll remind you one more time,
[10] when you leave the courthouse you can't go
[11] discuss this case with outsiders.  You
[12] shouldn't even discuss it with each other
[13] until you go back to deliberate, because you
[14] have to wait until you've gotten everything
[15] and that won't be until finally when you go
[16] back to deliberate.
[17]         Sometimes during testimony you
[18] may see a stenographer raise their hand and
[19] stop a witness because they didn't hear
[20] something.  Somehow it got garbled.  Maybe a
[21] lawyer was talking over the witness or maybe
[22] the witness just lowered their voice or for
[23] whatever reason the stenographer wants to make
[24] sure that he gets down what the witness is
[25] saying.  Well, you're just as important as the
              Carl G. Sokolski
              Official Court Reporter
              (215) 683-8060

51CR00034302009
Johnathan Robins

Page 25

[1]
[2] stenographer. So if a witness gets on the
[3] witness stand and for whatever reason you
[4] can't hear what that witness is saying, you
[5] have to let us know. If you raise your hand,
[6] what should happen is one of the court
[7] officers should come over to you and ask you
[8] what's up, and if you explain to the court
[9] officer I can't hear or I need a drink of
[10] water or you would like us to take a break,
[11] I'd like to go back and use the restroom, we
[12] try to minimize the level of torment that
[13] you're going to have to endure on this jury.
[14] So if there's something that we can do to help
[15] you in that regard, you just have to let us
[16] know and one way to do that in the box is you
[17] can raise your hand and tell us what the
[18] problem is. But it's important that you pay
[19] attention and that you're able to hear
[20] everything the witness has to say.
[21]          I told you before that
[22] everything you get in this case has to come to
[23] you in this courtroom. So over lunch, when we
[24] break for the day, at any time, you're not to
[25] go out and do your own investigation in this

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 26

[1]
[2] case.
[3]          I see that everybody is wearing
[4] their juror badges, I think. Okay. And
[5] that's important. The reason we put the badge
[6] on you is so that when you're in the elevator,
[7] for example, you've all had this experience,
[8] I'm sure, you get on the elevator or you walk
[9] into a room and you see somebody. You know
[10] you know them. You don't know where you know
[11] them from. And we want don't people saying
[12] did we go to school together and then within
[13] ten seconds everybody realizes, no, you're on
[14] the jury and this is a witness or the judge
[15] or. So you wear the juror badge. That lets
[16] everybody know that you're a juror here in the
[17] courthouse.
[18]          I can tell you that both of
[19] these lawyers, I don't know Mr. Robins well
[20] but I know Mr. McGill and I know Mr. Stackow,
[21] they're both very friendly people and on a
[22] given day I can be half friendly myself.
[23] However, if we see you in the hallway, we're
[24] not going to say hello. We're not going to
[25] talk to you. And the reason for that is very

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 27

[1]
[2] simple. When this case is all over, whatever
[3] you may do, whatever your verdict may be,
[4] nobody wants somebody coming back and saying,
[5] well, of course that was the jury's verdict, I
[6] saw the jurors, they were out in the hallway
[7] talking to whomever. So when we don't say
[8] hello, there's a good reason for that.
[9]          And one final caution and that
[10] is if anyone comes up to you and wants to talk
[11] to you about this case, if you're approached
[12] by anybody and they say they want to tell you
[13] something about this case, talk to you about
[14] this case, they indicate any interest at all
[15] in this case, you're to report that
[16] immediately to a court officer the first
[17] opportunity you get because that can be very
[18] serious.
[19]          And with that, Mr. Stackow, are
[20] you prepared to address the jury?
[21]          MR. McGILL: Excuse me, Your
[22] Honor.
[23]          THE COURT: Mr. McGill, do you
[24] have something?
[25]          MR. McGILL: Yes, sir. Would

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 28

[1]
[2] Your Honor indulge me for a moment?
[3]          THE COURT: Sure.
[4]          MR. McGILL: Thank you.
[5]          MR. STACKOW: Your Honor, I'm
[6] sorry. Mr. McGill raised a concern. Was the
[7] jury sworn?
[8]          THE COURT: Mr. DeFino, did you
[9] forget the swear the jury in?
[10]          COURT CRIER: I swore them in,
[11] Your Honor.
[12]          MR. STACKOW: Sorry about that.
[13] My apologies.
[14]          THE COURT: You remember. You
[15] were sworn, right?
[16]          A JUROR: Yes.
[17]          THE COURT: That kind of stuff
[18] happens all the time and that why there's a
[19] judge, two lawyers and staff in the courtroom,
[20] because sometimes people do forget things and
[21] we're here to keep a check on each other. So,
[22] Mr. Stackow?
[23]          MR. STACKOW: Thank you. And
[24] may it please the Court. Mr. Robins and Mr.
[25] McGill as well. Good morning, ladies and

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 29

[1]
[2] gentlemen.
[3]        JURY COLLECTIVELY: Good
[4] morning.
[5]        MR. STACKOW: As I mentioned
[6] yesterday, my name is Michael Stackow. I'm
[7] the Assistant District Attorney that's going
[8] to be presenting this case on behalf of the
[9] Commonwealth. And, you know, I say it that
[10] way that we're going to be presenting this
[11] case. Obviously I represent the Commonwealth
[12] in its entity of all of us, meaning all of us
[13] citizens of this city and to a larger degree
[14] the Commonwealth. But I say it in that way
[15] because I'm going to be calling witnesses and
[16] it's your job, as His Honor has told you, to
[17] listen very carefully to the testimony.
[18]        This isn't going to be a
[19] lengthy case. This isn't a factually complex
[20] case, to be perfectly up front with you.
[21] There are certain facts that you may find are
[22] in dispute, but I think at the end of the day
[23] as the evidence is presented you'll realize
[24] that there's very few essential facts that are
[25] going to be in dispute in this case. And I

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 30

[1]
[2] say that because once you hear all of the
[3] facts, all of the witnesses today, and then,
[4] whether it's later today or at some point
[5] tomorrow, His Honor's instructions on the law,
[6] it's going to be very clear exactly the crimes
[7] that have been committed in this case.
[8]        Let me explain a little bit
[9] what I mean by that. The Commonwealth has
[10] brought five criminal charges against the
[11] defendant, Mr. Robins. He's charged with a
[12] crime called involuntary deviate sexual
[13] intercourse. He's charged with unlawful
[14] contact with a minor. He's charged with
[15] statutory sexual assault. He's charged with
[16] interference with the custody of a child, as
[17] well as corrupting the morals of a minor. And
[18] all of these charges are dependent on the
[19] defendant being an adult and the complaining
[20] witness or the victim or in this case Ericka
[21] Johnson being a child. We have these laws and
[22] there's other laws like that, specifically in
[23] Pennsylvania and in most if not all of the
[24] states in our country, to protect children.
[25]        As you will find, the evidence

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 31

[1]
[2] in this case is that there was a relationship
[3] between the defendant and Ericka, that that
[4] relationship became intimate or sexual, that
[5] Ericka actually became pregnant because of the
[6] sexual relationship with the defendant and had
[7] this child, and that for periods of time, some
[8] extended periods of time, they were living
[9] together or essentially living together. This
[10] is while Ericka was in seventh grade at Upper
[11] Darby High School.
[12]        Some of the evidence you will
[13] hear, you might scratch your head and ask
[14] yourselves, wow, why did you do that, Ericka,
[15] or where was your mom? Why would she let you
[16] do that? And that's a natural reaction to
[17] have. But what it comes down to is that the
[18] overall reason why we have crimes like this on
[19] the books is to protect children from making
[20] the immature or, frankly, stupid decisions
[21] that kids can make.
[22]        Ericka was fourteen at the time
[23] that she met that man, Johnathan Robins, on a
[24] telephone chat line just around December '06
[25] into January of '07. And they actually went

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 32

[1]
[2] out. They met up. She had told him, even
[3] though the chat line was designed for adults
[4] or persons over eighteen, she said, hey, just
[5] so you know, I'm fourteen. He said that's
[6] okay, I'll still treat you well. And the
[7] evidence is going to show that in fact he did.
[8] He bought her things, paid to get her hair
[9] done, and Ericka will say that she liked that.
[10] She enjoyed that she could have some nice
[11] things and look good to go to school, you
[12] know. All along she told him how old she was
[13] and even his own common sense would have told
[14] him he knew exactly how old she was.
[15]        And then in May of 2007 the
[16] evidence will show that she became pregnant
[17] and during the course of the pregnancy, things
[18] really changed as if the defendant started
[19] treating her differently, no longer paying for
[20] the things to keep her around or to make her
[21] feel good or look good or getting her hair
[22] done.
[23]        Ericka will do her best as soon
[24] as I'm done talking to explain some of the
[25] things she did or what was going through her

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 33

[1]
[2] head at different times.  And as I said
[3] before, some of it may not make sense to us as
[4] adults and detached adults, meaning we're not,
[5] you know, personally involved in this case
[6] other than here in court.  And I ask you, if
[7] that comes up at any point or when it does
[8] come up during, you know, it raises the
[9] question in your mind, realize that that's why
[10] we have these laws, to protect kids from
[11] themselves sometimes, to protect them from
[12] making immature decisions because they don't
[13] have the sophistication and the maturity that
[14] adults do to make these decisions.  It's to
[15] protect Ericka from people like Mr. Robins, to
[16] be perfectly honest, from what he did in
[17] enticing her, in getting her to the point
[18] where she agreed to the sexual relationship,
[19] you know, where she wasn't fighting to leave
[20] and was of the mindset to do what that
[21] that was the best thing to do at least under
[22] the circumstances and the options that were
[23] presented to her, to continue this
[24] relationship with the defendant.
[25]       Again, some of it you're going

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 34

[1]
[2] to shake your head and be like why, why would
[3] you do that?  And when you do, I'll just ask
[4] you to think back to what we all know about
[5] the purpose for these laws.
[6]       So essentially, ladies and
[7] gentlemen, you're going to hear from Ericka
[8] Johnson and then later on this morning or into
[9] this afternoon her mother, Lucille Freeman.
[10] She's going to testify she wasn't aware of the
[11] extent certainly of the relationship, wasn't
[12] aware of it really until after the child was
[13] born.
[14]       You're going to hear from two
[15] police officers, two Twenty-Fifth District
[16] police officers, because on February eleventh
[17] of last year, 2009, they were called to where
[18] the defendant was living on North Eighth
[19] Street because there was a dispute between
[20] Ericka and the defendant about the child, who
[21] should have the child.  They had sort of
[22] physically separated the previous August of
[23] 2008, had been sharing custody of little
[24] Johnathan, or John-John, as Ericka calls him.
[25] And at this point, you know, on February

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 35

[1]
[2] eleventh of last year, the evidence will show
[3] that the police came out trying to resolve the
[4] dispute, but when these police officers
[5] realized exactly how old the defendant was and
[6] here was a man saying this is my child, that's
[7] the mother, I don't want to give the child to
[8] the mother, and the police officers realized
[9] exactly how old Ericka was, putting two and
[10] two together, they realized that a crime had
[11] been committed simply with the sexual
[12] relationship and the birth of little
[13] John-John.
[14]       That's essentially the facts,
[15] ladies and gentlemen.  And as I said earlier,
[16] I think you'll find that most if not all of
[17] those facts are not going to be in dispute.
[18] And once you find those facts, if you find
[19] those facts, apply them to the law, that the
[20] defendant was an adult, he was forty years
[21] old, Ericka was a child less than sixteen and
[22] they had a sexual relationship, he's guilty.
[23] He's guilty of the involuntary deviate sexual
[24] intercourse.  He's guilty of corrupting the
[25] morals of a minor.  He's guilty of statutory

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 36

[1]
[2] sexual assault.
[3]       Now, there's multiple charges
[4] even though it seems like a simple case
[5] because the statutory sexual assault relates
[6] to the particular form of sexual intercourse,
[7] what we call vaginal intercourse, and I
[8] apologize that we have to be so graphic in
[9] some of these terms, but that's the nature of
[10] this case that's the nature of the law and
[11] that's the nature of what Mr. Robins put
[12] Ericka through when she was only fourteen.
[13]       The involuntary deviate sexual
[14] intercourse refers to the oral intercourse
[15] that they had when she was fourteen and he was
[16] forty.  The unlawful contact with a minor
[17] refers to the initial contact on that
[18] telephone chat line, because to prove the
[19] defendant guilty of that we have to show that
[20] he was an adult, that Ericka was a child, and
[21] that he had contact with her for the purpose
[22] of a sexual offense.
[23]       Interference with the custody
[24] of a child does not refer to little John-John.
[25] It doesn't refer to Johnathan at all.  It

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 37

[1]
[2] refers to the defendant enticing or taking
[3] Ericka away from her mother, from Ericka's
[4] mother. And you'll hear evidence that in fact
[5] that was to the degree that in January of
[6] 2008, he actually took her to Missouri
[7] purportedly to get married while she was eight
[8] months pregnant.
[9]        And then you'll hear about the
[10] charge of corrupting the morals of a minor,
[11] which applies to everything that the defendant
[12] did to corrupt or that would tend to corrupt
[13] the morals of a child, Ericka Johnson.
[14]        So thank you, ladies and
[15] gentlemen, for your commitment yesterday, your
[16] promise to be fair and impartial jurors, to
[17] judge this case dispassionately but with a
[18] concerned mind and attentive mind to the
[19] evidence that we'll present. I know that your
[20] commitment will carry throughout the trial to
[21] pay attention, so I'm going to do my best to
[22] not waste yourselves' or the Court's time, and
[23] I think that you'll find at the end of this
[24] case the facts really aren't in dispute. The
[25] law is clear and the defendant is guilty.
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 38

[1]
[2] Thank you.
[3]        Thank you, Your Honor.
[4]        THE COURT: Mr. Robins, at this
[5] time you do not want to open on the jury.
[6] You're going to reserve that until later?
[7]        THE DEFENDANT: Yes.
[8]        MR. STACKOW: Mr. Stackow, do
[9] you have a witness?
[10]        MR. STACKOW: I do.
[11] Commonwealth calls Ericka Johnson to the
[12] stand.
[13]        COURT CRIER: She's not in the
[14] hallway.
[15]        MR. STACKOW: I'm sorry, Your
[16] Honor. It appears maybe the first witness
[17] wasn't directly out in the hallway.
[18]        THE COURT: She was out there
[19] earlier before we got started?
[20]        MR. STACKOW: She was. I saw
[21] her right before the opening remarks. I could
[22] call the second witness if she's out there as
[23] well.
[24]        THE COURT: Whatever you want
[25] to do. She may just be down in the ladies'
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 39

[1]
[2] room. Do you want to wait for five or ten
[3] minutes?
[4]        MR. STACKOW: I would prefer to
[5] do that.
[6]        THE COURT: All right. Why
[7] don't we let the jury wait in the back.
[8] You're excused.
[9]        COURT CRIER: Please remain
[10] seated.
[11]        THE COURT: On the other hand,
[12] you just might want to stay here.
[13]        MR. STACKOW: Thank you, Your
[14] Honor.
[15]        THE COURT: That's all right.
[16]        COURT CRIER: Raise your right
[17] hand. Please state your name and spell your
[18] last name for the record.
[19]        THE WITNESS: Ericka Johnson.
[20] E-R-I-C-K-A. J-O-H-N-S-O-N.
[21]        ERICKA JOHNSON, after having
[22] been duly sworn, was examined and testified as
[23] follows. . .
[24]        COURT CRIER: Pull your chair
[25] up. You got to speak into the mike so
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 40

[1]        Ericka Johnson - direct
[2] everybody can hear you.
[3]        MR. STACKOW: May I proceed,
[4] Your Honor?
[5]        THE COURT: Sure.
[6]        MR. STACKOW: Thank you.
[7]        DIRECT EXAMINATION
[8] BY MR. STACKOW:
[9]    Q.    Good morning, Ericka.
[10]    A.    Good morning.
[11]    Q.    Can you tell the ladies and
[12] gentlemen of this jury how old you are today?
[13]    A.    I'm seventeen.
[14]        THE COURT: What's your birth
[15] date?
[16]        THE WITNESS: 7/30/1992.
[17]        THE COURT: 7/30/92?
[18]        THE WITNESS: Yes.
[19] BY MR. STACKOW:
[20]    Q.    Now, do you have a child of
[21] your own?
[22]    A.    Yes. He's two.
[23]    Q.    And what's your child's name?
[24]    A.    Johnathan Robins, Jr.
[25]    Q.    When was Johnathan Junior born?
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 41

[1]        Ericka Johnson - direct
[2]    A.    February twentieth of 2008.
[3]    Q.    I'm going to ask you just a
[4] little bit to keep your voice a little
[5] louder, I think, and you can maybe move the
[6] microphone a little bit closer to you or slide
[7] the chair just an inch, I think would do it.
[8] There you go.  That should do it.  Great.
[9]        When was Johnathan born?
[10]    A.    February twentieth of 2008.
[11]    Q.    So he's how old now?
[12]    A.    He just turned two.
[13]    Q.    Was your pregnancy with
[14] Johnathan, was that full term, full nine
[15] months?
[16]    A.    Yes.
[17]    Q.    And does Johnathan live with
[18] you now?
[19]    A.    Yes.
[20]    Q.    And where do you live now,
[21] Ericka?
[22]    A.    In Upper Darby.
[23]    Q.    And who do you live with?
[24]    A.    My mom and my little sister.
[25]    Q.    Now, your son, does he live
            Carl G. Sokolski
          Official Court Reporter
            (215) 683-8060

Page 42

[1]        Ericka Johnson - direct
[2] with you all the time?
[3]    A.    Yes.
[4]    Q.    Okay.  Who takes care of him
[5] primarily?
[6]    A.    I do.
[7]    Q.    Do you have a nickname for your
[8] son, by the way?
[9]    A.    Yeah.
[10]    Q.    What?
[11]    A.    It's John-John.
[12]    Q.    Okay.  Does your mom help out
[13] sometimes taking care of John-John as well?
[14]    A.    Yes.
[15]    Q.    How about your little sister?
[16]    A.    Yeah.
[17]    Q.    How old is she?
[18]    A.    She's fourteen.
[19]    Q.    Let me ask you about John-John
[20] being born.
[21]    A.    Okay.
[22]    Q.    You mentioned it was a full
[23] pregnancy.  Was he healthy when he was born,
[24] Ericka?
[25]    A.    Yeah, he was healthy, but he
            Carl G. Sokolski
          Official Court Reporter
            (215) 683-8060

Page 43

[1]        Ericka Johnson - direct
[2] came out with pneumonia and he stayed in the
[3] hospital for like eight days and then he came
[4] home.
[5]    Q.    Now, who is John-John's father?
[6]    A.    Johnathan Robins.
[7]    Q.    And do you see Johnathan
[8] Robins?
[9]    A.    Yes.
[10]    Q.    Your son's father here in court
[11] today?
[12]    A.    Yes.
[13]    Q.    Can you point him out for the
[14] jury?
[15]    A.    Right there.
[16]    MR. STACKOW:  Your Honor, the
[17] record should reflect she's identified the
[18] defendant as the father of her child.
[19]    THE COURT:  Any objection?
[20]    THE DEFENDANT:  No.
[21] BY MR. STACKOW:
[22]    Q.    Ericka, was the defendant
[23] present when John-John was born?
[24]    A.    No.
[25]    Q.    Did he come to the hospital at
            Carl G. Sokolski
          Official Court Reporter
            (215) 683-8060

Page 44

[1]        Ericka Johnson - direct
[2] all?
[3]    A.    After.
[4]    Q.    You mentioned that John-John
[5] was in the hospital for about eight days with
[6] the pneumonia; is that right?
[7]    A.    Yes.
[8]    Q.    Since then has he been healthy?
[9]    A.    Since he came out the hospital?
[10]    Q.    Yes, for the most part.
[11]    A.    Yeah.  You could say that,
[12] yeah.
[13]    Q.    Other than maybe an occasional
[14] cold or ear infection or something like that?
[15]    A.    He never had none of that.
[16]    Q.    Okay.  Good.  So let me ask
[17] you, then.  Now, you said you live in Upper
[18] Darby with your mom and your little sister and
[19] your son.  Do you work or go to school now,
[20] Ericka?
[21]    A.    I dropped out of school and I
[22] work two jobs now.
[23]    Q.    What jobs do you work?
[24]    A.    I works at two McDonald's, the
[25] one in Torresdale and I work in the one in
            Carl G. Sokolski
          Official Court Reporter
            (215) 683-8060

Page 45

[1]        Ericka Johnson - direct
[2] Darby.
[3]    Q.    How many days a week do you
[4] work?
[5]    A.    About, I work almost every day.
[6] I only have probably like two or three days
[7] out the week that I don't got to go to work.
[8] But I work every day.
[9]    Q.    Do you work at, some days, do
[10] you work at both McDonald's or is it just one
[11] or the other?
[12]    A.    Some days I work at both of
[13] them. It all depends on how my schedule is.
[14] But most of the time I'm working at both of
[15] them.
[16]    Q.    When did you last go to school?
[17] When was it that you dropped out, Ericka?
[18]    A.    Around like February. I guess
[19] like February twelfth or something like that.
[20] It was around the middle of the month. It was
[21] 2008 I dropped out.
[22]    Q.    And why was it that you dropped
[23] out, Ericka?
[24]    A.    Oh. Because it got difficult,
[25] like. He wasn't helping out. I thought he
         Carl G. Sokolski
         Official Court Reporter
         (215) 683-8060

Page 46

[1]        Ericka Johnson - direct
[2] was supposed to help. And it got hard and I
[3] just dropped out.
[4]    Q.    When you say he was supposed to
[5] help, who were you referring to?
[6]    A.    Johnathan Robins.
[7]    Q.    And what was he supposed to
[8] help with? What do you mean by that?
[9]    A.    He's supposed to help out with
[10] his child.
[11]    Q.    How old was John-John when you
[12] dropped out of school?
[13]    A.    He didn't even turn, he wasn't
[14] one yet. He was about eleven months and a
[15] half. He had like at least a week and a half
[16] before his birthday.
[17]        THE COURT: I'm sorry. Your
[18] son John-John's birthday is what? February?
[19]        THE WITNESS: February
[20] twentieth of 2008.
[21]        THE COURT: 2008.
[22]        THE WITNESS: Yes.
[23]        THE COURT: And you dropped out
[24] of school in mid-February of 2009?
[25]        THE WITNESS: Oh. Yes. I'm
         Carl G. Sokolski
         Official Court Reporter
         (215) 683-8060

Page 47

[1]        Ericka Johnson - direct
[2] sorry. Yes.
[3]        THE COURT: Okay.
[4] BY MR. STACKOW:
[5]    Q.    And where were you going to
[6] school when you dropped out?
[7]    A.    I was going to upper Darby High
[8] School.
[9]    Q.    And what grade were you in,
[10] Ericka?
[11]    A.    In the ninth.
[12]    Q.    Prior to that, prior to being
[13] in the middle of your ninth grade year, had
[14] you had to repeat any grades in school at all,
[15] Ericka?
[16]    A.    The third grade.
[17]    Q.    At any point from that third
[18] grade to ninth grade, did you have to repeat
[19] any grades?
[20]    A.    No.
[21]    Q.    How were you doing in school at
[22] that time?
[23]    A.    Before I dropped out?
[24]    Q.    Yeah.
[25]    A.    Horrible.
         Carl G. Sokolski
         Official Court Reporter
         (215) 683-8060

Page 48

[1]        Ericka Johnson - direct
[2]    Q.    Was that unusual for you?
[3]    A.    Yeah, it was.
[4]    Q.    Can you explain what you mean
[5] by that for the jury?
[6]    A.    Like, I couldn't get no
[7] homework done or, like, I couldn't even get up
[8] to go to school because I was tired, and then
[9] I had to keep arguing with him on the phone.
[10]    Q.    Who's him?
[11]    A.    Johnathan Robins.
[12]    Q.    Take your time, Ericka. I'm
[13] sorry to ask you some of these questions.
[14] What about in sixth, seventh and eighth grade?
[15] How were you doing in school for those years?
[16]    A.    I was doing fine.
[17]    Q.    When you say fine, what do you
[18] mean? What kind of grades did you usually
[19] get?
[20]    A.    I always had As and Bs.
[21]    Q.    Where did you go before you
[22] went to Upper Darby High School?
[23]    A.    Beverly Hills Middle School.
[24] It's just around the corner but it's still in
[25] Upper Darby.
         Carl G. Sokolski
         Official Court Reporter
         (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 49

[1]        Ericka Johnson - direct
[2]    Q.    Okay.  Now, let me ask you.
[3] How was it you met this man, the defendant?
[4]    A.    It was off of a chat line.
[5]    Q.    What grade were you in in
[6] school?
[7]    A.    I was in seventh grade.
[8]    Q.    And was that, what school were
[9] you going to?
[10]    A.    Beverly Hills Middle School.
[11]    Q.    Do you remember exactly when it
[12] was that you met the defendant?
[13]    A.    It was a little bit after
[14] Christmas going into January first.
[15]    Q.    And do you recall what year
[16] that was of January?
[17]    A.    It was just, it was just in
[18] 2007.
[19]    Q.    Okay.  Now, I want you to
[20] explain a little bit about this chat line for
[21] the jury.  How does the chat line work, first
[22] of all?
[23]    A.    You dial a number.  You get on
[24] there.  It's certain numbers you have to press
[25] to get to, I guess to talk to people,
            Carl G. Sokolski
          Official Court Reporter
            (215) 683-8060

Page 50

[1]        Ericka Johnson - direct
[2] whatever.  And then you record your greeting
[3] and then if you want to send a message out,
[4] you got to press a button to send a message
[5] out and then they'll, they'll send a message
[6] back to you and you listen to it or you'll
[7] press a number so you can connect with them,
[8] like that.
[9]    Q.    Who were you supposed to
[10] connect with on this chat line?
[11]    A.    It was, I really don't connect
[12] with nobody on that line.  I would probably
[13] just like send messages out.  But, like, it
[14] wasn't supposed to be him.
[15]    Q.    Is there some age restrictions
[16] for the chat line, at least when you were
[17] using it back in '07?
[18]    A.    Yeah.  You got to be eighteen.
[19]    Q.    How old were you when you were
[20] using it?
[21]    A.    I was fourteen.
[22]    Q.    How did you get to use it if
[23] you were underage?
[24]    A.    Because it's free to the
[25] public.  Anybody can use it.  Anybody can just
            Carl G. Sokolski
          Official Court Reporter
            (215) 683-8060

Page 51

[1]        Ericka Johnson - direct
[2] pick up the phone and call and they won't
[3] even, they won't ask about none of that stuff.
[4]    Q.    I see.  So do you recall
[5] exactly how it was that you were connected to
[6] or with the defendant?
[7]    A.    I'm not that sure, but I know I
[8] didn't press a button to connect with him.  It
[9] was just probably like a automatically
[10] connect, because it's always been a automatic
[11] connect.  But I don't recall touching any
[12] button to connect with him.
[13]    Q.    Do you recall the first
[14] conversation that you had with him?
[15]    A.    Not really.  I remember asking
[16] him a question about how old he was and he
[17] wouldn't tell me.  So he told me to, with all
[18] the questions I have for him, write them down
[19] on a piece of paper and he was going to meet
[20] up with me and he was going to answer all the
[21] questions.  And when I met up with him, he
[22] took me out to dinner and that's when I asked
[23] him all the questions.  But most of the
[24] questions, well, most of the questions he did
[25] answer but it took him a long time to give me
            Carl G. Sokolski
          Official Court Reporter
            (215) 683-8060

Page 52

[1]        Ericka Johnson - direct
[2] the answer, like.
[3]    Q.    What were some of your
[4] questions that you had?
[5]    A.    Like his age.  He took me
[6] around the whole world just to get his age.
[7] And when I finally found out, we was walking,
[8] I think we was walking out of the place we was
[9] eating and he told me his age, and then I was
[10] like, I was shocked and I was like I don't
[11] know what to do.
[12]    Q.    What age did he tell you that
[13] he was?
[14]    A.    Thirty-nine.  He said he just
[15] got home from jail not too long ago with
[16] something.
[17]        THE DEFENDANT:  Objection.
[18] Objection.
[19]        THE COURT:  Okay.  The
[20] objection is sustained.
[21] BY MR. STACKOW:
[22]    Q.    Ericka, what if anything did
[23] you tell the defendant about your age?
[24]    A.    Yeah, I did.
[25]    Q.    What did you tell him?
            Carl G. Sokolski
          Official Court Reporter
            (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 53

Ericka Johnson - direct

[1]
[2]    A.    I told him I was fourteen.  I
[3] said why would -- no.  I didn't say like why.
[4] I just said, like, that's not a problem for
[5] you?  That's all I kept asking.  He said no.
[6] He said it wouldn't matter how old you are, if
[7] I find a woman I will treat them the same
[8] because they all get, they all should be
[9] treated the same.  Or it was something that he
[10] said.  And I was like you right but you, you
[11] old.  You not old but you older than me.  So,
[12] like, your age is not, I mean my age is not a
[13] problem to you?  I felt that kind of weird.
[14]    Q.    Now, when was it that you had
[15] that?  When did you tell him how old you were?
[16]    A.    The same day when we was
[17] talking on the phone.  I didn't even waste
[18] time about that.  I just told him.
[19]    Q.    Okay.  So did he say, mention
[20] anything else about your age during that phone
[21] conversation or during the time that you guys
[22] went to dinner?
[23]    A.    No.
[24]    Q.    Now, when was it that you and
[25] the defendant met up in person for the first

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 54

Ericka Johnson - direct

[1]
[2] time?
[3]    A.    I don't remember the exact
[4] date, but it was a little after Christmas.
[5]    Q.    Okay.  What else do you recall
[6] about that time when you first met up with the
[7] defendant?
[8]    A.    I really don't know.
[9]    Q.    What happened after the meal
[10] that you guys had together?
[11]    A.    We went out.  We went down the
[12] street to go watch a movie and then after
[13] that, he went home.
[14]    Q.    And did you go home at that
[15] point?
[16]    A.    Yeah, I went home.
[17]    Q.    How did you get home?
[18]    A.    I walked.  I walked down the
[19] street.
[20]    Q.    Did you have any conversations
[21] about your home life with the defendant during
[22] that first time you met up with him?
[23]    A.    I can't.  I don't remember if I
[24] did or didn't.  I can't remember.  But I
[25] wouldn't talk about no personal stuff the

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 55

Ericka Johnson - direct

[1]
[2] first day.
[3]    Q.    Did you mention where you were
[4] going to school?
[5]    A.    No, I really didn't.
[6]    Q.    Okay.  Now, did you see the
[7] defendant again after that first night?
[8]    A.    Yeah, probably like, probably
[9] like a couple days later to a week, I guess.
[10]    Q.    How was it that you met up that
[11] second time?
[12]    A.    Because I had called.  I had
[13] called him and told him that I wanted my hair
[14] done and he got my hair done for me.  So we
[15] just met up on Sixty-Ninth Street and he took
[16] me to go get my hair done, and after that I
[17] went to his house and then from his house I
[18] just went home.
[19]    Q.    Now, did you actually go inside
[20] the defendant's house at that time?
[21]    A.    Yeah.  We watched a movie.
[22]    Q.    Do you remember where he was
[23] living at that time, on what street?
[24]    A.    Eighth Street.
[25]    Q.    Is that in Philadelphia?

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 56

Ericka Johnson - direct

[1]
[2]    A.    Yes.
[3]    Q.    Eighth and what?  What was the
[4] cross street?
[5]    A.    Cambria, I think.
[6]    Q.    And what did this house look
[7] like, Ericka?  The inside of the house.
[8]    A.    I really don't know because it
[9] was dark.  He just took me into the front
[10] room.  The front room was livable.  But I
[11] didn't see the rest of the house.
[12]    Q.    Was anybody else in the house
[13] besides you and the defendant?
[14]    A.    His, his niece was in there
[15] just for a little bit.
[16]    Q.    How old was the niece?
[17]    A.    She probably like, I think
[18] she's about to be eighteen, nineteen now.  I'm
[19] not sure.
[20]    Q.    Did you talk with the niece,
[21] the defendant's niece?
[22]    A.    Yeah.  We was kind of friends,
[23] like.  I don't hang around girls a lot.  But
[24] we was kind of friends.
[25]    Q.    Did you know her or were you

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 57

[1]    Ericka Johnson - direct
[2] friends with her prior to seeing her at the
[3] defendant's house?
[4]    A.    No. I only knew her from him.
[5]    Q.    I see.
[6]    A.    Yeah.
[7]    Q.    And did you actually have a
[8] conversation with this niece when you met her
[9] that night?
[10]    A.    About her uncle?
[11]    Q.    Yeah, or just about anything,
[12] actually. Did you guys just talk?
[13]    A.    Yeah. I talked. I talked
[14] about him to her, and I mean she would say she
[15] don't know or probably try to beat around the
[16] bush about it. But most of the stuff --
[17]    THE DEFENDANT: Objection.
[18] It's hearsay.
[19]    THE COURT: Yeah. Why isn't
[20] this hearsay?
[21]    MR. STACKOW: Because it's not
[22] being offered for the truth. There's no
[23] statements in there by the niece. It was just
[24] to show that they had a conversation, Your
[25] Honor. The substance of the conversations I'm

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 58

[1]    Ericka Johnson - direct
[2] not bringing out for any substance or any
[3] truth of the matter. So it's just to show
[4] that they had a conversation, that there were
[5] words back and forth and she didn't know. In
[6] other words, the niece's statement that she
[7] didn't know is not an assertion under the
[8] hearsay rule. There's no statement there so
[9] it's not hearsay.
[10]    THE COURT: Hearsay is one of
[11] those terms that people hear even without
[12] coming to court. What hearsay means is --
[13] and this is for the jury's benefit but if
[14] Ericka is listening, that's fine too -- a
[15] statement made by somebody who's not in the
[16] courtroom, and the reason we don't allow those
[17] statements in is that that person is not here
[18] to be cross examined. That person is not here
[19] for you to evaluate their credibility. The
[20] only person that's here is the person saying I
[21] had a conversation with somebody, and they can
[22] be cross examined. They can be judged as to
[23] whether they had a conversation. But the
[24] content of the conversation, what the other
[25] person was saying, is not admissible.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 59

[1]    Ericka Johnson - direct
[2]    So the objection is a good
[3] objection. Mr. Stackow's explanation, pretty
[4] much along the same lines as I've just
[5] instructed you on, is that you can consider
[6] that testimony for what it is, a description
[7] of her talking to somebody, a niece, but she's
[8] not allowed to tell you what the niece said to
[9] her and that's just not admissible. Okay?
[10]    MR. STACKOW: Thank you, Your
[11] Honor.
[12] BY MR. STACKOW:
[13]    Q.    Ericka, where was the defendant
[14] when you were having this conversation with
[15] his niece?
[16]    A.    He was in the room but, like,
[17] how he was sitting, we was I guess by the
[18] computer and I would just whisper and stuff to
[19] her.
[20]    Q.    I see.
[21]    A.    And she would answer.
[22]    Q.    Now, after that night, was that
[23] the first time that you had been inside the
[24] defendant's residence?
[25]    A.    That was like the second time.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 60

[1]    Ericka Johnson - direct
[2]    Q.    Did you see him again after
[3] that night?
[4]    A.    Yeah. I'm not sure, like, how
[5] many days. But it was, it wasn't a while
[6] while but it was probably like a week before I
[7] saw him again. And then --
[8]    Q.    How is it that you saw him
[9] again?
[10]    A.    Well, at that time we had each
[11] other's phone number. So when I called him
[12] and he wouldn't answer, he would call me back
[13] and I'd be like, well, I'm bored, I ain't got
[14] nothing to do or I want to go shopping, let's
[15] go shopping. He'll take me shopping. But I
[16] didn't think nothing of it because, I mean,
[17] I'm in school, like. Everybody want to dress
[18] nice. Everybody want to look good. And I
[19] just, like, kept going because I wanted to go
[20] shopping. I wanted things.
[21]    Q.    When you would go shopping, was
[22] it just you and the defendant?
[23]    A.    Yes.
[24]    Q.    What kind of things would you
[25] go shopping for?

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 61

Ericka Johnson - direct

[1]
[2] A.    Underwear, bras, like the
[3] uniform khaki pants, the college shirts.
[4]       Q.    Now, when you say uniforms,
[5] just so we're clear, are you talking about a
[6] school uniform or some other uniform?
[7] A.    Yeah, school uniform.
[8]       Q.    And where did you have to go to
[9] buy the school uniform?
[10] A.    At any store.
[11]       Q.    Okay.
[12]       THE COURT:  I'm sorry.  I
[13] missed it.  You said what school you were
[14] going to at the time, and I don't remember
[15] what the name of the school was.
[16]       THE WITNESS:  At the time?
[17] Which one?
[18]       THE COURT:  Well, at the time
[19] period when you first met Mr. Robins.
[20]       THE WITNESS:  Oh.  Beverly
[21] Hills Middle School.
[22]       THE COURT:.  It's called Beverly
[23] Hills?
[24]       THE WITNESS:  Yes.
[25]       THE COURT:  Oh, yeah?  It's not

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 62

Ericka Johnson - direct

[1]
[2] in Beverly Hills.
[3]       THE WITNESS:  No.
[4]       THE COURT:  All right.  It's
[5] called Beverly Hills Middle School.  And
[6] middle school is what grades?
[7]       THE WITNESS:  It's from six to
[8] eight.
[9]       THE COURT:  Sixth grade to
[10] eighth grade.
[11]       THE WITNESS:  Yes.
[12]       THE COURT:  And this uniform,
[13] what did this uniform look like?
[14]       THE WITNESS:  You can wear any
[15] type of pants but it can't be jeans.  You can
[16] where any type of shirt but it has to be a
[17] collar to it.
[18]       THE COURT:  A collar to it.
[19]       THE WITNESS:  Yeah.  That was
[20] it.
[21]       THE COURT:  All right.  Thanks.
[22]       THE WITNESS:  You're welcome.
[23] BY MR. STACKOW:
[24]       Q.    Whose idea was it to go
[25] shopping for the school uniform or the

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 63

Ericka Johnson - direct

[1]
[2] clothes?
[3] A.    It was me, because I really
[4] needed them.
[5]       Q.    Did you tell the defendant?
[6] A.    Yeah.  I told him I needed them
[7] and he said, I don't remember exactly what he
[8] said but he said I guess give him some time or
[9] something, and then he took me and then we
[10] went.
[11]       Q.    Did he help you pick out any of
[12] the clothes?
[13] A.    No, not really.  When we used
[14] to go out shopping he never picked out
[15] nothing.  He would just let me go ahead and do
[16] what I wanted to do, and that was it.
[17]       Q.    Now, at some point, Ericka, did
[18] this relationship that you had with the
[19] defendant move to a physical relationship?
[20] A.    Yeah.
[21]       Q.    When did that happen?
[22] A.    Like around March.
[23]       Q.    Of 2007?
[24] A.    Yes.
[25]       Q.    So let me ask you about that

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 64

Ericka Johnson - direct

[1]
[2] first time that it turned physical.  Where
[3] were you when that happened?
[4] A.    At his house.
[5]       Q.    Was that the Eighth and Cambria
[6] house?
[7] A.    Yes.
[8]       Q.    What were you, before anything
[9] that brings us to court happened, what were
[10] you and Mr. Robins doing that day?
[11] A.    Well, after I got my hair done
[12] I waited a couple weeks, I guess like a week
[13] and a half.  I came home from school.  I guess
[14] that weekend, I spent the weekend with him or
[15] a couple days with him.  But I was over his
[16] house.  We was watching TV, playing music, and
[17] he had went out to get something to eat.  And
[18] then we came back upstairs, ate and we was
[19] still listening to some more music, and then
[20] that's when it happened.
[21]       Q.    What room in his house were you
[22] in when it happened?
[23] A.    The front room.
[24]       Q.    Now, was this a living room,
[25] bedroom, or some other kind of room?

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009                                          Trial (Jury) Volume 3
Johnathan Robins                                          March 11, 2010.

Page 65

[1]        Ericka Johnson - direct
[2]    A.    No.  This was a bedroom.
[3]    Q.    A bedroom.
[4]    A.    Uh-huh.
[5]    Q.    What did the defendant do when
[6] you were in the bedroom?
[7]    A.    He, he looked funny, like, like
[8] scary to me.  I didn't.  I was really nervous.
[9] I didn't know if something was going to
[10] happen.  But I had went over there and sat on
[11] his lap and then I hugged him and he started
[12] getting a little touchy.  And I told him,
[13] like, I told him I was kind of scared, but
[14] then he was like what you need to be scared
[15] for, like.  But then it just happened.
[16]    Q.    Where was he touching you when
[17] you were sitting on his lap?
[18]    A.    On my chest.
[19]    Q.    Was that where he was touching
[20] you over clothes or on your skin?
[21]    A.    No.  I was, I had clothes on.
[22]    Q.    Now, what happened after he
[23] said there's no reason to be scared or don't
[24] be scared?  What happened next?
[25]    A.    And then it just, it just
               Carl G. Sokolski
            Official Court Reporter
              (215) 683-8060

Page 66

[1]        Ericka Johnson - direct
[2] happened.
[3]    Q.    When you say it happened, did
[4] you and the defendant have some sort of
[5] intimate?
[6]    A.    We had sex, yes.
[7]    Q.    You had sex?
[8]    A.    Yes.
[9]    Q.    That night?
[10]    A.    Yes.
[11]    Q.    In that bedroom?
[12]    A.    Yes.
[13]    Q.    Were you on the bed or some
[14] other part of the bedroom?
[15]    A.    No, on the bed.
[16]    Q.    Were your clothes on or off,
[17] Ericka?
[18]    A.    They was off.  We turned, I
[19] think we turned the lights off.  So I took
[20] them off and I went under the sheets real
[21] quick.
[22]    Q.    And what about the defendant?
[23] What did he do when you took your clothes off
[24] and went under the sheets?
[25]    A.    He said why?  He said why you
               Carl G. Sokolski
            Official Court Reporter
              (215) 683-8060

Page 67

[1]        Ericka Johnson - direct
[2] jump under the sheet?  You don't want me to
[3] see you or something?  And I was like no, I'm
[4] kind of nervous.  But I don't remember if he
[5] took all of his off.  I just remember that I
[6] took mine off and I flew under the sheets real
[7] quick.
[8]    Q.    So did the defendant get into
[9] bed with you at that point?
[10]    A.    Yes.
[11]    Q.    And what did he do once he got
[12] into the bed?
[13]    A.    Kissing on me, rubbing on me,
[14] touching me.  That was it.  Until I was like,
[15] I was still scared.  I ain't know.  I was
[16] still shaking.  And then that's when we had
[17] sex and then I didn't feel no.  I didn't feel
[18] like being scared and all this other stuff.  I
[19] just felt like, like damn.  Sorry.  But I just
[20] had sex.  That's how I felt.
[21]    Q.    When you say you had sex, did
[22] the defendant's penis actually touch your
[23] body?
[24]    A.    Yes.
[25]    Q.    What part of your body?
               Carl G. Sokolski
            Official Court Reporter
              (215) 683-8060

Page 68

[1]        Ericka Johnson - direct
[2]    A.    My vagina.
[3]    Q.    Inside?
[4]    A.    Yes.
[5]    Q.    Of your vagina?  Did you say
[6] anything to Mr. Robins after the sexual
[7] intercourse?
[8]    A.    No.  I ain't even have much to
[9] say to him after.
[10]    Q.    Did he say anything to you?
[11]    A.    I can't.  I don't remember,
[12] because I was knocked out.  I was asleep.
[13]    Q.    Okay.  Did you sleep in his bed
[14] that night?
[15]    A.    Yeah.
[16]    Q.    What happened the next morning?
[17]    A.    Oh.  Well, I got up, went to
[18] the bathroom, changed my clothes and I was
[19] about to go home.  And then I asked him, I
[20] think I asked him for some money.  He gave me
[21] the money so I could get on the bus and go
[22] home.  And I got ready for school that week
[23] and that was it.
[24]    Q.    Now, were you living just with
[25] you and your mom and your little sister at
               Carl G. Sokolski
            Official Court Reporter
              (215) 683-8060

51CR00034302009
Johnathan Robins

Page 69

Ericka Johnson - direct

[1]
[2] that time?
[3]    A.    Yeah.
[4]    Q.    Did your mom ask you where you
[5] were or did you say anything to her about
[6] where you were?
[7]    A.    She asked me where I was and I
[8] lied to her. I told her I was over Shaniqua
[9] house, his niece house. And she said all
[10] right, I want to meet her. But by the time
[11] Shaniqua got down there to meet me, my mom was
[12] gone. So I called her up and said that she
[13] was here. Well, she was. She was right
[14] there. I asked did she want to speak to her.
[15] She said no. So I just met Shaniqua at
[16] Sixty-Ninth Street and we just went to his
[17] house.
[18]    Q.    Wait. I just want to be clear.
[19] I thought I heard you but I may have missed
[20] it. Who was Shaniqua, again?
[21]    A.    His niece.
[22]    Q.    The defendant's niece?
[23]    A.    Yes.
[24]    Q.    Is that the same niece that you
[25] had met the first night you were over his

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 70

Ericka Johnson - direct

[1]
[2] house?
[3]    A.    Yeah.
[4]    Q.    By the way, did Shaniqua, do
[5] you know whether she went to school at that
[6] time?
[7]    A.    I don't know. I really didn't
[8] get in her business.
[9]    Q.    Okay. Did she live nearby
[10] where you were living at that time?
[11]    A.    What, from Upper Darby?
[12]    Q.    Yes.
[13]    A.    She lived in Philly.
[14]    Q.    So now was that the only time,
[15] the night that you just described for us,
[16] Ericka, that you and the defendant had sexual
[17] intercourse?
[18]    A.    Yeah, at first, that first
[19] time. But it happened like down the line
[20] probably a couple times out of a month, like.
[21] It wasn't all heavy until I got pregnant. But
[22] one night I was over there and I was, I was
[23] asleep. I was in a deep sleep and I woke up
[24] and my vagina and stuff was wet and it was
[25] hurting. And I said, What is going on? I

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 71

Ericka Johnson - direct

[1]
[2] said my stuff hurt. He say, I put my fingers
[3] in your butt and in your vagina. I said, why?
[4] And I don't even think he gave me an answer
[5] for that. But I was feeling hurt because,
[6] like, you did that when I was asleep. Why
[7] would you do that? You could have just waited
[8] until I woke up or not even just touched me,
[9] just let me sleep until I just woke up. That
[10] was it. But he never gave me an answer why he
[11] did that.
[12]    Q.    Was that the only other sexual
[13] thing that happened between you and the
[14] defendant is this touching that one night?
[15]    A.    Yeah, that one night. But when
[16] I was over there probably like a couple weeks
[17] ago, we did have sex. It was the vagina and
[18] it was oral and that was it. It wasn't
[19] really, like, nothing all too dramatic.
[20]    Q.    When you say oral, do you mean
[21] oral sex, Ericka?
[22]    A.    Yes.
[23]    Q.    When did that happen?
[24]    A.    It was before. It was before I
[25] got pregnant.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 72

Ericka Johnson - direct

[1]
[2]    Q.    When was it that you got
[3] pregnant?
[4]    A.    I got pregnant Mothers Day.
[5]    Q.    When's that?
[6]    A.    Mothers Day.
[7]    Q.    Mothers Day.
[8]    A.    Yeah.
[9]    Q.    So I'll ask you about that in a
[10] second. But this oral sex that you mentioned,
[11] it was before Mothers Day. Where were you
[12] when that happened?
[13]    A.    In his house.
[14]    Q.    Is it the same front room?
[15]    A.    In the front room.
[16]    Q.    What were you and the defendant
[17] doing just prior to the oral sex?
[18]    A.    I don't remember. I don't
[19] remember what happened. But all I know is,
[20] like, we got into it and we had oral sex and
[21] we had sex.
[22]    Q.    So there was oral sex and
[23] vaginal sexual intercourse, Ericka?
[24]    A.    Yeah.
[25]    Q.    When you say oral sex, who was

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Page 73

[1]        Ericka Johnson - direct
[2] performing oral sex on whom?
[3]    A.    It was both.
[4]    Q.    So what part of his body was
[5] touching your mouth?
[6]    A.    His mouth.
[7]    Q.    Okay.  But so it was his mouth
[8] on your mouth?
[9]    A.    No, his mouth on my vagina.
[10]    Q.    I see.  And what about, was any
[11] part of his body touching your mouth?
[12]    A.    Yes, his penis.
[13]    Q.    Was that where his penis went
[14] inside of your mouth for that oral sex?
[15]    A.    Yes.
[16]    Q.    Were you guys in the bed or
[17] some other place in the room at that time?
[18]    A.    We was in the bed.
[19]    Q.    You mentioned that you became
[20] pregnant on Mothers Day?
[21]    A.    Yes.
[22]    Q.    2007?
[23]    A.    Yes.
[24]    Q.    Can you tell the ladies and
[25] gentlemen of the jury about that day, Ericka?

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 74

[1]        Ericka Johnson - direct
[2]    A.    Well, I didn't know I was
[3] pregnant.  I never had morning sickness or
[4] nothing, but I started feeling a little sick.
[5] So I just waved it off.  I kept going to
[6] school or whatever.  And then I find out that
[7] I'm pregnant and I'm only fourteen.  I didn't
[8] know what was going on.  I ain't want to tell
[9] my mom because I was scared.  So I told him
[10] and he was like, no, you probably not
[11] pregnant, you just probably, probably it will
[12] pass.  But then it just got worse.  It got
[13] bigger.  I was like, what's going on?  My feet
[14] started swelling up.  And then it just
[15] started.  I mean, it wasn't hard but it
[16] started going downhill just a little bit and
[17] then it got fixed.  He fixed it.  And then it
[18] just started going downhill again.
[19]    Q.    What do you mean he fixed it?
[20]    A.    Like, he when I found out I was
[21] pregnant, I was scared and I told him that I
[22] was thinking about getting an abortion, but he
[23] was like, no, it's no need for that if I'm
[24] going to be here helping you.  But if I would
[25] have knew what I knew today, like, I wouldn't

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 75

[1]        Ericka Johnson - direct
[2] have probably never had the baby.  I probably
[3] would have had an abortion, because he not
[4] helping.
[5]    Q.    How often were you staying at
[6] the defendant's residence or house when you
[7] were pregnant?
[8]    A.    I was living with him.  I
[9] started living with him in November.  I think
[10] it was November or October.  It was one of
[11] them months.  But I know I had just came home
[12] from the doctor's and I found out I was
[13] nineteen weeks pregnant it wasn't nothing I
[14] could do about it.  But before all that, I was
[15] staying there probably every weekend or every
[16] other weekend when I could get out the house.
[17] And then I find out I was pregnant like for
[18] real for real and I had to start to move in
[19] with him because me and my mom was going
[20] through some things.
[21]    Q.    Was there anyplace else you
[22] could live besides your mom's house or the
[23] defendant's house when you were pregnant,
[24] Ericka?
[25]    A.    No.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 76

[1]        Ericka Johnson - direct
[2]    Q.    Now, you mentioned I think at
[3] the very beginning and Judge Cunningham asked
[4] you your birthday.
[5]    A.    Uh-huh.
[6]    Q.    What was your birthday, again?
[7]    A.    July thirtieth, 1992.
[8]    Q.    Do you remember turning fifteen
[9] in 2007?
[10]    A.    Yeah.  I was over my sister
[11] house.  I was doing somebody hair and I had
[12] went back home and he said that he wanted to
[13] take me somewhere.  I said, where?  And he
[14] wind up taking me to Florida, I guess to
[15] celebrate my birthday.  And I was --
[16]    THE COURT:  I'm sorry.  He
[17] wound up taking you where to celebrate your
[18] birthday?
[19]    THE WITNESS:  Florida.
[20]    THE COURT:  Florida?
[21]    THE WITNESS:  Yes.
[22]    THE COURT:  The State of
[23] Florida?
[24]    THE WITNESS:  Yes.
[25]    THE COURT:  I thought maybe

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 77

[1]      Ericka Johnson - direct
[2] this was like Beverly Hills Middle School, it
[3] wasn't really in Florida.
[4]      THE WITNESS:  No.
[5]      THE COURT:  Okay.  How did he
[6] take you to Florida?  Did he drive?
[7]      THE WITNESS:  No.  We caught
[8] the plane.
[9]      THE COURT:  A plane?
[10]      THE WITNESS:  Yes.
[11]      THE COURT:  All right.
[12]      THE WITNESS:  And at that time
[13] it was like the beginning.  It was like,
[14] probably like July twenty-second, but I didn't
[15] think nothing of it because my birthday was at
[16] the end of the month.  It was on the
[17] thirtieth.  And we went there.  I kind of knew
[18] I was pregnant but I didn't know if I was.  I
[19] didn't know if I was sure or not.  So I went.
[20] We had a good time, and then we came home and
[21] then that was it.
[22] BY MR. STACKOW:
[23]      Q.      Now, besides the defendant, did
[24] anybody else know that you were or thought you
[25] were pregnant at that time?
          Carl G. Sokolski
          Official Court Reporter
          (215) 683-8060

Page 78

[1]      Ericka Johnson - direct
[2]      A.      No, not at that point.  But my
[3] oldest sister, like, she started catching on,
[4] like, all the little nasty stuff I would eat.
[5] But then I would be like no, no, I'm not, like
[6] just try and deny it.  But then it was too
[7] late.  Like, she knew.  I knew she knew but I
[8] ain't want her to tell my mom.  But she
[9] didn't.  I mean she told my mom but she told
[10] me that she didn't say nothing, but I already
[11] know she said something.
[12]      Q.      Now, how was your relationship
[13] with Mr. Robins after your birthday and as it
[14] went into the fall and before you gave birth
[15] to John-John?  What was your relationship like
[16] with the defendant during that time?
[17]      A.      It was, it's better than now,
[18] like.  He did so much more things to prove his
[19] point to me, I guess.  But I didn't, I didn't
[20] see no signs and I didn't even follow all the
[21] details.
[22]      Q.      Well, so it sounds like he
[23] treateed you well during that time; is that
[24] right?
[25]      A.      Yeah.
          Carl G. Sokolski
          Official Court Reporter
          (215) 683-8060

Page 79

[1]      Ericka Johnson - direct
[2]      Q.      Now, what about your living
[3] situation.  Did you continue to live with him
[4] during that time?
[5]      A.      After I had the baby, I moved
[6] in my mom's for a month because they wanted to
[7] check all around the house to see if it was
[8] stable for the baby to stay there.  And then
[9] after that, I had moved with him.  I think it
[10] was like in April or March.  Like the end of
[11] March to April I moved with him.
[12]      Q.      This was after John-John was
[13] born?
[14]      A.      Yeah.
[15]      Q.      So that would have been 2008.
[16]      A.      Uh-huh.
[17]      Q.      Is that right?
[18]      A.      Yeah.
[19]      Q.      I'm going to come back to that,
[20] and let me just ask you about January of 2008
[21] when you were eight months pregnant.
[22]      A.      Uh-huh.
[23]      Q.      Do you recall taking another
[24] trip with the defendant around that time?
[25]      A.      Yes.  January sixteenth we went
          Carl G. Sokolski
          Official Court Reporter
          (215) 683-8060

Page 80

[1]      Ericka Johnson - direct
[2] to Missouri, caught a plane to Missouri to get
[3] married.
[4]      Q.      Now, tell the ladies and
[5] gentlemen of the jury what you recall about
[6] that morning before even going to the airport.
[7]      A.      I wasn't going to school at
[8] that time because I just wasn't going.  I was
[9] just feeling miserable so I decided not to go
[10] that week.  And I went to his house.  After I
[11] came from my mom house, I went to his house.
[12] And I was playing around and I was eating,
[13] watching TV all late.  He turned around and
[14] said go to sleep, we got to get up early.  And
[15] I said why, like?  When I was pregnant, I
[16] really didn't pay attention.  So I was like,
[17] why?  He was like, because we going somewhere.
[18] I said, where we going?  He said to Missouri.
[19] I said why?  He said to get married.  I said,
[20] you don't want to wait until I'm sixteen or
[21] eighteen?  He said no, we can do it now to
[22] stop your mom from getting in between, like,
[23] what we trying to do.  I said, well what's you
[24] mean?  What are we trying to do?  He said your
[25] mom keep ruling things.
          Carl G. Sokolski
          Official Court Reporter
          (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 81

[1]         Ericka Johnson - direct
[2]         I mean, my mom is going to rule
[3] stuff until I turn eighteen but, like, I had
[4] no choice for her.  Like, she has to rule.
[5] I'm her child.  So who was him to say she
[6] taking over your life and all this stuff?
[7] Like, I understand my mom used to discipline
[8] me and all that stuff, but like who was him to
[9] come in and say that she doing it wrong?
[10]      Q.      Did you say these things to the
[11] defendant when he brought up going to
[12] Missouri?
[13]      A.      Not at that point, but I told
[14] him before all this.
[15]      Q.      So had you had a discussion
[16] with the defendant about getting married
[17] before?
[18]      A.      Yeah, we had the discussion and
[19] that's when I asked him.  I said, you don't
[20] want to wait until I'm like sixteen or
[21] eighteen?  Like, I think it will be better.
[22] And he said no.  So then he got on the
[23] Internet and tried to find somewhere that
[24] where I was old enough but still young to get
[25] married.
              Carl G. Sokolski
            Official Court Reporter
              (215) 683-8060

Page 82

[1]         Ericka Johnson - direct
[2]      Q.      And that's then when he
[3] mentioned Missouri to you; is that right?
[4]      A.      Yeah.
[5]      Q.      Okay.  So did you guys, do you
[6] recall going to the airport and flying to
[7] Missouri on January sixteenth?
[8]      A.      Yeah.
[9]      Q.      What time did you leave for the
[10] airport?
[11]      A.      We left like two o'clock in the
[12] morning.
[13]      Q.      What do you remember about
[14] that, about going to the airport?
[15]      A.      I remember getting up.  I put
[16] my clothes on, walked down the street, get in
[17] a car and going to the airport, getting
[18] something to eat and I started dozing off a
[19] little bit.  Then the plane came and I just
[20] got on there, and then I guess I fell asleep
[21] on the plane and then I woke back up.
[22]      Q.      Now, was it just you and the
[23] defendant?
[24]      A.      Yeah, just me and him.
[25]      Q.      And did you mention to anybody
              Carl G. Sokolski
            Official Court Reporter
              (215) 683-8060

Page 83

[1]         Ericka Johnson - direct
[2] that you were going to Missouri?
[3]      A.      No.
[4]      Q.      Did you ever have a discussion
[5] with your mom about leaving the state to get
[6] married or getting married at all?
[7]      A.      No.
[8]      Q.      So you went to Missouri.  What
[9] happened when you were in Missouri?
[10]      A.      We got something to eat and
[11] then we went over to, we had to catch the bus.
[12] We went over to this building and we was in
[13] the building.  We sat there and we signed for
[14] our marriage certificate.  He paid them.  And
[15] then we had to go to another part of the
[16] building to stand in a line and wait for this
[17] little envelope, and then they gave us a
[18] number.  We stayed in line again and then when
[19] they called our number, we went up.  And then
[20] after that we sat down.
[21]      Q.      Did you have to show proof of
[22] age at all, Ericka?
[23]      A.      No, not really.
[24]      Q.      Did you have a, like a driver's
[25] license?  Or I guess not a driver's license
              Carl G. Sokolski
            Official Court Reporter
              (215) 683-8060

Page 84

[1]         Ericka Johnson - direct
[2] because you weren't old enough for a driver's
[3] license at that point, were you?
[4]      A.      Uh-uh.
[5]      Q.      Did you have any kind of a
[6] photo identification on you?
[7]      A.      Yeah.
[8]      Q.      And what's the photo ID?
[9]      A.      It was, it was from South
[10] Carolina.  It was a fake one.  We went to go
[11] get this done probably like a couple months
[12] ago before all this happened.  And it said I
[13] was twenty-three.  So that's what we used.
[14] That's why I didn't have, that's why I didn't,
[15] my mom didn't need to sign, because they took
[16] that as in, all right, she's old enough; all
[17] right, she can go sign it herself.
[18]      Q.      Who was with you when you got
[19] this fake ID?
[20]      A.      Johnathan Robins.
[21]      Q.      Where did you go to get the
[22] fake ID?
[23]      A.      It was in North Philly.  It was
[24] I think Thirteenth or Fourteenth and Spring
[25] Garden or Broad and Spring Garden.
              Carl G. Sokolski
            Official Court Reporter
              (215) 683-8060

51CR00034302009                                                    Trial (Jury) Volume 3
Johnathan Robins                                                        March 11, 2010

Page 85

[1]          Ericka Johnson - direct
[2]     Q.     Was it a government office or
[3] some other kind of building?
[4]     A.     No. It was like a little check
[5] cashing place. They do everything in there, I
[6] guess.
[7]     Q.     How did you know to go there to
[8] get a fake ID?
[9]     A.     I didn't know; he knew. He
[10] know where everything is. I was just getting
[11] used to Philly. I didn't know nothing about
[12] it. But then he told me. He was, like, come
[13] with me and I was like why? He was like
[14] because I need you to do something, or
[15] something like that. And I said, where are we
[16] going? He said just come on. And he said,
[17] you got a ID? I said I got my school ID. He
[18] say, all right, that's good. I gave him my
[19] school ID. We walked out and caught the bus,
[20] and we got off the bus and walked into the
[21] place.
[22]     Q.     To the check cashing place?
[23]     A.     Yeah.
[24]     Q.     What happened there at the
[25] check cashing place?
                    Carl G. Sokolski
                 Official Court Reporter
                    (215) 683-8060

Page 86

[1]          Ericka Johnson - direct
[2]     A.     We read the little policy about
[3] getting ID and then I filled out this piece of
[4] paper, gave it to him, and we picked out the
[5] ID that I wanted and I showed him my regular,
[6] my school ID, to know to tell him it was me,
[7] and he gave it to me within like ten minutes.
[8]     Q.     And this was what, a South
[9] Carolina ID?
[10]     A.     Yeah.
[11]     Q.     What kind of ID was it?
[12]     A.     Identification card.
[13]     Q.     Did it have your picture on it?
[14]     A.     Yeah.
[15]     Q.     Was it a picture that they took
[16] there at the check cashing place or the
[17] picture from your school ID?
[18]     A.     No. It was the picture that
[19] they took there.
[20]     Q.     And it had the date of birth
[21] that would have put you about twenty-three
[22] years old at that time; is that right?
[23]     A.     Yeah. It was still 7/30. It
[24] was just 1986, I believe.
[25]     Q.     Why South Carolina? Who picked
                    Carl G. Sokolski
                 Official Court Reporter
                    (215) 683-8060

Page 87

[1]          Ericka Johnson - direct
[2] out South Carolina?
[3]     A.     Johnathan did. I ain't. I
[4] told him. I said all right, well, for me to
[5] get a ID, why don't I get a Pennsylvania ID?
[6] And he said no. He said something and I was
[7] like that don't even make sense. He said no,
[8] we going to get South Carolina. I was like
[9] all right. I didn't know what was going on
[10] anyway. I didn't know what I was going to use
[11] it for. So I just got an ID. I thought it
[12] was going to be something that I could just
[13] flash around. I didn't know.
[14]     Q.     So how long after you got this
[15] ID did you get to Missouri?
[16]     A.     Probably like, I wasn't, when I
[17] got the ID I wasn't even pregnant. Probably
[18] like a year later, probably.
[19]     Q.     Now, when you came back from
[20] Missouri, how long after that was John-John
[21] born?
[22]     A.     A month later.
[23]     Q.     How was your relationship with
[24] the defendant after your son was born?
[25]     A.     It was cool. It was all right.
                    Carl G. Sokolski
                 Official Court Reporter
                    (215) 683-8060

Page 88

[1]          Ericka Johnson - direct
[2]     Q.     Did you continue to essentially
[3] live at his house?
[4]     A.     Yeah. He made it comfortable
[5] for me and my child. Well, our child. And he
[6] would watch him. I'll go to school, come
[7] home, go pick up the mail from my mom house,
[8] go back to his house, and then I just get up
[9] and do it all over again.
[10]     Q.     At some point did that
[11] relationship change between you and the
[12] defendant?
[13]     A.     Yeah.
[14]     Q.     When was that, Ericka?
[15]     A.     Probably when the baby was
[16] probably like five, six months. And I
[17] decided, like, I didn't want to stay there
[18] because every time I would ask him to fix up
[19] up the house, he wouldn't. Like, he wanted to
[20] at a point but then he would say my dad this,
[21] my dad that. And I just got tired of it. I
[22] told my mom, I said, Mom, I want to come home.
[23] She said come on. So I just got some of my
[24] stuff and I just left. And then I had to go
[25] back. My aunt had to take me up there to get
                    Carl G. Sokolski
                 Official Court Reporter
                    (215) 683-8060

51CR00034302009
Johnathan Robins

Page 89

Ericka Johnson - direct

[1]
[2] the rest of my stuff. And after that, like, I
[3] haven't been talking to him.
[4]    Q.    To the defendant.
[5]    A.    Uh-huh.
[6]    Q.    After you moved back to your
[7] mom's house, where did John-John stay? Where
[8] did he live?
[9]    A.    He stayed with me.
[10]    Q.    Did the defendant get to see
[11] John-John at all?
[12]    A.    Yeah. Yeah. We set up some
[13] type of routine and it was he would get him
[14] six o'clock in the morning and I'd have to
[15] walk to the bus stop to catch my bus and go
[16] home, and then by the time I get home he'll be
[17] at the bus stop waiting. Or if I tell him,
[18] like, can you meet me a little later like
[19] around six or seven o'clock, he'll do it. But
[20] it was like a every-day thing. And when I
[21] wouldn't feel good, I would call him early in
[22] the morning. I would call him that night,
[23] probably. I don't really feel good, I don't
[24] think I'm going in, so you shouldn't come.
[25] And he would say all right, well, why you all

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 90

Ericka Johnson - direct

[1]
[2] don't want to go to school? I'd say because
[3] I don't feel good, I don't want to go to
[4] school and they got to send me back home.
[5] That's like more extra work my mom got to do.
[6] So most of the time he'll come and get him and
[7] then some of the time he won't.
[8]    Q.    Now, let me ask you about
[9] February eleventh of last year. Do you recall
[10] police or going to the defendant's house
[11] regarding your son around February eleventh of
[12] last year?
[13]    A.    Yeah.
[14]    Q.    Why did you go to the
[15] defendant's house?
[16]    A.    Because every time I would call
[17] him, he wouldn't answer the phone. This was
[18] going on for like two days straight. So I
[19] wanted to know where my child was. He
[20] wouldn't answer the phone. He wouldn't even
[21] pick it up. I would leave several voice
[22] messages on his phone and he wouldn't answer.
[23] So I guess, what was that,
[24] Monday or Tuesday? I called him early in the
[25] morning, like six o'clock. He answered the

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 91

Ericka Johnson - direct

[1]
[2] phone. I said, well, where you been at? Why
[3] do you want to know? I said all right, well,
[4] can I have my child? I said all right, well,
[5] back? And he said, he said, I was up there at
[6] Sixty-Ninth Street waiting for you for a whole
[7] hour and a half. I said I understand that,
[8] but I called and put it on the answering
[9] machine that I was sick and I didn't feel like
[10] it.
[11]    So, I mean, then I guess he got
[12] mad. I think, I don't know if he hung up on
[13] me or not. But he wasn't saying nothing. So
[14] I called him again. He wouldn't answer. Then
[15] I called him again. He wouldn't answer. So I
[16] called him one more time. He answered and
[17] like we really, I was like cursing him out but
[18] he wasn't saying nothing. So I just hung up
[19] the phone, called my mom, said Mom, I got to
[20] borrow ten dollars, can I get ten dollars? So
[21] I went up to her house, got the ten dollars,
[22] got on the El and all this other stuff, and I
[23] went up to his house.
[24]    Q.    When you say all the other
[25] stuff, you mean catching the bus to get up

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 92

Ericka Johnson - direct

[1]
[2] there?
[3]    A.    I'm talking about the bus and
[4] walking and all that stuff.
[5]    Q.    Got you. So what happened when
[6] you went to the defendant's house that day?
[7]    A.    When I went to his house he
[8] wasn't there. So now I'm saying, like, all
[9] right, he trying to run away with my child, he
[10] not trying to give him to me, like. So I was,
[11] I sat there. I sat there and sat there at the
[12] door and keep knocking and kicking and
[13] knocking and kicking. So I got my mom on the
[14] other line and I got somebody else on the
[15] other line to put my mom on the three-way
[16] because the phone that I had, I could only
[17] talk to the people that's in that service. So
[18] I called my mom. My mom said just stay there
[19] until you see him, and I was like all right.
[20]    So I was just sitting there and
[21] it was cold outside. So I was about to start
[22] walking. Next thing you know, he come down
[23] the street. I guess he was at the laundromat.
[24] But he come down the street with the cart and
[25] my child in his hands. And when I went to go

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 93

[1]       Ericka Johnson - direct
[2] try to grab my child, he wouldn't give him to
[3] me. And when I saw my child, he had all these
[4] bumps on his face. He had a hoodie on. He
[5] had too small pants on. His socks was too
[6] small. And I don't even think he had a hat
[7] on. Like, it didn't, it didn't look right for
[8] a eleven month old baby to be out with no type
[9] of clothes on. Like, he didn't have nothing
[10] on. And that really made me mad.
[11]       Q.      So what happened at that point?
[12] What did you do?
[13]       A.      And we was still walking across
[14] the street and I was still trying to take him
[15] and he would keep going like this with his
[16] arm. And I'm like, look, I'm going to get
[17] him. He said, You're not getting my child
[18] today, you're not going to get him. So I was
[19] like, all right, well, you want to keep
[20] playing games, I don't feel like playing games
[21] right now. So I told my mom that I was going
[22] to call her back. So I hung up with all them
[23] and I called the police and the police came.
[24] And I sat right there at his steps so he
[25] wouldn't get in, because he was not going to
                  Carl G. Sokolski
                  Official Court Reporter
                    (215) 683-8060

Page 94

[1]       Ericka Johnson - direct
[2] keep my baby in that house with him.
[3]       Q.      Now, I don't want you to tell
[4] us what the police said to you or to
[5] Johnathan, but at some point did the police
[6] ask you for identification?
[7]       A.      Yeah, they did, but I didn't
[8] have nothing on me. So I just told them my
[9] birth date and all that and then they said all
[10] right. And then they asked him a question and
[11] then they said all right. And the police said
[12] something to him and he gave the baby up. I
[13] guess when he went in the house, they gave the
[14] baby to me and told me sit in the car. And
[15] then I saw them lock him up. I saw them
[16] arrest him and put him in the car.
[17]       Q.      And did that surprise you that
[18] they were arresting him, Ericka?
[19]       A.      No. I knew it was going to
[20] happen. I mean, they wouldn't be like, all
[21] right, you the dad, we going to let you slide
[22] on that. It was his age. That's what they
[23] was really looking at, his age.
[24]       Q.      I see.
[25]       A.      And they just, they got him.
                  Carl G. Sokolski
                  Official Court Reporter
                    (215) 683-8060

Page 95

[1]       Ericka Johnson - direct
[2]       Q.      Did the police take you
[3] somewhere after that, after they put you in
[4] the car?
[5]       A.      They took me to, I forgot the
[6] street but it was still in North Philly. It
[7] was probably like down the street from there a
[8] couple blocks. They took me to Special
[9] Victims and I sat there. I think I talked to
[10] two people about it.
[11]       Q.      Do you remember talking to a
[12] female detective by the last name of Wilson?
[13]       A.      Yeah.
[14]       MR. STACKOW: Your Honor, if I
[15] could have this document marked as
[16] Commonwealth C-1, please. A copy has been
[17] previously provided to the defense, but I'd
[18] ask if you need an extra.
[19]       COURT CRIER: So marked
[20] Commonwealth Exhibit C-1 and shown to the
[21] witness, Your Honor.
[22]       THE COURT: Thank you.
[23] BY MR. STACKOW:
[24]       Q.      Ericka, do you recognize this
[25] document, this three-page statement?
                  Carl G. Sokolski
                  Official Court Reporter
                    (215) 683-8060

Page 96

[1]       Ericka Johnson - direct
[2]       A.      Yeah.
[3]       Q.      And what is that, Ericka?
[4]       A.      This is what happened that day.
[5]       Q.      Is this the statement that you
[6] gave to Detective Wilson at the Special
[7] Victims Unit?
[8]       A.      Yeah.
[9]       Q.      And did you sign this anywhere,
[10] Ericka?
[11]       A.      Yeah. I signed it at the
[12] bottom and I signed it at the bottom of the
[13] other page and at the bottom of the other
[14] page.
[15]       MR. STACKOW: All right.
[16] Ericka, thank you very much. That's all the
[17] questions I have for you at this time.
[18]       THE WITNESS: All right.
[19]       MR. STACKOW: Thank you, Your
[20] Honor.
[21]       THE COURT: All right. Ericka,
[22] you have to stay there, just for a little bit,
[23] maybe. I don't know. But the lawyers take
[24] turns. So Mr. Stackow is done with his
[25] questions. Now it's, Mr. Robins is
                  Carl G. Sokolski
                  Official Court Reporter
                    (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 97

Ericka Johnson - cross

[1]        Ericka Johnson - cross
[2] representing himself.  He is his own lawyer in
[3] this case, so he'll be asking you questions.
[4]        Before we do that, does anybody
[5] in the jury need to take a break?  Are you
[6] okay?  Is your back bothering you?  Are you
[7] okay there?
[8]        A JUROR:  I'll be all right.
[9]        THE COURT:  Mr. Robins, it's
[10] your turn.  Mr. Robins, you'll remain seated
[11] at the table.
[12]        THE DEFENDANT:  I just need to
[13] get something out of my bag.
[14]        THE COURT:  Okay.
[15]        CROSS EXAMINATION
[16] BY THE DEFENDANT:
[17]    Q.    Okay.  First question.  You
[18] said that when you --
[19]        THE COURT:  Mr. Robins, it
[20] would be helpful if you were to put the
[21] microphone in front of you.
[22]        THE DEFENDANT:  I'm sorry.
[23]        THE COURT:  So everybody,
[24] especially the stenographer, would pick up
[25] your questions.
Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 98

Ericka Johnson - cross

[1]        Ericka Johnson - cross
[2] BY THE DEFENDANT:
[3]    Q.    When we first met, why do you
[4] think, well, before we even met and we talked
[5] to each other on the adult phone date line,
[6] why do you think I was attracted to you before
[7] I met you?  The conversation that we had, what
[8] were we talking about?
[9]        MR. STACKOW:  Objection to
[10] that, Your Honor.
[11]        THE COURT:  Well, there's
[12] nothing objectionable to what were we talking
[13] about.
[14]        MR. STACKOW:  Okay.  It was
[15] about speculating as to his thoughts.
[16]        THE COURT:  Yeah, I got you.
[17] The question is what were you talking about on
[18] the chat line before you ever met him in
[19] person?  What did you talk about?
[20]        THE WITNESS:  I can't even
[21] remember.  You trying to go way back.  I don't
[22] remember.  But all I was talking about was I
[23] asked you was my age a problem to you and you
[24] said no, and I asked you why and you said
[25] something about you think that all women
Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 99

Ericka Johnson - cross

[1]        Ericka Johnson - cross
[2] should be treated the same, don't matter how
[3] old they are or something like that.  That's
[4] what you.  I remember you saying that.  That's
[5] all I remember.  I don't remember saying
[6] nothing out of the ordinary about nothing.
[7] BY THE DEFENDANT:
[8]    Q.    I have a question.  Why is our
[9] son named Johnathan Robins, Jr.?
[10]    A.    Because that's what you wanted
[11] him to be named.
[12]    Q.    Did we agree on who was to name
[13] the children?
[14]    A.    I'm sorry?
[15]    Q.    Did we agree on who was to name
[16] the children?
[17]    A.    Yeah.  You said you name the
[18] boys and I name the girls.  I said it's not
[19] necessary for no girls because this is the
[20] last, this is the first and last child I will
[21] have.
[22]    Q.    No, but when did we have that
[23] discussion?  The first time we had that
[24] discussion.
[25]    A.    I don't remember the first time
Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 100

Ericka Johnson - cross

[1]        Ericka Johnson - cross
[2] we had discussion about kids.  I remember the
[3] first discussion we had about kids was when I
[4] was pregnant and before, like, probably like
[5] two, three months before I was pregnant.
[6]    Q.    So before we actually met, we
[7] never had a discussion about children.
[8]    A.    No, not that I can recall.
[9]    Q.    Did we have any discussion
[10] about marriage?
[11]    A.    It wasn't a hard conversation
[12] about it.  We touched on it but then it blew
[13] away, like.  We wasn't on it every day.
[14]    Q.    Again, what do you think in our
[15] conversation made me attracted to you besides
[16] you saying, you know, what your age was that
[17] you claim?  Besides that, what else in our
[18] conversation do you think attracted me to you?
[19]        MR. STACKOW:  Objection to
[20] that.
[21]        THE COURT:  Yeah.  Asking what
[22] somebody thinks about your thoughts, that's
[23] not appropriate for any witness.
[24]        THE DEFENDANT:  Okay.  Sorry.
[25]        THE COURT:  You can ask
Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 101

[1]        Ericka Johnson - cross
[2] questions like what did I say or do but not,
[3] you can't ask her to be a mindreader.
[4]        THE DEFENDANT:  Okay.  You're
[5] right.
[6] BY THE DEFENDANT:
[7]    Q.    You were dating other men
[8] before me, correct?
[9]    A.    Not other men.  It was only
[10] one.
[11]    Q.    Why did you tell me you left
[12] him?
[13]    A.    Why did I leave my old
[14] boyfriend before I met you?
[15]    Q.    Yeah.
[16]    A.    We broke up.  I never left him.
[17] We been broke up.
[18]    Q.    But didn't you tell me that the
[19] reason why you didn't want to be with him,
[20] because he didn't want to make a commitment?
[21]    A.    Yeah.  That was because he knew
[22] my age and he was just a little bit older than
[23] me.  He say he didn't feel like taking that
[24] route and I said all right, well, I can't be
[25] with you.  Like, he wanted to go around and

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 102

[1]        Ericka Johnson - cross
[2] deal with the other girls and I wanted that
[3] person that was not going to do that, like,
[4] stay with me, don't try to mess around on
[5] people.  That's how diseases come.
[6]    Q.    So when we first had our
[7] conversation before we actually met for
[8] dinner, wasn't our conversation about
[9] commitment?
[10]    A.    Yeah, it was.  But it wasn't a
[11] heavy.  It wasn't a heavy talk about
[12] commitment.  The heavy talk about commitment
[13] was when we made it official January what?
[14] January first of the new year.  That's when it
[15] was official.  That's when we started hitting
[16] base on it.  We wasn't like talking about it
[17] like every single day.
[18]    Q.    So on January first, 2007, what
[19] did we talk about that was the conversation
[20] about commitment?
[21]    A.    Johnathan, that was like three
[22] years ago.  I don't remember.  I remember you
[23] saying that you want to be with somebody, you
[24] do want to get married, you do want to have
[25] kids.  I said I do too, I said, but not right

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 103

[1]        Ericka Johnson - cross
[2] now.  You said we could wait.  I said are you
[3] willing to wait?  You said yeah.  I said all
[4] right.  I said when I see you in person, we'll
[5] talk about it.  That's when I asked you.  I
[6] asked you a question.  You told me whatever
[7] question I had, to write it down on a piece of
[8] paper and then when we see each other, read
[9] the questions that was on my paper to you.
[10] That's exactly what you told me.
[11]    Q.    And that was before we met?
[12]    A.    Yes.  It's when we was on the
[13] phone.
[14]    Q.    Okay.  So basically we was
[15] having a conversation about all the questions
[16] we wanted to ask each other before we met.
[17]    A.    No.  You told me to ask the
[18] questions when we were in person.  You said
[19] you wasn't answering no questions over the
[20] phone, because I had asked you your age like
[21] twice and you wouldn't tell me.  You said, you
[22] know what?  I got something for you.  Because
[23] I kept on asking you questions and you say,
[24] you know what?  Since you want to ask me all
[25] these questions, how about you write it down

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 104

[1]        Ericka Johnson - cross
[2] and then when we meet up you can ask me the
[3] questions.
[4]        We met up.  I did ask you a
[5] couple of questions.  I did ask you your age.
[6] You dragged that on.  You didn't tell me when
[7] we was in there.  And I asked you a couple
[8] other things and it took me, it took a long
[9] time to get the answers but I got the answers.
[10] After we walked out the building where we was
[11] eating at, that's when you finally told me
[12] your age.  And I said, well, my age is not a
[13] problem?  You said no.
[14]    Q.    Okay.  Another question.  So
[15] again, did we have a conversation on who was
[16] to name the children before you got pregnant?
[17]    A.    Yeah.  We talked about it but
[18] it didn't even hit base.  It wasn't, it wasn't
[19] a strong conversation about it.  Because I
[20] told you off the gate I was going to name
[21] them.  You said no and we came to agreement
[22] that you would name the boys and I would name
[23] the girls.  And I told you.  I just said it.
[24] I said this would be the first and last child
[25] that I will have by you.  I specifically said

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 105

[1]        Ericka Johnson - cross
[2] that. I remember me saying that, because I
[3] know I didn't want to have no more kids by
[4] you.
[5]        Q.        That's what you said. When did
[6] you say that? When did you make that
[7] statement?
[8]        A.        I said that during when I was
[9] pregnant, when I didn't know I was pregnant,
[10] in the beginning of the pregnancy and at the
[11] end of the pregnancy. I told you. I said
[12] this is my first and last child by you, I
[13] don't want no more kids. Because before I got
[14] pregnant, you was doing everything you could
[15] to keep me. But now, since you got me because
[16] I'm pregnant and I got your baby, you ain't
[17] got nothing to prove because you already got
[18] me. That's how I felt.
[19]        Q.        Now, before you got pregnant
[20] with Johnathan Robins, Jr., weren't you
[21] pregnant before?
[22]        MR. STACKOW: Objection to
[23] that, Your Honor.
[24]        THE COURT: Yeah. Objection
[25] sustained.
            Carl G. Sokolski
        Official Court Reporter
          (215) 683-8060

Page 106

[1]        Ericka Johnson - cross
[2]        THE DEFENDANT: But the
[3] pregnancy was with me.
[4]        THE COURT: Mr. Robins,
[5] objection sustained.
[6]        THE DEFENDANT: I'm sorry, sir.
[7] BY THE DEFENDANT:
[8]        Q.        When we started going out, did
[9] I or did I not introduce you to everybody that
[10] I knew?
[11]        A.        You did.
[12]        Q.        My mother, father, sister.
[13]        A.        You did.
[14]        Q.        Friends.
[15]        A.        But the thing about that was
[16] you didn't tell them my age.
[17]        Q.        Well, who told them your age?
[18]        A.        Well, we had an agreement that
[19] I wasn't going to tell them my age.
[20]        Q.        Well, did anybody tell them
[21] your age?
[22]        A.        Not that I can recall, no.
[23]        Q.        No. So you mean to tell me
[24] we're around all my friends, my mom, my dad,
[25] my sister and everybody, and nobody told them
            Carl G. Sokolski
        Official Court Reporter
          (215) 683-8060

Page 107

[1]        Ericka Johnson - cross
[2] how old you were, not even you.
[3]        A.        No. Around your friends but
[4] not around your family. Your family never new
[5] how old I was. Do you remember that?
[6]        Q.        Oh. So I got a good question
[7] here. So do you mean to tell me, how many
[8] times have you gone out with my sister and my
[9] mom and her friends and gone with their
[10] friends to Atlantic City and all, all this
[11] other stuff? How many times have we done
[12] that?
[13]        A.        A couple times.
[14]        Q.        A couple?
[15]        A.        Yeah, a couple of times.
[16]        Q.        So you haven't been —
[17]        A.        All that time they didn't know
[18] my age and you knew because when Vicky —
[19]        Q.        Go ahead.
[20]        A.        When Vicky had her birthday
[21] party, they was asking me how old I was and I
[22] was looking at you and you went like that
[23] (indicating). What was I supposed to do?
[24] What was I supposed to say?
[25]        Q.        So we haven't been around my
            Carl G. Sokolski
        Official Court Reporter
          (215) 683-8060

Page 108

[1]        Ericka Johnson - cross
[2] family more than what? Eight times? Or what
[3] would you say?
[4]        A.        Yeah. I said it was a couple
[5] of times, because most of the time I didn't
[6] want to go.
[7]        MR. STACKOW: Your Honor, could
[8] I just interject for one moment? Because the
[9] witness made a motion during a previous answer
[10] about the birthday.
[11]        THE COURT: Right.
[12]        MR. STACKOW: And when she
[13] testified, that she looked to the defendant
[14] and the defendant just went like this. The
[15] record should reflect that she shrugged her
[16] shoulders, that's all. I just wanted the
[17] record to reflect that.
[18]        THE DEFENDANT: When was that?
[19]        THE COURT: All right. Ericka,
[20] was that an accurate description of what you
[21] did? I couldn't see.
[22]        THE WITNESS: Yeah. That's
[23] what he did to me. He went like this
[24] (indicating).
[25]        THE COURT: You looked at him
            Carl G. Sokolski
        Official Court Reporter
          (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 109

[1]        Ericka Johnson - cross
[2] and he shrugged his shoulders.
[3]        THE WITNESS:  Yes.
[4]        THE COURT:  Okay.
[5] BY THE DEFENDANT:
[6]        Q.      So you mean to tell me that my
[7] family and my friends just accepted not
[8] knowing your age?
[9]        A.      They didn't.  Now they do.
[10] They didn't know my age until, like, probably
[11] like last year or something.  It was around
[12] that time.  But from when we started talking
[13] until I was pregnant until after I had the
[14] baby, probably like a couple months down, they
[15] didn't know my age.  Now, you know they know
[16] they didn't know my age.
[17]        Q.      Why did I introduce you to my
[18] family?  Did I tell you why?
[19]        A.      You didn't tell me why.  You
[20] just introduced me to them.  You didn't sit
[21] there and tell me why you did it.  You didn't
[22] say none of that.
[23]        Q.      Okay.
[24]        A.      Not that I recall.  I mean, I
[25] don't remember.  Last time I asked, you said
                Carl G. Sokolski
                Official Court Reporter
                (215) 683-8060

Page 110

[1]        Ericka Johnson - cross
[2] come on, let's go.  Where are we going?  Don't
[3] worry about it, come on, let's go, I want you
[4] to meet somebody.  That's all I heard from
[5] your mouth.  That's all.
[6]        Q.      So we never planned when we
[7] went to see my family or anything.  We just
[8] jumped up and went.
[9]        A.      No.  We planned.  I'm talking
[10] about like in the beginning.  Every time I
[11] would say, well, where are we going, you said
[12] come on, don't worry about it, I got somebody
[13] for you to meet.  You wouldn't tell me who it
[14] is until we get to them.  But now, like, when
[15] I know them now, like, I'm knowing them
[16] enough, you say, oh, come on, we going to my
[17] mom house.  You would say that.  Or sometimes
[18] you would slip up and say, um, come on, come
[19] on, we just going to go out.  I said where are
[20] we going?  Just come on.  We wind up going to
[21] probably your friend's house or down to your
[22] mom's house.  That's about it.
[23]        Q.      Okay.  Did we also attend my
[24] sister's reception?
[25]        A.      The wedding?
                Carl G. Sokolski
                Official Court Reporter
                (215) 683-8060

Page 111

[1]        Ericka Johnson - cross
[2]        Q.      What?
[3]        A.      Reception?  Wedding?
[4]        Q.      Yeah, reception in Atlantic
[5] City.
[6]        A.      In June.
[7]        Q.      In June of what?
[8]        A.      2007.
[9]        Q.      2007.  That was the first time
[10] you basically were introduced to my family,
[11] right?
[12]        A.      Yeah, all of them.
[13]        A.      Yeah.
[14]        A.      But still at that time they
[15] didn't know my age.
[16]        Q.      So you mean to tell me that —
[17] okay.  I've been through that.  I say that you
[18] told them what your age was but you're saying
[19] that you didn't.
[20]        A.      I didn't.  At that time her
[21] reception, wedding, whatever it was, that was
[22] a month after Mothers Day.  That was June.
[23] She got married in June or whatever it is.
[24] What she had in Atlantic City, that event was
[25] in June.  I was a couple weeks pregnant.  I
                Carl G. Sokolski
                Official Court Reporter
                (215) 683-8060

Page 112

[1]        Ericka Johnson - cross
[2] didn't even know.  You didn't even, they
[3] didn't even know my age.  They didn't.  I
[4] would just come out, oh, yeah, I'm fifteen
[5] messing around with a forty-year-old guy?  You
[6] know they would look at you like you retarded,
[7] right?  They didn't know my age.
[8]        Q.      Okay.  Now, did we or did we
[9] not decide to start a family?  That's why we
[10] started going together.
[11]        A.      We did.  But then I asked you
[12] if you could wait, not like.  I asked you if
[13] you could wait.  You said yeah.  I said but
[14] then I really wanted to rush into things
[15] because me and my mom wasn't working out and I
[16] was like, well, if I take full control of it,
[17] then she wouldn't have nothing to say.  And we
[18] agreed on that.  We talked about that.
[19]        Q.      So did we when we were first
[20] going together around January first, 2007,
[21] discuss children, who's going to name the
[22] children, marriage, and is that one of the
[23] main reasons why we started going together?
[24]        A.      You asked that question before
[25] and I told you.  I said we talked about it but
                Carl G. Sokolski
                Official Court Reporter
                (215) 683-8060

51CR00034302009
Johnathan Robins

Page 113

Ericka Johnson - cross

[2] it wasn't as serious as it was when I found
[3] out I was pregnant or, like, during I was
[4] pregnant. We talked about it a little bit.
[5] It was hint and hint, that was it. But it
[6] wasn't about, it wasn't nothing like so
[7] serious. It wasn't serious. But then I took
[8] it serious because I was pregnant. At that
[9] time you didn't want to take it serious. You
[10] thought everything was a joke.
[11] Q.    Oh. Who thought everything was
[12] a joke?
[13] A.    You.
[14] Q.    Why do you say that?
[15] A.    Because you just did.
[16] Q.    How?
[17] A.    Because you did.
[18] Q.    How?
[19]    MR. STACKOW: Objection, Your
[20] Honor.
[21]    THE DEFENDANT: Okay. You're
[22] right. Okay.
[23] BY THE DEFENDANT:
[24] Q.    Were we actually trying to have
[25] a baby?

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 114

Ericka Johnson - cross

[2] A.    Yeah, at one point.
[3] Q.    Okay.
[4] A.    We was trying to have a baby
[5] because we sat there and talked about it. I
[6] say I do want to have a child and I was
[7] roaring in my head like you too old for me to
[8] have a child by you. I didn't say that to
[9] you. This is what I was thinking. But then I
[10] said, you know what? All right. Boom. Then
[11] when I found out I was pregnant, you said you
[12] know it's going to be difficult because of
[13] this relationship. I said, well, what's you
[14] mean, like? Why? You say because your age
[15] and my age, somebody going to try to take
[16] this, try to rip it apart. You did say that
[17] to me. And I said, well, I'll do everything
[18] in my power to keep this relationship going,
[19] because at that time I really wanted to be
[20] with you because I thought it was going to
[21] work because you took care of me. For most of
[22] the part you took care of me. You did.
[23] Everything I asked you to do, you did it
[24] without no hesitation.
[25] Q.    So everything that you asked me

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 115

Ericka Johnson - cross

[2] to do I did without hesitation. That's
[3] exactly what you just said, correct?
[4] A.    Yeah, I said it.
[5] Q.    Okay.
[6] A.    But that still don't justify
[7] you. You not supposed to listen to no fifteen
[8] year old saying that she want to have a baby
[9] and you give it to her. Like, you supposed to
[10] be the grown-up about it. You supposed to say
[11] I don't think that's a good idea or try to
[12] talk me out of it. You ain't even, you ain't
[13] do none of that. You said all right, you want
[14] this done? Okay, I'll give it to you. You
[15] want a baby? Okay, I'll give you a baby. Now
[16] this is the end result right here.
[17] Q.    Do you remember who gave a
[18] marriage ring to who first?
[19] A.    Who what?
[20] Q.    Who first gave a marriage ring
[21] to somebody? Me or you?
[22] A.    I remember it was in the
[23] summertime. I did. But it wasn't. You would
[24] call that probably like a engagement ring, a
[25] marriage ring. Because at that time we wasn't

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 116

Ericka Johnson - cross

[2] even engaged. So I mean I did give you a
[3] ring, but what? You can't say that we just
[4] for engagement. That could have been for
[5] something else. That ring could have been for
[6] something else. Anybody can go around wearing
[7] a plain ring. I can, you can. What do that?
[8] A ring don't got a name to it.
[9]    MR. STACKOW: Objection at this
[10] point, Your Honor.
[11]    THE COURT: Overruled.
[12]    MR. STACKOW: There's got to be
[13] some questions.
[14]    THE COURT: Overruled. That's
[15] her answer. It's a run-on answer but that's
[16] her answer.
[17]    MR. STACKOW: I understand.
[18] BY THE DEFENDANT:
[19] Q.    But didn't you want to go
[20] looking for marriage rings?
[21] A.    Yeah, I did.
[22] Q.    So when you gave me the ring —
[23] A.    But still, a ring can mean
[24] anything. If you don't have papers, the ring
[25] don't mean nothing. That's how I look at it.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 117

[1]        Ericka Johnson - cross
[2] We went to look for rings and you give me a
[3] fake ring. It looked like it was real but it
[4] was fake. What ring, I mean? How was that,
[5] like? I don't understand.
[6]        Q.    Now, when you got pregnant and
[7] we both realized you were pregnant, where was
[8] I working? What was I doing?
[9]        A.    You was working for Verizon
[10] selling FiOS.
[11]        Q.    No, the first, when I was first
[12] working. I wasn't working during that year.
[13]        A.    You said during when I was
[14] pregnant. During when I was pregnant you was
[15] doing the FiOS. You was doing Verizon.
[16]        Q.    When you first got pregnant.
[17]        A.    When I first got pregnant you
[18] were was working at Spaghetti Warehouse and
[19] McCormick & Schmick.
[20]        Q.    Now, once I learned that you
[21] were pregnant, what did I decide to do?
[22]        MR. STACKOW: Objection.
[23]        THE COURT: Well, what did he
[24] do after you told him that you were pregnant?
[25]        THE WITNESS: I guess he wrote
            Carl G. Sokolski
        Official Court Reporter
            (215) 683-8060

Page 118

[1]        Ericka Johnson - cross
[2] in his mind that he decided that he need to
[3] get a real job. We sat there and we talked
[4] about it. I said you need a job that's going
[5] to keep you on a schedule. That's what I told
[6] him. And you got a job that kept you on a
[7] schedule.
[8] BY THE DEFENDANT:
[9]        Q.    You said I needed a job to keep
[10] me on a schedule. Why?
[11]        A.    Because you would leave out
[12] different hours of the night even though you
[13] supposed to be at home with me because I'm the
[14] one pregnant. I know, I understand you had to
[15] work, but you need. I wanted you for family
[16] time and I need you to go to work sometimes.
[17] So you had to be on a schedule.
[18]        Q.    Now, before I started working
[19] selling Verizon FiOS, did we discuss the job?
[20]        A.    Yeah, we did.
[21]        Q.    Do you remember what the job
[22] entailed me doing and why I actually took that
[23] job?
[24]        A.    Going out to sell FiOS to I
[25] guess people who wanted it, and you was trying
            Carl G. Sokolski
        Official Court Reporter
            (215) 683-8060

Page 119

[1]        Ericka Johnson - cross
[2] to get a higher place. You was trying to be a
[3] owner or a trainer or whatever it was.
[4]        Q.    So what were like the hours and
[5] the —
[6]        A.    The hours? Well, by the time I
[7] would wake up, you would be gone. I'd take a
[8] nap. By the time I ate dinner and go to
[9] sleep, when I wake up, try to go to the
[10] bathroom, you'd be home. So probably what?
[11] From six in the morning to probably like six
[12] at night or seven at night. Most of the time
[13] I was 'sleep.
[14]        Q.    Okay. And this job, if you
[15] said I wanted to go to a higher, you knew
[16] that — well, I'm asking. Did you know that I
[17] was trying to get, like you said, my own
[18] business off of that? Because I'll explain to
[19] the jury later about that job. But that it
[20] would probably take me on average a couple of
[21] years to actually do that? Do you remember?
[22]        A.    You told me. I remember you
[23] saying that. And I said if it make you happy,
[24] go ahead and do it.
[25]        Q.    And that I would have to work
            Carl G. Sokolski
        Official Court Reporter
            (215) 683-8060

Page 120

[1]        Ericka Johnson - cross
[2] six days a week, you know, and I actually
[3] asked your permission to actually —
[4]        A.    And I said yes. But I got mad
[5] because one day I asked you to stay home and
[6] you didn't. It was one day. I was eight
[7] months pregnant. My stomach hurt and all.
[8] And you couldn't stay home.
[9]        Q.    Did I tell you why?
[10]        A.    Just for that one day.
[11]        Q.    But did I tell you why?
[12]        A.    So you can get somebody under
[13] you. So you can train somebody so they can be
[14] under you. But still, don't family come
[15] first? Anything could have happened to me and
[16] the baby while I was in the house by myself.
[17] And it didn't even work. That person didn't
[18] even come. So you risked that person, well,
[19] you risked me for that person. You don't care
[20] if I got hurt that day.
[21]        Q.    Why did I take the job in the
[22] first place, do you think? Okay. You're
[23] right. Okay. Like you said, I was taking
[24] better. Was it your understanding that I was
[25] taking better jobs for us?
            Carl G. Sokolski
        Official Court Reporter
            (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 121

Ericka Johnson - cross

[1]
[2]   A.   You was.
[3]   Q.   And was it your understanding
[4] that I was trying to get, like you said, a
[5] better job and better income as fast as
[6] possible?
[7]   A.   Yes.
[8]   Q.   And you're saying that I put
[9] the job over you, but from your understanding,
[10] why did I have a job?
[11]   A.   You had the job so that when
[12] your child came out, he had everything that he
[13] needed.
[14]   Q.   Did I also have a job for you?
[15]   A.   Yeah, but I wasn't even worried
[16] about myself.  I was worried about when he
[17] came out, what he was going to get and what he
[18] was going to have.  But it seemed like you
[19] wasn't worried about that.  You was worried
[20] about the job.  So when he finally did come
[21] out, what did you get him?  Two, three things,
[22] that's it.  You were supposed to be working a
[23] big job that got money, right?
[24]   Q.   Well, did you also understand
[25] that there are certain rules to that job like

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 122

Ericka Johnson - cross

[2] you really couldn't take off days?
[3]       MR. STACKOW:  Objection,
[4] relevance.
[5]       THE COURT:  Yeah.  Mr. Robins,
[6] what's the relevance of all of this?  I mean,
[7] so you and she were living together and you
[8] got married and she was pregnant and, I mean,
[9] so what?
[10]       THE DEFENDANT:  I'll move on.
[11]       THE COURT:  Can you just
[12] explain to me how it's relevant to the charge
[13] here?
[14]       THE DEFENDANT:  Well, I will
[15] explain.
[16]       THE COURT:  Or you can just
[17] move on to something.  That's all right.
[18]       THE DEFENDANT:  I'll move on.
[19] I'll move on.
[20] BY THE DEFENDANT:
[21]   Q.   After the baby was born, you
[22] said you were living with your mother and
[23] everything.  When did I come to the hospital?
[24]   A.   You came to the hospital the
[25] same day the baby was born but probably like

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 123

Ericka Johnson - cross

[2] seven o'clock, seven or eight o'clock in the
[3] morning.
[4]   Q.   Okay.
[5]   A.   After my mom left, you came.
[6]   Q.   And what did you tell the staff
[7] who I was?
[8]   A.   I said this is my husband.
[9] This is the father.
[10]   Q.   You didn't tell --
[11]   A.   And they went back and they
[12] told my mom.
[13]   Q.   You didn't tell the staff that
[14] I was your uncle?
[15]   A.   I don't remember.  I do
[16] remember me saying that you was my uncle, but
[17] when you came, when they asked me when you
[18] left, I said that's my husband.  And that's
[19] how the word.  Listen.  That's how the word
[20] got back out to my mom that you was the
[21] father.
[22]   Q.   Who was the first one to tell
[23] the staff I was your husband?
[24]   A.   You said something and then I
[25] said something.  But you said something when

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 124

Ericka Johnson - cross

[2] I probably wasn't even paying attention to
[3] it.  But when you first came, I did tell you
[4] that, I did tell them that you was my uncle
[5] just because on the simple fact that I didn't
[6] even want all this drama.  But then I guess
[7] when you told her, I guess when you left, I
[8] was still there and I said.  She said, well,
[9] who was that?  I said, yeah, that was my
[10] husband.  She was like, yeah, because he
[11] showed me all types of identification saying
[12] that is his baby.  I said, oh.
[13]       Then the news got back to my
[14] mom.  One of the nurses came back home to my
[15] mom and told her that, oh, well, your daughter
[16] is married, she got a older guy coming to see
[17] his child.  My mom asked me.  I denied it.
[18]   Q.   Okay.  Also, we used to talk
[19] back and forth on cell phones, correct?
[20]   A.   Yeah.
[21]   Q.   Whose cell phones were they?
[22]   A.   Yours.
[23]   Q.   When did we first get them?
[24]   A.   Before Valentine's Day.
[25]   Q.   So we got two cell phones both

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 125

[1]         Ericka Johnson - cross
[2] in my name, one for you, one for me.
[3]     A.     Yeah.
[4]     Q.     And how long did you have the
[5] phone for?
[6]     A.     Like a year, almost two.
[7]     Q.     And you used a cell phone.
[8] Your mother never asked you where the cell
[9] phone came from?
[10]    A.     No, because it's a cell phone.
[11] It's not nothing major.
[12]    Q.     So if she wanted to find out
[13] who the cell phone came from, it would have
[14] been real easy, right?
[15]    A.     I guess so.  It was under your
[16] name, right?
[17]    Q.     Yes.
[18]    A.     All right.
[19]    Q.     Now, when you came back, when
[20] you came back to, after the baby was born and
[21] you stayed at your mother's house for like a
[22] week or something or —
[23]    A.     A month.
[24]    Q.     You stayed there a whole month?
[25]    A.     Yes.  I told you.  The baby was
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 126

[1]         Ericka Johnson - cross
[2] born in February.  I moved out at the end of
[3] March to the first of April because the doctor
[4] kept coming back and forth to check him.  And
[5] you told me, oh, why did you go down there and
[6] have the baby?  You should have just came up
[7] here.  All this stuff should have been just
[8] squashed.  That's what you told me.  And I
[9] said everything is down here for me.  I'm not
[10] going to go up there and have my child in
[11] Philadelphia when I don't know nothing about
[12] it.  And I came down there to visit my mom and
[13] I wind up having the baby down there.  That
[14] wasn't my fault.
[15]    Q.     Okay.  When I left my job, why
[16] did I leave my job?
[17]    MR. STACKOW:  Objection.
[18]    THE COURT:  Did he ever tell
[19] you why he left his job?
[20]    THE WITNESS:  No.  If I asked
[21] him something, he would drag me around.  So I
[22] never really got a real answer for it.
[23]    THE COURT:  Okay.
[24] BY THE DEFENDANT:
[25]    Q.     Well, I left the job soon after
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 127

[1]         Ericka Johnson - cross
[2] the baby was born, correct?
[3]     A.     Yeah.
[4]     Q.     Do you want to tell everybody,
[5] do you know why?
[6]     A.     You left the job after the baby
[7] was born but you couldn't stay home that day
[8] when I asked you to.
[9]     Q.     After the baby was born, who
[10] mainly was the one taking care of him, taking
[11] him back and forth to the doctor?
[12]    A.     You did, because I was trying
[13] to finish my education in school.
[14]    Q.     Yeah.  So basically I was
[15] unemployed for that amount of time, correct?
[16]    A.     Just for a little bit.
[17]    Q.     For how long?
[18]    A.     I'm not sure how long it was,
[19] but you knew you could just go out.  You knew
[20] you could have went out anywhere and got a
[21] job.
[22]    Q.     But at that time I was watching
[23] the baby and I also had other things that I
[24] had to take care of too at that time, did I
[25] not?
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 128

[1]         Ericka Johnson - cross
[2]     A.     I understand that, but you
[3] didn't have a problem throwing a sack on and
[4] going out there.
[5]     THE COURT:  Mr. Robins, I'm
[6] going to ask you again.  What's the relevance
[7] of all of this?  You are not charged with
[8] being a deficient husband or a deficient
[9] father.  All of these crimes relate to you
[10] having sexual intercourse or other sexual acts
[11] with someone.  In some of these statutes it
[12] says under the age of of sixteen.  In other
[13] statutes it's under the age of eighteen.  And
[14] that's what you are charged with.  So you
[15] could be father of the year.  You could be
[16] husband of the year.  You could be the most
[17] attentive paramour that any woman in the City
[18] of Philadelphia has ever known.  It would have
[19] nothing to do with the charges in this case.
[20]         So unless you can come up with
[21] some relevant questions, I'm going to have to
[22] rule that you have no more questions.  Now, do
[23] you have some relevant questions?
[24]    THE DEFENDANT:  Yes.
[25] BY THE DEFENDANT:
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

---

Page 129

[1]         Ericka Johnson - cross
[2]   Q.     Is one of the reasons why you
[3] are coming to court now is because you were
[4] worried about me taking custody of our son?
[5]   A.    Yeah.
[6]   Q.    So that is --
[7]        THE COURT:  That is also
[8] irrelevant unless her coming to court is going
[9] to change her age or it's going to change your
[10] age.  It doesn't matter whether she's
[11] concerned about who has custody of her child.
[12] It doesn't matter.  I'm going to ask you to
[13] restrict your questions to relevant issues and
[14] I'm going to give you the lunch break to think
[15] about that.
[16]        THE DEFENDANT:  Yes, sir.
[17]        THE COURT:  And we were going
[18] to have to break close to 12:30 anyway because
[19] all those people who keep coming in and out of
[20] court are not on this case.  They're on
[21] another case that I pushed back from the
[22] morning list until this afternoon when you
[23] would be at lunch.
[24]        So we'll break now with the
[25] idea that we will resume at, let's say, 1:45.
                Carl G. Sokolski
              Official Court Reporter
                (215) 683-8060

---

Page 130

[1]         Ericka Johnson - cross
[2] The court officers will tell you where to come
[3] back in order to be on time.  While we were
[4] doing jury selection, there was one episode
[5] where people straggled in ten, fifteen minutes
[6] late.  You can't do that once you're on the
[7] jury, because if one of you is late, then all
[8] of you are late.  We can't begin until
[9] everybody is back.
[10]        Let me remind you about what
[11] I've told you at other times, and that is keep
[12] on the jury badge.  Don't discuss the case
[13] among yourselves.  Don't discuss it with
[14] anybody outside, and if anybody approaches
[15] you, let the court officers know about that at
[16] the first opportunity.
[17]        Anything else before the jury
[18] is excused for the morning?
[19]        MR. STACKOW:  No, Your Honor.
[20]        THE DEFENDANT:  No.
[21]        THE COURT:  All right.  1:45.
[22] Follow the directions of the court officer.
[23]        COURT CRIER:  Please remain
[24] seated as the jury exits.
[25]        (Jury excused.)
                Carl G. Sokolski
              Official Court Reporter
                (215) 683-8060

---

Page 131

[1]         Ericka Johnson - cross
[2]        THE COURT:  Ericka, that means
[3] you're going to have to be back at 1:45 also.
[4] Okay?
[5]        THE WITNESS:  All right.
[6]        THE COURT:  All right.  Just
[7] talk to the District Attorney.  Well, actually
[8] you can't talk to the DA because you're under
[9] cross examination right now.  So I'm reminding
[10] the witness that because she's under cross
[11] examination, she's not to discuss this matter
[12] with the District Attorney.  You understand
[13] that, right, Mr. Stackow?
[14]        MR. STACKOW:  I do, yes, Your
[15] Honor.
[16]        THE COURT:  All right.  But it
[17] is important that whatever you do over the
[18] lunch break that you come back here before
[19] 1:45.
[20]        THE WITNESS:  Okay.
[21]        THE COURT:  All right?
[22]        THE WITNESS:  All right.
[23]        THE COURT:  Sometimes it's a
[24] problem getting through the lobby because of
[25] the metal detectors and all of that, so you
                Carl G. Sokolski
              Official Court Reporter
                (215) 683-8060

---

Page 132

[1]
[2] should really be back in the building by 1:30
[3] to make sure that you're back here by 1:45.
[4]        THE WITNESS:  All right.
[5]        THE COURT:  We'll see you then.
[6] Mr. DeFino, help the witness off the stand.
[7]        (Witness excused.)
[8]        THE COURT:  Mr. Robins, maybe
[9] you want to speak to Mr. McGill over the lunch
[10] break.  The law says that I am to give you no
[11] additional consideration because you're not a
[12] lawyer.  I have, however.  I mean, throughout
[13] the morning I've tried to help you in
[14] formulating questions and explaining how to
[15] present issues to the witness.  But when we
[16] come back this afternoon, the basic rule is
[17] you don't ask anything unless it's relevant to
[18] the case.
[19]        I don't know when the last time
[20] was you spoke to the complainant, but today is
[21] not the day to have that long overdue
[22] conversation about how do you feel and this is
[23] how I feel and why do you think I did that.
[24] You're to confine your questions to relevant
[25] issues.  And in this case, the relevant issues
                Carl G. Sokolski
              Official Court Reporter
                (215) 683-8060

---

51CR00034302009                                                Trial (Jury) Volume 3
Johnathan Robins                                                    March 11, 2010

Page 133

[1]
[2] are how old she was, how old you were, and
[3] whether you actually had, whether the two of
[4] you actually had sexual contact as described
[5] in these statutes. Do you understand?
[6]          THE DEFENDANT: Yes. I was
[7] just trying to --
[8]          THE COURT: It doesn't matter,
[9] Mr. Robins. You don't have to explain
[10] anything to me.
[11]          THE DEFENDANT: I'm sorry, sir.
[12]          THE COURT: And I'll see you
[13] this afternoon, no later than 1:45. All
[14] right?
[15]          MR. STACKOW: Yes, Your Honor.
[16]          (A luncheon recess was taken.)
[17]          MR. STACKOW: Your Honor, I
[18] believe the defense has an issue that he
[19] wanted to raise.
[20]          THE COURT: All right. Before
[21] we bring the jury in, is there something that
[22] you want to address?
[23]          MR. McGILL: Judge, as Your
[24] Honor is aware, Mr. Robins' investigator was
[25] to serve subpoena a Detective Rowe, R-O-W-E,

                    Carl G. Sokolski
                   Official Court Reporter
                     (215) 683-8060

Page 134

[1]
[2] from the Delaware County Police Department.
[3] On Tuesday, the investigator went to the
[4] Delaware County Police Department. Detective
[5] Rowe was not present but his sergeant, his
[6] supervisor, was, and his supervisor sergeant
[7] accepted the subpoena. He advised that
[8] Tuesday was Detective Rowe's day off and he
[9] was not in a position to contact him but that
[10] he would take care of it the next day.
[11]          Wednesday the investigator
[12] called to follow up and was told that
[13] Detective Rowe was not in and that the
[14] sergeant had no way of contacting him. This
[15] morning, the investigator called once again
[16] and was not able to speak to the sergeant but
[17] was given the sergeant's voice mail and on it
[18] she left a detailed message that the subpoena
[19] had been served, it's a court order, and
[20] wanted the sergeant to ensure that the
[21] detective would honor the subpoena, please get
[22] back to her.
[23]          As of I guess about one o'clock
[24] when I spoke to the investigator, she had not
[25] heard back from the sergeant, was going to

                    Carl G. Sokolski
                   Official Court Reporter
                     (215) 683-8060

Page 135

[1]
[2] call him again but also suggested that perhaps
[3] if the Court put in a call, that that might
[4] raise more interest in the detective honoring
[5] the subpoena.
[6]          THE COURT: Well, when you get
[7] the detective, what's the offer of proof?
[8] What would the detective testify to?
[9]          MR. McGILL: Well, that's what
[10] I also mentioned to Mr. Robins, that he talk
[11] to Mr. Stackow about a possible stipulation.
[12]          THE COURT: Why don't you tell
[13] me. What's the offer of proof? You expect
[14] the detective to testify to what?
[15]          THE DEFENDANT: Ericka was
[16] questioned about the baby's father and all
[17] that, and he's to testify whether she divulged
[18] to him that she misrepresented her age to me
[19] when he was questioning her.
[20]          THE COURT: What information do
[21] you have to make you think that she did?
[22]          THE DEFENDANT: Well, Ericka
[23] told me that, you know, that he questioned
[24] her.
[25]          THE COURT: I don't understand

                    Carl G. Sokolski
                   Official Court Reporter
                     (215) 683-8060

Page 136

[1]
[2] it. Do you have a written statement taken by
[3] this detective?
[4]          THE DEFENDANT: No, I do not.
[5]          THE COURT: Have you spoken to
[6] the detective?
[7]          THE DEFENDANT: No, I have not.
[8]          THE COURT: So are you just
[9] fishing?
[10]          THE DEFENDANT: I'm going by
[11] what Ericka told me. Yes. I understand that
[12] you can't hold up the trial if he does not
[13] appear.
[14]          THE COURT: All right. Well,
[15] if he's here, maybe I'll let him testify. In
[16] the meantime, maybe you want to ask Ericka on
[17] cross examination if she ever did that.
[18]          THE DEFENDANT: Okay.
[19]          THE COURT: Do you have any
[20] other questions for Ericka?
[21]          THE DEFENDANT: Yes. And
[22] they'll stick, they'll be specifically about
[23] her age and what she told people her age when
[24] she goes for employment.
[25]          THE COURT: Okay. That's fine.

                    Carl G. Sokolski
                   Official Court Reporter
                     (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

---

Page 137

[1]
[2] You don't have to tell me, just as long as we
[3] keep it relevant.
[4]         MR. STACKOW:  Your Honor,
[5] there's a gentleman here who told me that he's
[6] the defendant's father.  He was the gentleman
[7] that just came in.  He is not a Commonwealth
[8] witness.  Just for sequestration purposes.
[9] And I know that while it may not have been
[10] specifically stated, we've both been complying
[11] with the sequestration of all witnesses.  But
[12] just so it's clear he's not a witness for the
[13] Commonwealth, if he wants to come in and
[14] observe.
[15]         THE COURT:  Is that your father
[16] in the audience?  Let's put it this way.  Do
[17] you know the man in the audience?
[18]         THE DEFENDANT:  Well, that's
[19] not my father.  He's outside.
[20]         THE COURT:  Oh, okay.  Well, do
[21] you have any objection to --
[22]         THE DEFENDANT:  Yeah, I do.
[23]         THE COURT:  So you don't want
[24] your father in here.
[25]         THE DEFENDANT:  No, I don't
                Carl G. Sokolski
            Official Court Reporter
                (215) 683-8060

---

Page 138

[1]
[2] want him in here, no.
[3]         THE COURT:  That's fine.  He
[4] can stay outside.  And the man who's in the
[5] courtroom, you have no objection to him being
[6] here?
[7]         THE DEFENDANT:  He's one of
[8] the, he's actually one of our witnesses.  He
[9] needs to be sequestered.
[10]         MR. McGILL:  He's the witness
[11] that was subpoenaed from the Delaware County
[12] Assistance office.  He's the custodian of
[13] records for DHS.  And that's another witness
[14] that Mr. Robins had the investigator subpoena.
[15]         THE COURT:  Okay.
[16]         MR. STACKOW:  And just so Your
[17] Honor knows, there may be a relevancy
[18] objection to that, but for the sake of keeping
[19] the case moving, we can wait.
[20]         THE COURT:  Why don't we just
[21] put the young lady back on the stand.  Do you
[22] want to bring her in?
[23]         COURT CRIER:  Sure.
[24]         MR. STACKOW:  And, sir, you'll
[25] have to wait outside.
                Carl G. Sokolski
            Official Court Reporter
                (215) 683-8060

---

Page 139

[1]
[2]         THE COURT:  Do you have
[3] proposed points on all of the five charges?
[4]         MR. STACKOW:  Yes.  That's all
[5] that I have at this point, Your Honor.  I
[6] didn't put them together in a complete package
[7] but I just printed those out.
[8]         COURT CRIER:  She just went to
[9] the restroom, Your Honor.
[10]         THE COURT:  You got to take her
[11] name down.  She would make a good juror.
[12]             Well, while we have time to do
[13] it, Mr. Robins, can you give us an offer of
[14] proof with regard to this witness who is
[15] sitting there related to the Department of
[16] Public Welfare in Upper Darby?
[17]         THE DEFENDANT:  Well, what I
[18] was trying to prove, one, is that fraud, that
[19] Ericka was lying to Welfare about her
[20] marriage.  The reason why I wanted that was
[21] because to show that Ericka, you know, will
[22] defraud and that's the reason.  I know you
[23] said before the reason why --
[24]         THE COURT:  No, that's okay.
[25] You want to show that she was lying about her
                Carl G. Sokolski
            Official Court Reporter
                (215) 683-8060

---

Page 140

[1]
[2] marital status.
[3]         THE DEFENDANT:  Her marital
[4] status and because she actually gets more
[5] money that way.
[6]         THE COURT:  All right.  That's
[7] fine.
[8]         THE DEFENDANT:  Also, one other
[9] question, to also show that she's also worried
[10] about me getting custody of my son.  Or
[11] that's?  I'm just going to ask her, you know,
[12] just, you know, just that question.  If not,
[13] then.  Well, if not, we'll just stick with the
[14] welfare issues.  Because I actually want to
[15] show that I was taking care of the child and
[16] that they were defrauding Welfare and only
[17] when I tried to get custody of the child did
[18] they get me locked up to stop me from getting
[19] custody and to stop me from stopping them
[20] getting welfare for the child.
[21]         COURT CRIER:  May I bring her
[22] in, Your Honor?
[23]         THE COURT:  Sure.
[24]             (Witness summoned.)
[25]         COURT CRIER:  May I remind you
                Carl G. Sokolski
            Official Court Reporter
                (215) 683-8060

---

51CR00034302009                                    Trial (Jury) Volume 3
Johnathan Robins                                        March 11, 2010

---

Page 141

[1]
[2] that you're still under oath.
[3]          May I, Your Honor?
[4]          THE COURT:  Yes.
[5]          COURT CRIER:  Please remain
[6] seated as the jury enters the courtroom.
[7]          (Jury summoned.)
[8]          COURT CRIER:  All present, Your
[9] Honor.
[10]          THE COURT:  Sorry for the
[11] delay.  That sentencing matter went on for
[12] longer than we had expected and when that was
[13] finished, the people in the courtroom still
[14] had to go to lunch, which they're constantly
[15] reminding me of.  So that's why we couldn't
[16] resume until just a few minutes ago.
[17]          When we left off, the witness
[18] was on cross examination and that's where
[19] we're going to pick up now.  Mr. Robins, do
[20] you have additional questions?
[21]          THE DEFENDANT:  Yes.
[22]          THE COURT:  Okay.
[23]          CROSS EXAMINATION (Cont'd.)
[24] BY THE DEFENDANT:
[25]     Q.     Miss Johnson, do you ever lie

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

Page 142

[1]          Ericka Johnson - cross
[2] about your age for any particular reason?
[3]     A.     It's not a reason to.
[4]     Q.     Oh.  It's never a reason to?
[5]     A.     No.
[6]     Q.     Do you ever lie about your age
[7] for any type of employment?
[8]          MR. STACKOW:  Objection, Your
[9] Honor.
[10]          THE COURT:  No, overruled.
[11]          THE WITNESS:  No, because now
[12] these jobs that I have, they know my age.
[13] BY THE DEFENDANT:
[14]     Q.     Before, did you or did you not
[15] work for places where you had to be eighteen
[16] and over?
[17]     A.     You're talking about Dynamite
[18] Braids On The Go Team.  Is that what you're
[19] talking about?
[20]     Q.     Yes.
[21]          THE COURT:  I'm sorry.  I
[22] didn't hear that.  You're talking about what?
[23]          THE WITNESS:  Dynamite Braids
[24] On The Go Team.
[25]          THE COURT:  Dynamite...

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

Page 143

[1]          Ericka Johnson - cross
[2]          THE WITNESS:  ...Braids On The
[3] Go Team.
[4]          THE COURT:  Braids On The Go
[5] Team.
[6]          THE WITNESSS:  Yeah.  All
[7] right.  What he talking about is with the job,
[8] you have had to be eighteen or older.
[9]          THE COURT:  What is it?  What
[10] is Dynamite Braids On The Go Team?
[11]          THE WITNESS:  It's when I set
[12] an appointment with a person that want to get
[13] their hair done and I go to their house and
[14] braid their hair and get the money and give it
[15] back to my manager, and that's how I get my
[16] check.
[17]          THE COURT:  Okay.  So you
[18] worked for a company and the company is called
[19] Dynamite Braids On The Go Team.
[20]          THE WITNESS:  Yes.
[21]          THE COURT:  Not to be confused
[22] with any other company by a similar name.  So
[23] you were working for them and you would go to
[24] the people's houses, braid their hair.  You
[25] would get paid for that.  And the company told

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

Page 144

[1]          Ericka Johnson - cross
[2] you that you had to be eighteen?
[3]          THE WITNESS:  Yes.
[4]          THE COURT:  Okay.
[5]          THE WITNESS:  But the thing
[6] about that was I told her I didn't want to
[7] work there no more.  She asked why.  I said
[8] because I'm not eighteen.  She said all right,
[9] well, it's not a big deal.  She came to my
[10] house on Kent Road and she told my mom what
[11] was the thing, what was going on, and she had
[12] my mom sign her signature where my signature
[13] was.  She signed it.  So she gave me another
[14] chance.  She could have just said no, but she
[15] didn't.  She gave me another chance and I was
[16] working again.
[17] BY THE DEFENDANT:
[18]     Q.     Didn't you also work at another
[19] braiding store near Sixty-Ninth Street?
[20]     A.     That was for about a month.
[21]     Q.     So this, the braiding service
[22] that you said came to your mother's house, you
[23] said they gave you another chance.  So you had
[24] to lie to them first to get the job.  Am I
[25] correct?

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

51CR00034302009
Johnathan Robins

---

## Page 145

[1]         Ericka Johnson - cross
[2]    A.    Yeah.
[3]    Q.    Okay.
[4]    A.    Because I really wanted that
[5] job.  But the whole thing that I messed up
[6] about it was I could have sat there and talked
[7] to her about it.  That's what she told me.
[8] But I didn't know.
[9]    Q.    So do you ever on any dating
[10] sites or any dating or social networks lie
[11] about your age?
[12]    A.    No, because I be at work all
[13] the time.  I don't get on none of that stuff.
[14] I learned my lesson from you.  Why would I go
[15] back and do it over again?
[16]    Q.    So this copy of your MySpace
[17] page that I printed out August fifteenth of
[18] 2009 that states your age being nineteen, --
[19]    A.    Okay.  I understand that, but
[20] you have to understand I'm not the only one
[21] that has my password.
[22]    Q.    Oh.  Oh, really.
[23]    A.    Yes, really.
[24]    Q.    So when was the last time
[25] you've actually looked at it?

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

## Page 146

[1]         Ericka Johnson - cross
[2]    A.    The last time I've been on
[3] there was when?  What?  This is when John-John
[4] was born.  My sister have access to it.  My
[5] older sister have access to it.  A friend
[6] across the street have access to it.  I don't
[7] have an Internet to get on.
[8]    Q.    Now, so why would they decide
[9] to put your age at nineteen?
[10]    MR. STACKOW:  Objection.
[11]    THE COURT:  Well, you can't be
[12] a mindreader.  But what he's asking is, do you
[13] know of any reason why somebody else with
[14] access to your MySpace page would put anything
[15] on that page that's not true, including your
[16] age?
[17]    THE WITNESS:  I mean, I don't
[18] know why they would do it but, like, I give
[19] them, like, I gave them permission to do it.
[20] It ain't like they did it behind my back.  I
[21] gave them my password because I don't go on
[22] there.  My little sister and her friends go on
[23] there.  They change things around.  I don't
[24] care because I'm never on there.  That's what
[25] that's about.  Like, I work all the time.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

## Page 147

[1]         Ericka Johnson - cross
[2]    THE COURT:  So the answer to
[3] the question is no, you don't know any reason
[4] why they would do that.
[5]    THE WITNESS:  I don't know of
[6] any reason why they would do that.  If I did I
[7] would tell him, but I don't know.
[8]    THE COURT:  Okay.
[9] BY THE DEFENDANT:
[10]    Q.    We went on a trip to, like you
[11] said, in July to Florida.  We also went to
[12] Missouri.  Now, you say the reason why we went
[13] to Missouri was to get married.  Now, could it
[14] have been because we were, it was I wanted
[15] something special for our marriage or because
[16] the actual law in Missouri is that you
[17] actually have to be eighteen to get married,
[18] the same law that there is in this state?  So
[19] if the law is exactly the same in Missouri as
[20] here, what's the difference?  Why would we
[21] have to go to Missouri when we could have just
[22] done it here?
[23]    A.    You asking me that?  I don't
[24] know.
[25]    MR. STACKOW:  I object to that

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

## Page 148

[1]         Ericka Johnson - cross
[2] question.  It's at least compound.
[3]    THE COURT:  If you break that
[4] question down, the first is do you know what
[5] the legal age for getting married in Missouri
[6] is?
[7]    THE WITNESS:  No, I really
[8] don't.
[9]    THE COURT:  Before you started
[10] out for Missouri, did he tell you that you
[11] were going to Missouri in order to get
[12] married?
[13]    THE WITNESS:  Yeah, and we —
[14]    THE COURT:  Did he ever give
[15] you an explanation for why Missouri?
[16]    THE WITNESS:  He said because
[17] you had to be fourteen.  The age had to be
[18] fourteen and with a parent's consent.
[19]    THE COURT:  So maybe it's true,
[20] maybe it's not true, but that's what he told
[21] you.
[22]    THE WITNESS:  Yeah.
[23]    THE COURT:  All right.
[24]    THE DEFENDANT:  I have a copy
[25] of the Missouri law right here.  That states

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 149

[1]       Ericka Johnson - cross
[2] even with parental consent --
[3]       THE COURT: Mr. Robins.
[4]       THE DEFENDANT: Yes.
[5]       THE COURT: Have you shown a
[6] copy to counsel?
[7]       MR. STACKOW: He did show me
[8] this earlier, Your Honor.
[9]       THE COURT: Okay.
[10] BY THE DEFENDANT:
[11]      Q.    So without a parent we must be
[12] eighteen.
[13]      MR. STACKOW: And I'm objecting
[14] to the form now of the question.
[15]      THE COURT: Well, it doesn't
[16] really matter what the law in Missouri is.
[17] What matters is what people thought the law
[18] was when they got on a plane and went to
[19] Missouri.
[20]         Since you got married, have you
[21] learned anything different about the law in
[22] Missouri?
[23]      THE WITNESS: No.
[24]      THE COURT: When you were in
[25] Missouri, you said you got married without
           Carl G. Sokolski
           Official Court Reporter
           (215) 683-8060

Page 150

[1]       Ericka Johnson - cross
[2] showing any proof of age?
[3]       THE WITNESS: The South
[4] Carolina ID.
[5]       THE COURT: Oh.  South
[6] Carolina.  I forgot.
[7]       THE WITNESS: Yeah.
[8]       THE COURT: The one you got on
[9] Broad Street that says you were born in —
[10]      THE WITNESS: Yeah.  That's how
[11] it was.
[12]      THE COURT: — eighty
[13] something?  '86.
[14]      THE WITNESS: Yes.
[15]      THE COURT: All right.
[16] BY THE DEFENDANT:
[17]      Q.    Okay.  I have a question.  In
[18] sometime around in January of 2008, did you
[19] ever complain to me that it seemed like I
[20] didn't want to touch you or hold you or have
[21] sex with you or anything like that?
[22]      A.    Yeah, at one point.
[23]      Q.    Why?
[24]      MR. STACKOW: Objection.
[25]      THE COURT: No, overruled.
           Carl G. Sokolski
           Official Court Reporter
           (215) 683-8060

Page 151

[1]       Ericka Johnson - cross
[2]       THE WITNESS: Oh.  Because I
[3] cheated on you.  And I told you I didn't and
[4] you said we was going to work it out.  And we
[5] started working it out, but then at the end,
[6] like, I really didn't want to be with you.
[7] BY THE DEFENDANT:
[8]       Q.    But is it or is it not that
[9] that's when it started coming out really how
[10] old you are?
[11]      A.    When?  I don't understand the
[12] question.
[13]      Q.    Around that time is when you
[14] had to divulge a few things to me.  Like when
[15] the baby was being born, you had to start
[16] telling me certain things.  So around that
[17] time, did you or did you not confess to me
[18] really what your age was?
[19]      A.    No.  I told you already when I
[20] met you.
[21]      Q.    Okay.  Another question.  Did
[22] you ever defraud, fill out any other
[23] applications for any government agencies lying
[24] about how old you were?
[25]      A.    Not that I can recall.  I don't
           Carl G. Sokolski
           Official Court Reporter
           (215) 683-8060

Page 152

[1]       Ericka Johnson - cross
[2] recall.  Everything on paperwork, like, I
[3] would go to the place and fill out the
[4] application, but I would put my real age, real
[5] birth date down.  That's how I would be able
[6] to get the job.  Wouldn't nobody take no South
[7] Carolina ID.  Everything has to be
[8] Pennsylvania.
[9]       Q.    Okay.  Do you remember when you
[10] were trying to get a, because my license is
[11] messed up and we have a car, but you needed to
[12] get a license?  Do you remember when in June
[13] of '07 you went to go apply for a license?
[14]      A.    Yeah, I remember that.  But do
[15] you remember who whose idea it was?
[16]      Q.    For you to go get a license?
[17] Yeah, it was my idea for you to go get a
[18] license.
[19]      A.    Exactly.  So you asking me the
[20] questions.  You already know about it.  Why
[21] are you asking me?
[22]      Q.    Okay.  What age did you put
[23] down when you went to apply?
[24]      A.    I really can't remember, but I
[25] did put a age that it wasn't my age.  So that
           Carl G. Sokolski
           Official Court Reporter
           (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 153

[1]         Ericka Johnson - cross
[2] was only so we can get the license.  Because
[3] that was your idea.  That wasn't my idea.  I
[4] told you I could wait until I turned sixteen.
[5]         THE COURT:  You're talking
[6] about a marriage license?
[7]         THE DEFENDANT:  No.  We're
[8] talking about a driver's license.
[9]         THE WITNESS:  No.  We're
[10] talking about the driver's license.
[11]         THE COURT:  Driver's license.
[12]         THE WITNESS:  Yes.
[13]         THE COURT:  And you have to be
[14] sixteen to get a driver's license.
[15]         THE WITNESS:  Yes.
[16]         THE COURT:  So you put down
[17] some age so that it would work, you could get
[18] it.
[19]         THE WITNESS:  Yeah, and it was
[20] his idea to do that.
[21] BY THE DEFENDANT:
[22]     Q.      So this is your signature on
[23] this application?
[24]     A.      Yeah, it's my signature.
[25]         MR. STACKOW:  Can I see it?
            Carl G. Sokolski
        Official Court Reporter
            (215) 683-8060

Page 154

[1]         Ericka Johnson - cross
[2]         THE DEFENDANT:  Yeah.
[3]         MR. STACKOW:  I have not been
[4] provided with this.
[5]         THE COURT:  Yeah, because I
[6] didn't want to walk it up there.
[7]         MR. STACKOW:  Could I ask the
[8] court staff if they could make an extra copy
[9] of this, Your Honor?  I don't have a copy.
[10]         THE COURT:  Can you do that?
[11] Mr. Gerard will do it.
[12]         MR. STACKOW:  Thank you very
[13] much.  I appreciate that.
[14] BY THE DEFENDANT:
[15]     Q.      So is there any other job that
[16] you lied about your age about except for those
[17] two hair braiding jobs?
[18]     A.      No, not that I can recall,
[19] because I haven't been working.  This is my
[20] first time really holding a job and with a
[21] steady income.  Can I?  I can ask him a
[22] question?
[23]         MR. STACKOW:  No.
[24]         THE COURT:  No.
[25]         THE WITNESS:  No?  All right.
            Carl G. Sokolski
        Official Court Reporter
            (215) 683-8060

Page 155

[1]         Ericka Johnson - cross
[2] BY THE DEFENDANT:
[3]     Q.      So at the time that, after the
[4] time that you say I did, basically after
[5] January 2008, did you go apply for a license
[6] again?
[7]     A.      January eighth?
[8]     Q.      No, after January.  After the
[9] month of January 2008, did you go apply for a
[10] license again, a driver's license?
[11]     A.      No.
[12]     Q.      Well, were you going to apply
[13] for a driver's license?
[14]     A.      No, I wasn't going to apply for
[15] a driver's license.  I was going to apply for
[16] a ID, state ID.
[17]     Q.      Because, you, see, on one
[18] driver's license copy before, underneath what
[19] your real age was you put down that you were
[20] born in '86, and after we had the revelation
[21] or whatever and if you want to see both of
[22] them, after on, what is this?  August of 2008.
[23] You actually applied for a driver's
[24] license with your signature, but this time you
[25] put your real age like you were supposed to.
            Carl G. Sokolski
        Official Court Reporter
            (215) 683-8060

Page 156

[1]         Ericka Johnson - cross
[2] If you want to --
[3]     A.      I know what you talking about.
[4]     Q.      Yeah.
[5]     A.      Do you want me to tell you what
[6] you talking about?
[7]     Q.      Go ahead.
[8]     A.      All right.  Well, it went like
[9] this.  If you can remember, it was your idea
[10] to get this driver's license because you
[11] didn't have a car because your stuff was
[12] messed up.  The second time was when you made
[13] that fake birth certificate for me and you
[14] told me to go down there and try it and it
[15] didn't work.  That's what happened.
[16]     Q.      So you said a what?  A fake
[17] who?
[18]     A.      Birth certificate.  You made
[19] it.
[20]     Q.      I made it.
[21]     A.      Yes, over your friend house.
[22]     Q.      Over my friend's house.
[23]     A.      Yes.
[24]     Q.      And you say --
[25]     A.      It was your idea for all this
            Carl G. Sokolski
        Official Court Reporter
            (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 157

[1]        Ericka Johnson - cross
[2] to start.
[3]    Q.    It was my idea completely.
[4]    A.    Yes. I'm fifteen years old,
[5] don't know nothing about no law, don't know
[6] nothing about no fake stuff. When I meet you,
[7] everything goes down. I see fake this and
[8] fake that and you can do this and you can do
[9] that. I never knew I could do this stuff
[10] before I met you.
[11]    Q.    So it was any time you lied or
[12] defrauded about your age, it was my idea; is
[13] that correct?
[14]    A.    Yes, it was, because I had no
[15] reason to lie.
[16]    Q.    So when you got on the adult
[17] Website that's supposed to be for eighteen and
[18] over and I have not met you yet, I guess that
[19] was my idea too.
[20]    A.    Your idea to get on? Yes, it
[21] was your idea to get on there. But when I go
[22] on there, I don't say my age. I give them a
[23] fake name and I give them a fake place where
[24] I'm at. I never go on there and say my age
[25] and my real name. You're not supposed to.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 158

[1]        Ericka Johnson - cross
[2]    Q.    Do you understand what you just
[3] said?
[4]        MR. STACKOW: Objection to
[5] that.
[6]        THE COURT: You have to phrase
[7] it as a question and it has to be a relevant
[8] question, Mr. Robins, which means not arguing
[9] with the witness.
[10]        THE DEFENDANT: Okay.
[11]        THE COURT: Just asking a
[12] question.
[13] BY THE DEFENDANT:
[14]    Q.    So you're saying when you go on
[15] this phone talk line you don't divulge your
[16] proper age.
[17]    A.    No. When I met you, I didn't
[18] tell you my real age, I mean my real name.
[19]    Q.    What did you just say?
[20]    A.    I said when I met you I didn't
[21] tell you my real name.
[22]    Q.    Well, before you said that.
[23]    A.    I said I didn't tell you my
[24] real age. I didn't mean to say that.
[25]    Q.    Oh, I guess not.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 159

[1]        Ericka Johnson - cross
[2]        MR. STACKOW: Objection to that
[3] as well, Your Honor.
[4]        THE COURT: Overruled.
[5] Everybody understands the conversation that's
[6] going on.
[7] BY THE DEFENDANT:
[8]    Q.    So the question that I had
[9] before is, like, you said that every deception
[10] in age was my idea, but before you even knew I
[11] existed you got on a phone talk line for
[12] adults and you were not, so the age deception
[13] before I even met you was yours.
[14]    A.    No, not really.
[15]        MR. STACKOW: Objection to
[16] that, Your Honor. It's no question.
[17]        THE COURT: Right. You're
[18] going to have to move on to something else.
[19] We all understand that she went on a chat line
[20] where it's implicit that you're over the age
[21] of eighteen if you're talking to somebody
[22] there that would be over the age of eighteen,
[23] and she said that she went on there, for what
[24] it's worth.
[25] BY THE DEFENDANT:

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 160

[1]        Ericka Johnson - cross
[2]    Q.    The issue about welfare,
[3] getting to that particular issue, do we have a
[4] dispute of how often I was taking care of my
[5] child and you collecting welfare? What is
[6] your understanding of how much I had him and
[7] how much you had him and what benefits you, if
[8] at all, if any, were supposed to receive from
[9] Welfare?
[10]    A.    I don't even understand your
[11] question.
[12]    Q.    Okay. I'm sorry. When did
[13] your mother apply for welfare for our son?
[14]    A.    My mother applied for welfare
[15] for my child when I was about probably like
[16] six months pregnant. I had to eat. I had to
[17] feed the child, right? You wasn't giving me
[18] the money to eat.
[19]    Q.    You said when you were six
[20] months pregnant?
[21]    A.    Yes.
[22]    Q.    Were you living with me at the
[23] time?
[24]    A.    No, I didn't, not yet. When I
[25] applied, that's when I moved with you. How

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 161

[1]        Ericka Johnson - cross
[2] you thought you could get all that food in
[3] your house?  How do you thought I was eating?
[4]        Q.      Well, was I not working?
[5]        A.      You was working but you was
[6] stingy with the money.  And then I was still
[7] going to school.  I had to pay for my books,
[8] all that other stuff, and you wasn't giving me
[9] the money for it.
[10]       Q.      Okay.  So when we got married,
[11] did you divulge to the Welfare officials that
[12] we were married?
[13]       A.      Yeah, I told them, but they
[14] said that they couldn't do nothing about it
[15] because it's not Pennsylvania.
[16]       Q.      When did you tell?  You told
[17] your caseworker.  When did you tell him?
[18]       A.      I told him.
[19]       Q.      When?
[20]       A.      I don't remember when I told
[21] him but I told him, like, I told him after I
[22] got off and I told him when I just recently
[23] got back on because my son need medical.  And
[24] I told him.  I said me and Johnathan Robins is
[25] married.  He said, well, it's nothing that he
                Carl G. Sokolski
             Official Court Reporter
               (215) 683-8060

Page 162

[1]        Ericka Johnson - cross
[2] can do because everything is still under my
[3] mom case.  I'm still a minor, so everything is
[4] still under my mother's case.
[5]        Q.      And do you know if I told him
[6] first that, you know, that I gave the proper
[7] facts to the officials first before you did?
[8]        A.      Okay.  That's fine.  But I'm
[9] saying, like, you wasn't helping.  What was I
[10] going to do when my child need medical and I
[11] need to go to the doctor too?  Was you going
[12] to pay hundreds of dollars for them to see me?
[13]       Q.      Did you tell Welfare how much I
[14] was watching the child, or did you act like I
[15] wasn't there?  Which one was it?
[16]       A.      You was watching him but then
[17] you saying, oh, well, I need to do things and
[18] this, that and the third, da-da-da-da-da,
[19] like.  You seemed like you didn't want to
[20] watch him no more.  So I just, I got up and
[21] left.
[22]       Q.      What do you mean?  When was
[23] this when you supposedly got up and left?
[24]       A.      August.
[25]       Q.      August of what?
                Carl G. Sokolski
             Official Court Reporter
               (215) 683-8060

Page 163

[1]        Ericka Johnson - cross
[2]        A.      Of '08.
[3]        Q.      Okay.  And was I watching the
[4] child after that?
[5]        A.      Yeah.  We was doing the
[6] halfway.  It was you got him one week or I got
[7] him one week and you had him two weeks, I had
[8] him two weeks.  We was going back and forth
[9] with it.
[10]       Q.      Did you tell Welfare about
[11] that?
[12]       A.      No.  I only told him, like, he
[13] was taking care of him for most of the part.
[14] But they not looking at what happened before.
[15] They looking at what happened now.  And now
[16] you're not there to help.  So what am I
[17] supposed to do?
[18]       Q.      So you're saying within the
[19] past how long have I not been there to help?
[20]       A.      Two years.
[21]       Q.      Even though I've paid since
[22] within the past what, six months, over about
[23] six thousand dollars in child support, I
[24] haven't been there?
[25]       A.      Johnathan, that's your problem.
                Carl G. Sokolski
             Official Court Reporter
               (215) 683-8060

Page 164

[1]        Ericka Johnson - cross
[2] I haven't gotten it.  I'm doing the best I can
[3] without child support.
[4]        Q.      Also, were you having a dispute
[5] about the custody of our son between you, me
[6] and your mother?
[7]        A.      Yes, I was, because I didn't
[8] want none of you all to have him.  I didn't
[9] want you to have him.  I didn't want my mom to
[10] have him.  That's my child.  If you not
[11] helping me, you not the dad.  If she not
[12] helping me, she not the grandmom.
[13]       Q.      Well, after we realized that
[14] you needed to get your education, did I or did
[15] I not want to take care of the child and let
[16] you go be and mature and do what you had to
[17] do?
[18]       MR. STACKOW:  Objection,
[19] relevance.
[20]       THE COURT:  Yeah.  We're
[21] getting back into that father of the year line
[22] of questioning.
[23]       THE DEFENDANT:  Okay.  Sorry.
[24]       THE COURT:  That's not the
[25] issue in this case.  The issue is under some
                Carl G. Sokolski
             Official Court Reporter
               (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 165

[1]        Ericka Johnson - cross
[2] of these statutes, if she's under sixteen,
[3] it's a crime.  If she's under eighteen, it's a
[4] crime.  That's what this case is about.
[5] BY THE DEFENDANT:
[6]        Q.      So again, did you or did you
[7] not lie to my family and friends about your
[8] age?
[9]        THE COURT:  No, no "again."
[10] The question has been asked and it has been
[11] answered.  If you have something new and it's
[12] relevant, then ask the question.
[13] BY THE DEFENDANT:
[14]        Q.      Okay.  So since it's your
[15] testimony that you told no one, you know, your
[16] age or whatever, did like, okay, Neil Bower,
[17] you know, Spaghetti Warehouse.
[18]        THE COURT:  Is that a question?
[19]        THE DEFENDANT:  Yeah.  I'm
[20] telling her the name of the person.
[21]        THE COURT:  There are no
[22] preambles.  Just ask a question.
[23] BY THE DEFENDANT:
[24]        Q.      When you applied for a job at
[25] Spaghetti Warehouse, did you lie about your
                Carl G. Sokolski
              Official Court Reporter
                (215) 683-8060

Page 166

[1]        Ericka Johnson - cross
[2] age there?
[3]        A.      Yeah, because it was your idea.
[4] You not getting it through your head.  It's
[5] your idea.  I never knew nothing about this
[6] until I met you.  You don't get it.
[7]        Q.      So it was my idea for you to
[8] apply?
[9]        A.      Before I met you, I was in
[10] school.  I was doing what I had to do.  Now I
[11] met you, I'm everywhere now.  That's not fair.
[12]        Q.      So you said I wanted you to get
[13] a job at Spaghetti Warehouse?  Or did you ask
[14] me to get a job or you said it was my idea?
[15]        A.      I wanted a job.
[16]        Q.      You wanted a job?
[17]        A.      You said apply for Spaghetti
[18] Warehouse.  I said, well, how old you got to
[19] be to work there?  You said eighteen.  I said,
[20] well, what age am I going to put there?  You
[21] said:  I don't know, make up one.  Because I
[22] wasn't going to apply for it if I had to be
[23] eighteen.  You know, my thing is doing hair,
[24] that's it.
[25]        Q.      Okay.  Is your testimony that
                Carl G. Sokolski
              Official Court Reporter
                (215) 683-8060

Page 167

[1]        Ericka Johnson - cross
[2] all the time we were together that my family
[3] did not know your age?
[4]        MR. STACKOW:  Objection.
[5]        THE COURT:  Yeah.  That's been
[6] asked and answered several times.  Objection
[7] sustained.  Plus the form of the question.
[8] BY THE DEFENDANT:
[9]        Q.      Can I ask, did you specifically
[10] tell Vicky, a name Vicky, that your age was
[11] nineteen?  Could I?
[12]        THE COURT:  Do you know
[13] somebody named Vicky?
[14]        THE WITNESS:  Uh-huh.  Yes, I
[15] do.
[16]        THE COURT:  And is Vicky
[17] related to --
[18]        THE WITNESS:  No.  She is on
[19] his part of the family.  And the only reason
[20] why I came up with a answer so quick, because
[21] she kept hounding me about my age.
[22]        THE COURT:  All right.  So what
[23] did you tell her your age was?
[24]        THE WITNESS:  I told her
[25] nineteen.  I didn't say nothing too young, too
                Carl G. Sokolski
              Official Court Reporter
                (215) 683-8060

Page 168

[1]        Ericka Johnson - cross
[2] old.  It was just basically right in the
[3] middle.  Even you, and he know, even if I did
[4] tell her my age while we was at her birthday
[5] party, some stuff would have kicked off.
[6]        THE COURT:  You mean if you had
[7] told her that you were fourteen years old.
[8]        THE WITNESS:  Yeah.  They would
[9] have looked at him.  Somebody would have
[10] probably got on the phone and called the cops,
[11] or they probably would have just waited until
[12] we left and we would have been at this, we
[13] would have been here a year ago, probably.
[14] BY THE DEFENDANT:
[15]        Q.      So Tyra Felder, did you tell
[16] Tyra Felder how old you were?
[17]        A.      I told Tyra.
[18]        Q.      How old did you tell her?
[19]        A.      That I was what?  Almost
[20] sixteen.
[21]        Q.      That's what you told Tyra.
[22]        A.      Yeah, that I was almost
[23] sixteen.
[24]        THE COURT:  At the time that
[25] you told her that, were you almost sixteen?
                Carl G. Sokolski
              Official Court Reporter
                (215) 683-8060

51CR00034302009
Johnathan Robins

Page 169

[1]        Ericka Johnson - cross
[2]        THE WITNESS: Yeah, I was.
[3] That's when the time that we had got a U-Haul
[4] truck and tried to take it to my mom, tried to
[5] get it to my mom house. Because they —
[6]        THE COURT: That's okay.
[7] You've answered the question.
[8] BY THE DEFENDANT:
[9]    Q.    When Tyra was actually, you and
[10] Tyra was taking the stuff out of the house and
[11] everything, did your mother ask Tyra did she
[12] know how old you were?
[13]    A.    Yeah, my mom asked Tyra that.
[14] Tyra didn't respond. Tyra didn't say
[15] anything.
[16]        THE COURT: This is all after
[17] the baby is born?
[18]        THE WITNESS: Uh-huh.
[19] BY THE DEFENDANT:
[20]    Q.    So before the baby was born did
[21] you tell Tyra your real age?
[22]    A.    No. I told her I was eighteen.
[23]    Q.    Okay. Neil Bower, how old did
[24] you tell him you were?
[25]    A.    Now, I can't remember that
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 170

[1] because I don't even remember, recall saying
[2] my age to him.
[3]
[4]        THE DEFENDANT: Your Honor, I'm
[5] finished with this witness.
[6]        THE COURT: Is there any
[7] redirect?
[8]        MR. STACKOW: No, thank you.
[9]        THE COURT: All right. You can
[10] step down. You're excused.
[11]        (Witness excused.)
[12]        MR. STACKOW: May this witness
[13] step out of the room, Your Honor?
[14]        THE COURT: Sure.
[15]        MR. STACKOW: The Commonwealth,
[16] if I may call our next witness, Lucille
[17] Freeman.
[18]        COURT CRIER: Right up here,
[19] ma'am. Please remain standing. Raise your
[20] right hand. Please state your name. Spell
[21] your name for the record.
[22]        THE WITNESS: Lucille Freeman.
[23] L-U-C-I-L-L-E. F-R-E-E-M-A-N.
[24]        LUCILLE FREEMAN, after having
[25] been duly sworn, was examined and testified as
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 171

[1]
[2] follows. . .
[3]        MR. STACKOW: May I proceed,
[4] Your Honor?
[5]        THE COURT: Sure.
[6]        MR. STACKOW: Thank you.
[7]        DIRECT EXAMINATION
[8] BY MR. STACKOW:
[9]    Q.    Good afternoon, Miss Freeman.
[10]    A.    Good afternoon.
[11]    Q.    Can you introduce yourself to
[12] the ladies and gentlemen of the jury and begin
[13] by telling us if you know the young lady that
[14] just testified, Ericka Freeman.
[15]    A.    Yes.
[16]    Q.    Or Ericka Johnson. I'm sorry.
[17]    A.    Yes. I'm Lucille Freeman,
[18] Ericka Johnson's mother.
[19]    Q.    How old is Ericka?
[20]    A.    Ericka is seventeen years old.
[21]    Q.    When is her birthday?
[22]    A.    July the thirtieth, 1992.
[23]    Q.    Do you have other children as
[24] well?
[25]    A.    Yes, I do.
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 172

[1]
[2]    Q.    How many other children do you
[3] have?
[4]    A.    Three.
[5]    Q.    What are their names and
[6] current ages?
[7]    A.    My oldest, her name Shenai
[8] Freeman. She's twenty-three years old. My
[9] other daughter, Devette Alexander, she's
[10] fourteen years old. My other daughter's name
[11] is Tericka Johnson. She's sixteen years old.
[12]    Q.    And you don't have to give us
[13] the exact address, but where do you live
[14] generally now, ma'am?
[15]    A.    In Upper Darby, PA.
[16]    Q.    How long have you lived at your
[17] current residence?
[18]    A.    Since last year, March the
[19] fifth.
[20]    Q.    How long have you lived in
[21] Upper Darby?
[22]    A.    Since '06.
[23]    Q.    And back in 2006 and 2007, how
[24] far away were you living from your current
[25] residence?
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

51CR00034302009                                                                                    Trial (Jury) Volume 3
Johnathan Robins                                                                                    March 11, 2010

---

Page 173

[1]
[2]      A.      Maybe about two blocks.
[3]      Q.      Who lives with you now?
[4]      A.      Ericka Johnson, Tericka Johnson
[5] and Devette Alexander and Johnathan Robins.
[6]      Q.      Who is Johnathan Robins?
[7]      A.      My grandson.
[8]      Q.      How old is Johnathan?
[9]      A.      Two.
[10]     Q.      Now, let me ask you just a
[11] little bit about your daughter Ericka.
[12] Thinking back to 2007 at the end of that
[13] school year and then into the summer, my first
[14] question is where was Ericka attending school
[15] back in 2007?
[16]     A.      She was attending Beverly Hills
[17] Middle School.  That's in Upper Darby.
[18]     Q.      How far away was that from the
[19] house where you were living at that time?
[20]     A.      Maybe like nine blocks.
[21]     Q.      Did you ever go to her school
[22] or walk her to her school at any dates when
[23] she was attending school there?
[24]     A.      Yes.  I have attended there for
[25] a parents' conference and when she has gotten
                    Carl G. Sokolski
                 Official Court Reporter
                    (215) 683-8060

---

Page 174

[1]
[2] all kinds of awards and certificates and
[3] stuff.  That's when I attended there for her.
[4]      Q.      Was there a uniform that she
[5] needed to wear or a set of clothes that she
[6] needed to wear to school?
[7]      A.      Yes.  They wore black, tan,
[8] blue, orange.  Anything that had a collar
[9] shirt, they could wear with.  That's what they
[10] could wear to school.
[11]     Q.      How about the bottoms?  What
[12] kind of bottoms?
[13]     A.      Black pants, tan pants, brown
[14] pants.  Just the solid colors that they could
[15] wear to school.
[16]     Q.      Now, Miss Freeman, I have to
[17] ask you a couple what may be difficult
[18] questions, but forgive me.  Do you know the
[19] father of Ericka's baby, Johnathan?  Do you
[20] know that person's name?
[21]     A.      As far as I know, it's
[22] Johnathan Robins.
[23]     Q.      Have you ever met that person
[24] or seen him in person?
[25]     A.      When I first seen him, he was
                    Carl G. Sokolski
                 Official Court Reporter
                    (215) 683-8060

---

Page 175

[1]
[2] in Upper Darby inside of a McDonald's when I
[3] first seen him, and I approached him and he
[4] looked at me and I looked at him.  And I told
[5] him, I said, You know you're messing with a
[6] minor?  And he looked away again.  And I said,
[7] Did you just hear what I said?  I said, If it
[8] was a cop around, I'd have got you locked up.
[9] He turned away again.  I said, I know you take
[10] care of my grandson, because he had a baby bag
[11] on the side to take the baby in.
[12]     Q.      So let me ask you this.  My
[13] next question was going to be when did this
[14] encounter happen?  Do you recall the date that
[15] that happened, ma'am?
[16]     A.      Oh, not really.
[17]     Q.      You mentioned something about
[18] your grandson.  Was your grandson born by the
[19] time that you had that encounter?
[20]     A.      Yeah, he was born.  He was, he
[21] had a baby pouch across his side with the baby
[22] in it.
[23]     Q.      So that's the first time you
[24] saw the father of your grandson?
[25]     A.      That's the first time.
                    Carl G. Sokolski
                 Official Court Reporter
                    (215) 683-8060

---

Page 176

[1]
[2]      Q.      Was at that McDonald's in Upper
[3] Darby?
[4]      A.      Yes.
[5]      Q.      Who else was he with?
[6]      A.      He was, well, at the time when
[7] I did see him, he was walking down the street
[8] with my daughter.  And I'm sitting in the nail
[9] salon and I happen to look up and look out the
[10] window, and that's when I seem them two
[11] walking down the street.  And I'm like, that
[12] can't be.  Oh, that can't be.  So after I got
[13] finished doing what I was doing, I left and I
[14] walked down the street.  She already had
[15] departed from him.  He was still inside the
[16] McDonald's ordering food or whatever he was
[17] doing.  And that's when I went in.  I
[18] approached him and started talking to him.
[19]     Q.      What did he say to you when
[20] you —
[21]     A.      He just looked at me like he
[22] was retarded or he was stupid or whatever, you
[23] know, like he didn't have nothing to say, you
[24] know.
[25]     Q.      Did you tell him who you were?
                    Carl G. Sokolski
                 Official Court Reporter
                    (215) 683-8060

---

51CR00034302009
Johnathan Robins

Page 177

[1]
[2]    A.    Yes, I did. I told him I was
[3] Ericka Johnson's mother. And he looked at me.
[4] He looked up and down and turned his head to
[5] the other way.
[6]    Q.    Do you see that man that you
[7] had this encounter with here in court today?
[8]    A.    Yes, I do.
[9]    Q.    Could you point him out for
[10] these folks on the jury?
[11]    A.    (Witness points.)
[12]    MR. STACKOW: The record should
[13] reflect she's identified the defendant as the
[14] person she had this encounter with.
[15]    THE COURT: Any objection to
[16] that?
[17]    THE DEFENDANT: No.
[18] BY MR. STACKOW:
[19]    Q.    Miss Freeman, let me take you
[20] back to your grandson's birth. When young
[21] Johnathan was born, do you recall that date,
[22] actually, Miss Freeman?
[23]    A.    When John-John went in, when
[24] Ericka went into the hospital, we went in at
[25] 5:05 that morning. I think it was on a

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 178

[1]
[2] Tuesday or a Wednesday morning she went in.
[3] When she went in, she had the baby and
[4] everything. When after she had the baby, I
[5] told Ericka I was going to go home and get
[6] ready for work and when I get home from work
[7] I'll be back. She said okay, Mom. So I'm
[8] going down in one elevator. He's coming up in
[9] another elevator.
[10]    Q.    When you say he, who were you
[11] referring to?
[12]    A.    Mr. Johnathan Robins was coming
[13] up in the next elevator.
[14]    Q.    Did you actually see him in
[15] that elevator or you learned later that he
[16] was?
[17]    A.    No. I learned later that he
[18] was coming up.
[19]    THE DEFENDANT: Objection.
[20] That's hearsay.
[21]    THE WITNESS: He was coming up
[22] in the next elevator.
[23]    THE COURT: No. The objection
[24] is that you couldn't know that unless somebody
[25] else told you.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 179

[1]
[2]    THE WITNESS: Right.
[3]    THE COURT: Okay. Well, then
[4] the objection is sustained. That is hearsay.
[5] BY MR. STACKOW:
[6]    Q.    Without saying what was told to
[7] you, did you in fact have a conversation with
[8] somebody?
[9]    A.    Uh-huh.
[10]    Q.    At the hospital?
[11]    A.    No. At the hospital, I didn't
[12] have any conversations at the hospital at all.
[13] One of the midwives came to my house. They
[14] come out to, when you come home from the
[15] hospital with your baby, they come out to your
[16] house to do, to check on you and the baby.
[17]    Q.    And when was that? How long
[18] after John-John was born was that?
[19]    A.    Maybe about two to three weeks.
[20] No. Two or three days. Yeah, two or three
[21] days. They come out. They check on you and
[22] the baby. Because the midwife said that
[23] Ericka left the hospital so fast that she
[24] forgot her pump for her breasts to feed the
[25] baby. So she comes in. She says, Hi, Miss

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 180

[1]
[2] Freeman, how are you doing? I said I'm fine,
[3] how are you? And she says, I have some --
[4]    Q.    Let me stop you for a second
[5] because I don't want you to get into the
[6] conversation back and forth that you had with
[7] this midwife that came out to the house.
[8]    A.    Uh-huh.
[9]    Q.    But as a result of that
[10] conversation, Miss Freeman, did you speak to
[11] your daughter about the father of her child?
[12]    A.    Yes, I did.
[13]    Q.    And what did you learn during
[14] that conversation with your daughter?
[15]    A.    Well, for one thing, she told
[16] me that the baby's father was a younger boy.
[17] We met the young boy and we assumed that that
[18] was the baby's dad. Come to find out it
[19] wasn't the baby's dad. So she had lied to me
[20] and said that that was the baby's dad, and on
[21] down the line it wasn't. It was Johnathan
[22] Robins.
[23]    Q.    All right. The defendant in
[24] court here.
[25]    A.    Yes.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Page 181

[1]
[2]   Q.    Now, how long after you learned
[3] that was it that you had this encounter with
[4] the defendant in the McDonald's?
[5]   A.    I'd say about a month.
[6]   Q.    Now, up until that, well, at
[7] any point did you ever give the defendant
[8] permission to have your daughter live with
[9] him?
[10]  A.    No, I didn't.
[11]  Q.    Did you ever give him
[12] permission to take your daughter out of state?
[13]  A.    No, I didn't.
[14]  Q.    Did you ever give him or
[15] anybody permission to marry your daughter,
[16] Ericka Johnson?
[17]  A.    No, I didn't.
[18]  Q.    Miss Freeman, just a couple
[19] more questions.  Once you learned the identity
[20] of the father of your grandson John-John, did
[21] you call the police?
[22]  A.    Yes, I did.
[23]  Q.    And who did you first call?
[24]  A.    I called the Upper Darby Police
[25] Department.  They sent someone out to talk to

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 182

[1]
[2] me and asked me what was going on and I told
[3] them.  They said right now take it over to
[4] Philadelphia court, I mean Philadelphia police
[5] station, and have them, you know, do more
[6] investigation than that too.  So that's what I
[7] did.  And I didn't hear from them for a good
[8] long time so I figured maybe they probably
[9] went on and started investigating or doing
[10] what they would do, whatever.  But I haven't
[11] heard from them for a while.  It's been a
[12] while since I haven't heard from them.
[13]  Q.    Let me ask you then about
[14] February eleventh of last year.  Do you recall
[15] talking to your daughter on the telephone
[16] regarding the custody of your grandson?
[17]  A.    Repeat that again?
[18]  Q.    Yeah.  The question was,
[19] directing your attention to February eleventh
[20] of last year, 2009, do you recall talking to
[21] your daughter Ericka on the telephone about
[22] her trying to get, find out or find where her
[23] son was, your grandson was?
[24]  A.    Yes, I did.
[25]  Q.    Okay.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 183

[1]
[2]  A.    Yes, I did.
[3]  Q.    Now, did you go to the police
[4] that day as well?  Do you recall going to the
[5] police that day?
[6]  A.    No.  I didn't go to the police.
[7]  Q.    Do you recall talking with a
[8] police officer?
[9]  A.    Yes.  I recall calling them and
[10] they said that call over to the Philadelphia
[11] police and let them know what's going on.
[12] That's what they told me.
[13]  MR. STACKOW:  Your Honor, I'd
[14] like to have this document marked as
[15] Commonwealth Exhibit C-2.  Again, a copy was
[16] previously provided to defense.  I have an
[17] extra copy here.  Do you need an extra copy?
[18]  THE DEFENDANT:  Yes.  Thanks.
[19]  MR. STACKOW:  You're welcome.
[20]  COURT CRIER:  So marked.
[21] Commonwealth Exhibit C-2 and shown to the
[22] witness.
[23] BY MR. STACKOW:
[24]  Q.    Miss Freeman, just take a
[25] moment to look over the three pages of the

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 184

[1]
[2] document that I marked as Commonwealth exhibit
[3] C-2.  Do you recognize this document, Miss
[4] Freeman?
[5]  A.    No, I don't.
[6]  Q.    Okay.  Does your signature
[7] appear on that?
[8]  A.    Uh-huh.
[9]  Q.    Is that in fact your signature?
[10]  A.    Yes, that's it.
[11]  Q.    Okay.  And what's the date and
[12] the time of that signature on there?
[13]  A.    The time is 12:14, 2/11/09.
[14]  Q.    Do you recall going to a police
[15] office at Front and Lehigh Streets in the City
[16] of Philadelphia on that day?
[17]  A.    Yes.  Yes.
[18]  Q.    Is that where that statement
[19] took place, as you recall, ma'am?
[20]  A.    Yes.
[21]  Q.    Now, let me ask you about
[22] the — and I'm not going to ask you any more
[23] questions about that document.  You can put it
[24] to the side if you'd like, Miss Freeman.  My
[25] questions are, was there a time after

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Page 185

[1]
[2] John-John your grandson was born that he and
[3] his mother, your daughter Ericka, did not live
[4] with you?
[5]     A.    Yes. It was, oh, about I think
[6] two months.
[7]     Q.    What was it that led to Ericka
[8] and her child not living in your home? Why
[9] was that?
[10]    A.    Well, Ericka Johnson told me
[11] she was a fully grown woman, she's married
[12] now, that she said she didn't want to live
[13] here no more. I said, Really? She said yeah.
[14] I said, Why you don't want to live here and
[15] you still a minor? Oh, John-John's dad said
[16] I'm a fully grown woman, I'm his wife. So
[17] after that, I just walked away.
[18]    Q.    How long was your daughter
[19] living outside of your home then? For how
[20] long? You know, how many months or weeks or
[21] days?
[22]    A.    Well, when? Before she met him
[23] or?
[24]    Q.    No. After you had that
[25] conversation with her, did she move out after
Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 186

[1]
[2] that conversation?
[3]    A.    Yeah.
[4]    Q.    Yeah. And how long did she
[5] move out for?
[6]    A.    She was gone for about a good,
[7] a good three months.
[8]    Q.    Did she come back to live with
[9] you after those three months?
[10]    A.    She came back because she said,
[11] she came back and she said, Mom, she can't
[12] deal with it because the baby was a infant and
[13] she said that --
[14]        THE DEFENDANT:  Objection.
[15]        THE COURT:  The basis?
[16]        THE DEFENDANT:  This is
[17] hearsay.
[18]        THE COURT:  No, overruled.
[19] BY MR. STACKOW:
[20]    Q.    You can go ahead, Miss Freeman.
[21] What did your daughter say when she came back
[22] home?
[23]    A.    She said, Mom, I can't take it
[24] any more. She said that it was hot, it was a
[25] hot day. And she said John-John's dad went
Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 187

[1]
[2] down in the basement and turned the
[3] electricity off. So when he turned the
[4] electricity off, he turned the air off too.
[5] So that's a baby. And I said, Well, pack your
[6] things up and come on back home.
[7]        When she got home she was
[8] crying. I said, Ericka, did he put his hands
[9] on you? Ericka looked at me and she just
[10] walked away. I said, Ericka, come here. I
[11] said, Did he put his hands on you? And she
[12] wanted to tell me something right then and
[13] there and after that she just said, Mom, I
[14] can't deal with it any more, I just can't take
[15] it any more.
[16]    Q.    And has Ericka lived with you
[17] ever since that time?
[18]    A.    Yes, she has.
[19]    Q.    Has your grandson John-John
[20] lived with you ever since that time?
[21]    A.    Yes, he has.
[22]    Q.    Now, if you know, Miss Freeman,
[23] has the defendant had visitation or times
[24] where he would see your grandson?
[25]    A.    He would come out when Ericka
Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 188

[1]        Lucille Freeman - cross
[2] was going to school. He would come out, pick
[3] up John-John and take him I guess back to his
[4] house or wherever he takes him at in the
[5] morning. And then when Ericka get out of
[6] school, he meets Ericka up Sixty-Ninth Street
[7] to pick the baby up.
[8]    Q.    And for how long did that go on
[9] for? How long? How much time?
[10]    A.    I guess until she got tired of
[11] his nonsense, whatever he was doing to her.
[12]    Q.    Since the time that you went to
[13] the police department on February eleventh,
[14] 2009, has the defendant had any visitations or
[15] custody with your grandson?
[16]    A.    Not that I know of.
[17]        MR. STACKOW:  Thank you very
[18] much, Miss Freeman. That's all the questions
[19] I have of this witness, Your Honor.
[20]        THE COURT:  Do you have any
[21] questions?
[22]        THE DEFENDANT:  Yes, sir.
[23]        CROSS EXAMINATION
[24] BY THE DEFENDANT:
[25]    Q.    Okay. You said Ericka would go
Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 189

[1]        Lucille Freeman - cross
[2] to school at the time before she met me.
[3] That's what you had said before.  When did
[4] Ericka stop going to school?
[5]        A.        Ericka stopped going to school
[6] when you were stalking her.
[7]        Q.        No, no.
[8]        THE DEFENDANT:  Objection.
[9]        THE COURT:  What's the basis?
[10]        THE DEFENDANT:  Because she's
[11] saying I was stalking her.
[12]        THE COURT:  Objection is
[13] overruled.  You were saying that Ericka went
[14] to school until he started stalking her?
[15]        THE WITNESS:  Yes.
[16]        THE COURT:  Are you able to
[17] give some date for that or?  Or what do you
[18] mean by stalking her?
[19]        THE WITNESS:  The principal
[20] would call me and she said, Miss Freeman, --
[21]        THE COURT:  Well, you can't
[22] tell us what the principal said to you.
[23]        THE WITNESS:  Okay.  Well, he
[24] was stalking her in the morning and in the
[25] evening when she gets out of school.  And she

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 190

[1]        Lucille Freeman - cross
[2] says she can't take it any more, why is he
[3] doing that?  And I said I don't know about
[4] that.
[5] BY THE DEFENDANT:
[6]        Q.        What time frame was this
[7] supposed to be?  Around when?
[8]        A.        From Monday through Friday,
[9] every day.
[10]        Q.        Well, what year, month?
[11]        A.        The time after she didn't have
[12] the baby.  That was when she went back to
[13] school.  So it had to be when she had, after
[14] she had the baby.  That was around what?  In
[15] '08.
[16]        Q.        And Ericka said that I was
[17] stalking her.
[18]        A.        Ericka said it and the
[19] principal said it.
[20]        Q.        Well, you can't say what the
[21] principal said.  So after the baby was born,
[22] you're saying in August of '08 I was stalking
[23] her.  That's what she told you.
[24]        A.        That's what she told me, yes.
[25]        Q.        Okay.  So did she give any

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 191

[1]        Lucille Freeman - cross
[2] specific days or times?  You say, okay, so in
[3] August of '08 she was going to school and I
[4] was stalking her.
[5]        A.        Yes.
[6]        Q.        August is summer.  There's no
[7] school.
[8]        A.        I didn't say August.  I didn't
[9] say August.  I said the time she was going to
[10] school.  You only go to school, you only go to
[11] school from January to September, from
[12] January, I mean from September till June.
[13] Okay?
[14]        Q.        Okay.  So the question I had
[15] asked is, when did Ericka?  Before she had the
[16] child, was she going to school?
[17]        A.        Yes, she was going to school.
[18]        Q.        Then why?  What year and month
[19] did you get a fine for her not going to
[20] school?
[21]        A.        I got a fine for her for, as a
[22] matter of fact, it was for her maternity
[23] leave.
[24]        Q.        So the school never tried to
[25] fine you before she was pregnant for her not

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 192

[1]        Lucille Freeman - cross
[2] going to school.
[3]        A.        No.  They did not notify me at
[4] all.
[5]        MR. STACKOW:  Objection.
[6]        THE DEFENDANT:  The relevancy
[7] of the question is if mistake in age --
[8]        MR. STACKOW:  Objection to the
[9] statement.
[10]        THE COURT:  Yeah, there's no
[11] statements.  At the conclusion of the case
[12] you'll be able to address the jury and to
[13] explain to the jury whatever relevancy you
[14] think any of this has.  But for now it's just
[15] a matter of you asking questions.
[16]        THE DEFENDANT:  Okay.
[17] BY THE DEFENDANT:
[18]        Q.        So before, you say before
[19] January of 2008, you knew nothing of me at
[20] all.
[21]        A.        No.
[22]        Q.        So when she was, when did you
[23] know she was pregnant?
[24]        A.        When I knew Ericka Johnson was
[25] pregnant is when my daughter said, Mom, look

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

---

Page 193

[1]       Lucille Freeman - cross
[2] at Ericka's stomach.  And I said maybe she
[3] just gaining a little weight.  And my daughter
[4] said no, Mom, look at Ericka's navel, it's
[5] popped out.
[6]     Q.     Around what month was this?
[7]     A.     That was around, probably
[8] around May or June, one of those months.
[9]     Q.     And at that point in time did
[10] you inquire of who the father was?
[11]     A.     At that time, like I said, she
[12] told me it was that eighteen-year-old boy that
[13] we had met.  She didn't say nothing about no
[14] older guy.  She said it was the young boy she
[15] was involved with that she had brung out to
[16] the house to meet us.  That was it.
[17]     Q.     So she basically lied to you
[18] about who the baby's father was.
[19]     A.     Yes, she did.
[20]     Q.     And did she lie to you about
[21] the pregnancy until a certain point?
[22]     A.     No, she did not lie to me.  She
[23] didn't tell me she was pregnant.
[24]     Q.     Did you notice at times when
[25] she might have gone shopping and had clothes

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

Page 194

[1]       Lucille Freeman - cross
[2] and had a cell phone in 2007?
[3]     A.     Yeah.  I knew she had a cell
[4] phone.  I knew she had clothes and going
[5] shopping.  Like I said again, the
[6] eighteen-year-old boy she was with.  And I'm
[7] thinking that he's the one that was buying her
[8] the things that she was getting.
[9]     Q.     Did you try to find out who the
[10] phone actually belonged to?  I mean, you never
[11] attempted to find out who the cell phone?
[12]     A.     No, I didn't, because it's just
[13] a cell phone.
[14]     Q.     Did you think it was your
[15] daughter's or someone else's?
[16]     A.     No.  It was my daughter's.
[17]     Q.     Did she get a bill for it?
[18]     A.     No.  I did not see a bill.
[19]     Q.     So if you didn't see a bill,
[20] don't you think maybe somebody else gave it to
[21] her?
[22]     MR. STACKOW:  Objection.
[23]     THE COURT:  Overruled.
[24]     THE WITNESS:  Well, like I said
[25] again, the boy she was involved with probably

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

Page 195

[1]       Lucille Freeman - cross
[2] gave her the phone or paid for the phone or
[3] however it went.  And, no, I was not trying to
[4] ask all kinds of questions about no cell
[5] phone.
[6] BY THE DEFENDANT:
[7]     Q.     Okay.  You claim that and your
[8] daughter was pregnant in, you noticed in May
[9] or June she was pregnant and her birth date is
[10] July.  So she was fourteen when she got
[11] pregnant, correct?
[12]     A.     Yeah.  I think so, yeah.
[13]     Q.     And you said that you thought
[14] the father was an eighteen-year-old person.
[15]     A.     Yes.
[16]     Q.     Did you pursue any remedies
[17] about that?
[18]     A.     No.
[19]     Q.     Okay.  When Ericka came and
[20] picked up her stuff somewhere in early 2008,
[21] she came with a U-Haul van.
[22]     A.     Yes, she did.
[23]     Q.     Did you say anything to the
[24] person that was with her?  Did you ask the
[25] person any questions?

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

Page 196

[1]       Lucille Freeman - cross
[2]     A.     I asked Ericka, Who was the
[3] girl that came here to pick your things up?
[4] She said it's one of Johnathan's relatives
[5] that came and picked her things up.  I said,
[6] Oh, yeah?  And I asked her, I said, Well,
[7] where is he at?  And she said, He's home with
[8] the baby.  I said, Oh, okay.  After that, she
[9] got all her things up.  I closed my door up
[10] and I locked it, and that was it.
[11]     Q.     Did you ask the young lady that
[12] was with Ericka did you know how old Ericka
[13] was?
[14]     A.     No, I didn't.
[15]     THE DEFENDANT:  May I just have
[16] a moment for a second, Your Honor, to get
[17] myself together?
[18] BY THE DEFENDANT:
[19]     Q.     Here's a question.  When on
[20] February eleventh, 2009, at the time that I
[21] was arrested and you had to go make out this
[22] statement, did you or Ericka call me before
[23] the police were called out?
[24]     A.     Ericka might have called you.
[25]     Q.     But you never called me?

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

---

Page 197

Lucille Freeman - cross

[1]
[2] A.    Call you for what?
[3] Q.    I'm just asking.
[4] A.    Call you for what?
[5] Q.    I'm just asking.
[6] A.    No.
[7] Q.    Okay.  So another question.
[8] When around January first of 2008, did you
[9] refuse to give Ericka her child back?
[10] A.    Yes, I did refuse to give her
[11] baby to her.
[12]        THE COURT:  I'm sorry.  That
[13] date was what?  January first, 2000 --
[14]        THE DEFENDANT:  2008.  Well,
[15] 2009.  My fault.  Wrong.
[16]        THE COURT:  So when the baby
[17] was about a year old, less than a year old.
[18]        THE WITNESS:  Yes.  When Ericka
[19] had came home, she was out with other people
[20] and it was below zero outside.  The baby was
[21] already sick.  I told Ericka she was not
[22] taking that baby back out in the air again.
[23] Ericka put up a fight.  First thing she did
[24] was get mad, call Johnathan Robins to come out
[25] to take the baby.  I said he's not coming to

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

Page 198

Lucille Freeman - cross

[1]
[2] my house to take anybody out because the baby
[3] is sick.  So Ericka gets mad even more.  She
[4] calls the police.  I say you can call the
[5] police all you want.
[6]        So the police came, knocked on
[7] the door.  I let them in and I explained to
[8] the police what was going on, and I told them
[9] the baby's already sick with a cold and he's
[10] not going to go back out there and it's below
[11] zero out there.  So they told me, Well, you
[12] got to listen to what your mom says.  Whatever
[13] mom say goes, because it is cold out there.
[14] They did not have a car seat for him.  They
[15] did not have a car for him.  Okay?  They were
[16] walking with this baby to take him back up to
[17] Philly.  And then that's when the police told
[18] them to go home
[19] BY THE DEFENDANT:
[20] Q.    So when the police were called,
[21] Ericka called me and I knew the police were
[22] there.  Well, I came there with the police
[23] there.  Did I run or deny who I was?
[24] A.    Say that again?
[25] Q.    With the police there at your

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

Page 199

Lucille Freeman - cross

[1]
[2] house on January first, 2009, did I deny who I
[3] was?  Did I tell them who I was?  Or what did
[4] I say, to your knowledge?  Who did I represent
[5] myself to them as?
[6] A.    I don't know what you
[7] represented to them because I was in the
[8] house.  You was outside talking to the police.
[9] So I didn't know what you was saying to the
[10] police.  I was inside.
[11] Q.    Okay.  Is there any other time
[12] the police were called to your house when I
[13] was outside your house?
[14] A.    Yes.  They were there because I
[15] called them.  It was another time.  He came
[16] out early in the morning, seven o'clock in the
[17] morning, to get the baby.  It was raining and
[18] it was still cold again.  Okay?  Another time.
[19] He's not going out because he's still sick
[20] again.  Mind you, he was born with asthma.
[21] Not asthma.  Oh, God.  I can't even get it
[22] out.  Pneumonia.  He was born with pneumonia.
[23] And he was still congested and everything.  So
[24] I told Ericka to go tell Mr. Robins to go
[25] home, come back tomorrow to get him.  He

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

Page 200

Lucille Freeman - cross

[1]
[2] refused to leave.  He stayed out there for
[3] about over two, three hours or whatever.
[4] I called the police.  The
[5] police came out.  I told the police that he
[6] wasn't getting him today, come back tomorrow
[7] to get him.  Like he said, the cop told him
[8] you don't have a car, you don't have a car
[9] seat to take the baby with you.  So like the
[10] mom said, you're not taking the baby at all
[11] today.
[12]        So the police told him to go
[13] home.  He refused to leave.  And then he
[14] started saying some things to the police
[15] officer and the police officer say, I don't
[16] care, just go home.  If she doesn't give you
[17] the baby tomorrow, then you call the police
[18] back.  And after that, that was it.
[19] Q.    So do you know how often I or
[20] Ericka took care of the baby?
[21] A.    (No response.)
[22] Q.    Since the baby was born, who
[23] was taking care of the baby?
[24] A.    To be honest, I look at it that
[25] Ericka was taking care of that baby.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

Page 201

Lucille Freeman - cross

[2] Q. Okay. You said Ericka was
[3] taking care of him. So when I was going back
[4] and forth picking him up, I wasn't taking care
[5] of him or?
[6] A. You were just picking him up
[7] while she goes to school.
[8] Q. And who filed for welfare for
[9] the child?
[10] A. I filed for welfare for the
[11] baby.
[12] Q. And when was that?
[13] A. I think it was in '09.
[14] Q. Did you file welfare for the
[15] baby earlier than that?
[16] A. No.. I filed for it when she
[17] said she need medical assistance, the baby
[18] needs his shot records and stuff. She did not
[19] have no kind of insurance for the baby. Okay?
[20] And then she said the money that Mr. Robins
[21] said he was going to give her to take care of
[22] the baby, she didn't see any of that money.
[23] Q. So what exact date did you
[24] file? Well, what month, what year? That's
[25] fine.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 202

Lucille Freeman - cross

[2] A. I don't recall what month that
[3] I did it, but I know I did it.
[4] Q. You didn't file twice? You
[5] only filed once?
[6] A. It only take one time to file
[7] for public assistance for a baby.
[8] Q. And for having a child on
[9] public assistance, do you get extra things
[10] like housing allowance because you have a baby
[11] on the housing allowance?
[12] A. I don't know about all that.
[13] All I know is I applied for assistance for her
[14] and her baby.
[15] Q. And did you when you filed, did
[16] you mention at all any type of care that I
[17] might be caring for the baby at all?
[18] A. At that time, I didn't care if
[19] you did or you didn't.
[20] Q. So how long have you been on
[21] public assistance?
[22] A. I'm not on assistance. My
[23] daughters are on assistance.
[24] Q. So when Ericka left the house
[25] with the U-Haul van, did you come looking for

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 203

Lucille Freeman - cross

[2] her?
[3] A. Yes, I did.
[4] Q. What month, what year?
[5] A. I don't know what month. But
[6] me and my aunt had came up there to find where
[7] you lived at. We got lost finding where you
[8] lived at, Mr. Robins lives at. And they told
[9] us to go on to a different street. So we went
[10] on a different street. We got lost. We
[11] circled back around. We came back around.
[12] And then we found Mr. Robins' house. We went
[13] there. We knocked on Mr. Robins' door. We
[14] kicked his door. We pound on Mr. Robins'
[15] door. We told Mr. Robins, You know you got a
[16] minor living up in that house, you know you
[17] are doing something that you don't have no
[18] business doing to this child. Okay? We
[19] didn't hear anything else. But the neighbor
[20] came out. The neighbor says, He's up in
[21] there, we just seen him go up in there with
[22] the baby. I said, Oh, really? And the
[23] neighbor said yes.
[24] So we sit outside for over two
[25] and a half hours. We called the police. It

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 204

Lucille Freeman - cross

[2] took the police, what? Two and a half hours
[3] just to get up there to see us to see what was
[4] going on, what was the problem. We still
[5] waited and waited and waited. Then the police
[6] came. When they finally came, I told the
[7] police what was going on and everything. The
[8] police officer said, Well, you got to take it
[9] down to the courthouse. So we took it down
[10] there. No, to the police station. We went
[11] down there. We put the complaint in. And
[12] then they said after that they couldn't do
[13] anything else. So after we went from there,
[14] then we went back on home.
[15] Q. Question. From the time that
[16] you allowed Ericka to leave to the time that
[17] you went looking for her, why? What changed
[18] your mind to make you go looking for her?
[19] A. Well, for one thing, the things
[20] that she said to me, and I look at it this
[21] way. Ericka shouldn't be living with no grown
[22] man with no baby at all.
[23] Q. So what things did Ericka say
[24] to you that changed your mind to have you from
[25] the time that you let her leave?

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 205

[1]        Lucille Freeman - cross
[2]    A:    She told me that she don't know
[3] how to be a wife.  This is her first baby.
[4] She doesn't know how to really take care of a
[5] baby.  She said he want things from her that
[6] she doesn't even know how to do.  And I'm
[7] asking her, Well, what is the things that he
[8] wants you to do?  And then after that, she
[9] turns her head and then she walks away.  And
[10] that was it.
[11]    Q.    What?  So you had a
[12] conversation, not a telephone call but a
[13] conversation with her about this that changed
[14] your mind to make you come looking for her?
[15]    A.    I told her when she called me.
[16] She called me on the phone.
[17]    Q.    So she called you on the phone.
[18]    A.    Yes, she called me on the
[19] phone.
[20]    Q.    And that conversation that you
[21] just told us about was a phone conversation,
[22] right?
[23]    MR. STACKOW:  Objection to
[24] cutting the witness off.
[25]    THE COURT:  No, overruled.
               Carl G. Sokolski
            Official Court Reporter
               (215) 683-8060

Page 206

[1]        Lucille Freeman - cross
[2] Were you describing a telephone conversation
[3] when you said she just turned and walked away?
[4]    THE WITNESS:  No.  We were
[5] together.  We did have conversations on the
[6] phone talking and then she comes and she talks
[7] to me.  The time that she's not with him, she
[8] does come and talk to me about different
[9] things about him.
[10]    THE COURT:  But the original
[11] question was, what did Ericka tell you that
[12] changed your mind and caused you to go to his
[13] house to try to change the situation?
[14]    THE WITNESS:  Like I said, she
[15] told me that she said she don't know how to be
[16] a wife to this man.  He wants things done and
[17] she doesn't know how to do it.  And that was
[18] it.
[19] BY THE DEFENDANT:
[20]    Q.    What things specifically?  Did
[21] she say?
[22]    A.    She turned her face to me and
[23] walked away.  She didn't tell me everything.
[24]    Q.    So just some vague.  So she
[25] never explained those things.
               Carl G. Sokolski
            Official Court Reporter
               (215) 683-8060

Page 207

[1]        Lucille Freeman - cross
[2]    A.    No, she didn't.
[3]    Q.    Is the reason you came up
[4] there, was it actually looking for the child
[5] because Ericka and I had called Welfare and
[6] told them to get our son off of your check?
[7] Is that the reason why you came up there?
[8]    A.    No, it was not the reason at
[9] all.
[10]    Q.    So you said that Ericka and I
[11] was living together for what?
[12]    A.    It had to be for like three
[13] months.
[14]    Q.    Three months in what?  2008?
[15]    A.    It had to be somewhere around
[16] there.
[17]    Q.    And was the check cut off for
[18] him while she was with me in 2008?
[19]    MR. STACKOW:  Objection.
[20]    THE COURT:  Well, overruled.
[21] At any time was the welfare check for the baby
[22] cut off?
[23]    THE WITNESS:  No, it wasn't.
[24] It was still on.
[25] BY THE DEFENDANT:
               Carl G. Sokolski
            Official Court Reporter
               (215) 683-8060

Page 208

[1]        Lucille Freeman - cross
[2]    Q.    Okay.  So when the welfare
[3] worker comes in here, you said that you first
[4] filed for my son in 2009; is that correct?
[5]    A.    I said I filed for, probably
[6] applied for the baby in '08.  I just got her
[7] turned off in '09 because she asked me, Mom,
[8] can you take me off of public assistance?  And
[9] I said, Are you sure you want to do that?  She
[10] said yes.
[11]    Q.    I thought you said 2009 when
[12] you first.  So when in 2008 do you say now
[13] that you had the check turned on?
[14]    A.    She asked me to put her on, it
[15] had to be in March or April.
[16]    THE COURT:  So it's after the
[17] baby was born?  Was it after the baby was
[18] born?
[19]    THE WITNESS:  Yes.
[20] BY THE DEFENDANT:
[21]    Q.    And you were receiving the
[22] check, correct?  In your name.
[23]    A.    Yes, because she's still
[24] underage to get any kind of assistance.  She
[25] has to be eighteen to get her own assistance.
               Carl G. Sokolski
            Official Court Reporter
               (215) 683-8060

51CR00034302009
Johnathan Robins

Page 209

[1]        Lucille Freeman - cross
[2]    Q.    And so for, like you said,
[3] three to four months myself, my wife and my
[4] child were living with me but you were
[5] collecting the check.
[6]    A.    I was getting the check and
[7] Ericka would come to me, ask me, Mom, when do
[8] I get my little digits?  And I would tell her.
[9] She would come down and pick it up.  And after
[10] that she'll tell me the baby needs diapers,
[11] the baby needs wipes or the baby needs some
[12] onesies, T-shirts.  I would give Ericka her
[13] money so she could go and do whatever she had
[14] to do for her baby.
[15]    Q.    Okay.  Do you know who was
[16] taking the baby to the hospital when he was
[17] first born, to the clinic when he was first
[18] born?
[19]    A.    I guess you was.
[20]    Q.    But I wasn't on any paperwork
[21] for the child as far as taking care of him,
[22] correct?
[23]    A.    I don't know.  I really don't
[24] know.
[25]    Q.    Well, you filled out the
              Carl G. Sokolski
           Official Court Reporter
             (215) 683-8060

Page 210

[1]        Lucille Freeman - cross
[2] paperwork.
[3]    A.    What paperwork?
[4]    Q.    The paperwork to apply for
[5] welfare.  Right?
[6]    A.    Yeah.
[7]    Q.    Okay.  Did you put down when
[8] Ericka, when you put Ericka on welfare, did
[9] you put down the fact that she was married on
[10] the application?
[11]    A.    No, I didn't.
[12]    Q.    Did she tell you that she was
[13] married?
[14]    A.    Yeah, she told me she was
[15] married.
[16]    Q.    When you first filed the
[17] application?
[18]    A.    She been told me she was
[19] married way before I went to the public
[20] assistance office to put in for assistance for
[21] her.
[22]    Q.    So, okay.  So how long were we
[23] married before you found out we were married?
[24]    THE COURT:  Well, that actually
[25] assumes a fact that's not in evidence.  So
              Carl G. Sokolski
           Official Court Reporter
             (215) 683-8060

Page 211

[1]        Lucille Freeman - cross
[2] far, we've heard that you have to be eighteen
[3] in Missouri to get married, that Ericka was
[4] not eighteen, that she had a phony ID.  So
[5] there is a question open as to whether you
[6] were ever married.  From what we've heard in
[7] this case so far, you were never married.  So
[8] you can't ask her a question that assumes a
[9] fact that's not in evidence.
[10]        You could rephrase the
[11] question, you know, related to when did you go
[12] to Missouri, when did you come back from
[13] Missouri, when did you go through a phony
[14] ceremony or however you want to characterize
[15] it.  But you can't ask her a question that
[16] assumes that you and Ericka were ever married
[17] because there's no evidence that you ever
[18] were.
[19]        THE DEFENDANT:  Can I present
[20] evidence, the law?  Do I have to?  The law
[21] about marriage.  Do I present it now or do I
[22] got to wait?  Okay.  I'll wait.
[23] BY THE DEFENDANT:
[24]    Q.    So from January 2008, at what
[25] point in time did you learn that supposedly we
              Carl G. Sokolski
           Official Court Reporter
             (215) 683-8060

Page 212

[1]        Lucille Freeman - cross
[2] had a ceremony for marriage?
[3]    A.    Repeat that again.
[4]    Q.    Okay.  At what point in time
[5] did you learn that we went to Missouri to get
[6] married?
[7]    A.    I didn't even know you had
[8] left, neither one of you all had left to go do
[9] anything.
[10]    Q.    At what point in time did you
[11] know this?
[12]    A.    Like I said, I did not know.
[13]    Q.    At what point in time did you
[14] find out?
[15]    A.    When I found out, when my
[16] daughter and them had went on it's a thing
[17] called MySpace and Ericka is all over MySpace.
[18] My daughter said, Mom, you need to look at
[19] this, look at Ericka, she's all on the beach
[20] and everything.  Then she says on vacation.
[21] On her MySpace page says on vacation.  And
[22] then when I did catch up with Ericka when she
[23] did come back home, I said, Where was you at?
[24] She said, Oh, I was on the beach.  What beach?
[25] She said, Mom, it's just a regular beach.  I
              Carl G. Sokolski
           Official Court Reporter
             (215) 683-8060

Page 213

[1]      Lucille Freeman - cross
[2] said, Oh, okay.  And after that I left it
[3] alone.
[4]     Q.     But the question is, when did
[5] you find out Ericka and I had went to Missouri
[6] to get married?
[7]     A.     I didn't find that out until,
[8] like I said, when Ericka came home.  That was
[9] like maybe two weeks later after she done came
[10] home.
[11]     Q.     Came home from where?  What
[12] month?  What month?  What year?  Around about.
[13]     A.     I don't know what month it was.
[14]     Q.     Late 2008?  Early 2009?
[15]     A.     It had to be in '08.
[16]     Q.     Late 2008?
[17]     A.     '08, '09, whatever.  You all
[18] went off and did this.  You all went off and
[19] snuck off and did this and you know you wasn't
[20] supposed to go do nothing like that.
[21]     Q.     All I'm asking is when --
[22]     THE COURT:  The answer to the
[23] question is she doesn't know.
[24]     THE DEFENDANT:  She doesn't
[25] know.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 214

[1]      Lucille Freeman - cross
[2]     THE COURT:  And that's her
[3] answer.   I'm not even sure you're talking
[4] about the same thing, unless there's a beach
[5] in Missouri.
[6]     THE DEFENDANT:  Yeah, I know
[7] that.  So the question about Missouri, I got
[8] to think the same thing.  So the answer to
[9] Missouri would not come up with beaches.  The
[10] reason that I was asking the question is
[11] because she said that --
[12]     MR. STACKOW:  Objection.
[13]     THE COURT:  The objection is
[14] sustained.
[15] BY THE DEFENDANT:
[16]     Q.     Well, earlier, did you not say
[17] that you put down that she was married on the
[18] application?  Did you put down that she was
[19] married on the application or supposedly
[20] married on the application?
[21]     A.     No, I did not put down nothing
[22] like that.
[23]     Q.     Okay.  Did you know that I had
[24] filed for custody of my son?
[25]     A.     Yeah, I knew.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 215

[1]      Lucille Freeman - cross
[2]     Q.     How did you find out?
[3]     A.     Ericka told me.
[4]     Q.     And what did she have to say
[5] about it?
[6]     A.     She said --
[7]     MR. STACKOW:  Objection.
[8]     THE COURT:  Well, overruled.
[9] Ericka told you that this man filed for
[10] custody of John-John.
[11]     THE WITNESS:  Uh-huh.
[12]     THE COURT:  Okay.
[13] BY THE DEFENDANT:
[14]     Q.     And if I had won custody, would
[15] that have stopped his check going to you or
[16] Ericka?
[17]     MR. STACKOW:  Objection.
[18]     THE COURT:  Well, overruled.
[19] If she knows.
[20]     THE WITNESS:  Repeat that
[21] again.
[22] BY THE DEFENDANT:
[23]     Q.     If I had won custody of my son,
[24] would that have stopped welfare from going to
[25] you or Ericka?

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 216

[1]      Lucille Freeman - cross
[2]     A.     Yeah, it would have stopped it.
[3]     Q.     So, okay.  Did Ericka act
[4] concerned about me getting custody of my son?
[5]     A.     Yeah.
[6]     Q.     Do you know there was a time
[7] where some hair -- I forget the name of this
[8] hair company place, Dynamite something or
[9] whatever.
[10]     A.     It's called Dynamite Braids,
[11] yes.
[12]     Q.     This lady came to your house.
[13] Did you have to tell her what age Ericka was?
[14]     A.     No, I didn't.
[15]     Q.     Okay.  Do you know if Ericka
[16] ever lied to her about her age to Dynamite
[17] Braids?
[18]     A.     I don't know if she did or she
[19] didn't, but the lady never asked me how old
[20] was Ericka to do hair.
[21]     Q.     Did you ever offer to tell her
[22] how old she was?
[23]     A.     No, I didn't offer to tell her
[24] because she didn't ask.  She was looking for a
[25] hairstylist that does good hair to help her

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009                                                    Trial (Jury) Volume 3
Johnathan Robins                                                    March 11, 2010

Page 217

[1]        Lucille Freeman - cross
[2] company out, and she seen what kind of styles
[3] that Ericka can bring for her and she told
[4] Ericka welcome aboard, you got the job.
[5]    Q.    Well, don't you think, so did
[6] you have to sign any papers or anything?
[7]    A.    No, I didn't.
[8]    Q.    Okay. Do you know if she ever
[9] lied about her age to get any jobs?
[10]   A.    Well, like I said, if she did,
[11] she wasn't with me to lie to get a job.
[12]   Q.    Do you know if she lied about
[13] her age when she was dating anyone or she
[14] tried to date anyone?
[15]   A.    Yeah. She did lie about one
[16] particular time. At one time she did tell
[17] somebody she was a certain age and then when
[18] the boy came back and told me that Ericka said
[19] she was, I said no, she was not, she's not.
[20] So she did lie about her age.
[21]   Q.    You said you looked at her
[22] MySpace page. You say she's on MySpace
[23] extensively sometimes?
[24]   A.    I looked at that MySpace page
[25] one time when my daughter said, Mom, can you

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 218

[1] look at the page? Look at her, look on the
[2] MySpace page so you can see where Ericka's at.
[3] She's on the beach. That's it. I don't look
[4] at MySpace page, things like that.
[5]        THE DEFENDANT: I'm done with
[6] this witness.
[7]        THE COURT: Any redirect?
[8]        THE WITNESS: Excuse me. Can I
[9] say something?
[10]        THE COURT: No. You just have
[11] to wait one second.
[12]        MR. STACKOW: No. I don't have
[13] any redirect. Thank you.
[14]        THE COURT: You're excused.
[15] You can step down.
[16]        (Witness excused.)
[17]        THE COURT: Do you have another
[18] witness?
[19]        MR. STACKOW: I do. I was
[20] going to ask for a five minute recess before
[21] calling that witness. I think we can finish
[22] that witness certainly before quarter after
[23] four or twenty after four.
[24]        THE COURT: All right. Mr.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 219

[1] Stackow is now making reckless predictions
[2] about how long witnesses will take. But on
[3] the outside chance that he's right, we'll take
[4] a five minute recess. You can get out of the
[5] box and we'll see you in about five minutes or
[6] so.
[7]        MR. STACKOW: Thank you.
[8]        COURT CRIER: Everyone remain
[9] seated while the jury leaves the room.
[10]        (Jury excused.)
[11]        THE COURT: And this would be
[12] your last witness?
[13]        MR. STACKOW: Yes, likely the
[14] last witness for the case, not just the day.
[15]        THE COURT: For the case,
[16] right.
[17]        MR. STACKOW: Yes. I may ask
[18] not to rest formally today.
[19]        THE COURT: Why?
[20]        MR. STACKOW: Because there's
[21] another police officer that isn't here this
[22] afternoon that I just wanted to talk to
[23] briefly before deciding whether to call him or
[24] not.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 220

[1]        THE COURT: Well, he has his
[2] witness here and I'd like to if we have time
[3] get started with his witness.
[4]        MR. STACKOW: Let me see if I
[5] can clear things up with the other officer.
[6] I'd also like to use the restroom. That was
[7] the main reason. If I may.
[8]        THE COURT: All right.
[9]        MR. STACKOW: Thank you. I'm
[10] going to hustle.
[11]        (A brief recess was taken.)
[12]        COURT CRIER: Court is back in
[13] session.
[14]        THE COURT: Do you think the
[15] jury is ready to come back in?
[16]        COURT CRIER: Anthony is in
[17] with them now, Your Honor.
[18]        THE COURT: Do you have your
[19] witness?
[20]        MR. STACKOW: I do, Your Honor.
[21] He's in the back.
[22]        COURT CRIER: May I, Your
[23] Honor?
[24]        THE COURT: Yes.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 221

[1]     Officer Mort - direct
[2]     COURT CRIER: Please remain
[3] seated as the jury enters the courtroom.
[4]     (Jury summoned.)
[5]     COURT CRIER: All present, Your
[6] Honor.
[7]     THE COURT: Mr. Stackow?
[8]     MR. STACKOW: Thank you, Your
[9] Honor. The Commonwealth's next witness is
[10] Police Officer Brian Mort.
[11]     COURT CRIER: Please state your
[12] name, your assignment, your badge number.
[13] Spell your last name for the record.
[14]     THE WITNESS: Brian Mort.
[15] M-O-R-T. Badge number 4632, currently
[16] assigned Twenty-Fifth District.
[17]     OFFICER BRIAN MORT, after
[18] having been duly sworn, was examined and
[19] testified as follows. . .
[20]     COURT CRIER: Have a seat and
[21] speak into the mike so everybody can hear you.
[22]     MR. STACKOW: May I begin, Your
[23] Honor?
[24]     THE COURT: Yes.
[25]     MR. STACKOW: Thank you.
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 222

[1]     Officer Mort - direct
[2]     DIRECT EXAMINATION
[3] BY MR. STACKOW:
[4]     Q.    Good afternoon, Officer.
[5]     A.    Good afternoon.
[6]     Q.    Can you tell the ladies and
[7] gentlemen of the jury how long you've been a
[8] Philadelphia police officer?
[9]     A.    Currently about two and a half
[10] years.
[11]     Q.    Have you been assigned to the
[12] Twenty-Fifth District that entire time?
[13]     A.    That's correct.
[14]     Q.    Where in the city, generally
[15] speaking, is the Twenty-Fifth District?
[16]     A.    It's bordered by Broad to G
[17] Street and Lehigh up to Roosevelt Boulevard.
[18]     Q.    Let me direct your attention to
[19] February eleventh of last year, 2009, at
[20] approximately ten o'clock in the morning.
[21] Were you working as a officer assigned to the
[22] Twenty-Fifth District at that time?
[23]     A.    That's correct.
[24]     Q.    Were you by yourself or with a
[25] partner?
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 223

[1]     Officer Mort - direct
[2]     A.    I was with a partner, Officer
[3] Boone. His badge number is 1525.
[4]     Q.    And you and Officer Boone, were
[5] you on foot patrol or in a patrol car?
[6]     A.    A marked patrol vehicle.
[7]     Q.    At around ten o'clock that
[8] morning did you have an occasion to respond to
[9] a residence in the area of Eighth and Cambria
[10] Streets?
[11]     A.    That's correct.
[12]     Q.    And what was the purpose for
[13] going to that residence?
[14]     A.    It was a domestic dispute.
[15]     Q.    And how did you get made, be
[16] made? Excuse me. How were you made aware of
[17] that domestic dispute? How did that come
[18] across to you?
[19]     A.    It was a radio call.
[20]     Q.    So that goes to the radio in
[21] the patrol car, I imagine?
[22]     A.    That's correct.
[23]     Q.    When you arrived at that
[24] location, and I'm speaking specifically of the
[25] twenty-nine hundred block of North Eighth
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 224

[1]     Officer Mort - direct
[2] Street, what did you see at that time,
[3] Officer?
[4]     A.    At that time there was a verbal
[5] dispute between the defendant, with the suit
[6] on with the ponytail, and complainant Ericka
[7] Johnson.
[8]     Q.    And where was this dispute
[9] generally taking place?
[10]     A.    It was out front of the
[11] location of 2931 North Eighth Street.
[12]     Q.    What did you do when you
[13] arrived and you realized that there was a
[14] dispute?
[15]     A.    Once we arrived, me and my
[16] partner talked to the defendant and the
[17] complainant. It was a dispute over a
[18] one-year-old child. She was stating that it
[19] was her day to have the child. Defendant also
[20] stated that it was his day to have the child
[21] also.
[22]     Q.    Was this child there?
[23]     A.    The defendant was holding the
[24] child in his hand.
[25]     Q.    Okay. Was this a male child, a
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 225

[1]        Officer Mort - direct
[2] little baby boy?
[3]      A.      That's correct.
[4]      Q.      Now, was there anybody else
[5] besides the child, the defendant and the
[6] complaining witness, Ericka Johnson?
[7]      A.      Just me and my partner.
[8]      Q.      What did you do once you began
[9] speaking with the defendant and the
[10] complaining witness?
[11]      A.      I advised the complainant that
[12] we can't just take children and give it to
[13] her, that we don't make that decision, that
[14] she had to go to 34 South Eleventh Street to
[15] get the proper paperwork for the custody.
[16]      Q.      Now, let me ask you a couple of
[17] questions.  The term complaining witness or
[18] complainant, what does that mean in police
[19] lingo?
[20]      A.      She does the one who told us she
[21] called police so she was the one that we made
[22] the complainant, because she wanted the child
[23] and she stated that it was her day to have it,
[24] so she had to have the proper paperwork
[25] stating that that was her day.  She couldn't
                  Carl G. Sokolski
             Official Court Reporter
                (215) 683-8060

Page 226

[1]        Officer Mort - direct
[2] produce that paperwork to me.
[3]      Q.      Okay.  And 34 South Eleventh
[4] Street, what is the significance of that
[5] address?
[6]      A.      It's basically Family Court
[7] where you you can go down there and basically
[8] for child custody disputes, landlord-tenant
[9] disputes.  They have lot of different things
[10] you can do down there.
[11]      Q.      Have you had the occasion in
[12] the past to advise people that that's probably
[13] where they should go?
[14]      A.      That's correct, yes.  And for
[15] them to go there, you have to do a report and
[16] give them the DC number.
[17]      Q.      So did you begin preparing up a
[18] report?
[19]      A.      That's correct.
[20]      Q.      What does this report entail?
[21] What do you have to do to prepare that report?
[22]      A.      Basically, I need the
[23] complainant's name, which would have been
[24] Ericka Johnson, with her date of birth on it
[25] and her address where she lives, her phone
                  Carl G. Sokolski
             Official Court Reporter
                (215) 683-8060

Page 227

[1]        Officer Mort - direct
[2] number.
[3]      Q.      Now, I'm going to get to the
[4] actual report in a minute here.  But while
[5] you're gathering the information that you need
[6] to make this report, are you talking to both
[7] Ericka Johnson and and the defendant or does
[8] that separate at some point?
[9]      A.      At that time they're still
[10] together.
[11]      Q.      So how does the conversation go
[12] at that point?  What happens?
[13]      A.      Once I retrieved her
[14] information, I went to the defendant and asked
[15] him his name, got his information with his
[16] date of birth.  At that time it dawned on me
[17] and my partner that she was sixteen at the
[18] time and he was forty-two.
[19]      Q.      Why did it dawn?  When you say
[20] it dawned on you, what do you mean by that?
[21]      A.      Just put the math together and
[22] realized she was sixteen and he was forty-two.
[23] And when I asked how old the child was, she
[24] stated it was almost a year old.
[25]      Q.      And did that raise some
                  Carl G. Sokolski
             Official Court Reporter
                (215) 683-8060

Page 228

[1]        Officer Mort - direct
[2] concerns?
[3]      A.      That's correct, because that to
[4] me would have made her fifteen, around, with
[5] him forty-one.
[6]      Q.      Now, what did you do at that
[7] point?  Well, actually, you know what?  Let me
[8] just stop you.  How did you learn the
[9] defendant's date of birth, first of all?
[10]      A.      I believe both of them produced
[11] ID to me.
[12]      Q.      And did you use that ID to
[13] record the information on your report?
[14]      A.      That's correct.
[15]      MR. STACKOW:  All right.  Let
[16] me show you that report at this point.  If I
[17] could have this marked as Commonwealth Exhibit
[18] C-3.  I'll provide the defendant with an extra
[19] copy there.
[20]      COURT CRIER:  So marked
[21] Commonwealth Exhibit C-3 and shown to the
[22] witness.
[23]      THE WITNESS:  Thank you.
[24] BY MR. STACKOW:
[25]      Q.      Officer, do you recognize this
                  Carl G. Sokolski
             Official Court Reporter
                (215) 683-8060

51CR00034302009
Johnathan Robins

Page 229

[1]      Officer Mort - direct
[2] document?
[3]      A.     That's correct.
[4]      Q.     Is this the report that we've
[5] been talking about that you prepared?
[6]      A.     Yes, that's correct.
[7]      Q.     What's the actual name for this
[8] report in the Philadelphia Police Department?
[9]      A.     It's a 75-48.
[10]      Q.     All right.  The copy that you
[11] have in front of you, that's obviously a copy,
[12] a photocopy of the original; is that correct?
[13]      A.     That's correct.
[14]      Q.     All right.  Is that a true and
[15] correct copy of the original that you
[16] prepared?
[17]      A.     Yes.
[18]      Q.     What was the date of birth that
[19] the defendant provided to you?
[20]      A.     3/29/66.
[21]      Q.     And how about the complainant,
[22] the date of birth you got from Ericka Johnson?
[23]      A.     Would be 7/30/92.
[24]      Q.     And what address did Miss
[25] Johnson provide to you at that time?
          Carl G. Sokolski
        Official Court Reporter
          (215) 683-8060

Page 230

[1]      Officer Mort - direct
[2]      A.     She gave me 256 Kent, it looks
[3] like PD, Upper Darby, PA.
[4]      Q.     And the address from the
[5] complainant, or the defendant Mr. Robins?
[6] What address did he provide?
[7]      A.     2931 North Eighth Street.
[8]      Q.     Now, once the age discrepancy
[9] or difference dawned on you, what did you do
[10] at that point, Officer?
[11]      A.     At that time I believe my
[12] partner separated the two individuals and I
[13] believe I received information from my partner
[14] that she stated that she had sex with the
[15] male, that she was fourteen when she first had
[16] sex and he was I think thirty-nine, almost
[17] going to be forty.
[18]      Q.     Where were you when you learned
[19] that information?
[20]      A.     I was with the defendant.
[21]      Q.     What were you and the defendant
[22] talking about prior to getting that
[23] information?
[24]      A.     I don't recall.
[25]      Q.     Where was the child, the baby
          Carl G. Sokolski
        Official Court Reporter
          (215) 683-8060

Page 231

[1]      Officer Mort - direct
[2] boy?
[3]      A.     He was still holding the child.
[4]      Q.     Did the defendant make any
[5] statement as to who the father of that child
[6] was?
[7]      A.     He stated he was the legal
[8] guardian, the father of that child.
[9]      Q.     Once you got that information
[10] from your partner, what did you do at that
[11] point?
[12]      A.     My partner actually contacted
[13] special victims and let them know of the
[14] situation of what was going on.
[15]      Q.     Without saying what was Special
[16] Victims contact -- or let me back up.  What's
[17] Special Victims Unit?  What does that mean?
[18]      A.     Whenever you have anything that
[19] has to do with I believe young children or any
[20] kind of sexual encounter, you would have to
[21] call them instead of East Detectives.  They
[22] would handle the job.
[23]      Q.     All right.  So without saying
[24] directly what was communicated from the
[25] Special Victims Unit to you or your partner,
          Carl G. Sokolski
        Official Court Reporter
          (215) 683-8060

Page 232

[1]      Officer Mort - direct
[2] what steps did you and he take after you spoke
[3] with the Special Victims Unit?
[4]      A.     At that time he was placed
[5] under arrest and transported to Special
[6] Victims along with the complainant to be
[7] interviewed.
[8]      MR. STACKOW:  Your Honor, I'd
[9] like to have this document marked as C-4,
[10] please.  I've provided the defendant with an
[11] extra copy, Your Honor.
[12]      COURT CRIER:  So marked
[13] Commonwealth Exhibit C-4 and shown to the
[14] witness.
[15]      THE WITNESS:  Thank you.
[16] BY MR. STACKOW:
[17]      Q.     Officer Mort, do you recognize
[18] this document, the two-page document marked as
[19] C-4?
[20]      A.     That's correct.
[21]      Q.     And what is that document?
[22]      A.     It's a 229.  When you arrest
[23] somebody you have to fill out this paperwork.
[24]      Q.     And did you fill out that
[25] paperwork in fact that you're holding?
          Carl G. Sokolski
        Official Court Reporter
          (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 233

[1]        Officer Mort - direct
[2]    A.    That's correct.
[3]    Q.    Is that a true and correct copy
[4] of the original of the 229?
[5]    A.    That's correct.
[6]    Q.    Let me direct your attention to
[7] the first page, the upper portion.  It looks
[8] to be biographical information; is that
[9] correct, Officer?
[10]    A.    That's correct.
[11]    Q.    And whose biographical
[12] information is that?
[13]    A.    It's Johnathan Robins'.
[14]    Q.    And how did you get the
[15] information that you used to fill in the
[16] blanks there?
[17]    A.    When he was placed under
[18] arrest, you just go step by step asking him
[19] questions about his information.
[20]    Q.    And did he provide you with his
[21] date of birth at that time again?
[22]    A.    That's correct.
[23]    Q.    And what was that date of
[24] birth?
[25]    A.    3/29/66.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 234

[1]        Officer Mort - direct
[2]    Q.    And did he also provide you
[3] with the same residence, the 2931 North Eighth
[4] Street address?
[5]    A.    That's correct.
[6]    Q.    Now, there's a second page to
[7] this as well, is there not, Officer?
[8]    A.    That's correct.
[9]    Q.    Do you go through this second
[10] page as well with the person being placed
[11] under arrest?
[12]    A.    Basically on the back we just
[13] put the, sometimes what he's being arrested
[14] for.
[15]    Q.    Okay.
[16]    A.    Which I left blank, and then
[17] just the police officers' names that were
[18] arresting him.
[19]    Q.    All right.  The question I was
[20] going to pose to you was there is a form for
[21] relatives and in particular a spouse.  Do you
[22] see that top part of it?
[23]    A.    That's correct.
[24]    Q.    Did you ask the defendant for
[25] any of the names of a spouse?  There's also a

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 235

[1]        Officer Mort - cross
[2] spot for mother, father, brother, sister.
[3]    A.    I believe when we were on
[4] location before we arrested him that he stated
[5] to us when we were out front of the residence
[6] that he was legally married to her out of
[7] another state.
[8]    Q.    Okay.
[9]    A.    But I didn't put that on there.
[10]    MR. STACKOW:  Thank you very
[11] much, Officer.  That is all the questions I
[12] have for this witness, Your Honor.
[13]    THE COURT:  Any questions?
[14]    THE DEFENDANT:  Yes.
[15]        CROSS EXAMINATION
[16] BY THE DEFENDANT:
[17]    Q.    When you came to the residence,
[18] did I seem nervous or did I act like I had
[19] tried to run or, you know, basic signs of like
[20] someone being nervous or anything?  Or did I
[21] just seem regular and normal?
[22]    A.    You seemed normal to me.  You
[23] were both just standing there arguing about a
[24] child.
[25]    Q.    Did I seem like I was concerned

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 236

[1]
[2] that I had done something wrong?
[3]    A.    No.  You were just standing
[4] there with a child.
[5]    Q.    Do you know if she spoke to you
[6] about if she called me earlier?  Or did Ericka
[7] ever say that she called earlier?  Did she
[8] speak to you and did she say that she had
[9] called earlier?
[10]    A.    No.  She just stated she wanted
[11] her child back.
[12]    Q.    And that's what her main
[13] mission was, to have —
[14]    A.    She said it was her day to have
[15] the child.
[16]    THE DEFENDANT:  No more
[17] questions.
[18]    MR. STACKOW:  No redirect.
[19]    THE COURT:  Okay.  You're
[20] excused.  You can step down.
[21]    THE WITNESS:  Thank you, Your
[22] Honor.
[23]    (Witness excused.)
[24]    THE COURT:  What would you like
[25] to do?

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 237

[1]
[2]        MR. STACKOW:  Your Honor, at
[3] this point I would formally move for the
[4] admission of all four Commonwealth Exhibits,
[5] C-1 through C-4 inclusive.  With that motion,
[6] the Commonwealth rests its case.
[7]        THE COURT:  All right.  The
[8] Commonwealth has rested.  Defense, what would
[9] you like to do?
[10]        THE DEFENDANT:  Can we just
[11] start new tomorrow or do I have to do my
[12] opening statement now?
[13]        THE COURT:  Do you have any
[14] witnesses here?
[15]        THE DEFENDANT:  We have the one
[16] welfare worker.
[17]        THE COURT:  All right.  Then
[18] why don't you give your opening and you can
[19] call your first witness.  It's not going to be
[20] a long witness.
[21]        THE DEFENDANT:  Okay.  Good
[22] morning, ladies and gentlemen.  As you know,
[23] you've heard the testimony.  I intend to give
[24] testimony that when I met Ericka on the date
[25] line that she lied about her age.  I stayed

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 238

[1]
[2] with her until we got married and then later
[3] on, you know, found out what age she was.
[4] Then I kind of, everything changed, you know.
[5] I had to basically send her back to her mom
[6] and everything.
[7]        Obviously I'm not skilled at
[8] this.  You know, this is something I felt that
[9] I just had to be the one to represent myself
[10] because, you know, my future is on the line,
[11] my son's on the line and so is my wife even
[12] though, you know.  And one of the reasons why
[13] I brought up the welfare fraud and the custody
[14] is because they did not make a fuss about
[15] anything, just as long as --
[16]        MR. STACKOW:  Objection.
[17]        THE COURT:  Well, the objection
[18] is that, as I explained to the jury earlier,
[19] what an opening statement does is it explains
[20] to the jury where you expect to go when you
[21] present your evidence.  At the conclusion of
[22] the case, there will be closing arguments and
[23] at that time you can argue whatever you want
[24] from whatever evidence has been introduced.
[25] But at this time it's just a statement of what

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 239

[1]
[2] you expect to present and you should confine
[3] your statement to those limits.
[4]        THE DEFENDANT:  Okay.  They
[5] basically, it was okay for me to take care of
[6] the baby and them to collect welfare and me to
[7] pay it.  But when I decided, you know, it's
[8] time for me to take care of my son and for my
[9] wife to go grow up like she's supposed to and
[10] they didn't and obviously the check would be
[11] cut off and obviously, as you've heard, my
[12] wife says that son is hers.  She's always said
[13] it's hers.  She doesn't really think it's
[14] mine.  So when I filed for custody it sort of,
[15] you know, she wanted to stop that.  And I'm
[16] going to show that her actually going through
[17] these proceedings actually stopped me from
[18] actually going to court and getting custody of
[19] my son so that they can keep him and have kept
[20] him and had him on welfare while I was paying
[21] over eight hundred something dollars a month
[22] to Welfare for them to have him.
[23]        That's about all I can say.
[24] I'm going to present my first witness and then
[25] I'll go ahead and if there's enough time I may

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 240

[1]
[2] even give testimony.  Thank you very much for
[3] your time.
[4]        THE COURT:  Do you want to call
[5] your first witness?
[6]        THE DEFENDANT:  Yeah.
[7]        THE COURT:  Do we have a name?
[8]        MR. McGILL:  Michael Ward.
[9]        THE DEFENDANT:  Michael Ward.
[10]        THE COURT:  The usual ending
[11] time is about 4:30.  That's so that the staff
[12] can take care of business and others as well
[13] who have to go back to their offices.
[14] Sometimes we stretch it a little bit beyond
[15] that if it means completing a witness.  But I
[16] expect that today we should conclude about
[17] 4:30.  Of course, that involves making
[18] reckless predictions about how long the
[19] witness is going to take.
[20]        COURT CRIER:  Up here, sir.
[21] Please remain standing.  Please state your
[22] name and spell your name for the record.
[23]        THE WITNESS:  My name is
[24] Michael M. Ward.  And that's W-A-R-D is the
[25] last name.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 241

[1]        Michael Ward - direct
[2]        MICHAEL M. WARD, after having
[3] been duly sworn, was examined and testified as
[4] follows. . .
[5]        DIRECT EXAMINATION
[6] BY THE DEFENDANT:
[7]    Q.    Okay. Mr. Ward, you have
[8] certain dates when my son was put on and taken
[9] off of welfare? Do you have those specific
[10] dates and who actually filed for him?
[11]    A.    Yes, I do.
[12]    Q.    Okay. Who filed for custody of
[13] Johnathan Robins, Jr.?
[14]    A.    Okay. No one filed custody
[15] with me. I don't handle anything to do with
[16] custody.
[17]    Q.    Okay. I'm sorry. Filed for
[18] welfare for Johnathan Robins, Jr.
[19]    A.    Okay. For welfare benefits.
[20] It would be his grandmother, Miss Lucille
[21] Freeman.
[22]    Q.    And when did she first put in
[23] her first application?
[24]    A.    Benefits were first opened from
[25] the date of his birth.

        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 242

[1]        Michael Ward - direct
[2]    Q.    From the date of his birth?
[3]    A.    February twentieth, I believe,
[4] 2008. And we're required at least to open
[5] medical coverage for any newborn in the state
[6] automatically, without application.
[7]    Q.    Okay. At that point in time,
[8] did she say at any point was the father taking
[9] care of the child? Was I taking care of the
[10] child or was Ericka taking care of the child,
[11] or did she mention who actually was caring for
[12] the child when she filed on her application?
[13]    A.    No. I would say no.
[14]    Q.    So if she filed the application
[15] and someone else was caring for the child, how
[16] do you find that out? How do you actually?
[17]    A.    Okay. Well, what our
[18] department is concerned with is first of all
[19] where they're residing, where the child is
[20] residing, where the applicant is residing.
[21] When the application is submitted, the
[22] applicant would list what's required to list,
[23] who else is in the household and their
[24] relationship, familial relationship. Then we
[25] have an interview and at that time it may be

        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 243

[1]        Michael Ward - direct
[2] discussed what the situation is, whose child
[3] it is, how they're related, as followup
[4] verification to the application. Some of that
[5] could be, you know, implied from the general
[6] information that I'm given by a client. We're
[7] not interested in our department as to who has
[8] custody necessarily, particularly if it's a
[9] natural, the natural, one of the natural
[10] parents bringing the child in or coming in to
[11] apply for benefits.
[12]    Q.    So to your knowledge, so you
[13] spoke with her. So no mention at all was I
[14] taking care of the child, to your knowledge,
[15] or you don't remember.
[16]    A.    Well, our assumption would be
[17] if she physically has the child and they're
[18] living in the household that they are at least
[19] head of the household. We rarely get anybody
[20] state one way or another in specific words,
[21] "I'm taking care of the child."
[22]    Q.    At what point in time did --
[23] okay. Benefits started February twentieth,
[24] 2008. At what point in time did it cease from
[25] that point?

        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 244

[1]        Michael Ward - direct
[2]    A.    They ceased July first, 2008.
[3]    Q.    And did she notify you? Why
[4] did it stop? Why did the benefits stop?
[5]    A.    Because the mother, Ericka
[6] Johnson, and the infant, Johnathan Robins,
[7] Jr., had left the household.
[8]    Q.    Did she say when? Who told
[9] you? Was it Ericka, me myself or Lucille
[10] Freeman that told you that?
[11]    A.    I can't remember exactly, but
[12] we have several means of communication that a
[13] client has with the office, either direct call
[14] to me on my own phone line. Information could
[15] have been left with our call center, statewide
[16] call center, and I'm sent an e-mail. And we
[17] have a system of alerts. Well, actually, the
[18] alerts wouldn't affect anyone leaving the
[19] household.
[20]        If there's a question as to
[21] whether or not someone is in the household, we
[22] do get information from time to time in the
[23] form of what we call a tip, a fraud tip.
[24] Basically, I did get a, some information from
[25] the Office of Inspector General and basically

        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 245

[1]        Michael Ward - direct
[2] it was just that we needed to verify who in
[3] total was in Miss Freeman's household at that
[4] point in time.
[5]    Q.    In the spring of, somewhere
[6] around in I guess March or April, did Ericka
[7] and I call you to tell you that the child was
[8] living with us?
[9]    A.    Yes.  I remember receiving a
[10] call approximately during that period from
[11] her.  I can't remember if I spoke with you or
[12] not.  And I confirmed at that time that she
[13] was, what she told me was that she was living
[14] with you, she and the baby.  This was
[15] subsequent to me speaking with Mrs. Freeman.
[16]    Q.    Okay.
[17]    A.    So those were combined.
[18]    Q.    So who do you think that you
[19] spoke to first?  Myself or --
[20]    A.    Oh, I definitely would have
[21] spoken to Miss Freeman first because she's my
[22] client.
[23]    Q.    But after we called you, I
[24] mean, did we call you first?
[25]    A.    I mean she was easier to call
              Carl G. Sokolski
              Official Court Reporter
              (215) 683-8060

Page 246

[1]        Michael Ward - direct
[2] first.  I'm sorry.
[3]    Q.    Did we call you first?  Did we
[4] notify you first or did Lucille Freeman notify
[5] you first?
[6]    A.    She notified me first.
[7]    Q.    Well, she notified you when?
[8] Do you know the approximate month or a date?
[9]    Q.    May I refer to notes at all?
[10]    Q.    Yes.
[11]        MR. STACKOW:  I have no
[12] objection.
[13]        THE WITNESS:  Is that
[14] permissible?  Okay.  Let's see.
[15] BY THE DEFENDANT:
[16]    Q.    Now, specifically, what are you
[17] referring to?
[18]    A.    I'm referring to some
[19] handwritten notes which I shared with you
[20] prior to the trial today.
[21]    Q.    Yes.
[22]    A.    They're basically a reference
[23] of when the benefits for Johnathan Junior
[24] were opened and closed and for what period
[25] they remained closed.
              Carl G. Sokolski
              Official Court Reporter
              (215) 683-8060

Page 247

[1]        Michael Ward - direct
[2]    Q.    Okay.
[3]    A.    In looking at them, it could
[4] help me to recall perhaps when I spoke with
[5] her.  I can't remember an exact date, though.
[6]    Q.    Okay.  There was also a
[7] complaint, an investigation, a complaint form
[8] that I looked at.  When was that complaint
[9] made and does it say by whom?
[10]    A.    The information came to me on
[11] May sixth, 2008.  That's what I had referred
[12] to earlier as fraud, what we call a fraud tip.
[13] It could come from any source.
[14]    Q.    Did Lucille, had Lucille
[15] Freeman talked to you before May fifth, before
[16] the tip came in, or after?
[17]    A.    Probably after.  I can't
[18] remember exactly.
[19]    Q.    So does it say who exactly
[20] called the tip in?
[21]    A.    No.  That's routine for our
[22] office, to comment honestly.
[23]    Q.    Can you read specifically the
[24] paperwork that the tip is on?  Can you read
[25] specifically what it says on it into the
              Carl G. Sokolski
              Official Court Reporter
              (215) 683-8060

Page 248

[1]        Michael Ward - direct
[2] record, please?
[3]    A.    Let's see.  It says reasons for
[4] referral.  And let's see.  Subject claiming
[5] grandson Johnathan Robins, Jr., to receive
[6] benefits.  Grandson Johnathan Robins, Jr., has
[7] never lived at the client address at 256 Kent
[8] Road, Upper Darby, PA., 19082.  He has always
[9] been with his mother since birth, February
[10] twentieth, 2008.  Please verify.
[11]        This was more or less the
[12] complaint.
[13]    Q.    Okay.
[14]    A.    Not a conclusion.
[15]    Q.    Okay.
[16]    A.    Or not a finding and not fact.
[17]    Q.    So you do remember our phone
[18] call or Ericka, well, Ericka's phone call to
[19] you with me.  Did you file any paperwork on
[20] the phone call we made to you?
[21]    A.    No.
[22]    Q.    Okay.
[23]    A.    I closed the case but there was
[24] no paperwork.
[25]    Q.    Okay.  You got the complaint in
              Carl G. Sokolski
              Official Court Reporter
              (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 249

[1]        Michael Ward - direct
[2] May and the files were closed in July, right?
[3]    A.    The case, the benefits were
[4] closed in July, yes.
[5]    Q.    And when were the benefits
[6] opened again?
[7]    A.    When were they opened?
[8]    Q.    Again.
[9]    A.    Again?
[10]    Q.    Yeah.
[11]    A.    That was September sixteenth,
[12] 2008.
[13]    Q.    So from what, July?  What was
[14] the date again?  July?
[15]    A.    They were closed between July
[16] first, 2008, until September sixteenth, 2008.
[17]    Q.    So the benefits were off for a
[18] month and a half before they, before she
[19] refiled.
[20]    A.    Yes.
[21]    Q.    And on September first, what
[22] did she?  I guess Lucille Freeman filed again.
[23] What did she claim in this claim again to get
[24] the benefits?  She claimed that Ericka and the
[25] child again was living now on Kent Road?

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 250

[1]        Michael Ward - direct
[2]    A.    Yes, that's right.  Well, I
[3] can't recall if that was the address at the
[4] time, but that they were living with her
[5] again, yes.
[6]    Q.    Now, when the complaint was
[7] made for the benefits from February to July,
[8] no followup on the complaint was done?  It was
[9] just left open?
[10]    A.    Yeah, there was followup on the
[11] eighth of May, 2008.  An investigator
[12] physically went to the premises.  He did not
[13] speak with Mrs. Freeman but he spoke with
[14] neighbors and went to one of her other
[15] daughters' school to seek any information he
[16] could on the household.
[17]    Q.    And what was the findings of
[18] the I guess investigation?
[19]    A.    Okay.  I'll read that to you.
[20] After visits to school and neighborhood,
[21] verification.  I believe this says one child
[22] who's twelve years old -- that would be
[23] Devette, it's Miss Freeman's daughter -- only
[24] in the house.  And that's the end of the
[25] statement.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 251

[1]        Michael Ward - direct
[2]    Q.    Okay.  So was she collecting
[3] money or just medical benefits for the child
[4] from February to July?
[5]    A.    Cash assistance, medical
[6] benefits and food stamp benefits.
[7]    Q.    If it was verified that my son
[8] wasn't living there, was she made to give the
[9] money and food stamps back?
[10]    A.    Could you repeat that for me?
[11]    Q.    If the report, the
[12] investigation from the complaint found out
[13] that my son was not living with her and the
[14] case was closed because of the investigation,
[15] did Welfare request the money and food stamps
[16] back that were given to her for the time my
[17] son was not there?
[18]    A.    If we determine there's an
[19] overpayment, I'm required to process it.
[20] There are many reasons when you can have an
[21] overpayment, particularly when you have
[22] overlapping dates and the time frame.
[23] Sometimes it's the fault of the client.
[24] Sometimes it's the fault of our office.
[25]    Q.    So basically, no.  Right?  Yes

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 252

[1]        Michael Ward - direct
[2] or no?  Did you all request the money and food
[3] stamps back or not?
[4]    A.    Yes.  An overpayment was filed.
[5]    Q.    An overpayment was filed.
[6]    A.    Right.
[7]    Q.    For how much?
[8]    A.    I can't tell you the exact
[9] figure, but it would have been for the period
[10] that between when we first knew or from when
[11] we first determined that she was gone until it
[12] was actually closed.
[13]    Q.    Okay.  Now, since the
[14] overpayment, it was filed but did they collect
[15] it?
[16]    A.    Oh, I have no idea, because my
[17] department, I have nothing to do with the
[18] collections.  That's handled elsewhere.
[19]    Q.    Okay.  Now, okay.  So the
[20] benefits again started for my son from
[21] September of 2008 until when?
[22]    A.    When were they opened again?
[23]    Q.    You said it was opened
[24] September sixteenth, 2008?
[25]    A.    Reopened September sixteenth,

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 253

[1]    Michael Ward - direct
[2] yes.
[3]    Q.    Until when?
[4]    A.    Until February first, 2010.
[5]    Q.    February first. So it's been
[6] opened since September until just a few months
[7] ago.
[8]    A.    Right, last month.
[9]    A.    Last month?
[10]    A.    Continuous.
[11]    Q.    And was there any mention or
[12] consideration of me actually caring for my son
[13] in this time frame in the report?
[14]    A.    No.
[15]    Q.    Were there any mention of me
[16] coming down to your office in November or
[17] October complaining to a supervisor that I had
[18] my son and I was trying to get him on CHIP and
[19] have my son seen at a health center but I
[20] couldn't, but I was complaining that I
[21] couldn't get health care for my son since I
[22] have him because Miss Freeman had him listed
[23] on health care and I couldn't get health care?
[24] No report or no nothing was filed that you
[25] know of?

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 254

[1]    Michael Ward - direct
[2]    A.    No. I never saw any formal
[3] complaint. I never remember any complaint
[4] made by you to me directly on the phone. I
[5] think, let me backtrack a minute. We had
[6] discussed that issue but there was never a
[7] formal complaint made. I have no recollection
[8] of you coming to the office, and my supervisor
[9] has never relayed to me that you had had any
[10] discussion with her about that matter in
[11] particular.
[12]    Q.    Okay. So if I was able to
[13] prove that in another court forum that I
[14] actually had the child and reported that to
[15] Welfare, if I actually got proof from like a
[16] court hearing or something, and they were
[17] found again and Miss Freeman was found again
[18] to be receiving monies when she did not have
[19] the child, I assume again she would be told
[20] reported and told to give some money back.
[21] I'm assuming that's how the process goes,
[22] correct? Because it went that way before. So
[23] if I was able to prove this time that she did
[24] not have my son, then she again would be told
[25] to give the money and food stamps back,

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 255

[1]    Michael Ward - cross
[2] correct?
[3]    A.    It's possible that we could
[4] find, that we could make a determination that
[5] there was an overpayment for a period during
[6] which Ericka and Johnathan Robins, Jr., were
[7] not in the household. That's as much as I can
[8] tell you or confirm at this point without more
[9] information.
[10]    THE DEFENDANT: Okay. That's
[11] it.
[12]    MR. STACKOW: May I, Your
[13] Honor?
[14]    THE COURT: If you'd like.
[15]    MR. STACKOW: I would.
[16]    CROSS EXAMINATION
[17] BY MR. STACKOW:
[18]    Q.    Good morning or good afternoon,
[19] Mr. Ward. What do you do for a living, first
[20] of all?
[21]    A.    I am an income maintenance
[22] caseworker for the Department of Public
[23] Welfare, Income Maintenance Bureau. I'm at
[24] the Delaware County office in Darby.
[25]    Q.    Okay. And you mentioned that

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 256

[1]    Michael Ward - cross
[2] you have clients; is that right?
[3]    A.    Yes, that's correct.
[4]    Q.    Lucille Freeman is in fact your
[5] client; is that right?
[6]    A.    Yes.
[7]    Q.    Any indication at all in your
[8] records or your? You've dealt with Miss
[9] Freeman, I assume, on a personal basis?
[10]    A.    Yes.
[11]    Q.    At any times when you've dealt
[12] with her or anything in your records, any
[13] indication to any degree whatsoever that Miss
[14] Freeman was anything less than forthright and
[15] honest with you?
[16]    A.    No. I never had any indication
[17] other than that.
[18]    Q.    And you mentioned that, are you
[19] familiar with her daughter, Ericka Johnson?
[20]    A.    Yes, I am.
[21]    Q.    Have you actually had in-person
[22] discussions with her?
[23]    A.    Yes. I've had a couple of
[24] conversations with her, an interview.
[25]    Q.    Same thing with Ericka. Any

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 257

Michael Ward - cross

[1]    Michael Ward - cross
[2] indication that she's been anything less than
[3] up front and fully cooperative and honest with
[4] you?
[5]    A.    No indication.
[6]    Q.    All right.  There's no fraud
[7] investigations or anything like that?
[8]    A.    No, nothing currently and
[9] nothing that I am aware of in either of their
[10] pasts as far as any complaints by the
[11] department.
[12]    Q.    And I guess I just want to ask
[13] you this last question or last few questions.
[14] Have you had personal dealings with the
[15] defendant, Mr. Robins?
[16]    A.    We've had maybe two or three
[17] phone conversations within maybe the last six
[18] months.
[19]    Q.    Anything before that?
[20]    A.    No, not that I can recall.
[21]    Q.    During those phone
[22] conversations, did he say how he was involved
[23] with Lucille Freeman and Ericka Johnson?
[24]    A.    I think he has said to me that
[25] he is Johnathan Junior's father.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 258

[1]    Michael Ward - cross
[2]    Q.    Has he said that on more than
[3] one occasion?
[4]    A.    Yes.
[5]    Q.    At any point did you raise any
[6] concerns about the fact that Ericka's age and
[7] given Mr. Robins' age might be something that
[8] he should be concerned about, meaning Mr.
[9] Robins?
[10]    A.    Well, I have perhaps personal
[11] concerns but it wasn't, those concerns had no
[12] bearing on eligibility, which is the sort of
[13] first-line concern as an income maintenance
[14] caseworker.
[15]    Q.    So it would be fair to say that
[16] you might have had personal concerns but no
[17] professional concerns.  That didn't affect how
[18] you would handle the case.
[19]    A.    Exactly.
[20]    Q.    I see.
[21]    A.    Exactly.
[22]    Q.    Did you express any of those
[23] personal concerns to Mr. Robins at any of
[24] those conversations?
[25]    A.    Oh, no, because I consideered

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 259

[1]    Michael Ward - redirect
[2] that to be a private, personal matter.
[3]    Q.    Okay.  You mentioned that the
[4] last date was February first, 2010, I believe,
[5] for payments for Johnathan Junior; is that
[6] right?
[7]    A.    Yes, that's correct.
[8]    Q.    And my question is, does that
[9] mean that it's current?  Are they still
[10] getting welfare for Johnathan Junior?
[11]    A.    Ericka and Johnathan Junior are
[12] not receiving any benefits of any type
[13] currently.
[14]    MR. STACKOW:  Thank you very
[15] much.  That's all the questions I have.  Thank
[16] you.
[17]    THE DEFENDANT:  Can I ask one
[18] on redirect?
[19]    THE COURT:  Sure.
[20]    REDIRECT EXAMINATION
[21] BY THE DEFENDANT:
[22]    Q.    Even though they're not
[23] receiving at this moment, they did reapply to
[24] get it again.  Am I right?
[25]    A.    Yes, that's correct.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 260

[1]    Michael Ward - recross
[2]    Q.    So they will be getting it
[3] again in a moment.
[4]    A.    Well, I haven't made a
[5] determination as to whether or not I could add
[6] them yet, but more than likely, yes.
[7]    THE DEFENDANT:  That's it.
[8]    THE COURT:  Anything else?
[9]    MR. STACKOW:  I do have just
[10] one followup.
[11]    RECROSS EXAMINATION
[12] BY MR. STACKOW:
[13]    Q.    That determination is going to
[14] be primarily based on where Ericka and her
[15] child are living; is that right?
[16]    A.    Living, yes.  That's one of
[17] the, probably the most important factor for
[18] our office.
[19]    Q.    And because your client again
[20] is Lucille Freeman and wherever she's living,
[21] I guess; is that right?
[22]    A.    Well, yes, and the fact that
[23] Ericka is a minor has a bearing on it.  She
[24] could not apply for benefits on her own
[25] legally.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Page 261

[1]        Michael Ward - redirect
[2]    Q.    Because she's less than
[3] eighteen?
[4]    A.    Yes, that's correct.
[5]        MR. STACKOW:  Thank you.
[6]        THE WITNESS:  As well as the
[7] baby, of course.
[8]        THE DEFENDANT:  A couple of
[9] more on redirect.
[10]        THE COURT:  It's not tennis.
[11] Is this something new based on this last?
[12]        THE DEFENDANT:  Yes.
[13]        REDIRECT EXAMINATION
[14] BY THE DEFENDANT:
[15]    Q.    You said it's basically where
[16] the child has living.  Has she at any point
[17] between September sixteenth, 2008, and
[18] February a month ago told you that Ericka and
[19] the child was not living with her, Lucille
[20] Freeman?
[21]    A.    During the period that you're
[22] asking about, she informed me by phone and I
[23] had her fill out another application, which is
[24] routine, and that's how I was notified for
[25] those periods during which the coverage

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 262

[1]        Michael Ward - redirect
[2]    Q.    Because when you spoke, you
[3] said that Ericka and the baby just moved back
[4] into with Lucille Freeman.
[5]    A.    The coverage was closed.  The
[6] last benefits were closed February first and
[7] it was sent between February first and when
[8] she filed another application, a new
[9] application on March fifth, I believe, or last
[10] Friday.  She told me that they were not in the
[11] household.
[12]    Q.    So do you know how long before
[13] February first Ericka and my son was not in
[14] the household that Lucille Freeman was
[15] collecting a check?
[16]    A.    The presumption was that they
[17] were in the household.  She didn't tell me
[18] till February first.
[19]    Q.    So it's a presumption but you
[20] did not check.
[21]    A.    We had no reason to have any
[22] belief that they were not.  If we did, we
[23] would have sent an investigator.  But I had no
[24] reason for that to be verified.
[25]    Q.    And you also stated that since

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 263

[1]        Michael Ward - redirect
[2] Ericka is below eighteen, she couldn't file
[3] for herself and her own son, correct?
[4]    A.    That's correct.
[5]    Q.    But if she's married, could
[6] she?
[7]    A.    I believe she could if she and
[8] her spouse filed together.  But just because
[9] she's married wouldn't necessarily, I don't
[10] believe she could necessarily have benefits in
[11] her own name without at least proof that she's
[12] married.
[13]    Q.    Okay.
[14]    A.    And being a minor.
[15]    Q.    Okay.  So, but you do realize
[16] that it says right here in the general policy
[17] of the handbook that you go by, 121.2, General
[18] Policy, General Assistance, that there is no
[19] age requirements for general assistance.  It's
[20] available to any person of any age.  A minor
[21] who is married, even if he lives with his
[22] parents, can qualify to get general assistance
[23] on their own under your policy, under your
[24] handbook.  This is the handbook that I got off
[25] line from your department, from the Department

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 264

[1]        Michael Ward - redirect
[2] of Public Welfare.
[3]    A.    Okay.
[4]    Q.    So even as long as she is
[5] married, even if she lives with her parents,
[6] she can collect it.  You didn't know that or?
[7]    A.    I'm not --
[8]    Q.    Do you want to take a look?  Do
[9] you want to look this over?
[10]    A.    I don't need to read it.  I am
[11] not specifically familiar with those
[12] regulations because I very rarely have cases
[13] where there is a minor parent who is with the
[14] father.  Usually, you need welfare because the
[15] father is not providing for the child or
[16] they've already separated.
[17]    Q.    So how much?  Because I've
[18] actually been paying child support in Delaware
[19] County.  Has Delaware County been paying child
[20] support to Welfare, to Ericka Johnson or
[21] Lucille Freeman?  Do you know how much of my
[22] money has actually gone to them?
[23]    A.    No, I don't know that.
[24]        THE DEFENDANT:  That's it.
[25]        MR. STACKOW:  I don't have any

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Page 265

[1]
[2] redirect, or recross.
[3]        THE COURT:  All right.  You're
[4] excused.  You can step down.
[5]        THE WITNESS:  Thank you.
[6]        (Witness excused.)
[7]        THE COURT:  All right.  That's
[8] probably enough for one day.  You'll be back
[9] tomorrow 9:30 or so and be ready to proceed;
[10] is that right?
[11]        THE DEFENDANT:  Yes.
[12]        THE COURT:  For this evening,
[13] just let me remind you to wear your juror
[14] badges.  I don't see yours.  Okay.  I know
[15] they're ugly, but that's no excuse to put them
[16] someplace where they can't be seen.  And do
[17] not talk to anyone about this case.  Do not go
[18] online.  Do not start Googling whatever comes
[19] to mind related to your jury service because,
[20] as I explained to you before, it just isn't
[21] fair.  It's not fair to either side if you go
[22] outside of this courtroom and try to come up
[23] with some additional information.
[24]        At the end of the day today,
[25] there were a lot of questions raised about

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 266

[1]
[2] married, unmarried, where you're living, do
[3] you get welfare, don't you get welfare.  If
[4] you're not convinced of what the law is in
[5] this courtroom, you don't go out and research
[6] it on your own.  And as of this moment, I
[7] don't even know what relevance that is to what
[8] we're discussing in this case.
[9]        Tomorrow at some time you'll
[10] hear the conclusion of the evidence, the
[11] lawyers' speeches and my charge to you with
[12] regard to the crimes involved.  And until that
[13] time, until you can go back do deliberate,
[14] keep an open mind and don't discuss the case
[15] even among yourselves.  If anyone approaches
[16] you and wants to discuss this case with you,
[17] that can be a serious matter and you should
[18] report that to a court officer as soon as
[19] possible.
[20]        Does anyone have anything else
[21] before the jury is excused for the evening?
[22]        MR. STACKOW:  No, Your Honor.
[23]        THE COURT:  Anybody?
[24]        THE DEFENDANT:  No.
[25]        THE COURT:  All right.  You're

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 267

[1]
[2] excused.
[3]        COURT CRIER:  What time do you
[4] want them in tomorrow, Your Honor?
[5]        THE COURT:  We're going to try
[6] to get started at 9:30.  At nine o'clock
[7] tomorrow, remember how there was a judge
[8] during jury selection who came down and
[9] welcomed you for jury service?  I get to do
[10] that tomorrow.  And we probably have a few
[11] cases that we have to do something with at
[12] 9:30, but our goal is 9:30.  So you should be
[13] here by 9:30 just in the off chance we're
[14] actually ready to start at 9:30.  Okay?
[15]        COURT CRIER:  Please remain
[16] seated as the jury exits.
[17]        (Jury excused.)
[18]        THE COURT:  Does anybody have
[19] anything else before we recess for the day?
[20]        MR. STACKOW:  I, do Your Honor.
[21]        THE COURT:  Okay.
[22]        MR. STACKOW:  I actually have a
[23] bail motion.  I was made aware during the
[24] course of the day today that the defendant
[25] actually contacted the complaining witness

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 268

[1]
[2] last night and told her, paraphrasing, that
[3] not to come to court, that if I lose, you
[4] lose, and that Ericka was obviously very upset
[5] by that, and both she and her mother told me
[6] that today.
[7]        Based on that, I have a motion
[8] to revoke the defendant's bail.
[9]        THE COURT:  How was the contact
[10] made?  I mean, was it over the phone?
[11]        MR. STACKOW:  It was over the
[12] phone.
[13]        THE COURT:  Well, how would
[14] both people know what was said on the phone?
[15]        MR. STACKOW:  Ericka knows
[16] because she spoke to him and the mother knows
[17] because Ericka told her afterwards and saw how
[18] upset her child was.
[19]        THE COURT:  Is Ericka still
[20] here?
[21]        MR. STACKOW:  Yes.  I asked
[22] them specifically to wait, both of them to
[23] wait.
[24]        THE COURT:  All right.  Do you
[25] admit that what the DA has just represented to

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

**Page 269**

[1] the Court?
[3]        THE DEFENDANT: I did not say
[4] that. But I was a over a friend's house. She
[5] called the friend's house. She called the
[6] friend's house. In fact, if we can, that's
[7] why I need Tyra here. If we can get the phone
[8] records of my friend's phone where she called
[9] the friend's phone, then --
[10]        THE COURT: All right. Well,
[11] she called the friend's phone but the question
[12] is whether you spoke to her and what the
[13] conversation was.
[14]        THE DEFENDANT: She asked me
[15] what do I want her to do. I'm like, do what
[16] you feeling like doing. I did not threaten
[17] her any type of way. I did not tell her, you
[18] know, not show up. I've been showing up to
[19] court every single day.
[20]        THE COURT: I'm not going to do
[21] anything with the bail at the moment. I am
[22] going to order the defendant to stay away from
[23] the complainant for the balance of the trial.
[24] If she calls you, you hang up. You do not
[25] call her. You do not go anywhere near her
            Carl G. Sokolski
            Official Court Reporter
            (215) 683-8060

**Page 270**

[2] house. You're to stay away from her, the
[3] family members. If anybody contacts her on
[4] your behalf, it's going to come back on you.
[5] Do you understand what I'm saying?
[6]        THE DEFENDANT: Yes, sir.
[7]        THE COURT: All right. So he's
[8] been on bail. He's always shown up. I don't
[9] know what the amount of the bail is, but it's
[10] been enough for him to be in court on time
[11] every day, and the facts are in dispute as to
[12] that conversation. And she did come in and
[13] she did testify, so whatever harm we would be
[14] seeking to prevent seems to be moot.
[15]        MR. STACKOW: Well,
[16] respectfully, I disagree.
[17]        THE COURT: What harm are you
[18] trying to prevent by locking him up?
[19]        MR. STACKOW: Further contact
[20] to the complaining witness. He's now what I
[21] would characterize as in a desperate
[22] situation. He thought up until ten a.m. this
[23] morning that he had gotten away with it, that
[24] she wasn't going to show up. Once she takes
[25] the witness stand and has now disclosed to the
            Carl G. Sokolski
            Official Court Reporter
            (215) 683-8060

**Page 271**

[2] jury everything about their relationship, he
[3] knows that he's found and that, I believe,
[4] makes him even more dangerous than it did at
[5] this time yesterday.
[6]        THE COURT: Why would he be
[7] dangerous to complainant? She's already
[8] testified and her testimony is preserved.
[9] There's nothing he can do about it.
[10]        MR. STACKOW: Well, I'd like
[11] her life to be preserved as well. It's just
[12] not her testimony.
[13]        THE COURT: Don't say a word.
[14] You didn't represent that there were any
[15] threats. What I heard was he was telling her
[16] don't come to court tomorrow because it will
[17] be bad for her.
[18]        MR. STACKOW: I think it's
[19] implied, at least a threat to some degree,
[20] that if I lose, you lose.
[21]        THE COURT: Right. If I lose,
[22] you lose. If I lose, I'm not going to be able
[23] to support the child, I'm not going to be able
[24] to take care of John-John. There's nothing
[25] that you have stated to the Court that implies
            Carl G. Sokolski
            Official Court Reporter
            (215) 683-8060

**Page 272**

[2] a threat to her well-being. And I've entered
[3] and order now that he's not to have any
[4] contact. He's to stay away. If you violate
[5] the order, you go to jail. Do you understand
[6] that?
[7]        THE DEFENDANT: Yes, sir.
[8]        THE COURT: Okay. So with
[9] that, is there anything else?
[10]        MR. STACKOW: Just one further
[11] request, that the defendant be ordered not to
[12] leave for five minutes just to give Ericka and
[13] her mother a little bit of a head start.
[14]        THE COURT: All right. Mr.
[15] McGill and his client will stay here until
[16] five o'clock.
[17]        MR. STACKOW: Thank you, Your
[18] Honor.
[19]        THE COURT: And at five o'clock
[20] they can leave.
[21]        MR. STACKOW: Very good. I
[22] appreciate that.
[23]        THE COURT: Anything else?
[24]        MR. McGILL: No, Judge. I
[25] would just like Mr. Stackow to remain so they
            Carl G. Sokolski
            Official Court Reporter
            (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 3
March 11, 2010

Page 273

[1]
[2] could try to work out the stipulation for the
[3] detective's testimony.
[4]         THE COURT:  Well, first he has
[5] to tell them that they're free to go.
[6]         MR. McGILL:  That's fine.
[7]         THE COURT:   And then he can
[8] come back in and whatever the stipulation is,
[9] you can try to work it out.  Anything else?
[10]        MR. STACKOW:  That's it.
[11]        COURT CRIER:  With that, Your
[12] Honor, that completes your list.  May I
[13] adjourn court until tomorrow morning nine a.m.
[14] to the call of the crier.
[15]                 -  -  -
[16]         (Trial concluded.)
[17]                 -  -  -
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 274

[1]
[2]         C E R T I F I C A T I O N.
[3]         I HEREBY CERTIFY that the
[4] proceedings and evidence are contained fully
[5] and accurately in the stenographic notes taken
[6] by me upon the foregoing matter on March 11,
[7] 2010, and that this is a correct transcript of
[8] same.
[9]
[10]
[11]         --------------------
[12]         Carl G. Sokolski.
        Official Court Reporter.
[13]
[14]
[15]         The foregoing certification of
[16] this transcript does not apply to any
[17] reproduction of the same by any means unless
[18] under the direct control and/or supervision of
[19] the certifying reporter.
[20]                 -  -  -
[21]
[22]
[23]
[24]
[25]

Carl G. Sokolski
Official Court Reporter
(215) 683-806
Court Reporting System (Generated 2014/07/22 20:40:57)

