3:21cv1474

# EXHIBIT D

# First Judicial District of Pennsylvania

*51CR00034302009*
*Johnathan Robins*

*Trial (Jury) Volume 4*
*March 12, 2010*



**Court Reporting System**

*First Judicial District of Pennsylvania*
*100 South Broad Street, Second Floor*
*Philadelphia, PA 19110*
*(215) 683-8000   FAX:(215) 683-8005*

Original File ROBINS4.V1, 166 Pages
CRS Catalog ID: 10041277

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 4
March 12, 2010

---

Page 1

[1]
[2] IN THE COURT OF COMMON PLEAS OF PHILADELPHIA
[3] FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
[4]      CRIMINAL TRIAL DIVISION
[5]
[6]
COMMONWEALTH        :
[7]   VS.            :
[8]
JOHNATHAN ROBINS    : CP-51-CR-0003430-2009
[9]
              - - -
[10]
[11]    Courtroom 901 Justice Center
        Philadelphia, Pennsylvania
[12]     Friday, March 12, 2010
[13]          - - -
[14] BEFORE:  HONORABLE CHARLES J. CUNNINGHAM, III
         AND A JURY
[15]
              - - -
[16]    CASE IN CHIEF
[17]         - - -
[18]
[19]      (VOLUME II)
[20]
[21]
[22]
[23]
[24]
[25]
           Carl G. Sokolski
         Official Court Reporter
            (215) 683-8060

---

Page 2

[1]
[2] APPEARANCES:
[3]
[4]    MICHAEL STACKOW, ESQ.
       Assistant District Attorney
[5]    Counsel for the Commonwealth
[6]    JOHNATHAN ROBINS, Pro Se
       THOMAS L. McGILL, JR., ESQ.
[7]      Counsel for the defendant
[8]
[9] DEFENDANT'S EVIDENCE DIRECT  CR.  REDR.  RECR.
[10] Tyra Felder        7   10
    Johnathan Robins   15  48  78
[11]
[12]    E X H I B I T S
[13] NO.                      MARKED
[14] D-1  Driver's License Application    22
    D-2  Complaint for Custody       34
[15] D-3  Letter from Wayne Williams, City of
         Philadelphia, Department of Public
[16]     Health, Dated December 30, 2008   36
    D-4  Photocopy of four MySpace pages   44
[17]
              - - -
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]
           Carl G. Sokolski
         Official Court Reporter
            (215) 683-8060

---

Page 3

[1]
[2]    P R O C E E D I N G S.
[3]      THE COURT:  It looks like this
[4] case could go to the jury this morning, right?
[5]    MR. STACKOW:  Yes.
[6]    THE COURT:  Before lunch?
[7]    MR. STACKOW:  Yes. Judge, I do
[8] have, if I may, one other supplement to the
[9] jury instructions that I gave to the Court
[10] yesterday.
[11]    THE COURT:  Did you give one to
[12] the defendant?
[13]    MR. STACKOW:  Yes, I did, Your
[14] Honor.
[15]    THE COURT:  Did you furnish the
[16] charge with regard to the crime?
[17]    MR. STACKOW:  I didn't, Your
[18] Honor.
[19]    THE COURT:  You gave me I think
[20] a rough copy of the points for charge.
[21]    MR. STACKOW:  I did.
[22]    THE COURT:  Do you still have a
[23] copy of that?
[24]    MR. STACKOW:  I do.
[25]    THE COURT:  Mr. Robins, do you
           Carl G. Sokolski
         Official Court Reporter
            (215) 683-8060

---

Page 4

[1]
[2] have all your witnesses here today?
[3]    THE DEFENDANT:  The only person
[4] I assume that's going to be testifying is Tyra
[5] Felder, the detective.  So we'll just do Miss
[6] Tyra Felder and after that I'll take the
[7] stand.
[8]    THE COURT:  Okay.
[9]    MR. STACKOW:  And, Your Honor,
[10] may I place something on the record regarding
[11] the detective?
[12]    THE COURT:  Sure.
[13]    MR. STACKOW:  After court
[14] yesterday, Mr. McGill provided me with a phone
[15] number for that detective out in Delaware
[16] County and I placed a phone call to that
[17] office this morning, spoke to a detective who
[18] works in the same department, who informed me
[19] that the detective whose name is Shawn Rowe,
[20] the requested witness is Shawn Rowe, that he
[21] was not working, that he would be in at four
[22] o'clock today and that I could leave a voice
[23] mail message.  I did leave a voice mail
[24] message asking him to call me.  I left him
[25] both my work number and my cell phone number.
           Carl G. Sokolski
         Official Court Reporter
            (215) 683-8060

---

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 4
March 12, 2010

Page 5

[1]
[2] I told him generally what it was about, that
[3] it was an ongoing trial right now. And I
[4] haven't heard anything since then, since that
[5] voice mail message was left this morning.
[6]         MR. McGILL: Your Honor, this
[7] is Courtroom D calling. I scheduled a date
[8] for a case that's being continued. May I
[9] accept the call?
[10]         THE COURT: Sure.
[11]         MR. McGILL: Thank you.
[12]         THE COURT: So you have one
[13] witness and that witness is who again?
[14]         THE DEFENDANT: Miss Tyra
[15] Felder.
[16]         THE COURT: And Miss Tyra
[17] Felder is what? A friend?
[18]         THE DEFENDANT: A friend.
[19]         THE COURT: All right.
[20]         MR. STACKOW: I would ask for
[21] an offer of proof, Your Honor.
[22]         THE DEFENDANT: She's going to
[23] be testifying about how old Ericka told her
[24] she was and she's also going to be testifying
[25] when she went with Ericka to go pick up
                Carl G. Sokolski
            Official Court Reporter
                (215) 683-8060

Page 6

[1]
[2] Ericka's stuff around in March of 2008 in a
[3] U-Haul van.
[4]         MR. STACKOW: Do you have a
[5] date of birth for Miss Felder?
[6]         THE WITNESS: 12/13/1980.
[7]         MR. STACKOW: Thank you.
[8]         MR. McGILL: Thank you, Your
[9] Honor.
[10]         COURT CRIER: Please remain
[11] seated while the ladies and gentlemen of the
[12] jury enter the courtroom.
[13]         (Jury summoned.).
[14]         THE COURT: Good morning,
[15] ladies and gentlemen.
[16]         JURY COLLECTIVELY: Good
[17] morning.
[18]         THE COURT: We're starting late
[19] this morning because some of you were late and
[20] as I pointed out the other day, if one of you
[21] is late, then that makes all of you late
[22] because we're not going to get started until
[23] all of you are here.
[24]         That is not the reason why we
[25] asked you to submit a lunch order. It's not
                Carl G. Sokolski
            Official Court Reporter
                (215) 683-8060

Page 7

[1]
[2] our intention to keep you in confinement from
[3] now until the end of the trial just to make
[4] sure we know where you are. We take lunch
[5] orders from every jury so that while they're
[6] deliberating, and we expect that you will be
[7] deliberarting by lunch, so that while you're
[8] deliberating you can stay together, eat lunch,
[9] take a break, eat lunch, resume deliberation,
[10] or eat lunch while you're deliberating. It
[11] will be up to you. That's the reason for the
[12] lunch order.
[13]         When we left off yesterday, it
[14] was the defense case that was on and it's
[15] still the defense case. Mr. Robins, do you
[16] have a witness to call?
[17]         THE DEFENDANT: Yes, I do, Your
[18] Honor. A Mrs. Tyra Felder.
[19]         COURT CRIER: Please remain
[20] standing. Please state for the record your
[21] name. Spell your name for the Court.
[22]         THE WITNESS: Tyra, T-Y-R-A.
[23] My last name is Felder, F-E-L-D-E-R-.
[24]         TYRA FELDER, after having been
[25] duly sworn, was examined and testified as
                Carl G. Sokolski
            Official Court Reporter
                (215) 683-8060

Page 8

[1]         Tyra Felder – direct
[2] follows:.
[3]         DIRECT EXAMINATION
[4] BY THE DEFENDANT:
[5]     Q.     Mrs. Felder.
[6]     A.     Yes.
[7]     Q.     Well, Miss Felder. How long
[8] have you known Ericka Johnson?
[9]     A.     Since 2008.
[10]     Q.     Who do you know her from?
[11]     A.     From you.
[12]     Q.     How long have you known me?
[13]     A.     Probably since I was like four.
[14]     Q.     Okay. Now, can you tell us
[15] what Ericka Johnson told you her age was?
[16]     A.     Well, when I first Ericka I was
[17] doing her hair and she told me that she was
[18] eighteen years old.
[19]     Q.     Okay.
[20]         THE COURT: I'm sorry. I
[21] missed the beginning of that.
[22]         THE WITNESS: When I first met
[23] her I was doing her hair and she told me that
[24] she was eighteen years old.
[25] BY THE DEFENDANT:
                Carl G. Sokolski
            Official Court Reporter
                (215) 683-8060

Page 9

[1]        Tyra Felder - direct
[2]     Q.    Well, around what time was
[3] this?
[4]     A.    This had to be around like
[5] February or March in 2008.
[6]     Q.    Okay.  So the baby had just
[7] been born.
[8]     A.    Uh-huh.
[9]     Q.    Can you tell us about the
[10] incident when you went to Ericka's mother's
[11] house in Upper Darby in a U-Haul van to pick
[12] up Ericka's things?
[13]     A.    Well, when I went to her
[14] mother's house, I was sitting outside while
[15] she went in to get her things and her mother
[16] came to the door and, well, of course, she was
[17] cursing and hollering and screaming at me.  I
[18] didn't know her, you know.  And she said to
[19] me, she was like, Do you know how old she is?
[20] I was like, She told me that she was eighteen.
[21] Well, you know, that's how I know how old she
[22] is.  And then she just went back in there and
[23] slammed the door, and her and Ericka was
[24] arguing and Ericka just was moving her things
[25] and it was just a big, chaotic scene.  And
            Carl G. Sokolski
            Official Court Reporter
            (215) 683-8060

Page 10

[1]        Tyra Felder - cross
[2] that's basically it.  Her mother never said
[3] her age to me or anything.
[4]     Q.    So her mother never told you
[5] how old she was?
[6]     A.    No, she didn't.
[7]     Q.    So do you know how old she is
[8] now?
[9]     A.    No, I do not.
[10]     THE DEFENDANT:  I'm finished.
[11]     THE COURT:  Do you have any
[12] questions?
[13]     MR. STACKOW:  I do, yes.  Thank
[14] you.
[15]        CROSS EXAMINATION
[16] BY MR. STACKOW:
[17]     Q.    Good morning, Miss Felder.
[18]     A.    Good morning.
[19]     Q.    You wouldn't be surprised to
[20] learn that Ericka is seventeen today, would
[21] you?
[22]     A.    I mean, no.
[23]     Q.    Okay.  You said you've known
[24] the defendant since you were a young girl; is
[25] that right?
            Carl G. Sokolski
            Official Court Reporter
            (215) 683-8060

Page 11

[1]        Tyra Felder - cross
[2]     A.    Uh-huh, yes.
[3]     Q.    And so for most of your life
[4] you two have been acquainted or friends.  Is
[5] that fair to say?
[6]     A.    Well, actually, he was friends
[7] with my mom, so, yeah, basically.
[8]     Q.    Okay.  When you say with your
[9] mom, you mean dating her?
[10]     A.    No, no, no.  Well, actually, he
[11] just was friends like with my mom and I had
[12] older siblings, so he was friends with them
[13] too.
[14]     Q.    Okay.  Do you know how old the
[15] defendant is today?
[16]     A.    No.
[17]     Q.    Would it surprise you to learn
[18] that he's actually, he'll be forty-four in a
[19] couple of weeks?  A little surprising, right?
[20]     A.    Well, I wouldn't know how old
[21] he is either.
[22]     Q.    Okay.  Now, let me ask you
[23] this.  March of 2008.  Or excuse me.  What did
[24] you say?  February or March of 2008 is when
[25] you first met Ericka Johnson?
            Carl G. Sokolski
            Official Court Reporter
            (215) 683-8060

Page 12

[1]        Tyra Felder - cross
[2]     A.    Yes.
[3]     Q.    She was not pregnant?
[4]     A.    No.  When I did her hair, she
[5] just had had the baby.
[6]     Q.    Did she bring in John-John with
[7] her?
[8]     A.    Yes.
[9]     Q.    Where was this being done?  At
[10] your house or at some other place?
[11]     A.    At my house, yes.
[12]     Q.    All right.  So I take it that
[13] Mr. Robins would have had to tell her where to
[14] go for this hair appointment; is that right?
[15]     A.    Yes.
[16]     Q.    Because he knew where you lived
[17] at that time.
[18]     A.    Yes.
[19]     Q.    But she had never been to that
[20] place before; is that right?
[21]     A.    No.
[22]     Q.    Was this something that she had
[23] to pay you for, the hair?  Or was it just
[24] something you were doing?
[25]     A.    Well, I was doing a favor for
            Carl G. Sokolski
            Official Court Reporter
            (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 4
March 12, 2010

Page 13

[1]      Tyra Felder - cross
[2] him.
[3]   Q.   Okay.  For Mr. Robins.
[4]   A.   Yes.
[5]   Q.   So he paid you money?
[6]   A.   Yes.
[7]   Q.   Now, was Mr. Robins there when
[8] she came to get her hair done?
[9]   A.   Yes.  He brung her there.
[10]   Q.   Did he stay while she was
[11] getting her hair done?
[12]   A.   Pretty much, most of the time.
[13]   Q.   So when the issue of the age
[14] came up, Mr. Robins was there?
[15]   A.   No.
[16]   Q.   He wasn't there.
[17]   A.   No.
[18]   Q.   So he had left at that point?
[19]   A.   Yes.  He had went to work.
[20]   Q.   So why was Ericka's age even a
[21] topic of conversation, then?
[22]   A.   Because she asked me how old
[23] was I.
[24]   Q.   Okay.  And it's only then that
[25] you asked her how old she was.
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 14

[1]
[2]   A.   Yes.
[3]   Q.   Had you told her that you were
[4] friends with Mr. Robins prior to that?
[5]   A.   Yes.
[6]   Q.   Longtime friends?
[7]   A.   Yes.
[8]      MR. STACKOW:  That's all the
[9] questions I have.
[10]      THE DEFENDANT:  That's it.  She
[11] can be excused.
[12]      THE COURT:  You can step down.
[13] You're excused.
[14]      THE WITNESS:  Okay.  Thank you.
[15]      (Witness excused.)
[16]      THE COURT:  Mr. Robins,
[17] anything else?
[18]      THE DEFENDANT:  I'll be taking
[19] the stand in a minute.  Can I just speak with
[20] my lawyer for a second?
[21]      THE COURT:  Okay.
[22]      (Brief pause in the
[23] proceedings.)
[24]      THE COURT:  Mr. Robins.
[25]      THE DEFENDANT:  Yes.
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 15

[1]      Johnathan Robins - direct
[2]      THE COURT:  Let's go.  It's
[3] show time.
[4]      THE DEFENDANT:  Yes, sir.
[5]      THE COURT:  Come right up here.
[6] Have a seat on the stand.  You'll be sworn in.
[7]      COURT CRIER:  Just remain
[8] standing.  Please state your name.  Spell your
[9] last name for us.
[10]      THE WITNESS:  Johnathan Robins.
[11] R-O-B-I-N-S.
[12]      JOHNATHAN ROBINS, after having
[13] been duly sworn, was examined and testified as
[14] follows. . .
[15]      DIRECT EXAMINATION.
[16]      THE WITNESS:  Okay.  When I
[17] first met Ericka, I was trying to date people.
[18] I was on the Internet, you know.  I actually
[19] contacted some, some girl in the
[20] Philippines.  It just didn't feel right.  And
[21] just on a humbug I actually happened to pick
[22] up and call the Philadelphia Raven.  It's a
[23] dating phone line.
[24]      When I called, I listened on
[25] the phone and there's different rooms and it
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 16

[1]      Johnathan Robins - direct
[2] was one person that, well, it was a few people
[3] that piqued my interest, and it was one young
[4] lady that said that, you know, she wanted a
[5] family, wanted to get married, and I was at
[6] the time when I actually wanted a family and
[7] get married myself.  And what I did was I
[8] tried to talk to her and what happens is she
[9] has to ring back.  It's like you press on the
[10] phone.  They have to ring back.  And so she
[11] rung back.  It's a few that actually rang back
[12] to me, but she rung back and we exchanged
[13] phone numbers.
[14]      After we exchanged phone
[15] numbers and after we actually got off of the
[16] Philadelphia Raven, which again is a adult
[17] eighteen dating service, -- when you get on
[18] it, it tells you the rules you have to be
[19] eighteen -- we conversed for weeks over the
[20] phone before we ever met.  So we basically got
[21] to know each other, what we wanted, you know,
[22] what we were looking for.  And I understood
[23] that she was nineteen but, you know, I asked
[24] her, you know, you're nineteen, why do you
[25] want a family?  Why?  That's what she wanted.
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 4
March 12, 2010

Page 17

[1]        Johnathan Robins - direct
[2]        A lot of females that actually
[3] were closer to my age in the neighborhood that
[4] I lived in were actually on drugs or smoked
[5] cigarettes or had children of their own.  I
[6] had no children.  And from my experience, a
[7] lot of -- I know how it sounds -- a lot of
[8] females, the way that other men treat them,
[9] they take it out on the next boyfriend or
[10] whatever.
[11]        And when I met her, we got to
[12] know each other.  We clicked.  Don't know why.
[13] We just happened to click.  So we met at, we
[14] met in Upper Darby, Sixty-Ninth Street.  There
[15] was a Hometown Buffet.  I believe we had
[16] dinner there.  We talked.  We talked about,
[17] again, about marriage, about children and what
[18] we expected, you know, in a relationship.  And
[19] I was like, again, I was to name the boys, she
[20] was to name the girls.  And we left.
[21]        I don't know from that period
[22] of time when we left Hometown Buffet, which
[23] was, that was like in December, I believe.
[24] But we talked and when we finished talking on
[25] the phone again, we decided to start going

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 18

[1]        Johnathan Robins - direct
[2] together January first, 2007.  That's when we
[3] were on the phone and we were official, all
[4] right, let's start dating.
[5]        So we, again, were just talking
[6] and eventually we started going out.  We
[7] started going out.  We went to my house in
[8] February.  And, yes, we did have intercourse.
[9] I believed she was nineteen.  That's what we
[10] talked about.  We also at that point in time,
[11] to make more of a commitment, she wanted us to
[12] be in contact with each other so she said we
[13] needed cell phones.  I'm like okay.  So I got
[14] a cell phone with two-year plan, a Sprint, you
[15] know.  We both got Fusic, matching Fusic cell
[16] phones.  And we constantly, we did constantly
[17] go out.
[18]        She wanted to get, again,
[19] married and have children.  It just so
[20] happened that the children came a little bit
[21] quicker than we had actually planned.  We
[22] actually thought we were going to have a
[23] relationship and get married first.  But she
[24] got pregnant.  She stayed with me for like,
[25] maybe like, she actually stayed with me most

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 19

[1]        Johnathan Robins - direct
[2] of 2007.  I did not -- do we have any water?
[3] Can I get some more water?  Because my mouth
[4] is getting dry.  Is it possible I could get
[5] some water?
[6]        THE COURT:  Officer, could you
[7] give the witness some water?
[8]        THE WITNESS:  We happened to go
[9] on vacation, like she said.  We went on
[10] vacation.  The reason why I went on vacation
[11] to Florida is before I ever met her, I had got
[12] a phone call about this plan, this what is
[13] it?  The thing where you sign up for the homes
[14] or the apartments in Florida and you actually
[15] become, I forget exactly what you call it.
[16] You actually pay for the apartment and you
[17] actually -- it's a name for it and I forgot
[18] what it is.  You actually pay for the
[19] apartment and that way you can fly back and
[20] forth to Florida and you will always have the
[21] apartment when you get down there and they
[22] would try to sell it to you.  They would try
[23] to sell it.  So you would get a deal if you at
[24] least allowed them to try to sell you the
[25] apartment.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 20

[1]        Johnathan Robins - direct
[2]        What I did was I paid two
[3] hundred dollars months before I met her, like
[4] almost like a year, more than a year before I
[5] met her, but I never took it up on the offer
[6] of the vacation because I had no one to go
[7] with.  And it just so happened when I started
[8] going with her, the service called again and
[9] said even though your time had expired, you
[10] have paid us two hundred dollars so we're
[11] going to allow you to reopen it if you still
[12] want to use it.  So I said okay, fine.
[13]        So we went.  We went to
[14] Florida, had a good time.  We went for a week
[15] at Universal Studios and Walt Disney.  This is
[16] what other couples do.  They go on vacation.
[17]        After that, I knew that she
[18] actually, I have a girlfriend with a child on
[19] the way.  I wanted to basically make more
[20] money.  I knew I had to make a better career.
[21] So I started looking for other work, other
[22] work to provide for her and my son.  And also,
[23] we knew we were going to get married and we
[24] just had to get around to it, but I wanted to
[25] get married before the child was actually born

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Page 21

[1]        Johnathan Robins - direct
[2] because I did not want my child to actually be
[3] born out of wedlock. That's one thing I
[4] definitely did not want. And because I
[5] wanted, like, because like this is what we
[6] wanted. We wanted, like, I've seen a lot of
[7] families where you have children by —
[8]        MR. STACKOW: Objection to
[9] this, Your Honor.
[10]        THE COURT: Well, overruled.
[11] You can continue. You've seen a lot of
[12] families, you were explaining.
[13]        THE WITNESS: With children who
[14] would have different fathers and different
[15] mothers. And what I liked about her is she
[16] didn't have any children, I didn't have any
[17] children, and we wanted us to have a family
[18] with us and that's what it was going to be,
[19] you know, with us and our children.
[20]        When I took a specific job —
[21] oh. Also, I want to introduce again into
[22] evidence the, because my license, my driver's
[23] license was actually messed up, tickets in
[24] Jersey. So I told her that, you know, we're
[25] walking, we're catching the bus. So I have a
Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 22

[1]        Johnathan Robins - direct
[2] car in the garage. It's no sense in it
[3] sitting there. So you need. I told her. It
[4] was my idea. You need to go get your license
[5] so I could put my car in your name so we can
[6] drive, because I didn't want my wife actually
[7] walking when I had a car in the garage.
[8]        Can we introduce this into
[9] evidence, the application she did for her
[10] driver's license?
[11]        THE COURT: Do you have a copy
[12] of that already?
[13]        THE WITNESS: Well, he saw it.
[14] I don't have it.
[15]        MR. STACKOW: If it's the one
[16] that was introduced yesterday.
[17]        THE WITNESS: Yeah, but I never
[18] introduced it.
[19]        MR. STACKOW: Yes, I do.
[20]        THE COURT: Was it already
[21] marked in evidence?
[22]        MR. STACKOW: No, it wasn't.
[23] No objection.
[24]        THE WITNESS: Can you make a
[25] copy and mark it Exhibit A?
Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 23

[1]        Johnathan Robins - direct
[2]        COURT CRIER: It's marked D-1.
[3] Your Honor.
[4]        THE WITNESS: Okay. D-1.
[5] Okay. And it was my idea to get the license,
[6] but like I said again, she was nineteen. She
[7] went down there and she actually took the test
[8] but didn't pass the test, you know. So on
[9] this paper, she's down here as born in 1986,
[10] July thirtieth, 1986. It has her signature
[11] and it has a signature of the officer inside
[12] the Department of Motor Vehicles.
[13]        Okay. Again, back when I was
[14] looking for another job, I found a good job.
[15] After going through many different jobs, I
[16] found a real good job wherein which this job,
[17] if you stayed there, followed the rules,
[18] normally within two years you can make like
[19] three figure salary. But it's a very hard
[20] job, a lot of turnover, but you can't miss
[21] days, you know. It's selling FiOS, the FiOS
[22] job. You actually go out in rain, snow,
[23] whatever temperature, late into the night, six
[24] days a week. That's what you do and you build
[25] up a team and you eventually branch off into
Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 24

[1]        Johnathan Robins - direct
[2] your own office once you have saved up enough
[3] money and get enough people on your team.
[4]        Before I took the job, I asked
[5] her permission. You know, I'm going to be
[6] working six days a week, you know. I'm not
[7] going to be here. And so I took the job and
[8] because in prospects of working for a good
[9] hard two years while she gave birth to the
[10] baby, she stayed home, she take care of it,
[11] and at the end of those two years we will be
[12] making good money, you know. So it's just
[13] that she had to basically accept the fact that
[14] I would not be home while I did this job.
[15]        When it came around to January,
[16] like I said, we decided to go ahead and get
[17] married. I had went on ahead and ordered the
[18] airline tickets to go get married. The reason
[19] why I decided to get married in Missouri, the
[20] law in Missouri is exactly the same as in the
[21] State of Pennsylvania. The only difference is
[22] you can waive the three-day waiting period.
[23] And this job that I had, you could not take
[24] off days, but I was going to take off one day
[25] and one day only to get married.
Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 25

[1]       Johnathan Robins - direct
[2]        Now, when I looked, I was
[3] seeing where could I go for us to have a
[4] vacation and just, you know, where she can
[5] enjoy this one day, make it special that we're
[6] getting married, because I couldn't, you know,
[7] take off or have any kind of celebration.
[8] Let's go on vacation, get married and come
[9] back home.
[10]       So I went to work one night,
[11] came home, got up early the next morning. We
[12] went. We got married in Missouri. After we
[13] got married we went around, saw all the
[14] sights, the arch, you know, stainless steel
[15] with a little bit of rust on it. We enjoyed
[16] ourselves in St. Louis. The same way we
[17] enjoyed ourselves in Florida, we enjoyed
[18] ourselves in St. Louis. That's why I actually
[19] picked going out there.
[20]       Now, there was another state
[21] that had a no waiting period where I could do
[22] it in one day. Well, this state had a no
[23] waiting period. Well, I actually wanted a
[24] vacation and I might have actually done it
[25] here, but it's just that I just needed to only

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 26

[1]       Johnathan Robins - direct
[2] be out one day because I was trying to get a
[3] higher or better position in the job. And
[4] even she said that one day she wanted, she
[5] begged me to stay home but I did not. I mean,
[6] it really hurt me to go, to not stay with her
[7] but actually go to work, because I wanted to
[8] build my team so that we can get more, you
[9] know, a better position.
[10]       But in January, at the end of
[11] January, before the baby was born, it was time
[12] to do taxes. Since, you know, I got married,
[13] let's go ahead and do our taxes. That's when
[14] Ericka came out with, you know, you can't put
[15] me down on your taxes and this is where Ericka
[16] starts her crying, which she does from time to
[17] time. I'm like, why? You know, it took a
[18] while for me to get it out of her, but she was
[19] not the age she actually was. So it was a
[20] long conversation, a long conversation. Why?
[21] You know. For what reason? A lot of crying.
[22] And she explained that, you know, she really
[23] wanted to be away from her mother and away
[24] from the situation that she was actually in.
[25] Because she used to tell me, you know, that

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 27

[1]       Johnathan Robins - direct
[2] her mother abused her and all that. So she
[3] did not want to be there and this is what she
[4] wanted. I was like, okay, okay, we'll just
[5] talk about it. But you know that we have to
[6] eventually straighten this out, you know,
[7] because there's a problem here, obviously.
[8] It's definitely a problem here.
[9]       So I went back to work and I
[10] worked until she gave birth. When she gave
[11] birth I was actually, she was home with her
[12] mother and she gave birth and I was getting
[13] ready for work and she woke me up, like, you
[14] know, I'm giving birth. So I went on ahead,
[15] got dressed. Instead of going to work I went
[16] to the hospital. I went to the hospital and
[17] she had the baby in twenty minutes.
[18]       And, like, our child was born
[19] with pneumonia. He's inside the incubator. So
[20] she told the nurse because like we wanted to
[21] see him, she told the nurse that this is my
[22] uncle, like she said before. I said no, no,
[23] I'm not the uncle, I'm the actual father. I
[24] gave him my ID and was like, you know,
[25] because the reason why I'm getting a little

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 28

[1]       Johnathan Robins - direct
[2] teary-eyed, because I remember my son when he
[3] was in the incubator. At that point I didn't
[4] tell my family he was born because I didn't
[5] know if he was going to live.
[6]       So like I said, I told the
[7] people who I was. Ericka didn't want to tell
[8] them I was the father. I told them I was the
[9] father because I did, I felt I did nothing
[10] wrong. And the investigation, like she said,
[11] the midwife went on ahead and went back to her
[12] mom and started the investigation. They
[13] started the investigation because I told them
[14] exactly what went on.
[15]       She stayed with her mother for
[16] a little while after that, and that's when I
[17] started having to find out and research the
[18] law because I wanted to know were we really
[19] married or not because, you know, I took an
[20] oath and it was important to me. And so I
[21] started. There's the Jenkins Law Library.
[22]       Obviously I had to quit the
[23] job, the job that I wanted to stay on for us.
[24] I hadn't planned on quitting it but I had to
[25] quit it because now I got to take care of the

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Page 29

[1]      Johnathan Robins - direct
[2] baby and she has to go to school. So after
[3] the baby was born, I quit my job and started
[4] taking care of my son. Then Ericka started
[5] going to school. First she was living with
[6] her mom. Then she moved back with me. That's
[7] when she, that's when Tyra went down there and
[8] picked up her things. She wanted to move
[9] back.
[10]      I looked at the law and from
[11] what I could see, we were married. I read
[12] Pennsylvania law. I read Missouri law. I'm
[13] like, okay, fine. But when she moved back, it
[14] was like because her mom was always arguing.
[15] She said she was abusive. But I'm like, look,
[16] you got to go to school. I'll work, I'll take
[17] care of the baby, you got to go to school.
[18]      Then she started getting into
[19] because it was like a different mindset. She
[20] started worrying about, like she said before,
[21] like, I acted differently. I didn't realize I
[22] was acting different toward her. But she
[23] would be mad because she said I wouldn't want
[24] to touch her, I wouldn't want to hold her, you
[25] know. I didn't know what. I actually didn't

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 30

[1]      Johnathan Robins - direct
[2] know what to do with her at this point in
[3] time, you know. And she said that, you know,
[4] I didn't want to hold her, I didn't want to
[5] touch her, you know. She said, it was like
[6] she was crying, like she was saying like she
[7] was dirty or something. I didn't want her to
[8] feel that way.
[9]      So, but after that, that's when
[10] she started dating other guys, I guess,
[11] because, you know, I wasn't, you know, with
[12] her. She stayed there but I wasn't with her,
[13] you know. And at some point in time after she
[14] finished the school year living with me in
[15] Philadelphia, because it was a long hike. It
[16] was a long hike from Philadelphia to go to
[17] Upper Darby for her every day and that's not
[18] fair for her. So we came to the conclusion
[19] you need to move back with your mom.
[20]      Oh. One other thing. During
[21] this period of time when she was living with
[22] me, when she moved back with me, we found out
[23] that because, see, I was trying to get care
[24] for my son, we found out that her mother was
[25] collecting the check. That's when her and I

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 31

[1]      Johnathan Robins - direct
[2] got on the phone and told the caseworker,
[3] look, she's staying here with me and we have
[4] our son.
[5]      I did not, like she said, I did
[6] not meet her mom until after the baby was
[7] born. And once she told me how old she was
[8] and when I saw her mother, I'm like, oh, boy,
[9] you know. What could I say? I couldn't say
[10] too much of anything. But she allowed her
[11] daughter to move back but only after we called
[12] to get the check cut off is only when her
[13] mother showed up at my front door trying to
[14] kick it in because she wanted the baby back.
[15]      Again, past that into the
[16] summer, we agreed, Ericka and I, we agreed
[17] that it's best, you need to move back in with
[18] your mother. I know you and your mother have
[19] your problems, but you need to grow up and do
[20] you and let me take care of the baby. So she
[21] moved back and when she did start the new
[22] school year, I would go in the morning,
[23] depending on when I worked. Sometimes I
[24] worked late at night and early in the morning.
[25] Sometimes I would come straight from work and

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 32

[1]      Johnathan Robins - direct
[2] be there early in the morning to pick the baby
[3] up so she could go to school. Then later on
[4] that night, afternoon or night, depending on
[5] what I was doing or what she was doing, I
[6] would drop him off. And this went on for like
[7] maybe like three, three months.
[8]      One of the things, because then
[9] when she moved back in with her mom she
[10] started to stop going to school again, because
[11] when she was with me, when I first met her in
[12] 2007, she wasn't going to school and I didn't
[13] know she wasn't going to school because she
[14] wasn't going to school, and when she moved
[15] back with her mom she started getting into the
[16] habit again of not going to school. That's
[17] when she said, you know, she said I would call
[18] her and ask her why you not going to school.
[19]      And when I came that day and
[20] they wouldn't give me my son and they called
[21] the cops because they think I'm going to hang
[22] out here, the main, one of the main reasons
[23] why I stayed out there is because I knew that
[24] they were going to call the police, you know,
[25] and I just wanted a report that I'm here

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 4
March 12, 2010

Page 33

[1] Johnathan Robins - direct
[2] picking up my son so that they wouldn't be
[3] able to say that, oh, no, he was never taking
[4] care of his son. That's one of the main
[5] reasons why I wanted to come out. I knew I
[6] wasn't going to get him that day because they
[7] had him. And again, I knew the issue was
[8] going to have to be sorted out anyway
[9] regardless, you know.
[10]        So they came and they said,
[11] okay, you got to pick him up some other time.
[12] No problem. So I left and then I guess in
[13] December of, in December of 2000 -- no. Back
[14] up. In November. In November, November
[15] eleventh exactly, as again I was taking care
[16] of my son, taking him to the health center,
[17] giving him all his appointments. They had
[18] been trying to get health care to put him on
[19] CHIP. They got to the point where they said
[20] we're not going to service your son any more
[21] at Health Care Center Six until you get health
[22] care for him. So we went into the little
[23] room, called up Keystone, because they found
[24] out that my son was on, the reason why I
[25] couldn't get it, because she still had him on
            Carl G. Sokolski
          Official Court Reporter
            (215) 683-8060

Page 34

[1] Johnathan Robins - direct
[2] Keystone on welfare in Upper Darby and
[3] Keystone would not allow me to switch it to
[4] Philadelphia so my son could get health care
[5] and only her mother, Lucille Freeman, could
[6] deal with the health care.
[7]        So I went on November eleventh
[8] down to Welfare in Upper Darby with my son.
[9] I'm like, look, I'm the one taking care of the
[10] boy. He needs health care. They're like,
[11] well, no, she has him. So the next Monday --
[12] I'd like to introduce this into evidence -- I
[13] filed a complaint for custody in Philadelphia.
[14]        COURT CRIER: It's marked D-2,
[15] Your Honor.
[16]        THE WITNESS: I filed a
[17] complaint for custody in Philadelphia court.
[18]        THE COURT: Just one second,
[19] Mr. Robins. Do you have a copy of this?
[20]        MR. STACKOW: I'm not sure if I
[21] do or not.
[22]        THE WITNESS: Yeah, I gave you
[23] a copy. I specifically gave you a copy.
[24]        COURT CRIER: It's marked D-2,
[25] Your Honor.
            Carl G. Sokolski
          Official Court Reporter
            (215) 683-8060

Page 35

[1] Johnathan Robins - direct
[2]        THE WITNESS: Wherein which on
[3] this complaint, it was issued wherein which I
[4] would have to come to court, wherein which I
[5] would have to come to court and Ericka Johnson
[6] would have to come to court in front of a
[7] judge. Again, I knew that the issue of
[8] would have to be dealt with, but my wife lied
[9] to me about when she first met me and so I did
[10] not think, you know, she would say anything
[11] different. I think, I thought that she was
[12] going to tell them, look, I lied about it to
[13] him and, you know, he found out later. That's
[14] what I thought. I mean, I'm the one that
[15] actually first set up a date for all of us to
[16] be in court in front of a judge over this
[17] issue, you know, and I did not think that my
[18] wife would say anything different. That's why
[19] I filed it.
[20]        The date that we were supposed
[21] to be in court on February twenty-fifth, I
[22] never made the date because obviously my wife
[23] had me arrested and neither one of the, the
[24] order inside the case was dismissed because
[25] nobody showed up. They didn't show up. I
            Carl G. Sokolski
          Official Court Reporter
            (215) 683-8060

Page 36

[1] Johnathan Robins - direct
[2] obviously couldn't show up. So the case for
[3] custody was just dismissed.
[4]        Like I said before, I never ran
[5] from the issue. I never told anybody anything
[6] different, you know. I always told everybody
[7] what my age was and who my wife was and who my
[8] son was, you know. I went to court to try to
[9] bring us into court to resolve the issue in
[10] Family Court about the issue about him,
[11] because I did not think my wife would say the
[12] things she said inside this case when I
[13] decided to file this custody case to bring us
[14] all in front of a judge.
[15]        Again, I also have a letter --
[16] I don't know what this exhibit, I guess D-3 --
[17] to show that because a worker inside Health
[18] Care Center Six, he wrote up a letter.
[19]        MR. STACKOW: Objection to
[20] this, Your Honor.
[21]        THE COURT: What's the basis of
[22] the objection?
[23]        MR. STACKOW: The letter is not
[24] in evidence at this point. He shouldn't be
[25] allowed to read from it.
            Carl G. Sokolski
          Official Court Reporter
            (215) 683-8060

Page 37

[1]        Johnathan Robins - direct
[2]        THE COURT:  All right.  Well,
[3] do you want to take the letter and show it to
[4] the DA?
[5]        MR. STACKOW:  Thank you, Your
[6] Honor.
[7]        THE COURT:  Do you have a copy
[8] of this already?
[9]        MR. STACKOW:  I don't believe
[10] so, Your Honor.
[11]        COURT CRIER:  Marking it D-3,
[12] right?
[13]        THE WITNESS:  Yes.
[14]        COURT CRIER:  Showing it to the
[15] Commonwealth.
[16]        MR. STACKOW:  I'd just ask for
[17] a copy, if I could be provided with a copy of
[18] that at the appropriate time.  It doesn't need
[19] to be right now.
[20]        THE COURT:  That means whenever
[21] you get a chance.
[22]        MR. STACKOW:  Right.
[23]        COURT CRIER:  D-3 has been
[24] shown to the witness.
[25]        THE COURT:  You can continue.
                Carl G. Sokolski
          Official Court Reporter
              (215) 683-8060

Page 38

[1]        Johnathan Robins - direct
[2] Mr. Robins.
[3]        THE WITNESS:  The letter
[4] basically says that this letter is to verify
[5] that Johnathan Robins, Sr., has been seeking
[6] medical attention for his son, Johanathan
[7] Robins, Jr., at Philadelphia Department of
[8] Public Health Center Six since his birth, you
[9] know, and the letter is dated December
[10] thirtieth, 2008.
[11]        I was going to use that letter
[12] in the custody case to show that I was the one
[13] who actually had him.  And I would have never,
[14] like, whatever Welfare, whatever they get
[15] didn't bother me.  It's just the fact that I
[16] couldn't get health care for my son when I had
[17] him is why I actually took this route of
[18] the —
[19]        THE COURT:  Mr. Robins.
[20]        THE WITNESS:  Yes.
[21]        THE COURT:  Can I just remind
[22] you what we talked about yesterday?
[23]        THE WITNESS:  Yes.
[24]        THE COURT:  And that is that
[25] you can introduce anything you want, as long
                Carl G. Sokolski
          Official Court Reporter
              (215) 683-8060

Page 39

[1]        Johnathan Robins - direct
[2] as it's relevant.
[3]        THE WITNESS:  Okay.
[4]        THE COURT:  The fact that you
[5] wanted a son, that you named your son after
[6] you, that you wanted to care for your son, all
[7] of that is irrelevant to the charges here.
[8] What you're charged with is getting that son
[9] by impregnating a fourteen year old and there
[10] are five offenses here.  They all have to do
[11] with her age, the fact that she was under
[12] eighteen for some of these crimes, under
[13] sixteen for some of these crimes.  It is a
[14] defense if you had a mistake as to her age.
[15] But those are the only issues that are really
[16] relevant to these charges.
[17]        THE WITNESS:  Yes, sir.
[18]        THE COURT:  So the jury is not
[19] going to be asked at the end of the trial to
[20] decide whether you're a good person or a bad
[21] person, whether you're a good father or a bad
[22] father.  None of that has anything to do with
[23] this case.  They're going to be asked to find
[24] facts as to your age, her age, whether you had
[25] intercourse, whether you had sexual acts with
                Carl G. Sokolski
          Official Court Reporter
              (215) 683-8060

Page 40

[1]        Johnathan Robins - direct
[2] her at a time when she was under a certain
[3] age.  That's what this case is all about.
[4]        THE WITNESS:  Okay.
[5]        THE COURT:  So you're going to
[6] have to confine your testimony to relevant
[7] matters.
[8]        THE WITNESS:  Yes, sir.
[9]        THE COURT:  Anything you want
[10] to tell the jury is fine, but it has to be
[11] relevant to these charges.  Okay?
[12]        THE WITNESS:  Yes, sir.
[13]        THE COURT:  All right.
[14]        THE WITNESS:  Also, back again
[15] to 2007 when I first met Ericka and I wanted
[16] her to get to know my family and friends, you
[17] know.  This is my new girlfriend.  So we went
[18] to my sister's wedding reception in Atlantic
[19] City so that she can meet everyone.  She told
[20] everyone at the reception, well, the people,
[21] the few people that I heard her speak with,
[22] that she was nineteen.  People are going to
[23] ask.  You know, Ericka said that, you know,
[24] people did ask.  Look, my mom, my dad, my
[25] sister, you know.  My sister flew all the way
                Carl G. Sokolski
          Official Court Reporter
              (215) 683-8060

51CR00034302009                                          Trial (Jury) Volume 4
Johnathan Robins                                               March 12, 2010

Page 41

[1]        Johnathan Robins - direct
[2] from Paris to have the reception. She going
[3] to ask, like, who are you and how old you are,
[4] you know. Ericka told her she was nineteen,
[5] you know.
[6]        THE COURT: Well, why would
[7] those people ask her that? Are they asking
[8] her that because they're looking at her and
[9] she looks like she's fourteen years old and
[10] they're trying to figure out what she's doing
[11] at the wedding with you? I mean, why are they
[12] asking her what her age is?
[13]        THE WITNESS: Well, because my
[14] sister asked, she looked kind of young. My
[15] sister even said that. I'm not even going to
[16] say. My sister said -- well, that's hearsay.
[17]        THE COURT: Well, did she look
[18] young or not?
[19]        THE WITNESS: Yeah. She looks
[20] how she looks now. She does.
[21]        THE COURT: When she was
[22] fourteen did she look like she was fourteen?
[23]        THE WITNESS: No, not really,
[24] because I know a lot of people that looks.
[25] She looks how she looks now. She looks like
                Carl G. Sokolski
                Official Court Reporter
                (215) 683-8060

Page 42

[1]        Johnathan Robins - direct
[2] a lot of people, like when the officer --
[3]        THE COURT: So in three years
[4] she hasn't gotten any older looking.
[5]        THE WITNESS: No. She looks
[6] the same.
[7]        THE COURT: All right.
[8]        THE WITNESS: Because like when
[9] the officer came up and to arrest me on
[10] February, he didn't know how old she was until
[11] she told him. So the same way with a lot of
[12] jobs that she gets, you know. She tells them
[13] that she's an older age and that's how she got
[14] the job at Dynamite Hair or whatever, you
[15] know.
[16]        But we were introduced to
[17] everybody because, you know, your friends and
[18] family is supposed to see if there's a problem
[19] with your girlfriend or your prospective mate.
[20] Nobody, nobody, no red flags went up anywhere
[21] with anybody, you know. So it was like she
[22] got the approval. Everybody was happy with
[23] Ericka and everybody accepted her at nineteen
[24] in the family, you know. So, you know, that's
[25] why I really didn't, you know. Like I said,
                Carl G. Sokolski
                Official Court Reporter
                (215) 683-8060

Page 43

[1]        Johnathan Robins - direct
[2] the family, like, they accepted it. I
[3] accepted it. But later on, I eventually had
[4] to tell my sister what her age was because
[5] when I got locked up, my mother was sick and I
[6] had to tell my sister, look, I can't care for
[7] mom any more because, like I said, my sister
[8] lives in Paris and I had to tell my sister how
[9] old she was in February of 2009.
[10]        And after she had told me what
[11] her age was in 2008, it was like I didn't, it
[12] was hard for me to tell people, you know. I
[13] told Ericka: You told these people how old
[14] you were, you made the mess, you clean it up,
[15] you know. You tell these people, you know. I
[16] was embarrassed, I guess. I was embarrassed.
[17] And I just, I didn't offer it. Like Tyra
[18] said, she didn't know how old she was. I
[19] didn't offer it because it's embarrassing.
[20] But I knew that I would have to explain myself
[21] in a court of law. That's, you know,
[22] eventually. That's why we're here. That's
[23] exactly why we're here.
[24]        Again, I would like to put this
[25] into evidence. This is D-4. He has a copy of
                Carl G. Sokolski
                Official Court Reporter
                (215) 683-8060

Page 44

[1]        Johnathan Robins - direct
[2] that one.
[3]        COURT CRIER: It's marked D-4,
[4] Your Honor.
[5]        THE WITNESS: Is it possible
[6] that the jury could see a picture in here or
[7] what she portrayed her age as? Because this
[8] is a page off of her MySpace Website showing
[9] that she's on it for dating and showing that
[10] she's announcing that she's nineteen and it
[11] has the date of 2009. Even after all this,
[12] she's still putting herself out there as a
[13] nineteen year old --
[14]        THE COURT: May I see it?
[15]        THE WITNESS: -- female.
[16]        THE COURT: Do you have a copy
[17] of this?
[18]        MR. STACKOW: Yes, Your Honor.
[19]        THE COURT: Well, at the bottom
[20] of the page, this was printed off of a
[21] computer on 8/15/2009. Is that what you're
[22] referring to?
[23]        THE WITNESS: Yes. Yes.
[24]        THE COURT: Okay. Do you have
[25] any objection to that?
                Carl G. Sokolski
                Official Court Reporter
                (215) 683-8060

Page 45

[1]      Johnathan Robins - direct
[2]      MR. STACKOW:  No.
[3]      THE WITNESS:  Can I just hand
[4] it to them?
[5]      THE COURT:  Do you want to show
[6] it to the jury?
[7]      THE WITNESS:  Yes.
[8]      THE COURT:  Mr. DeFino?  You
[9] can give it to juror number one and let him
[10] pass it down.  You want the jury to see what,
[11] Mr. Robins?
[12]      THE WITNESS:  The fact that
[13] Ericka again, you know.
[14]      THE COURT:  At the top of the
[15] page there's a photograph and it has her age
[16] as nineteen?
[17]      THE WITNESS:  Yes.
[18]      THE COURT:  Okay.
[19]      THE WITNESS:  And that's like
[20] the favorite age she wants to tell everybody.
[21] She's been telling everybody she's nineteen.
[22] Obviously, she had to say that she was twenty
[23] when her birthday came around.  But that's
[24] what, you know.  Even after we, you know, had
[25] the baby and she then lied to me and we had
              Carl G. Sokolski
              Official Court Reporter
              (215) 683-8060

Page 46

[1]      Johnathan Robins - direct
[2] the baby and we got married, now she still is.
[3] And after I'm locked up, you know, her page
[4] still, you know, says that she's nineteen even
[5] after all this mess.
[6]      THE COURT:  Well, didn't you
[7] say that when she went down to get her license
[8] she gave her birth date as 1986?
[9]      THE WITNESS:  Yeah.
[10]      THE COURT:  Well, if she gave
[11] her birth date as 1986 and she did that in
[12] what, 2007?  2008?
[13]      THE WITNESS:  Yeah, but see --
[14]      THE COURT:  She was
[15] misrepresenting that she was twenty-one,
[16] twenty-two, right?
[17]      THE WITNESS:  Yes.
[18]      THE COURT:  Well, the document
[19] speaks for itself.  Her testimony was that a
[20] lot of people have her password and she hasn't
[21] put anything on that in a long time.
[22]      THE WITNESS:  But she also has
[23] pictures of the new guy that's her boyfriend
[24] and it's listed on the back page.  There's a
[25] picture of her, quote unquote, her husband, a
              Carl G. Sokolski
              Official Court Reporter
              (215) 683-8060

Page 47

[1]      Johnathan Robins - direct
[2] different guy.  So she had to put that on
[3] there.  I actually met the guy that's on the
[4] back page, if you flip back.  I actually met
[5] him because I wanted to find out where in the
[6] world you got my son at, you know.
[7]      (Evidence circulated among the
[8] jurors.)
[9]      THE COURT:  You know, if your
[10] back becomes a problem just let us know and
[11] we'll let you take a break.  Okay?
[12]      A JUROR:  Okay.  I have a
[13] pillow.
[14]      THE COURT:  Okay.
[15]      COURT CRIER:  D-4 has been
[16] published to the jury, Your Honor.
[17]      THE COURT:  Mr. Robins, what
[18] else?
[19]      THE WITNESS:  Okay.  It's not
[20] too much else, I mean.  The facts are what
[21] they are.  The only issue is, you know, does
[22] she put herself out there as a different age
[23] when she meets people?  You know.
[24]      That's about the end of my
[25] testimony.  I'm going to let him.  If you have
              Carl G. Sokolski
              Official Court Reporter
              (215) 683-8060

Page 48

[1]      Johnathan Robins - cross
[2] any questions for me, then you go ahead and
[3] just ask me whatever you need to ask me.
[4]      THE COURT:  Any cross
[5] examination?
[6]      MR. STACKOW:  Yes.  May I?
[7]      THE COURT:  Sure.
[8]      CROSS EXAMINATION
[9] BY MR. STACKOW:
[10]      Q.      Did she get a driver's license
[11] or learner's permit when she went down in June
[12] of 2007?
[13]      A.      It was stamped.  The lady
[14] signed her name.  But she didn't pass the
[15] test.
[16]      Q.      So she never got.  Were you
[17] there for that?
[18]      A.      Yes.
[19]      Q.      You actually went down with
[20] her; is that right?
[21]      A.      Yes, I did.
[22]      Q.      And Ericka, this was for a
[23] learner's permit; is that right?
[24]      A.      Yes.
[25]      Q.      Not a driver's license, just a
              Carl G. Sokolski
              Official Court Reporter
              (215) 683-8060

Page 49

[1]        Johnathan Robins - cross
[2] learner's permit.
[3]    A.    I guess, yeah.  If you get a
[4] learner's permit, then a driver's license,
[5] yeah.
[6]    Q.    Well, --
[7]    A.    Yes.
[8]    Q.    Simple question.  Learner's
[9] permit is what she went --
[10]    A.    Yes.
[11]    Q.    -- what this is an application
[12] for; is that right?
[13]    A.    It's a Class C autmotive, yeah,
[14] learner's permit.  Absolutely.
[15]    Q.    And she never got the learner's
[16] permit.
[17]    A.    No.
[18]    Q.    That's your testimony, right?
[19]    A.    That's correct.
[20]    Q.    You in fact were aware of this
[21] photo identification that she had from South
[22] Carolina, correct?
[23]    A.    Yes.
[24]    Q.    That's because you went with
[25] her to get this photo identification; isn't

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 50

[1]        Johnathan Robins - cross
[2] that right?
[3]    A.    No.
[4]    Q.    You didn't go to Broad and
[5] Spring Garden to the check cashing place --
[6]    A.    No.  Maybe one of the other
[7] guys --
[8]    Q.    Excuse me.  Let me finish my
[9] question first.  You didn't go to Broad and
[10] Spring Garden to the check cashing place to
[11] get this fake photo ID for Ericka?
[12]    A.    No.
[13]    Q.    So when she went down to get
[14] her learner's permit in June of 2007, you were
[15] aware that she was using that identification
[16] as proof of her age; isn't that right?
[17]    A.    I can't remember exactly what
[18] identification she pulled out with it, to be
[19] honest with you.  I know that you have to
[20] have.  I do remember she had her Social
[21] Security card.  In fact, whatever other
[22] identification I actually don't remember
[23] because, you know, she approached the lady.
[24] But I do remember she had to look for her
[25] Social Security card.  As far as if she used a

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 51

[1]        Johnathan Robins - cross
[2] actual Carolina ID, I do not recall.
[3]    Q.    This was after your sister's
[4] wedding reception, correct, when she went down
[5] to get her learner's permit?
[6]    A.    Yes.
[7]    Q.    And it was at that point, as
[8] you said, that your sister and other family
[9] members had been asking Ericka how old she
[10] was?
[11]    A.    Yes.
[12]    Q.    And you knew that when she went
[13] down to get her learner's permit she produced
[14] some photo ID; is that right?
[15]    A.    I don't know if it was.  I know
[16] that she produced a Social Security card.  I
[17] don't know if she produced that photo ID.  I
[18] can't remember.
[19]    Q.    Did you ask her to see whatever
[20] she produced to get her learner's permit so
[21] you could see how old she was?
[22]    A.    No, not really, because I --
[23]    Q.    It's a simple question,
[24] Mr. Robins.  Did you ask her at that time to
[25] see her identification that she was using to

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 52

[1]        Johnathan Robins - cross
[2] try to get this learner's permit?
[3]    A.    No.
[4]    Q.    Did you know she was using a
[5] South Carolina identification?
[6]    A.    Yes, at some point, because
[7] obviously we got married with it.
[8]    Q.    And as His Honor said, that has
[9] a date of birth of July the thirtieth, 1986,
[10] correct?
[11]    A.    As Your Honor said?
[12]    Q.    The judge, Judge Cunningham,
[13] the person whose courtroom you're in.  He
[14] asked you a few minutes ago, isn't it true
[15] that this identification has a date of birth
[16] of July thirtieth, 1986?
[17]    A.    Which?  I mean, which
[18] identification?  We haven't --
[19]    Q.    Was there more than the south
[20] Carolina one?
[21]    A.    The paperwork has the
[22] identification, has the birth date on it.  But
[23] the identification, we don't have that unless
[24] you do, unless Ericka gave it to you.  It
[25] hasn't been produced.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

S1CR00034302009
Johnathan Robins

---

Page 53

[1]         Johnathan Robins - cross
[2]     Q.     Well, you've seen it when you
[3] got married, right? That's your testimony?
[4]     A.     Yes.
[5]     Q.     That was a South Carolina photo
[6] identification, correct?
[7]     A.     Yes.
[8]     Q.     An it had the birth date of
[9] July thirtieth, 1986, correct?
[10]     A.     Yes. Yes. I believe it did,
[11] yes.
[12]     Q.     So at the time that you met,
[13] that would have put her at twenty years of
[14] age; isn't that right? On January first of
[15] 2007, if that was her correct date of birth,
[16] she would have been twenty years of age; isn't
[17] that right?
[18]     A.     At January first, 2007, it
[19] would make her twenty? That's what you're
[20] asking me?
[21]     Q.     Yes.
[22]     A.     I would actually have to do the
[23] math, I'm going to be honest with you.
[24]     Q.     All right. Now, let me ask you
[25] some questions here. You said that you had

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

Page 54

[1]         Johnathan Robins - cross
[2] sexual intercourse with Ericka?
[3]     A.     Yes.
[4]     Q.     In March of 2007?
[5]     A.     Yes.
[6]     Q.     That was vaginal sexual
[7] intercourse; is that correct?
[8]     A.     Yes.
[9]     Q.     You also at some point had oral
[10] sex with Ericka; isn't that right?
[11]     A.     Yes.
[12]     Q.     Where you placed your penis
[13] inside of her mouth, correct?
[14]     A.     Well, that was, she wanted to
[15] try a bunch of things. That was the only time
[16] we actually did that. It was more of the
[17] other way around.
[18]     Q.     She told you that she wanted to
[19] try a bunch of things? Is that what she said
[20] to you?
[21]     A.     Well, she didn't. Yeah. Yeah.
[22] She actually, how can I put it? I can't
[23] remember the exact details, you know. I can't
[24] remember the exact details. But she was
[25] actually, she wanted to have a baby. So we

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

Page 55

[1]         Johnathan Robins - cross
[2] actually were trying to have a baby. I didn't
[3] think it was coming that quick. She didn't
[4] think. But we were actually, so it's not like
[5] I remember every single detail.
[6]     Q.     Is it your testimony to this
[7] jury that she said that she wanted to try a
[8] lot of different things in the context of
[9] having a baby?
[10]     A.     No.
[11]     Q.     Is that your testimony?
[12]     A.     No.
[13]     Q.     So my question to you is, is it
[14] true or not that Ericka said to you that --
[15] that's your testimony -- that she wanted to
[16] try a lot of things, meaning sexual things?
[17]     A.     No. She didn't exactly say
[18] that. What I'm saying is I knew she always
[19] wanted to try different things. She wanted us
[20] to wash up in the tub together. She wanted us
[21] to try different positions. She didn't come
[22] out and just say, you know, let's try
[23] different things.
[24]     Q.     Your date of birth is March
[25] twenty-ninth, 1966, correct?

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

Page 56

[1]         Johnathan Robins - cross
[2]     A.     Correct.
[3]     Q.     You now know Ericka's date of
[4] birth to be July thirtieth, 1992, correct?
[5]     A.     Correct.
[6]     Q.     And it's your testimony that in
[7] April of 2008 Ericka told you her correct age;
[8] is that right?
[9]     A.     January. January.
[10]     Q.     January of 2008?
[11]     A.     Just before the baby was born.
[12]     Q.     All right. And that she told
[13] you she was in fact fifteen, correct?
[14]     A.     Yes.
[15]     Q.     And then John-John was born
[16] about a month later; is that right?
[17]     A.     Less than a month later.
[18]     Q.     And at some point you and
[19] Ericka lived together with your child; is that
[20] right?
[21]     A.     That is correct.
[22]     Q.     And did you have sexual
[23] intercourse with her after you and she lived
[24] together after John-John was born?
[25]     A.     Once, twice we tried it, but it

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 4
March 12, 2010

Page 57

[1]        Johnathan Robins - cross
[2] was just, that was later on, like in what?
[3] You know. But it just, you know. It just
[4] wasn't.
[5]    Q.    When was that?
[6]    A.    Maybe like April. I'm going to
[7] be honest with you. Like, when was it?
[8]    Q.    April of 2008 you had sexual
[9] intercourse with Ericka?
[10]   A.    Yeah, because I believed she
[11] was my wife now, because I read the law on it
[12] and she --
[13]   Q.    That's not my question.
[14]   A.    Yes. Yes.
[15]   Q.    My question is the timing of
[16] when you had the sexual intercourse with her.
[17]   A.    Yes.
[18]   Q.    At some point did you realize
[19] that Ericka was not in fact legally your wife?
[20]   A.    She is legally my wife.
[21]   Q.    She is.
[22]   A.    Yes.
[23]   Q.    Let me ask you to take a look
[24] at this complaint for custody that you had
[25] marked as an exhibit.
                Carl G. Sokolski
              Official Court Reporter
                (215) 683-8060

Page 58

[1]        Johnathan Robins - cross
[2]    A.    Yes.
[3]    Q.    Do you have that in front of
[4] you?
[5]    A.    Yes, I do.
[6]    Q.    That was dated November of
[7] 2008, correct?
[8]    A.    That is correct.
[9]    Q.    That you filed this, correct?
[10]   A.    Yes, but the lady --
[11]   Q.    You gave the information?
[12]   A.    Yeah, and I know exactly what
[13] you getting ready to say. The lady did not
[14] know. I told her we married but she put
[15] down unmarried on it because she did not
[16] realize that I could be married to her. I
[17] know exactly what you're talking about.
[18]   Q.    Let me ask you some questions
[19] so the jury is very clear about what we're
[20] talking about. Okay?
[21]   A.    Okay.
[22]   Q.    This is a document, a court
[23] filed document, correct?
[24]   A.    That is correct.
[25]   Q.    And actually there's some pages
                Carl G. Sokolski
              Official Court Reporter
                (215) 683-8060

Page 59

[1]        Johnathan Robins - cross
[2] missing in the copy that you brought to court
[3] with you; isn't that right?
[4]    A.    Yes.
[5]    Q.    But the original is something
[6] that you would have had to have signed; isn't
[7] that correct?
[8]    A.    That is correct.
[9]    Q.    And you're asked to sign it
[10] after reviewing it to make sure everything's
[11] correct; isn't that right?
[12]   A.    Well, she refused -- yes. But
[13] the lady refused to put down that we were
[14] married. The lady actually refused and I just
[15] went on ahead and signed it.
[16]   Q.    Well, there's actually no
[17] section there to say whether you're married or
[18] not; isn't that right?
[19]   A.    Well, it says baby born out of
[20] wedlock.
[21]   Q.    Right. And it says that the
[22] baby in fact was born out of wedlock; isn't
[23] that right?
[24]   A.    Well, that's what this document
[25] says, yes.
                Carl G. Sokolski
              Official Court Reporter
                (215) 683-8060

Page 60

[1]        Johnathan Robins - cross
[2]    Q.    Did you cross that out?
[3]    A.    I didn't cross it out.
[4]    Q.    Did you refuse to sign that
[5] document?
[6]    A.    I did not refuse to sign it.
[7]    Q.    In fact you did sign it; is
[8] that right?
[9]    A.    Because I wanted to go to
[10] court.
[11]   Q.    Because you wanted custody of
[12] your baby.
[13]   A.    Because I wanted --
[14]   Q.    Because you wanted your son.
[15]   A.    Yes.
[16]   Q.    Now, it's your testimony to
[17] this jury that you actually researched the
[18] law?
[19]   A.    Yes.
[20]   Q.    Of marriage in Missouri and
[21] Pennsylvania and other states?
[22]   A.    Absolutely.
[23]   Q.    And you must have realized then
[24] that a person can't be married in Pennsylvania
[25] unless they're sixteen years of age; isn't
                Carl G. Sokolski
              Official Court Reporter
                (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 4
March 12, 2010

Page 61

Johnathan Robins - cross

[1]        Johnathan Robins - cross
[2] that right?
[3]    A.    No, that is not correct.
[4]    Q.    You didn't realize that.
[5]    A.    Here, you can look at it
[6] yourself. In fact, --
[7]    Q.    Let me ask you this, Mr.
[8] Robins. Didn't you realize that in your
[9] research that Missouri allows marriages for
[10] persons fifteen years of age with some sort of
[11] court order?
[12]    A.    No. In actuality I --
[13]    Q.    Did you realize that as well?
[14]    A.    No. In actuality, because I
[15] actually researched the law on that, with
[16] parental consent, with a court order fifteen.
[17] And okay. No records shall be authorized.
[18] Under fifteen. However, such license may be
[19] issued. Okay. Yeah, you are correct, with a
[20] court order.
[21]    Q.    In Pennsylvania, you actually
[22] have to be sixteen with a court order. Did
[23] you know that?
[24]    A.    Yeah, but we didn't get a court
[25] order.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 62

Johnathan Robins - cross

[1]        Johnathan Robins - cross
[2]    Q.    That's because she was only
[3] fifteen in January of 2008; isn't that right?
[4]    A.    That is correct.
[5]    Q.    And you knew that, in fact,
[6] didn't you?
[7]    A.    In when?
[8]    Q.    Before you went to Missouri.
[9]    A.    No.
[10]    Q.    It's your testimony under oath
[11] that you didn't know when you flew to Missouri
[12] with Ericka Johnson that she was only fifteen
[13] years of age?
[14]    A.    That is my testimony.
[15]    Q.    All right. So let's talk about
[16] this trip to Missouri. You said you saw the
[17] arch?
[18]    A.    Yeah.
[19]    Q.    What city was that in?
[20]    A.    St. Louis.
[21]    Q.    All right. So why did you go
[22] to St. Louis in Missouri?
[23]    A.    Well, because the plane tickets
[24] were cheaper at that time. So that was part
[25] of the reason, you know, the flight tickets.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 63

Johnathan Robins - cross

[1]        Johnathan Robins - cross
[2]    Q.    All right.
[3]    Q.    And Missouri was a good place
[4]    Q.    Of course, you would have had
[5] to apply for a marriage license ahead of time;
[6] isn't that right?
[7]    A.    No. You can walk in. That's
[8] why. Because, like I said, I only needed, I
[9] could only take off one day. I only wanted to
[10] take off one day. In Missouri, you walk in,
[11] you apply for the license. Then you walk a
[12] block away and get married. No waiting period
[13] at all.
[14]    Q.    So it's your testimony that
[15] that's why you picked Missouri.
[16]    A.    One of the main reasons.
[17]    Q.    The other reason being the
[18] court order requirement; isn't that right?
[19]    A.    No, because the court order
[20] requirement is irrelevant because there was no
[21] court order.
[22]    Q.    Now, let me ask you.
[23]    A.    Do you want a copy of Missouri
[24] and Pennsylvania law here? Here it is right
[25] here.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 64

Johnathan Robins - cross

[1]        Johnathan Robins - cross
[2]    A.    His Honor will instruct the
[3] jury on the law at the end. Thank you,
[4] though.
[5]    Q.    You printed this MySpace page
[6] out; is that right?
[7]    A.    Yes, I did.
[8]    Q.    So you actually were able to
[9] access it enough to print this out?
[10]    A.    Well, you don't need a
[11] password, if you can look. Only if somebody's
[12] profile is private would I not be able to get
[13] all that. Her profile was not private.
[14]    Q.    So her profile is not private.
[15] You were able to go on there and print all
[16] this stuff out; is that right?
[17]    A.    That is correct.
[18]    Q.    Was that the way that you
[19] learned that she was saying that she had
[20] another husband?
[21]    A.    Yeah. She got some dude in
[22] there and she didn't even spell it right. She
[23] left the B out.
[24]    Q.    Well, never mind. You knew
[25] that Ericka was going to school or registered

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 4
March 12, 2010

Page 65

Johnathan Robins - cross

[1]      Johnathan Robins - cross
[2] to go to school at this time; is that right?
[3]      A.    At which?  Now I know, yes.
[4]      Q.    In March of 2007.
[5]      A.    No.
[6]      Q.    You didn't know that, that she
[7] was registered to go to school at all?
[8]      A.    No.
[9]      Q.    What was she doing during the
[10] day?
[11]     A.    Home,
[12]     Q.    Home with you or home with her
[13] mom?
[14]     A.    Yeah.  See, a lot of times --
[15]     Q.    My question is simple.
[16]     A.    Yes.
[17]     Q.    When you said home, are you
[18] referring to your home or to your mom's home?
[19]     A.    Yes.  When she was living with
[20] me, she was home.
[21]     Q.    Okay.  So she did, however,
[22] tell you that she needed some clothes for
[23] school around that time of March of 2007;
[24] isn't that right?
[25]     A.    No, that is not correct.
                Carl G. Sokolski
              Official Court Reporter
                (215) 683-8060

Page 66

Johnathan Robins - cross

[1]      Johnathan Robins - cross
[2]      Q.    So you didn't take her out
[3] clothes shopping?
[4]      A.    I frequently took her out
[5] clothes shopping for all types of clothes.
[6] Like she said, I let her pick what she wanted.
[7] And did I notice a whole bunch of school
[8] clothes?  No.
[9]      Q.    Well, she was picking out khaki
[10] pants, right?
[11]     A.    She may have picked out
[12] sometimes a khaki pants, but she mainly
[13] dressed in jeans.  She would wear jeans all
[14] the time, a lot of times.  Her main focus was
[15] buying a lot of jeans.
[16]     Q.    She picked out a lot of plain
[17] colored collared shirts too?
[18]     A.    No.
[19]     Q.    Do you ever remember buying any
[20] of those kinds of clothes?
[21]     A.    Not offhand, but I must say I'm
[22] pretty sure she did.  But I have khaki pants
[23] too and I have polo shirts too, so.
[24]     Q.    And you're a forty-four year
[25] old man.
                Carl G. Sokolski
              Official Court Reporter
                (215) 683-8060

Page 67

Johnathan Robins - cross

[1]      Johnathan Robins - cross
[2]      A.    Yeah.
[3]      Q.    Now, when you did learn that
[4] Ericka was, according to you, that when you
[5] learned that she was going to school, you knew
[6] that she was going to school in upper Darby,
[7] correct?
[8]      A.    Yes.  I found out after we had
[9] our conversation, not that conversation,
[10] because later on we had to get into the
[11] details of everything.  We had to set up when
[12] she's going to start going back and after she
[13] had the baby, she needed to go back, which was
[14] like a week or so later, like, you know, you
[15] got to go back to school.
[16]     Q.    And it's your testimony that
[17] that's the first time you realized she was
[18] registered to go to school?
[19]     A.    That is correct.
[20]     Q.    Okay.
[21]     A.    And I also asked her, like, she
[22] also said that her mother -- that's why I
[23] asked her mother about a fine -- she said her
[24] mother received a fine for her not going to
[25] school in 2007.
                Carl G. Sokolski
              Official Court Reporter
                (215) 683-8060

Page 68

Johnathan Robins - cross

[1]      Johnathan Robins - cross
[2]      Q.    Now, this is a person, Ericka,
[3] that when you first met her, you had discussed
[4] marriage?
[5]      A.    Yes.
[6]      Q.    You had discussed having kids?
[7]      A.    Yeah, because I did not want
[8] what.  Like, on those lines, a lot of people
[9] on the lines for flings and stuff like that.
[10] That's why a lot of the other people didn't
[11] really interest me.  I just picked up on this
[12] rarely that I was on it.  But to find someone
[13] that was actually interested in a
[14] relationship, you know.  Because that's why
[15] she said she left a lot of her other
[16] boyfriends for, because they did not want the
[17] commitment of it.  So that was the main reason
[18] that I was attracted to her.  She wanted a
[19] commitment, which a lot of the other females
[20] did not want.
[21]     Q.    So from March of 2007 to, well,
[22] even from January of 2007 to March of 2007 or
[23] even June of 2007, did Ericka live with you at
[24] your house on North Eighth Street in
[25] Philadelphia?
                Carl G. Sokolski
              Official Court Reporter
                (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 4
March 12, 2010

Page 69

[1]    Johnathan Robins - cross
[2]    A.    From January of 2007?
[3]    Q.    Yes.
[4]    A.    She didn't live with me because
[5] that's when we started dating.  It took a
[6] while for her to actually move in.
[7]    Q.    When did she live with you,
[8] move in with you?
[9]    A.    July.  Probably somewhere
[10] around in June, somewhere in that
[11] neighborhood.
[12]    Q.    June of 2007.
[13]    A.    Yes.
[14]    Q.    Did she ever stay overnight at
[15] your house prior to that, moving in?
[16]    A.    Yes.
[17]    Q.    Did you ever ask her what she
[18] was doing or where she was going when she
[19] wasn't, when you guys weren't together?
[20]    A.    Yes.  She said she would, when
[21] before she moved in, she was going back to
[22] live with her mother because she didn't want
[23] to live with her any more because she was
[24] saying, like, her mother was abusive and
[25] everything.  So before she moved in, she would

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 70

[1] go back home to her mother.
[2]    Q.    Now, did you ever say, hey,
[3] I'll go over to your mom's house and talk to
[4] her or see what's going on, see if I could
[5] help out?
[6]    A.    If you want me to explain
[7] exactly how she told me her mother was, I did
[8] not want to deal with such a person.
[9]    Q.    But this was going to be the
[10] grandmother of your children, correct?
[11]    A.    One of the things that I
[12] actually wanted too was is that if I was to
[13] have, how can I say it, a fiancee and a wife,
[14] I did not necessarily want to marry the whole
[15] family on the other side, because I would keep
[16] my family out of our business.  And the fact
[17] that she really didn't like her mother at the
[18] time, you know, that it would just be us, not
[19] me, her and everybody else.  That's, you know.
[20]    Q.    I didn't, you know.
[21]    Q.    But you wanted to make sure
[22] Ericka wasn't like the girls in your
[23] neighborhood in Philadelphia; isn't that
[24] right?

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 71

[1]    Johnathan Robins - cross
[2]    A.    What do you mean?  Well, we
[3] spoke.  And one of the things when we spoke
[4] about when we first started talking was trust.
[5] So, you know, I mean, it just didn't dawn on
[6] me that all this was going to happen when I
[7] first met her.  It just didn't, you know.  It
[8] just didn't.  This did not dawn on me, trust
[9] me on that.
[10]    Q.    My question is, you didn't want
[11] Ericka to be like the girls that you described
[12] earlier in your neighborhood in Philadelphia;
[13] is that right?
[14]    A.    One of the things, like, when I
[15] first met her, she did smoke, drink and she
[16] did do a little weed, but she said she wanted
[17] to stop.  So she said it was like if I can
[18] encourage her, which she did stop smoking
[19] cigarettes and weed and alcohol, which she
[20] didn't do like a whole bunch or whatever.  But
[21] when she did smoke a little bit, she had to
[22] smoke outside because I don't allow smoking in
[23] the house.  So, you know, the fact that she
[24] wanted to give up some of the things like the
[25] smoking and all, which, like, a lot of other

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 72

[1]    Johnathan Robins - cross
[2] women smoke and I can't really deal with
[3] cigarette smoke, you know, that's why she had
[4] to smoke outside.  So it's a lot.
[5]    I mean, we clicked.  It's hard
[6] to explain, but it's like everybody said.  We
[7] just looked so good together.  If you were to
[8] see us before all this, I know it sounds real
[9] weird, but we actually were two people that
[10] just seemed, like everybody said, we seemed
[11] like we belonged together, my family, my
[12] friends.  They were like dag, it just seems
[13] like you all —
[14]    Q.    When they would say those
[15] things, was that before or after they asked
[16] you how old she was or at the same time?
[17]    A.    Well, I guess before or after.
[18]    Q.    So it wasn't just —
[19]    A.    I said before or after.  I
[20] really can't sit here and say honestly that,
[21] like, somebody asked her age, then said you
[22] all look good together or something, because
[23] they knew she was younger.  You could see
[24] she's younger.  But even though when she told
[25] them that she was nineteen, you know, people

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Page 73

[1]        Johnathan Robins - cross
[2] are like, you know, you're a good guy, you
[3] know. A lot of people in our neighborhood
[4] realized that the people that I deal with know
[5] that a lot of guys that's more around her age
[6] will just sleep with her and leave her and,
[7] you know, and they felt that I was a good guy,
[8] that I would take care of her.
[9]        Q.        Did your ever meet any of her
[10] family prior to going to Missouri?
[11]       A.        No.
[12]       Q.        You never met in fact anybody
[13] related to her prior to then; is that right?
[14]       A.        We tried to have. I didn't
[15] meet any of her family but we tried to have
[16] her sister come to the baby shower that my
[17] sister had flew in from Paris to give at
[18] somebody's house in Center City. But she gave
[19] the excuse that her -- you know what? Yeah, I
[20] did meet a family member of hers. It wasn't
[21] an adult family. It was some. She had
[22] brought over her nieces and nephews. That's
[23] all. Little kids. That's the only technical
[24] thing. I actually met her nieces and nephews.
[25] But the mother of the nieces and nephews I

Page 74

[1]        Johnathan Robins - cross
[2] never actually met. We were trying to have
[3] her come to the baby shower but Ericka said,
[4] you know, she's on drugs, she acts up, so, you
[5] know, it's not good for her to even be there.
[6]        Q.        Did your ever ask her what her
[7] connection to South Carolina was or if she had
[8] any family in South Carolina?
[9]        A.        No. In actuality, I asked her
[10] about South Carolina and she said she had
[11] moved down there for a brief bit with like her
[12] dad, then just came back up. Now her dad
[13] lives out in Harrisburg. And that's about all
[14] she really spoke about it.
[15]       Q.        Let me just ask you some
[16] questions about Tyra Felder. That was the
[17] person that you had known since she was about
[18] four years of age; is that right?
[19]       A.        That is correct.
[20]       Q.        And she would do hair for
[21] girls; is that right?
[22]       A.        Yeah. Because, see, Tyra and
[23] her both do hair. That's my wife does hair
[24] and Tyra does hair.
[25]       Q.        And you paid to have Tyra do

Page 75

[1]        Johnathan Robins - cross
[2] Ericka's hair; is that right?
[3]        A.        Yeah, because I got tired of
[4] paying a hundred something dollars to all
[5] these other shops. I'm like, look, go to
[6] Tyra, Tyra owes me some money, let Tyra do
[7] your hair.
[8]        Q.        Let me ask you about the
[9] February of 2008 at the hospital. Were you
[10] there when you heard Ericka say that you were
[11] in fact her uncle and not the father of the
[12] child?
[13]       A.        Because when I went to, when I
[14] went looking for her, she had the baby so
[15] fast, she never made it into the delivery
[16] room. She was in the pre room. So that's
[17] where I met her. She was already dressed and
[18] everything. She had the baby in twenty
[19] minutes, just dropped him right
[20] out. And then she said we have to go down and
[21] see our son. So when we went down, I guess we
[22] saw some nurses or whatever and she was
[23] telling the nurses, you know, that this is my
[24] uncle. And I told them no, I'm the father of
[25] the child.

Page 76

[1]        Johnathan Robins - cross
[2]        Q.        The nurses were directing these
[3] conversations to Ericka or these questions to
[4] Ericka; is that right?
[5]        A.        Yes. And Ericka lied to them
[6] and I set them straight, I'm the father of the
[7] child.
[8]        Q.        And you were right there at the
[9] time?
[10]       A.        I was right there.
[11]       Q.        It was your testimony that you
[12] and Ericka actually went to the hospital
[13] together?
[14]       A.        No. She was giving birth. I
[15] woke up. I was going to work. I was going to
[16] work. In actuality, we actually had to do
[17] some training at the Verizon building down
[18] there at Eighteenth and Arch. But when she
[19] called me, she was like -- I just woke up.
[20] She was like, I'm going into labor, I'm going
[21] into labor. I'm like all right. I got
[22] dressed to go take the baby, take the car seat
[23] to the hospital, and by the time I got dressed
[24] she called me back, the baby's here. I'm
[25] like, what? So I went down there with the car

·51CR00034302009
Johnathan Robins

Trial (Jury) Volume 4
March 12, 2010

Page 77

Johnathan Robins - cross

[1]
[2] seat. I brought the car seat because you
[3] can't bring the baby back home without a car
[4] seat. And like I said, she was already there
[5] because she gave birth, obviously.
[6]    Q.    And it's your testimony that
[7] you actually walked down or took an elevator
[8] down to wherever the baby was with Ericka?
[9] That's your testimony?
[10]    A.    I don't know if the elevator is
[11] up or down. I can't remember if it actually
[12] went up or it went down. I actually can't
[13] remember that.
[14]    Q.    Isn't it in fact true that
[15] Ericka was still in bed, in her hospital bed,
[16] when you showed up and the nurses approached
[17] her, asking her who you were? Isn't that
[18] right? And that you weren't present when she
[19] said that's the uncle, that's my uncle.
[20]    A.    No. No. No. Like I said, she
[21] dropped the baby in twenty minutes. The baby
[22] was there before I even got out the house. So
[23] by the time I got there, she was already
[24] dressed and ready to go. She was, yeah,
[25] dropped the baby in twenty minutes, dressed

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 78

Johnathan Robins - redirect

[1]
[2] and ready to go. So when I went up to the
[3] room, it was just her in that room. It was
[4] just her in the room. And we went down to go
[5] see my son.
[6]    Q.    And you without any hospital
[7] staff or any assistance, you and Ericka just
[8] went down to see your son? That's your
[9] testimony?
[10]    A.    Yes, I believe. There was no
[11] staff with us. The staff was at the room with
[12] the, because they're at the room with the
[13] babies in the incubators.
[14]    MR. STACKOW: That's all the
[15] questions I have. Thank you, Your Honor.
[16]    REDIRECT EXAMINATION.
[17]    THE WITNESS: Okay. Since she
[18] brought up the issue of marriage, as you know,
[19] with statutory rape, it says specifically in
[20] the law that it is statutory rape unless the
[21] complainant is married. It does specifically
[22] recognize that a person can be married at
[23] fourteen in the State of Pennsylvania, because
[24] if you read specifically in the statutory rape
[25] charge, it specifically lets you know that a

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 79

Johnathan Robins - redirect

[1]
[2] fourteen year old can be married. Do you want
[3] to? Can you? Do you question that or?
[4]    THE COURT: Mr. Robins, do you
[5] have anything else you want to testify to?
[6]    THE WITNESS: Yes. I'd like to
[7] put this into evidence. Would I have you read
[8] this law or would I have --
[9]    THE COURT: You want the law of
[10] annulment? Voidable marriages? What law are
[11] you referring to?
[12]    THE WITNESS: Well, see, in
[13] both states, a voidable marriage is a
[14] marriage, if someone misrepresents their age
[15] it's voidable. But the status of a voidable
[16] marriage is valid, a valid marriage. It says
[17] specifically in the paper that even though a
[18] marriage may be entered into by
[19] misrepresentation, fraud, which is fraud,
[20] duress, it can be voidable. But the status of
[21] a voidable marriage is valid and only the
[22] parties, the husband and the wife, can
[23] challenge it. It says it specifically in the
[24] law. Only Ericka and I can challenge. She
[25] never filed for divorce. I never filed for

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 80

Johnathan Robins - redirect

[1]
[2] divorce. And it says specifically in the law
[3] only we can challenge our marriage. Yeah, I
[4] know. When I found out, I had to dig for
[5] that. Because I was like, you know, it's not
[6] a commonly known thing.
[7]    THE COURT: You're referring to
[8] the law in Missouri.
[9]    THE WITNESS: Yeah. In fact,
[10] one at the top is Pennsylvania and the bottom
[11] is Missouri, and they both say the same thing
[12] on that issue. And in the Missouri statute,
[13] it says a marriage goes by whatever state it's
[14] actually entered into.
[15]    THE COURT: Okay. You can keep
[16] your copy. You can highlight what part you're
[17] interested in and we can discuss whether
[18] instructing the jury on any of it is
[19] appropriate.
[20]    THE WITNESS: Okay. Because I
[21] did admit that I slept with her after, you
[22] know, but we were married and I just let you
[23] know that and, you know, I could easily just
[24] sat up here and told you no, that I didn't
[25] know. So we're going to, like you said,

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Page 81

[1]
[2] highlight it.
[3]        Also, just one last thing so
[4] that the jury will realize it. In the State
[5] of Missouri, without any court -- this is the
[6] state law -- without any court order, without
[7] any parental consent, she had to be eighteen,
[8] you know. So it's not like we had to, there's
[9] some special thing about Missouri that's not
[10] the same way you, you know. The same way you
[11] have to be eighteen here is the same way you
[12] have to be in Missouri. But if you
[13] misrepresent your age here or in Missouri, the
[14] exact law applies. There is no legal
[15] difference. There's no deception of going to
[16] Missouri to get married when the same exact
[17] law exists here, you know. Like I said, this
[18] law is something I had to dig for.
[19]        Let me think is there anything
[20] else that's relevant so that we can go ahead
[21] and get done. No. If you can think of
[22] anything that might, Mr. McGill, any questions
[23] that you might want to ask. I know you're
[24] looking at me, like.
[25]        THE COURT: Do you want to go
           Carl G. Sokolski
           Official Court Reporter
           (215) 683-8060

Page 82

[1]
[2] over and speak to your lawyer?
[3]        THE WITNESS: Yes, please.
[4]        (Witness excused.)
[5]        THE COURT: While you do that,
[6] we can take a ten minute break. The jury can
[7] get out of the box. We'll give Mr. Robins an
[8] opportunity to speak to his lawyer.
[9]        (Jury excused.)
[10]       (A brief recess was taken.)
[11]       COURT CRIER: Court is
[12] reconvened.
[13]       THE COURT: Before we bring the
[14] jury in, do you have anything else you wanted
[15] to testify to?
[16]       THE DEFENDANT: No. It's just
[17] that I'll have to give this to you for points
[18] of charge.
[19]       THE COURT: Yeah, we'll discuss
[20] that. The first question is, is there
[21] anything else you want to testify to?
[22]       THE DEFENDANT: No.
[23]       THE COURT: Do you have any
[24] other witnesses?
[25]       THE DEFENDANT: No, I guess
           Carl G. Sokolski
           Official Court Reporter
           (215) 683-8060

Page 83

[1]
[2] not.
[3]        THE COURT: Do you have any
[4] rebuttal witnesses?
[5]        MR. STACKOW: No, Your Honor.
[6]        THE COURT: So I'll bring the
[7] jury out. I'll tell them, if you like, you
[8] can tell the jury that you're resting. Is
[9] there an objection to any of the exhibits?
[10]       MR. STACKOW: No.
[11]       THE COURT: So you can rest and
[12] move for admission of your exhibits in front
[13] of the jury and the DA has no objection so
[14] they'll be admitted. And then, Mr. Robins,
[15] are you ready to speak to the jury?
[16]       THE DEFENDANT: Yes.
[17]       THE COURT: As for points for
[18] charge, the DA did submit some proposed
[19] points. I'm going to give them as well as the
[20] standard instructions. Sometimes when I give
[21] a standard instruction, I wind up explaining
[22] it a little bit, so it's not strictly the
[23] standard jury instruction but it's basically
[24] from the book.
[25]       I'll instruct the jury on the
           Carl G. Sokolski
           Official Court Reporter
           (215) 683-8060

Page 84

[1]
[2] standard instruction on arguments of counsel,
[3] the number of witnesses, judging the
[4] credibility of witnesses, judging the
[5] defendant's testimony, resolving conflicts in
[6] testimony, false in one, proof of the date of
[7] the incident, direct and circumstantial
[8] evidence, the burden of proof, reasonable
[9] doubt, the crimes charged as was proposed by
[10] the DA.
[11]       And with regard to Missouri and
[12] Pennsylvania law of marriage, what's the
[13] District Attorney's recommendation?
[14]       MR. STACKOW: Your Honor, I
[15] think at this point that the law shouldn't, I
[16] mean, I'm not asking the Court and I would
[17] recommend that the Court not provide any laws
[18] regarding marriage in either Pennsylvania or
[19] Missouri. It's going to be up to the jury
[20] what if any of that testimony they believe,
[21] and the laws in either state aren't going to
[22] help him do that. The marriage issue, whether
[23] it was a valid marriage or not, if they find
[24] it was a valid marriage, they're going to go
[25] off the defendant's testimony. If they think
           Carl G. Sokolski
           Official Court Reporter
           (215) 683-8060

Page 85

[1]
[2] that's lacking, obviously they can consider
[3] that as well. But I don't think that there
[4] should be specific instructions as to what the
[5] law is in Missouri versus what the law is in
[6] Pennsylvania.
[7]         THE COURT: And your request is
[8] what?
[9]         THE DEFENDANT: I request that
[10] the law actually be explained to them about
[11] marriage, because if they decide to --
[12]         THE COURT: Well, I've read
[13] what you have handed up to the bench and in
[14] reading that, I don't know what the law of
[15] Missouri is. That's out of a book. It states
[16] some basic rules. It says that at commonlaw
[17] you could be married if you were between the
[18] ages of twelve and fourteen. I don't know how
[19] that helps you. It says Missouri has a law
[20] with regard to voidable marriages and who can
[21] challenge marriages, but it's inadequate to
[22] give me enough information to tell the jury
[23] what the law of Missouri is on marriage. I
[24] mean, they can consider what you thought the
[25] law was or that you researched the law and

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 86

[1]
[2] whether you know what the law, whether you
[3] were right about the law or not I don't think
[4] is at issue. What's at issue is what you
[5] described in your testimony. But I don't know
[6] what the law of Missouri is and I don't have a
[7] point for charge with regard to the law of
[8] Pennsylvania either.
[9]         THE DEFENDANT: Well, on the
[10] statutory rape it specifically says --
[11]         THE COURT: It doesn't mean
[12] what you say it means, because you are correct
[13] that every state has to recognize marriages
[14] that are legal in the state where they were
[15] performed. All they're saying in the
[16] statutory rape definition is that if somebody
[17] is legally married because they got married
[18] someplace else where they could be married,
[19] Pennsylvania would have to acknowledge that
[20] and so for purposes of statutory rape they
[21] could not be prosecuted. They're legally
[22] married under the law of wherever, Arkansas,
[23] West Virginia.
[24]         People who don't have a legal
[25] education and try to learn the law by reading

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 87

[1]
[2] a law book make all the same mistakes that
[3] you've made so far, and you can't pull out one
[4] line or one paragraph and say, oh, here it is,
[5] now I know what the law is, because you don't.
[6] And I don't know what the law of Missouri is
[7] either.
[8]         So I'm not going to attempt to
[9] instruct the jury on the law of marriage in
[10] Pennsylvania or Missouri, and you shouldn't
[11] try to do that in your closing argument
[12] either. If you try to do that, I'm going to
[13] stop you. Now, you can argue, if you'd like,
[14] about how you tried to research the law and
[15] what your impression of the law was, but if at
[16] any time you say and the law of Missouri tells
[17] you that, I will stop you. Do you understand?
[18]         Mr. Stackow is going to speak
[19] for, his estimate is fifteen minutes. I'm
[20] going to impose a twenty-minute limit on each
[21] side with closing arguments. So defense will
[22] have twenty minutes and the DA will have
[23] twenty minutes. Do you understand?
[24]         MR. STACKOW: Yes, Your Honor.
[25]         THE DEFENDANT: Well, I just

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 88

[1]
[2] object. I was going to say objection, that I
[3] just really think that the law of Missouri.
[4]         THE COURT: I got your
[5] objection.
[6]         THE DEFENDANT: Okay.
[7]         THE COURT: All right. With
[8] that in mind, is everybody all set to go?
[9]         MR. STACKOW: Yes, Your Honor.
[10]         THE DEFENDANT: Yes.
[11]         COURT CRIER: Please remain
[12] seated. Please cease all conversation while
[13] the jury enters the courtroom.
[14]         (Jury summoned.)
[15]         THE COURT: Mr. Robins, do you
[16] have anything additional you wanted to
[17] present?
[18]         THE DEFENDANT: No, Your Honor,
[19] I do not. The defense rests. I move for
[20] admission of my exhibits.
[21]         THE COURT: Is there any
[22] objection to the admission of the defense
[23] exhibits?
[24]         MR. STACKOW: No objection.
[25]         THE COURT: All right. Then

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 4
March 12, 2010

Page 89

[1]
[2] they're admitted.
[3]            Ladies and gentlemen, we've now
[4] arrived at the next stage of this case. The
[5] evidence has been completed. Mr. Stackow
[6] informed us over the break that he has no
[7] additional evidence he wants to present. You
[8] don't have any rebuttal.
[9]      MR. STACKOW:  That's correct,
[10] Your Honor.
[11]      THE COURT:  So the Commonwealth
[12] rests, the defense is presented, and now it's
[13] time for them to make speeches. It's a fairly
[14] short and simple case. There are five crimes
[15] charged but they're simple crimes to explain
[16] and to understand, and I've told each counsel,
[17] Mr. Robins and the DA, that each will have
[18] twenty minutes to give a closing argument.
[19]            If they say anything about the
[20] evidence in this case and it disagrees with
[21] your recollection of what you heard from the
[22] witness stand, you're right and they're wrong.
[23] If you're not sure about the evidence, if you
[24] think, well, gee, maybe a witness did say
[25] something else, when you go back to deliberate

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 90

[1]
[2] you'll have eleven other people to discuss
[3] that with.
[4]            It's unavoidable that during
[5] speeches people may come in go out. Try not
[6] to be distracted because each side, this is
[7] their last chance to address you. And even
[8] though it's your recollection of the evidence
[9] that controls, what they say is not evidence,
[10] and even though the law comes from me and if
[11] they try to get into discussion of the law and
[12] they're wrong, I'll have to correct them,
[13] closing arguments can be valuable to you
[14] because each side has the opportunity and in
[15] fact the responsibility to take what you've
[16] heard in this case and present it in a way
[17] that is favorable to their side and help put
[18] some of the evidence together and present
[19] arguments. They may touch upon things that
[20] you haven't thought of. On the other hand,
[21] they may leave out things that you've been
[22] sitting there thinking about. You're not
[23] limited by what they argue to you. Eventually
[24] when you go back to deliberate, you may have
[25] your own view of the evidence that neither

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 91

[1]
[2] lawyer touches upon.
[3]            Because the Commonwealth has
[4] the burden of proof, they get to speak second.
[5] So you'll hear first from the defendant, then
[6] from the DA. After closing arguments, I will
[7] instruct you on the law and then you'll go
[8] back to deliberate. So, Mr. Robins?
[9]      THE DEFENDANT:  Good morning.
[10]      JURY COLLECTIVELY:  Good
[11] morning.
[12]      THE DEFENDANT:  Again, I'm
[13] Johanathan Robins. When I first met Ericka, I
[14] met her on a date line. As she always does,
[15] she tells people that she's nineteen. That's
[16] her favorite age she tells people. She sat
[17] here and said that, told you, the jury, that
[18] no, I don't lie about my age, you know. She
[19] kept on saying, no, I told him my real age.
[20] And then later on in testimony she says, well,
[21] yeah, I do meet guys online and she don't tell
[22] her right age on the line, later on after she
[23] done told you that she did tell her right age
[24] on the line. And then in a Freudian slip when
[25] I kept questioning her about what did she tell

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 92

[1]
[2] you me her age was, she said, yeah, I told you
[3] the wrong, I told you the wrong age. And then
[4] she said, oh, no, the wrong name. Then I
[5] backed up and said, you know, what did you say
[6] again? And she admitted in a Freudian slip
[7] that, yes, she did tell me the wrong age when
[8] she first met me on this date line.
[9]            Again, she has ID that says
[10] that she's over eighteen. She was employed at
[11] other places that says she's eighteen. The
[12] hair place, you know. People might blame me.
[13] Well, you should have known she was under
[14] eighteen. Well, when she told people in my
[15] family, they bought it. They believed it.
[16] They trusted her. When she told that hair
[17] service, they trusted her. They thought she
[18] was over a certain age. So sometimes people
[19] are older and actually do look young, you
[20] know. But she has ID and she also just tells
[21] people that she is an older age.
[22]            She told us that over a long
[23] period of time she told us that, oh, no, she
[24] didn't tell anybody in my family how old she
[25] was. She didn't say, oh, no, they just didn't

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 93

[1]
[2] know how old I was. Then after I kept on
[3] cross examining her, kept on cross examining
[4] her, oh, yeah, I told Vicky. She told more
[5] than Vicky. She told my mom, my sister,
[6] Vicky, everybody that she was nineteen.
[7]         So she also, the MySpace page.
[8] It's very interesting after all of this, after
[9] all this, that she knows she lied to other
[10] people. She knows that I'm going through a
[11] trial about her representing her age. She's
[12] still on her MySpace page. Now her favorite
[13] is saying that she's nineteen. And when I
[14] showed it to her or told her about it she
[15] said, well, other people got my password. But
[16] she didn't act like she was so surprised that
[17] it wasn't nineteen. I mean, even though other
[18] people have your password, you don't notice
[19] that it says nineteen on your page?
[20]         You know, I really do still
[21] care about my wife but I know that she's a
[22] child and even though she's my wife, it's like
[23] you really can't turn off your emotions. I
[24] guess that's how Ericka, like, with the hair
[25] thing. She tells them the wrong age. She

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 94

[1]
[2] tells them she's eighteen, nineteen, twenty.
[3] She gets in. Now that people like her, get to
[4] know her, down the line, oh, yeah, this is
[5] your age now. Like when the lady came to her
[6] house, that's when the lady found out what her
[7] true age was. And then she said that, you
[8] know, she had to go ahead, her mom had to sign
[9] something, even though her mother testified
[10] that she didn't have to sign anything. So I
[11] don't know what really happened, you know.
[12]         I, you know, after I found out,
[13] I really had to research the law because
[14] marriage was important to me. It was very
[15] important. I waited a long time to get
[16] married. I had no other children by anybody
[17] else. And the fact that, you know, people
[18] saying that we weren't married, you know, I
[19] did a lot of research on it. And my
[20] understanding of the law, we're married, you
[21] know. So but yet and still, I knew that she
[22] needed to grow up. That's why I decided to
[23] try to take custody of the boy and let her go
[24] and grow up with her mother, but evidently she
[25] doesn't want that.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 95

[1]
[2]         As far as when she was living
[3] with me in 2007, if she's living with me and
[4] no one's coming, it's like why wouldn't the
[5] mother, you know, say like where is my
[6] daughter at? Where is my daughter staying
[7] nights? You know, I didn't think that she
[8] was, you know, that age because nobody was
[9] coming to my door. The only time when her
[10] mother came to my door is when, like I said,
[11] we got the check cut off and I got the baby
[12] back. That's the only time she came to the
[13] door. Other than that, she was fine with
[14] Ericka being wherever she was because I was
[15] providing food, housing, shelter, clothing,
[16] whatever, because that meant that all the
[17] money that the mother had on welfare for
[18] Ericka she could just pocket herself.
[19]         But other than that, I did not
[20] know how old she was until after we got
[21] married and were about to have the baby and
[22] the whole world just changed. The whole world
[23] just changed in one minute, and all the plans
[24] we had before were now scratched off. Where
[25] we were working, you know, now it's like I'm

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 96

[1]
[2] taking care of the baby and she's going to
[3] school, which was not what I thought was going
[4] to happen when we was going through this
[5] before in 2007.
[6]         I did not know how old she was
[7] until then. I did not intend to hide or
[8] disguise who I was at any point in time. I
[9] filed for custody knowing that we had to come
[10] to court in front of a judge and it would have
[11] to be explained and that it's no way in the
[12] world that I thought that my wife was going to
[13] say anything different than I lied to him, you
[14] know, he found out later, I'm sorry. I would
[15] have never. Why in the world would I file for
[16] us to go to court if she was going to say
[17] something different, say the things that she
[18] said up here? That's why I filed. I mean, I
[19] did not think that those words were actually
[20] going to come from her. You know, the person
[21] she is now is not the person I married. It's
[22] like it's two different people, you know, and
[23] it's like she's really changed.
[24]         As I said before, I'm not
[25] guilty of the sexual assault because I did not

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Page 97

[1]
[2] know. It was a mistake of age. I did not
[3] know. You know, if I knew, you know, we
[4] wouldn't be here because she'd have been gone
[5] from the gate, you know. But my family took
[6] her in. My family loved her, you know. And
[7] eventually, you know, they found out. And now
[8] she have to go back to hers.
[9]          Me personally, hopefully you'll
[10] see that I told the truth and hopefully you'll
[11] see that all the stumbling and fumbling and
[12] contradictory evidence that they were saying,
[13] that maybe, you know, they weren't exactly as
[14] truthful with you as I was. So I'm closing
[15] saying that I'm innocent of these charges and
[16] hopefully you will find me innocent of these
[17] charges, you know. Thank you very much.
[18]          THE COURT: Mr. Stackow?
[19]          MR. STACKOW: Thank you, Your
[20] Honor. May it please the Court. Mr. Robins
[21] and Mr. McGill. Ladies and gentlemen, good
[22] morning to you as well.
[23]          JURY COLLECTIVELY: Good
[24] morning.
[25]          MR. STACKOW: I'm not going to

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 98

[1]
[2] take the allotted twenty minutes. There's
[3] no need to do that. You folks have heard
[4] everything that we've heard and we've all
[5] noted that you've paid attention throughout
[6] the last few days. And I'll repeat what I
[7] said the other day, that at the end of this
[8] case the material facts really aren't going to
[9] be in dispute and you know that now.
[10]          We know Ericka's age, that she
[11] was fourteen when she met the defendant and
[12] that he was forty years old, that they had a
[13] child together born on February twentieth,
[14] 2008, little John-John now, and that at the
[15] time that Ericka became pregnant, that she was
[16] still fourteen and the defendant was still
[17] forty years old. In Pennsylvania that's a
[18] crime. That's statutory sexual assault when
[19] there's that age difference, and the law as
[20] His Honor will instruct you says that the age
[21] difference just has to be four years, not, you
[22] know, twenty-six years as in this case.
[23]          So I'm not going to take up all
[24] the time but I want to repeat a few things
[25] that His Honor has already said and maybe

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 99

[1]
[2] touch on a couple of things that he may talk
[3] about in giving you his law, giving you the
[4] law of Pennsylvania, that is. The fact that
[5] I'm not going to go over all the evidence, you
[6] folks should consider the things that I
[7] mention, the things that I don't mention and
[8] reasonable inferences to be taken from that.
[9]          A lot of times and really what
[10] you may find during your deliberations is
[11] you're being asked to get inside the
[12] defendant's head. What did he know? What
[13] should he have known and when should he have
[14] known it? And there's no way that evidence
[15] can be presented about that. It's almost a
[16] form of circumstantial evidence. In this case
[17] you're going to have to make reasonable
[18] inferences from the facts that you've heard
[19] from both sides to tell you and exactly figure
[20] out what the defendant knew or what he should
[21] have known and when he knew those things. And
[22] I think if you do that, if you apply the law
[23] that His Honor will instruct you and you use
[24] your common sense, it will be clear to you
[25] that the defendant knew or certainly should

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 100

[1]
[2] have known that Ericka was underage.
[3]          There's been some talk about a
[4] mistake of age, and it's not simply enough
[5] that the defendant testifies that, well, I
[6] thought she was of age, I thought she was
[7] eighteen, nineteen or twenty and then that's
[8] it. It's got to be a reasonable belief. It's
[9] got to be a belief that would be reasonable
[10] under all the circumstances.
[11]          And it's interesting to note
[12] how many people, how many times when Ericka
[13] came into contact with people, her age was an
[14] issue. And it seemed to be an issue to
[15] everybody but the defendant. Everybody was
[16] asking or everybody was curious. The
[17] defendant's turning a blind eye to that, if
[18] not willfully knowing that she was underage,
[19] shows you that any belief that he had and his
[20] testimony isn't reasonable and should, I
[21] submit, if you use your common sense and all
[22] of the facts, take that off the table right
[23] away.
[24]          So what I want to next talk
[25] about is some things that His Honor will

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 101

[1]
[2] instruct you in a little bit, and it's really
[3] witness credibility. How do you judge
[4] credibility of witnesses? The judge will read
[5] an instruction that lists a number of factors
[6] about how to judge the credibility of
[7] witnesses, but they're really all borne from
[8] our common sense and understanding of human
[9] nature and how we interact with people, and it
[10] kind of boils down to the credibility of
[11] witnesses is their accuracy and believability,
[12] and that's what I want to take next ten
[13] minutes or so to talk about.
[14]        Let's talk about the testimony
[15] of Ericka Johnson. Obviously when I spoke to
[16] you yesterday I described her as a young lady
[17] now that made some very bad and immature,
[18] unsophisticated decisions when she was
[19] fourteen, beginning with being on that chat
[20] line in the first place. But what I want to
[21] talk to you about her testimony is these
[22] images, that during the course of her account
[23] of being with the defendant, how she was able
[24] to visually or almost visually give you a
[25] visual image of exactly what she was going

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 102

[1]
[2] through.
[3]        The one incident in particular
[4] that I'm speaking of is the first time that
[5] she had sexual intercourse with Mr. Robins,
[6] with the defendant. Think back to her
[7] testimony. And the judge is, some of the
[8] points that the judge will say is the body
[9] language or demeanor of a person and their
[10] ability to recall specific events. In other
[11] words, the more detailed testimony is, the
[12] more detailed people talk about things in the
[13] past, the better their credibility is. The
[14] more likely they're able to, they're speaking
[15] from an experience that they went through, not
[16] something that they're making up.
[17]        So think back to that testimony
[18] when Ericka is describing the time that she's
[19] over at the defendant's house in March of
[20] 2007. And, you know, she's got the maturity
[21] that, the experience of three years now on her
[22] so she can describe it a little bit better,
[23] but at fourteen years of age she's not sure
[24] what's going on. She's not sure exactly what
[25] the defendant wants, what he's doing, how to

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 103

[1]
[2] respond. Not to say that she's resisting or
[3] not consenting in the legal sense, but she's
[4] scared and she's confused and she doesn't know
[5] what exactly is going to happen step by step
[6] by step.
[7]        Think of her describing being
[8] in this man's bedroom by themselves. It's
[9] dark. She's sitting on his lap and he begins
[10] touching her chest over the clothes and it
[11] makes her uncomfortable, you know. The
[12] defendant talks to her, convinces her to have
[13] sexual intercourse. And like a fourteen year
[14] old girl would do or somebody underage,
[15] somebody immature, she describes to you
[16] exactly what she does. She takes off her
[17] close and hurries into the bed and pulls the
[18] sheet over her. And the defendant's response
[19] is, Why don't you let me see you? Why don't
[20] you let me see your body? And Ericka's
[21] description of what happened next. That's not
[22] just Ericka recounting what was going through
[23] her mind in this terribly confusing, what must
[24] be terribly confusing event to her, but that's
[25] also stuff that the defendant was present for.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 104

[1]
[2] That's the kind of evidence that you can use
[3] to say, listen, when a girl acts like that,
[4] when she reacts that way, when she's told you
[5] already that she's fourteen on the chat line,
[6] when you don't know her family, when you
[7] haven't seen any ID, you don't know where
[8] she's going, you've got an obligation there.
[9] You better find out. And you can't just come
[10] in here and say, well, I thought she was
[11] nineteen because she told me she was nineteen.
[12] Confronted with those kinds of circumstances,
[13] we know better and your common sense tells you
[14] better. He should have known, and if he
[15] should have known, then his belief is not
[16] reasonable.
[17]        So even just the details that
[18] Ericka is able to relay about their first
[19] conversation over the telephone, how she said
[20] that she was fourteen to him and his response
[21] was, well, that's okay, I believe women should
[22] be treated no matter what their age equally,
[23] and exactly the words that she was able to
[24] recount. That's something from personal
[25] experience. That goes to show you that her

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Page 105

[1]
[2] account of that initial phone conversation is
[3] believable, is credible. It's accurate and
[4] it's believable, and therefore you should find
[5] that that testimony is credible.
[6]        And compare that to the
[7] defendant's account. You know, when he gets
[8] up on the witness stand and he's talking about
[9] this, it's almost like he's giving this social
[10] networking profile of people that he's looking
[11] for. And, you know, his character, what
[12] exactly his thinking is, starts to become a
[13] little clearer throughout the course of his
[14] testimony and all the other evidence of what
[15] we now know. This is a man that was looking
[16] for somebody that he could isolate, that he
[17] could convince and talk to and control to the
[18] point of doing exactly what he did to Ericka.
[19] It's almost like in his own delusional mind
[20] he's created some sort of perfect little
[21] family and he needed an immature person to be
[22] able to do that, and to Ericka's great
[23] unfortune, she was the one that happened to be
[24] on the line that day.
[25]        So listen to His Honor's
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 106

[1]
[2] instructions on the law, listen to his
[3] instructions on the credibility of witnesses,
[4] and it will become clear to you that the
[5] defendant knew. He knew exactly what he was
[6] doing. He controlled the situation from the
[7] very beginning, from that phone conversation
[8] to the time out to dinner. This is a man that
[9] wanted to get married and have children but
[10] yet never did anything to find out about, you
[11] know, Ericka's family, and that's because
[12] that's the way he wanted it. He wanted
[13] someone that he could easily isolate and
[14] manipulate. That's exactly why we have these
[15] laws to protect children from these decisions
[16] that we know kids will make in Pennsylvania.
[17]        This is a tragic case, really.
[18] For Ericka Johnson to have gone through what
[19] she did just because this man wanted some
[20] delusional family fantasy life of his own is
[21] really a tragedy.
[22]        Now, his fate after the
[23] verdict, that's obviously what His Honor will
[24] consider. There's lots of things that go into
[25] that. That's nothing that you folks need to
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 107

[1]
[2] be worried about. Your job at this point is
[3] to figure out the facts, who do you believe,
[4] who don't you believe, what parts of their
[5] accounts do you believe, what parts you don't
[6] believe, and apply it to the facts or apply it
[7] to the law, excuse me, that His Honor will
[8] give you. And in this case, the law is very
[9] clear.
[10]        As I mentioned yesterday
[11] morning, there's five criminal charges that
[12] have been brought against the defendant. Two
[13] that are probably most similar sounding and
[14] will be during the judges instruction are
[15] involuntary deviate sexual intercourse and
[16] statutory sexual assault. To prove the
[17] defendant guilty of those charges, we the
[18] Commonwealth have to show beyond a reasonable
[19] doubt that he was or that Ericka was less than
[20] sixteen at the time that they had sexual
[21] intercourse, that he was more than, four or
[22] more years older than she, and that they were
[23] not married at the time of the sexual
[24] intercourse.
[25]        For involuntary deviate sexual
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 108

[1]
[2] intercourse, it's just that the oral sex is
[3] the only distinction, the oral sex versus the
[4] vaginal sex. Oral sex applies to the
[5] involuntary deviate sexual intercourse and the
[6] vaginal sex to the statutory sexual assault.
[7]        Now, unlawful contact with a
[8] minor. As His Honor will instruct you, that
[9] means that if the defendant being an adult
[10] contacts in any one of a number of ways,
[11] including on the telephone chat line, somebody
[12] who's less than eighteen for the purpose of
[13] engaging in a sexual offense, in this case
[14] underage sex with a minor, that person is
[15] guilty of that charge. And you'll note that
[16] in the instructions on that charge, there
[17] isn't any of this talk about a reasonable
[18] belief about an age, and that's really because
[19] we recognize as a society and the law that
[20] it's on the obligation of the adult to
[21] affirmatively do that, to affirmatively know
[22] exactly the age of these persons, you know,
[23] somebody that you're contacting with.
[24]        Now, corrupting the morals of a
[25] minor and interference with the custody of a
        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 109

[1]
[2] child, those are more broadly based type of
[3] crimes. But as I mentioned yesterday morning,
[4] the interference with custody of a child has
[5] nothing to do with Johnathan and John-John.
[6] This case isn't about his custody. It's not
[7] about his child support or welfare benefits.
[8] It's about him, the defendant, taking Ericka
[9] away from her mother. It's not a forced
[10] taking. It's not a kidnapping type taking.
[11] It's an enticement or in any way creating a
[12] situation where he lures her away from the
[13] custody of her mother.
[14]        Now, I want to wrap up by
[15] talking about the interest and the motivation
[16] in this case. That's one of the factors that
[17] His Honor will instruct you about credibility.
[18] Does somebody have an interest or motive to
[19] testify one way or the other? And in
[20] particular, the defendant. He'll give you a
[21] specific instruction that the defendant has a
[22] motive, an interest in the outcome of the
[23] case, and that you can consider that in
[24] evaluating his credibility.
[25]        You can also consider the
                Carl G. Sokolski
                Official Court Reporter
                (215) 683-8060

Page 110

[1]
[2] interests and motives of both Ericka Johnson
[3] and her mother. This wasn't their idea. This
[4] wasn't where they wanted to be. Ericka and
[5] her mother, I would submit, wanted anything
[6] else other than to be in this situation. And
[7] even on February eleventh, 2009, when they
[8] called the police, Ericka didn't run up to the
[9] police and say he raped me, he's too old, I'm
[10] too young. It wasn't anything like that. She
[11] just wanted to get her child back. They
[12] weren't looking to get the defendant locked
[13] up, as he says, or anything like that. It was
[14] the police officers just realizing exactly how
[15] the age difference was that caused them to
[16] arrest the defendant.
[17]        Even the defendant's own
[18] witness, Mr. Michael Ward, the Delaware County
[19] public assistance caseworker for Miss Freeman,
[20] clearly said that there is no, any evidence of
[21] anything but that Lucille Freeman and Ericka
[22] Johnson were anything but honest and above
[23] board in all his dealings with them over the
[24] years.
[25]        So clearly, when you consider
                Carl G. Sokolski
                Official Court Reporter
                (215) 683-8060

Page 111

[1]
[2] all of that evidence, it's clear exactly what
[3] was going on. And just because the defendant
[4] says he thought Ericka was eighteen or
[5] nineteen or twenty, you've heard the
[6] discrepancies in how really that's not even
[7] reasonable for him to believe it, but just
[8] because he says it doesn't mean you have to
[9] accept it.
[10]        Just because we're here, just
[11] because there's a trial, doesn't mean that
[12] somebody's got facts or evidence to dispute.
[13] He's got a right to, a constitutional right to
[14] a trial by jury and he's exercised that right.
[15] So be it. We've given him that trial. We
[16] presented our witnesses. They've testified in
[17] front of you after taking an oath, and they
[18] testified credibly. Now it's your obligation
[19] to weigh that evidence and apply it to the
[20] law. If you do that, I think it will become
[21] clear that maybe still in his own mind, in his
[22] own deluded mind, he thinks he did nothing
[23] wrong. Maybe, and it's even come out in his
[24] closing arguments and part of his testimony,
[25] he still wants Ericka back. He still,
                Carl G. Sokolski
                Official Court Reporter
                (215) 683-8060

Page 112

[1]
[2] can't do anything but call her his wife.
[3]        It's time to say Mr. Robins,
[4] enough is enough. You shouldn't have been
[5] messing with that girl in the first place.
[6] You can't get up on this witness stand and
[7] fool us. You knew better. You certainly
[8] should have known better. And you are guilty.
[9]        Thank you very much, ladies and
[10] gentlemen. Thank you, Your Honor.
[11]        THE COURT: All right. Ladies
[12] and gentlemen, if you'd like to take a break,
[13] let me know and we can do that. Otherwise
[14] I'll go just go right right into giving you my
[15] instructions. I don't see anybody asking for
[16] a break. You will lock the doors, nobody in
[17] and out of the courtroom during the Court's
[18] instructions.
[19]        COURT CRIER: Yes.
[20]        THE COURT: If anybody wants to
[21] leave the courtroom, you have to do that now.
[22] It still won't eliminate the possibility that
[23] the sheriff will come in through the side door
[24] or somebody will come in through the back
[25] door, but.
                Carl G. Sokolski
                Official Court Reporter
                (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 4
March 12, 2010

Page 113

[1]
[2]        The Pennsylvania Supreme Court
[3] has a committee and that committee's job is to
[4] write up proposed instructions, jury
[5] instructions. It's lawyers and judges and
[6] people trying to make complicated concepts
[7] simple to understand so that people like
[8] yourselves, who don't work in here every day,
[9] can be informed on what the law is in an easy
[10] to understand way. Actually, when I was
[11] practicing law, a lot of times I would pull
[12] down the standard jury instruction to look up
[13] the law, because it is easy to understand.
[14]        Because they've gone to all
[15] that trouble, I'm going to read their standard
[16] instruction to you, and I know that can be
[17] boring. Actually, if I put my mind to it, I
[18] could make it really boring. I'll try not to
[19] do that. I'll try to from time to time talk
[20] to you like this so we're actually
[21] communicating and explain things to you along
[22] the way that I think need an explanation.
[23]        As I've told you already, the
[24] speeches of counsel are not part of the
[25] evidence and you should not consider them as

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 114

[1]
[2] such. However, in deciding the case, you
[3] should carefully consider the evidence in
[4] light of the various reasons and arguments
[5] each lawyer presented to you. Now, when I say
[6] each lawyer I'm including the defendant, Mr.
[7] Robins, because he was his own lawyer in this
[8] case. So I'm not leaving him out. I'm
[9] including him in the term lawyer.
[10]        It is the right and duty of
[11] each lawyer to discuss the evidence in a
[12] manner that is most favorable to the side that
[13] that lawyer represents. You should be guided
[14] by each lawyer's arguments to the extent that
[15] they are supported by the evidence and insofar
[16] as they aid you in applying your own reason
[17] and common sense. However, you're not
[18] required to accept the argument of either
[19] lawyer. It is for you and you alone to decide
[20] this case based on the evidence as it was
[21] presented from the witness stand and in
[22] accordance with the instructions I'm now going
[23] to give you.
[24]        So if what the lawyers said to
[25] you makes sense, then use it. If you think it

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 115

[1]
[2] was just a bunch of hot air, disregard it.
[3] It's really, the decision in this case is
[4] really up to you and your reception and
[5] interpretation of the evidence and this law as
[6] I explain it to you.
[7]        You should not decide this case
[8] on the basis of which side presented the
[9] greater number of witnesses or the greater
[10] amount of evidence. Instead, you should
[11] decide which witness to believe and which
[12] evidence to accept on the basis of whether or
[13] not the testimony or evidence is believable.
[14] In deciding which of several witnesses to
[15] believe, it is proper for you to consider
[16] whether or not the testimony of each witness
[17] is supported by other evidence in the case.
[18]        However, you should recognize
[19] that it is entirely possible for a single
[20] witness to give truthful and accurate
[21] testimony and that his or her testimony may be
[22] believed even though a greater number of
[23] witnesses of apparently equal reliability
[24] contradicted him or her. The question for you
[25] to decide, based on all the considerations I'm

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 116

[1]
[2] discussing with you now, is not which side
[3] produced the most evidence but instead which
[4] evidence you believe.
[5]        The testimony of Ericka, the
[6] complainant in this case, standing alone, if
[7] believed by you, is sufficient proof upon
[8] which to find the defendant guilty in this
[9] case. The testimony of a victim in a case
[10] like this need not be supported by other
[11] evidence to sustain a conviction. Thus, you
[12] may find the defendant guilty if the testimony
[13] of Ericka convinces you beyond a reasonable
[14] doubt that the defendant is guilty.
[15]        Every case, this case included,
[16] has two kinds of evidence, direct evidence and
[17] circumstantial evidence. You've heard the
[18] term circumstantial evidence in the past.
[19] It's used outside of courtrooms.
[20]        An example of circumstantial
[21] evidence that is often given is suppose
[22] yesterday, yesterday afternoon, you went to
[23] the movie theater and when you went into the
[24] theater it was a sunny day and a couple of
[25] hours later you came out and when you came out

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 4
March 12, 2010

Page 117

[1]
[2] you saw that windshield wipers were going on
[3] some of the cars, people were putting down
[4] umbrellas, the ground was all wet. That would
[5] be an indication or circumstantial evidence
[6] that while you were in the theater it had
[7] rained.
[8]         So let me explain as the
[9] committee explains it. On the one hand, there
[10] is direct evidence, which is testimony by a
[11] witness from his or her own personal knowledge
[12] such as something that he or she saw or heard.
[13] The other type of evidence is circumstantial
[14] evidence, which is testimony about facts that
[15] point to the existence of other facts that are
[16] in question.
[17]         So if a witness comes in and
[18] says when I went into the theater yesterday it
[19] was a bright sunny day, everything was dry
[20] outside, the sun was shining; two hours later
[21] I came out of the theater, here's what I saw,
[22] all of that is direct evidence, what the
[23] witness says they experienced. But that
[24] description of what the witness saw after
[25] coming out is also circumstantial evidence of

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 118

[1]
[2] what happened when the witness wasn't there to
[3] see it.
[4]         Whether or not circumstantial
[5] evidence is proof of the other facts in
[6] question depends, in part, on the application
[7] of common sense and human experience. You
[8] should recognize that it is sometimes
[9] necessary to rely upon circumstantial evidence
[10] in criminal cases, particularly where the
[11] crime was committed in secret. In deciding
[12] whether or not to accept circumstantial
[13] evidence as proof of the facts in question,
[14] you must be satisfied, first, that the
[15] testimony of the witness is truthful and
[16] accurate; second, that the existence of the
[17] facts that the witness testifies to leads to
[18] the conclusion that the facts in question also
[19] happened.
[20]         So you have to believe him when
[21] he says it was sunny when he went in. You
[22] have to believe him when he describes what he
[23] saw when he came out. And then you have to
[24] conclude that that inference that it rained
[25] while he was in the theater is reasonable.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 119

[1]
[2]         I've been telling you since you
[3] first came into this courtroom that it's your
[4] job to find the facts, and that all depends on
[5] making a decision on credibility of the
[6] witnesses. As judges of the facts, you are
[7] the sole judges of the credibility of the
[8] witnesses and their testimony. This means you
[9] must judge the truthfulness and accuracy of
[10] each witness's testimony and decide whether to
[11] believe all or part or none of that testimony.
[12]         The following are some of the
[13] factors that you may and should consider when
[14] judging credibility and deciding whether or
[15] not to believe the testimony. These are all
[16] things you're going to recognize as things you
[17] do in every-day life. But this is a reminder
[18] not to leave your common sense outside the
[19] courtroom, that the judgment that you're
[20] making is a common-sense, every-day kind of
[21] judgment that you always make, but now you're
[22] doing it as a juror in this case.
[23]         So you would ask yourself, for
[24] example, was the witness able to see, hear or
[25] know the things about which the witness

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 120

[1]
[2] testified? How well could the witness
[3] remember and describe the things about which
[4] they testified? Was the ability of the
[5] witness to see, hear, know, remember or
[6] describe those things affected by youth, old
[7] age or any physical, mental or intellectual
[8] deficiency? Did the witness testify in a
[9] convincing manner? How did the witness look,
[10] act and speak while testifying? Was the
[11] testimony uncertain? Was it confused? Was it
[12] self-contradictory or evasive? Did the
[13] witness have any interest in the outcome of
[14] the case, any bias, prejudice or other motive
[15] that might affect their testimony? How well
[16] does the testimony of the witness fit with the
[17] other evidence in the case, including the
[18] testimony of other witnesses? Was it
[19] contradicted or supported by the other
[20] testimony, by the other evidence? Does it
[21] make sense?
[22]         If you believe some part of the
[23] testimony of a witness to be inaccurate,
[24] consider whether the inaccuracy casts doubt
[25] upon the rest of that witness's testimony.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Page 121

[1]
[2] This may depend on whether the witness has
[3] been inaccurate in an important matter or a
[4] minor detail or any possible explanation.  For
[5] example, did the witness make an honest
[6] mistake or simply forget, or did the witness
[7] deliberately falsify?
[8]            While you are judging the
[9] credibility of each witness, you are likely to
[10] be judging the credibility of other witnesses
[11] or evidence.  If there is a real,
[12] irreconcilable conflict, it is up to you to
[13] decide which if any conflicting testimony or
[14] evidence to believe.
[15]            As sole judges of credibility
[16] and fact, you, the jurors, are responsible to
[17] give the testimony of every witness and all
[18] the other evidence whatever credibility you
[19] think it deserves.
[20]            If you decide that a witness
[21] deliberately testified falsely, not a mistake,
[22] but if you think that somebody swore to tell
[23] the truth, got up on the stand and told you a
[24] lie and that lie is about a material point,
[25] that is, about a matter that could affect the

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 122

[1]
[2] outcome of the trial, you may for that reason
[3] alone choose to disbelieve the rest of that
[4] witness's testimony, but you're not required
[5] to do so.  You should consider not only the
[6] deliberate falsehood but also all other
[7] factors bearing on the witness's credibility
[8] in deciding whether to believe other parts of
[9] their testimony.
[10]            The defendant took the stand in
[11] this case as a witness.  And remember, early
[12] on, I explained to you that no matter what the
[13] witness's job, no matter what the witness's
[14] title, you have to evaluate every witness.
[15] That's true even where the witness's title is
[16] defendant.  He has a right not to testify but
[17] if he gets on the stand and he testifies, then
[18] he gets evaluated just like any other witness.
[19] So all of the things that I've told you about
[20] evaluating a witness apply to him as well as
[21] everybody else.  You should not disbelieve the
[22] defendant's testimony merely because he is the
[23] defendant.  In weighing his testimony,
[24] however, you may consider the fact that he has
[25] a vital interest in the outcome of this trial.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 123

[1]
[2] You may take the defendant's interest into
[3] account just as you would the interest of any
[4] other witness along with all other facts and
[5] circumstances bearing on credibility in making
[6] up your minds what weight his testimony
[7] deserves.
[8]            Now, in general terms, how do
[9] you deal with conflicting testimony?  I mean,
[10] if one witness says I told him I was fourteen
[11] and the other witness says she never told me
[12] she was fourteen, how do you deal with that
[13] or any other conflict in any of the evidence?
[14] Where there is a conflict in the testimony,
[15] the jury has the duty of deciding which
[16] testimony to believe, but you should first try
[17] to reconcile, that is, fit together any
[18] conflicts in the testimony if you can fairly
[19] do so.  Discrepancies and conflicts between
[20] the testimony of different witnesses may or
[21] may not cause you to disbelieve some or all of
[22] their testimony.
[23]            Remember that two or more
[24] persons witnessing an incident may see or hear
[25] it happen differently.  Also, it's not

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 124

[1]
[2] uncommon for a witness to be innocently
[3] mistaken in his or her recollection of how
[4] something happened.
[5]            If you cannot reconcile a
[6] conflict in the testimony, it is up to you to
[7] decide which testimony, if any, to believe and
[8] which to reject as untrue or inaccurate.  In
[9] making this decision, consider whether the
[10] conflict involves a matter of importance or
[11] merely some detail and whether the conflict is
[12] brought about by an innocent mistake or by an
[13] intentional falsehood.  You should also keep
[14] in mind the other factors already discussed
[15] which go into deciding whether or not to
[16] believe a witness.
[17]            In deciding which of
[18] conflicting testimony to believe, you should
[19] not necessarily be swayed by the number of
[20] witnesses on either side.  You may find that
[21] the testimony of a few witnesses, even of just
[22] one witness, is more believable than the
[23] opposing testimony of a greater number of
[24] witnesses.  On the other hand, you should also
[25] consider the extent to which conflicting

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 4
March 12, 2010

Page 125

[1]
[2] testimony is supported by other evidence.
[3]        When the Commonwealth moves to
[4] trial, they have a paper. It's called an
[5] information. Sometimes it's called a bill of
[6] information, a bill of indictment. But it's a
[7] list of what charges are in the case and it's
[8] a notice of what the trial is going to be
[9] about. The bills of information in this case
[10] allege that the crime was committed between
[11] 2007 and 2008 on diverse dates. And in some
[12] instances there may be a reference to
[13] specific, the specific date of February first,
[14] 2007. But each charge then states on diverse
[15] dates between 2007 and 2008.
[16]        You are not bound by the date
[17] that's alleged in the information. This is
[18] just a notice to the defendant so he
[19] understands what the time frame is for these
[20] acts that have been alleged. It is not an
[21] essential element of the crime charged. You
[22] may find the defendant guilty if you are
[23] satisfied beyond a reasonable doubt that he
[24] committed the crime charged in and around the
[25] dates charged in the information even though

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 126

[1]
[2] you're not satisfied that he committed it on a
[3] particular date.
[4]        So the fact that witnesses were
[5] not able to say here's what happened on
[6] February seventeenth and then on March
[7] twenty-ninth this is what we did and on June
[8] the second, even though you don't have that
[9] kind of specific date, that's not an essential
[10] element of the crime.
[11]        I'm going to give you the
[12] definitions of the crimes charged, and before
[13] I do that I'm going to give you an overall
[14] instruction as to things we've already touched
[15] upon a little bit, the presumption of
[16] innocence, the Commonwealth's burden, and the
[17] meaning of reasonable doubt.
[18]        A fundamental principle of our
[19] system of criminal law is that the defendant
[20] is presumed to be innocent. The mere fact
[21] that he was arrested and accused of a crime is
[22] not evidence against him. Furthermore, the
[23] defendant is presumed innocent throughout the
[24] trial and unless and until you conclude, based
[25] on careful and impartial consideration of the

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 127

[1]
[2] evidence, that the Commonwealth has proven him
[3] guilty beyond a reasonable doubt. It is not
[4] the defendant's burden to prove that he is not
[5] guilty.
[6]        Now, there is an exception to
[7] that and I'll explain the exception when we
[8] get to the definitions of these crimes. There
[9] is a defense of mistake of age, and you'll see
[10] the difference when I get to that explanation
[11] of that defense.
[12]        It is the Commonwealth that
[13] always has the burden of proving each and
[14] every element of the crime charged and that
[15] the defendant is guilty of that crime beyond a
[16] reasonable doubt. The person accused of a
[17] crime is not required to present evidence or
[18] prove anything in his or her own defense,
[19] except with regard to the defense of mistake
[20] of age. If the Commonwealth's evidence fails
[21] to meet its burden, then your verdict must be
[22] not guilty. On the other hand, if the
[23] Commonwealth's evidence does prove beyond a
[24] reasonable doubt that the defendant is guilty,
[25] then your verdict must be guilty.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 128

[1]
[2]        Although the Commonwealth has
[3] the burden of proving that the defendant is
[4] guilty, this does not mean that the
[5] Commonwealth must prove its case beyond all
[6] doubt and to a mathematical certainty, nor
[7] must it demonstrate the complete impossibility
[8] of innocence.
[9]        That part about mathematical
[10] certainty, there are some things in life that
[11] we expect to be proven to a mathematical
[12] certainty. If you do your taxes and you make
[13] a mistake on the math, the IRS will
[14] immediately call that to your attention
[15] because they expect you to be right to a
[16] mathematical certainty.
[17]        If you hire somebody to design
[18] a bridge, he's going to put together a design.
[19] He's going to give you all the calculations
[20] and then you're going to be able to take that
[21] and give it to somebody else and get another
[22] engineer to give you their opinion, and he's
[23] going to check to make sure that it works out
[24] to mathematical certainty.
[25]        What we do in court isn't like

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009                                                    Trial (Jury) Volume 4
Johnathan Robins                                                            March 12, 2010

Page 129

[1]
[2] that.  It isn't like an accounting problem or
[3] an engineering problem.  You have people come
[4] in and testify to something that happened in
[5] the past, and it just doesn't happen with that
[6] kind of certainty.
[7]            Therefore, in a criminal case
[8] like this, the burden is proof beyond a
[9] reasonable doubt.  And here's what that means.
[10] A reasonable doubt is a doubt that would cause
[11] a reasonably careful and sensible person to
[12] hesitate or be restrained from acting upon a
[13] matter of the highest importance in his or her
[14] own affairs.
[15]            A reasonable doubt must fairly
[16] arise out of the evidence that was presented
[17] or out of the lack of evidence with respect to
[18] some element of the crime.  A reasonable doubt
[19] must be a real doubt.  It may not be an
[20] imagined one, nor may it be a doubt that you
[21] manufacture in order to avoid carrying out an
[22] unpleasant duty.
[23]            So to summarize, you may not
[24] find the defendant guilty based on a mere
[25] suspicion of guilt.  The Commonwealth has the

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 130

[1]
[2] burden of proving the defendant guilty beyond
[3] a reasonable doubt.  If it meets that burden,
[4] then the defendant is no longer presumed
[5] innocent and you must find him guilty.  On the
[6] other hand, if the Commonwealth does not meet
[7] its burden, then you must find the defendant
[8] not guilty.
[9]            When you go out to deliberate,
[10] you will have with you a verdict sheet.  It
[11] says Verdict Report, Criminal Case.  This is
[12] where you record your verdict.  There are five
[13] charges listed here in no particular order.
[14] And in the far column there's a place for a
[15] verdict.  You would put in there guilty or not
[16] guilty.  So for the first offense, your
[17] verdict would be written in guilty or not
[18] guilty, whichever it is.  You'll come back
[19] with a sheet that says guilty or not guilty.
[20] And it could be guilty, guilty, guilty all the
[21] way down or it could be not guilty, not
[22] guilty, not guilty all the way down, or it
[23] could be some combination, guilty of some
[24] charges, not guilty of others.
[25]            Your job is to make a decision

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 131

[1]
[2] as to guilty or not guilty.  Only in homicide
[3] cases does the jury play any role in
[4] sentencing, and this is not a homicide.  In
[5] this case and all other criminal cases, if you
[6] find the defendant guilty, there will be a
[7] sentencing hearing at some point and that will
[8] be determined by me.  That will not be your
[9] determination.  And I'll have more
[10] instructions for you with regard to the
[11] verdict at the very end.
[12]            Now, with regard to these
[13] charges, and I'll just give them to you in the
[14] order that they're on the verdict sheet,
[15] which, as I said, is in no particular order,
[16] unlawful contact with a minor.  The defendant
[17] has been charged with unlawful contact with a
[18] minor.  To find the defendant guilty of this
[19] offense, you must find that each of the
[20] following three elements has been proven
[21] beyond a reasonable doubt:  First, that the
[22] defendant was intentionally in contact with a
[23] minor.  Second, that the contact was for the
[24] purpose of engaging in an unlawful act, that
[25] unlawful act being the various sexual offenses

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 132

[1]
[2] that are charged in this case as well as
[3] interfering with the custody of a child and
[4] corruption of a minor.  Third, that either the
[5] defendant or the person being contacted is
[6] within the Commonwealth.  That's really not
[7] much in dispute.  I mean, there hasn't been
[8] any testimony about people living in New
[9] Jersey and calling people in Pennsylvania on
[10] the phone or being on the Internet where we
[11] don't even know where they are.  All the
[12] testimony in this case is that whatever
[13] contact was going on on the phone, in person,
[14] was happening here in Pennsylvania.
[15]            Contact is any direct or
[16] indirect contact or communication by any
[17] means, method or device, including contact or
[18] communication in person or through an agent or
[19] agency, through any print medium, the mails,
[20] the common carrier or communication carrier,
[21] any electronic communication system,
[22] blah-blah-blah-blah-blah.  It certainly
[23] includes the telephone.  It would include the
[24] Internet if there had been e-mails or Internet
[25] contact.  And it also includes sitting in a

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 133

[1]
[2] restaurant across from each other and talking,
[3] because it's in person. But it has to be
[4] intentional, so that the defendant was
[5] intentionally in contact with a minor.
[6]         You're going to have to make a
[7] decision at what point he knew that she was a
[8] minor, and a minor is an individual under the
[9] age of eighteen. So you're going to have to
[10] decide the credibility of testimony. She says
[11] on the telephone, while talking on the
[12] telephone, she told him I'm fourteen, how old
[13] are you? And he said make a list, when we get
[14] together I'll answer all your questions. And
[15] then when they got together at the restaurant,
[16] she again told him I'm fourteen, and how old
[17] are you? The defendant says that's not what
[18] happened, that she consistently misrepresented
[19] her age.
[20]         So you have to make a
[21] determination. When he spoke to her on the
[22] phone, he's not looking at her, so her
[23] appearance isn't going to affect that one way
[24] or the other. That's a separate argument made
[25] by counsel, that everybody is asking her how

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 134

[1]
[2] old she is because every time they look at her
[3] they see somebody very young.
[4]         If he did not make unlawful
[5] contact with her on the phone, there's
[6] continuing contact, I mean, in the restaurant,
[7] at his place. At what point, at any point,
[8] did he know that she was under the age of
[9] eighteen?
[10]         If you find that the
[11] Commonwealth has made out all of those
[12] elements beyond a reasonable doubt, you must
[13] find the defendant guilty of this charge,
[14] unlawful contact with a minor. On the other
[15] hand, if they have not made out all of those
[16] elements beyond a reasonable doubt, you must
[17] find the defendant not guilty.
[18]         Next is involuntary deviate
[19] sexual intercourse. They could have come up
[20] with a worse name for this crime. They just
[21] didn't try hard enough. Deviate makes it
[22] sound like something it's not alleged to be
[23] and it's involuntary, but as you'll hear from
[24] the definition, voluntariness has nothing to
[25] do with this crime in this case because this

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 135

[1]
[2] is all based on age. And if she were older,
[3] then the defendant would be committing this
[4] crime only if he forced her to do things that
[5] she did not want to do, that she resisted.
[6] We'd have to get into the meaning of all of
[7] that. None of that applies. So don't be
[8] confused by involuntary deviate sexual
[9] intercourse. And deviate we'll touch upon in
[10] the definition.
[11]         A person commits involuntary
[12] deviate sexual intercourse when that person
[13] engages in deviate sexual intercourse with a
[14] child who is over twelve but under sixteen.
[15] Children under twelve, that's a different
[16] crime. This crime is involuntary deviate
[17] sexual intercourse. So the first question is,
[18] is the victim between the ages of twelve and
[19] sixteen? And the defendant is four or more
[20] years older. If you find, I mean, it's really
[21] undisputed in this case. He has told you his
[22] age. Everybody has talked about his age.
[23] He's considerably more than four years older
[24] than she was. Under our Crimes Code, such an
[25] offense can be committed by either a male or a

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 136

[1]
[2] female upon a child of the same or opposite
[3] sex.
[4]         In order to find the defendant
[5] guilty of this type of involuntary deviate
[6] sexual intercourse, you must be satisfied
[7] beyond a reasonable doubt that the defendant
[8] had deviate sexual intercourse with the
[9] victim, that the victim was a child older than
[10] twelve but under the age of sixteen, that the
[11] defendant was four or more years older than
[12] the child, and the defendant and the child
[13] were not married to each other.
[14]         I know in the course of telling
[15] the story, at some point they go off to
[16] Missouri and go through some kind of a
[17] ceremony and that the defendant describes
[18] themselves as, describes himself as being
[19] married to her. But all the activity that
[20] takes place up until that trip to Missouri has
[21] nothing to do with that last sentence about
[22] that the defendant and the child were not
[23] married to each other. As to activity that
[24] they engaged in after coming back from
[25] Missouri, I don't know if they were married or

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

51CR00034302009
Johnathan Robins

Page 137

[1]
[2] not. I mean, they described going out there
[3] and getting a license. She got the license by
[4] fraud and clearly the defendant has done a lot
[5] of reading about the law of Missouri. I don't
[6] know what the law of Missouri is and I don't
[7] think anybody else has introduced any
[8] evidence, competent evidence, about the law of
[9] Missouri. The Commonwealth certainly hasn't.
[10]          So with regard to involuntary
[11] deviate sexual intercourse, let me define
[12] deviate sexual intercourse, because it has a
[13] particular meaning in criminal law. Deviate
[14] is not a value judgment. Deviate is a legal
[15] term and it's not the same as deviant, which
[16] often has a negative connotation. Deviate
[17] sexual intercourse occurs if a man's penis
[18] penetrates the mouth or anus of a person or if
[19] the person's tongue penetrates the sexual
[20] organ of a woman.
[21]          So you had testimony in this
[22] case about both. You had testimony about him
[23] performing oral sex on her and she performing
[24] oral sex on him. Oral sex, in case you
[25] haven't figured it out from this convoluted
                Carl G. Sokolski
            Official Court Reporter
               (215) 683-8060

Page 138

[1]
[2] definition, is deviate sexual intercourse.
[3]          Deviate sexual intercourse
[4] includes the slightest degree of penetration
[5] and it is not required that there be any
[6] emission of semen, and I don't recall any
[7] testimony about an emission of semen,
[8] ejaculation, but it's not necessary anyway for
[9] the crime to be completed. And there wasn't a
[10] great deal of detail, no embarrassing details
[11] about exactly how much penetration took place,
[12] but that doesn't matter because the slightest
[13] degree of penetration, the slightest degree of
[14] penetration of her vagina by him orally, the
[15] slightest degree of penetration of his mouth,
[16] excuse me, her mouth with his penis, either
[17] way, that's deviate sexual intercourse.
[18]          Don't let the name of this
[19] crime involuntary deviate sexual intercourse
[20] mislead you. It is immaterial to a charge of
[21] involuntary deviate sexual intercourse with a
[22] child under sixteen whether the child objected
[23] or resisted or even whether the child
[24] consented. When a child is under sixteen and
[25] the defendant is at least four years older,
                Carl G. Sokolski
            Official Court Reporter
               (215) 683-8060

Page 139

[1]
[2] consent is no defense.
[3]          The defendant may assert the
[4] defense of mistake of age. It is a defense to
[5] a charge of involuntary deviate sexual
[6] intercourse with a child under sixteen that
[7] the defendant reasonably believed the child to
[8] be sixteen years of age or older. The
[9] defendant has the burden of proving this
[10] defense by a preponderance of the evidence.
[11]          Accordingly, if the child was
[12] under sixteen and the defendant was at least
[13] four years older, you must find the defendant
[14] guilty unless you are satisfied by the greater
[15] weight of the evidence that the defendant
[16] believed and was reasonable in believing that
[17] the child was sixteen or older. And again,
[18] that goes back to whose testimony are you
[19] going to believe. Do you believe Ericka when
[20] she says from the beginning I told him I was
[21] fourteen and we talked about the difference in
[22] our ages? And then the question becomes how
[23] could he reject that? How could he hear some
[24] girl tell him that she's only fourteen and
[25] then still insist on saying, well, I thought
                Carl G. Sokolski
            Official Court Reporter
               (215) 683-8060

Page 140

[1]
[2] she was at least sixteen?
[3]          Statutory sexual assault. Now,
[4] as you hear this, it will sound like something
[5] that you've heard about outside of court. It
[6] will sound like statutory rape, which is a
[7] term that is a fairly common term. This crime
[8] in Pennsylvania is statutory sexual assault.
[9]          The defendant has been charged
[10] with statutory sexual assault. To find the
[11] defendant guilty of this offense, you must
[12] find that the following four elements have
[13] been proven beyond a reasonable doubt: First,
[14] that the defendant had sexual intercourse with
[15] Ericka. Second, that Ericka was a child under
[16] the age of sixteen. Third, that the defendant
[17] was four or more years older than Ericka.
[18] And, finally, that the defendant and the child
[19] were not married to each other. That means
[20] not married at the time of the sexual
[21] intercourse. So any sexual intercourse that
[22] took place prior to the time they went off to
[23] Missouri, marriage is no defense. After they
[24] went off to Missouri, I still don't know if
[25] they're married. The defendant seems to think
                Carl G. Sokolski
            Official Court Reporter
               (215) 683-8060

51CR00034302009
Johnathan Robins

Page 141

[1]
[2] that they are.
[3]        For purposes of this crime,
[4] sexual intercourse has a special meaning and
[5] it's a compound meaning, but one of those
[6] meanings is sexual intercourse like we all
[7] understand the term, sexual intercourse being
[8] the penetration of a woman's vagina by a man's
[9] penis.
[10]        As described in the elements of
[11] the offense, it is immaterial whether the
[12] child consented to the intercourse. Consent
[13] of the child is no defense. The fact that the
[14] defendant did not know the age of a child or
[15] that a child lied about his or her age or that
[16] a defendant honestly but unreasonably believed
[17] that a child was sixteen or older would not by
[18] itself be a defense to statutory sexual
[19] assault. It is a defense, however, if a
[20] defendant, even though mistaken about a
[21] child's age, reasonably believed that the
[22] child was sixteen or older.
[23]        A defendant has the burden of
[24] proving this defense by a preponderance of the
[25] evidence, that is, the greater weight of the

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 142

[1]
[2] evidence. This means you cannot find the
[3] defendant guilty if you are satisfied by a
[4] preponderance of the evidence that the
[5] defendant believed the child was sixteen or
[6] older and that the defendant's belief was
[7] reasonable under the circumstances.
[8]        Just two more to go.
[9] Interfering with the custody of a child. The
[10] defendant has been charged with interfering
[11] with the custody of a child. To find the
[12] defendant guilty of this offense, you must
[13] find that all of the following elements have
[14] been proven beyond a reasonable doubt: First,
[15] that the defendant took or enticed Ericka from
[16] the custody of her parent. Second, that
[17] Ericka was under the age of eighteen at the
[18] time. Third, that the defendant had no legal
[19] privilege to take the child. And there really
[20] hasn't been any legal privilege raised in any
[21] context here. The story that was presented by
[22] both sides is meeting on a some kind of a chat
[23] room or telephone line, two strangers, and
[24] then going to dinner and then to his house and
[25] there's no, don't be confused by this last one

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 143

[1]
[2] that says a defendant did not have a legal
[3] privilege to take the child. And, fourth,
[4] that the defendant either knew he was doing
[5] these things or he acted recklessly in doing
[6] them.
[7]        A defendant acts recklessly if
[8] he consciously disregards a substantial and
[9] unjustifiable risk that he is taking a child
[10] from someone else's custody, that the child is
[11] under eighteen, and that the defendant has no
[12] legal privilege to take the child. It must be
[13] grossly unreasonable for the defendant to
[14] disregard the risk that what he or she is
[15] doing amounts to these things.
[16]        There may be circumstances
[17] which exist in a case that provide the
[18] defendant a complete defense to this charge.
[19] The Commonwealth must prove beyond a
[20] reasonable doubt that such circumstances did
[21] not exist. One, that the defendant believed
[22] that his actions were necessary to preserve
[23] the child from danger. Second, that the
[24] child, who was at least fourteen years at the
[25] time, went with the defendant at the child's

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 144

[1]
[2] own instigation, not because she was enticed,
[3] in a circumstance where the defendant had no
[4] purpose to commit a criminal offense with or
[5] against the child.
[6]        If the Commonwealth has proven
[7] all of the elements of this offense beyond a
[8] reasonable doubt, then you must find the
[9] defendant guilty of interfering with the
[10] custody of a child. If the Commonwealth has
[11] not proven any of these elements beyond a
[12] reasonable doubt, then you must find the
[13] defendant not guilty.
[14]        And finally, corruption of a
[15] minor. The defendant has been charged with
[16] corrupting a minor. To find the defendant
[17] guilty of this offense, you must find that
[18] each of the following three elements has been
[19] proven beyond a reasonable doubt: First, the
[20] defendant was eighteen years of age or older
[21] at the time of this incident. Second, that
[22] Ericka was under eighteen years of age. And,
[23] third, that the defendant aided, abetted,
[24] enticed or encouraged Ericka to commit the
[25] acts that I've already defined for you, the

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 145

[1]
[2] crimes that the defendant has been charged
[3] with, or corrupted or tended to corrupt the
[4] morals of Ericka by the alleged conduct that
[5] I've already described to you.
[6]           The Commonwealth must prove
[7] beyond a reasonable doubt the elements of this
[8] offense.  If they've proved those elements
[9] beyond a reasonable doubt, you must find the
[10] defendant guilty.  If they failed to prove any
[11] of those elements beyond a reasonable doubt,
[12] you must find the defendant not guilty.
[13]           I have a final instruction for
[14] the jury with regard to going out to
[15] deliberate, unanimity of their verdict.
[16] Before I do that, does anyone have anything
[17] additional?
[18]           MR. STACKOW:  No, Your Honor.
[19]           THE COURT:  Mr. Robins?
[20]           THE DEFENDANT:  No, Your Honor.
[21]           THE COURT:  Okay.  Before you
[22] retire to decide this case, I just want to
[23] provide you with some final guidelines for how
[24] you should conduct your deliberations.  It is
[25] my responsibility to decide all questions of

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 146

[1]
[2] law.  Therefore, you must accept and follow my
[3] rulings and instructions on the law.  I am
[4] not, however, the judge of the facts.  It is
[5] not for me to decide what are the true facts
[6] concerning the charges against the defendant.
[7]           You, the jurors, are the sole
[8] judges of the facts.  It will be your
[9] responsibility to consider the evidence, to
[10] find the facts and, applying the law to the
[11] facts as you find them, to decide whether the
[12] defendant has been proven guilty beyond a
[13] reasonable doubt.
[14]           And we sort of covered some of
[15] that in the general questioning in the
[16] beginning because I asked everybody, you know,
[17] can you follow certain instructions?  And one
[18] example I gave you was in Pennsylvania, the
[19] law of Pennsylvania is if a man is forty years
[20] old and he has this kind of contact with a
[21] fourteen year old, because some of the laws
[22] say under eighteen and some of the laws say
[23] under sixteen, could you follow the Court's
[24] instruction?  And none of you had a problem
[25] with that.  It's not up to you to go back in

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 147

[1]
[2] your deliberations and try to decide whether
[3] this is a good law or a bad law.  You simply
[4] have to find the facts with regard to the age
[5] and the acts committed between the defendant
[6] and Ericka.
[7]           Your decision in this case, as
[8] in every criminal case, is a matter of
[9] considerable importance.  Remember that it is
[10] your responsibility as jurors to perform your
[11] duties and reach a verdict based on the
[12] evidence as it was presented during the trial.
[13] However, in deciding the facts, you may
[14] properly apply common sense and draw upon your
[15] own every-day practical knowledge of life as
[16] each of you has experienced it.
[17]           You should keep your
[18] deliberations free of any bias or prejudice.
[19] Both the Commonwealth and the defendant have a
[20] right to expect that you will consider the
[21] evidence conscientiously and apply the law as
[22] I have outlined it to you.
[23]           Upon retiring to deliberate,
[24] you should select one of the twelve to be the
[25] foreman.  He or she is the one who will

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 148

[1]
[2] announce the verdict in the courtroom after
[3] you have finished deliberating.  Also, once in
[4] a while a jury will have a question and it's
[5] the foreman who will write out the question
[6] and sign it and send it out.
[7]           Although the foreman is the one
[8] who announces the verdict, sometimes juries
[9] are polled, and they're polled to find out if
[10] the verdict is unanimous, because whatever
[11] your verdict is, it has to be unanimous, which
[12] means the foreman will stand up and say this
[13] is our verdict but then each juror will be
[14] asked individually, is this in fact your
[15] verdict?
[16]           When I say unanimous, this
[17] means in order to return a verdict each of you
[18] must agree to it.  So remember I told you,
[19] next to each charge you're going to put either
[20] guilty or not guilty.  Before you can put down
[21] guilty or not guilty for that first charge,
[22] all twelve have to agree that it's guilty or
[23] not guilty.  And I keep saying the first
[24] charge.  There's no order that you have to
[25] take these in.  It's entirely up to you.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 149

[1]
[2]      You have a duty to consult with
[3] each other and to deliberate with a view to
[4] reaching an agreement if it can be done
[5] without doing any violence to your individual
[6] judgment.  Each of you must decide the case
[7] for yourself but only after there has been
[8] impartial consideration with your fellow
[9] jurors.
[10]      In the course of deliberations,
[11] each of you as jurors should not hesitate to
[12] re-examine your own views and change your
[13] opinion if convinced that you are wrong.
[14] However, no juror should surrender an honest
[15] conviction as to the weight or effect of the
[16] evidence solely because of the opinion of your
[17] fellow jurors or for the mere purpose of
[18] reaching a verdict.
[19]      In closing, I would like to
[20] suggest that you will be able to deliberate
[21] more easily and in a way that will be better
[22] for all concerned if each of you treat your
[23] fellow jurors and their views with the same
[24] courtesy and respect as you would other
[25] persons in your every-day life.
              Carl G. Sokolski
           Official Court Reporter
              (215) 683-8060

Page 150

[1]
[2]      And I always read that the way
[3] it's written hoping that someday some
[4] appellate court will look at it and realize
[5] that it's wrong, that you really should treat
[6] yourself in jury deliberations and each other
[7] better than you treat people in every-day life
[8] and every-day situations, because this is not
[9] every day.  This is a matter of the highest
[10] importance to both sides and you should treat
[11] each other with the same respect that you
[12] would expect in a matter of the highest
[13] importance in your own life.
[14]      So with that in mind, does
[15] anyone have anything else?
[16]      MR. STACKOW:  Not for the
[17] Commonwealth, Your Honor, no.
[18]      THE COURT:  Anything else?
[19]      THE DEFENDANT:  No.
[20]      THE COURT:  All right.  Then,
[21] jurors number thirteen and fourteen, we
[22] couldn't have done it without you.  However,
[23] now we are going to do it without you.  So you
[24] will be excused.  We can only allow twelve
[25] back in to deliberate.  And the court officer
              Carl G. Sokolski
           Official Court Reporter
              (215) 683-8060

Page 151

[1]
[2] will give you directions.
[3]      COURT CRIER:  Just remain
[4] seated.  Jurors thirteen and fourteen, go
[5] inside.
[6]      (Alternate jurors discharged.)
[7]      THE COURT:  While they're doing
[8] that, do we know?  I'm sure lunch has arrived
[9] by now.
[10]      COURT CRIER:  Yeah.  Their
[11] lunches are in the back.
[12]      THE COURT:  When you go back,
[13] you can eat your lunch and then begin
[14] deliberation.  You can begin your deliberation
[15] while you're eating lunch.  You can do it any
[16] way you want to do it.  It's entirely up to
[17] you.
[18]      COURT CRIER:  Please remain
[19] seated while the jurors leave the room.
[20]      (The jury retired to deliberate
[21] its verdict at 1:18 p.m.)
[22]      THE COURT:  It's usually a good
[23] idea just to hang around for a few minutes,
[24] although I don't think they'll have any
[25] questions considering the fact that they have
              Carl G. Sokolski
           Official Court Reporter
              (215) 683-8060

Page 152

[1]
[2] their lunch back there already.  At some point
[3] we have to designate a lunch hour.  I'm
[4] thinking from 1:30 till 2:30 everybody is free
[5] to go out, have lunch, whatever you want to
[6] do, as long as that's acceptable to the
[7] stenographer.  So from 1:30 till 2:30.  And
[8] then after 2:30, Mr. DeFino, if for any reason
[9] you can't be back here at 2:30, just make sure
[10] Mr. DeFino can reach you.
[11]      MR. McGILL:  Oh.  Not a
[12] problem, Judge.
[13]      THE COURT:  You should stay
[14] around until 1:30.  Sometimes they go out and
[15] then they immediately realize that they want
[16] something.  But if they can get through the
[17] first ten minutes without asking a question,
[18] we'll all go to lunch.
[19]      (A recess was taken pending the
[20] outcome of the jury's deliberations.)
[21]      COURT CRIER:  Court is
[22] reconvened.
[23]      THE COURT:  Okay.  If we can go
[24] on the record.  I don't have my copy in front
[25] of me.  Do we have another copy?  Did
              Carl G. Sokolski
           Official Court Reporter
              (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 4
March 12, 2010

---

Page 153

[1]
[2] everybody get a copy?
[3]        MR. STACKOW:  Yes, Your Honor.
[4]        THE COURT:  Okay.
[5]        THE COURT:  We have a question.
[6] So what would you like to do?  Mr. Stackow,
[7] you first.
[8]        MR. STACKOW:  Your Honor, I
[9] would suggest just reinstructing them on those
[10] two charges in their entirety.
[11]        THE COURT:  And, Mr. Robins,
[12] what would you like to do?
[13]        MR. McGILL:  Judge, can you
[14] clarify whether the age criteria means are
[15] they interested in if the person is sixteen as
[16] opposed to fourteen, or are they asking if the
[17] mistake as to age is the issue?  I don't think
[18] it's clear.
[19]        THE COURT:  Well, the good news
[20] is I can't find all of the charges but I do
[21] have these two.  What I did with the other
[22] three I have no idea.  But we don't need them
[23] at the moment.  With regard to these two, I
[24] would only read them the part that relates to
[25] age, which is what they're asking for.  So

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

Page 154

[1]
[2] with regard to corrupting the morals of a
[3] minor, the defendant was eighteen years of age
[4] or older at the time of the incident and
[5] Ericka, the minor, was under eighteen years of
[6] age at the time.  And with regard to
[7] interfering with custody, I would simply tell
[8] them that -- actually, I don't see anything in
[9] the charge about the defendant's age.  Is
[10] there?  Oh, yeah.  It's sort of summarized in
[11] the next element when they say.  No, they
[12] don't.  Do you have a copy of the charge in
[13] front of you?
[14]        MR. STACKOW:  I don't, Your
[15] Honor.
[16]        THE COURT:  I mean, one of the
[17] elements is that the child was under the age
[18] of eighteen.  Both of these statutes draw the
[19] line at eighteen.  And then after that, well.
[20] Mr. McGill, this is your copy?
[21]        MR. McGILL:  Yeah.  It's from
[22] the standard instructions, Judge.
[23]        THE COURT:  Yeah.  Well, that's
[24] what I was reading from before as well.  It's
[25] just what I had before was printed out from it

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

Page 155

[1]
[2] looks like Lexis.  Is that where you got this?
[3]        MR. STACKOW:  Yes.
[4]        MR. McGILL:  I think I have
[5] that also, Your Honor.
[6]        THE COURT:  Well, it doesn't
[7] matter.  See if you can find anything in there
[8] about the defendant's age.  Because in the
[9] standard instructions they tell you that the
[10] child's under the eighteen.  That's one of the
[11] elements of interfering with custody of a
[12] child.
[13]        MR. McGILL:  Child under the
[14] age of eighteen.  Do you know the Crimes Code
[15] section?
[16]        MR. STACKOW:  I'm looking at it
[17] right now.  6301, Your Honor.  It says whoever
[18] being of the age of eighteen years and
[19] upwards.  So I have no objection if the Court
[20] wants to include that language.
[21]        THE COURT:  So it's the same as
[22] corrupting the morals.
[23]        MR. STACKOW:  Same as the
[24] interference with the custody of children.
[25]        THE COURT:  Interference and

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

Page 156

[1]
[2] corruption are both he's over eighteen, she's
[3] under eighteen.
[4]        MR. STACKOW:  He's eighteen or
[5] older, she's less than eighteen, yeah.  Not
[6] that the distinction makes a difference in
[7] this case, but.
[8]        THE COURT:  That's my proposal,
[9] that we bring them in and just tell them those
[10] age parameters with those two.  That's all
[11] they're asking about.  Any objection to that?
[12]        THE DEFENDANT:  No.
[13]        MR. STACKOW:  No, Your Honor.
[14]        THE COURT:  All right.  Do you
[15] want to bring them in?
[16]        (The jury returned to the
[17] courtroom with a question at 2:43 p.m.)
[18]        THE COURT:  All right.  Would
[19] the foreman please stand?  I have before me a
[20] question with your signature:  Can you explain
[21] the age criteria of the charges number four
[22] and five on the list, one, interference with
[23] custody of children; two, corruption of minor.
[24]        Is that the jury's question?
[25]        A JUROR:  Yes, it is.

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

---

Page 157

[1]
[2]        THE COURT:  Okay.  The time on
[3] this question is 2:05 p.m.  You can have a
[4] seat.  I had told everybody in the courtroom
[5] from 1:30 to 2:30 we would all be able to go
[6] to lunch, because I wanted to go to lunch too,
[7] which is why it's now just after 2:30 when
[8] we're getting around to answering your
[9] question.
[10]        You've only asked about the age
[11] criteria part of those crimes, so that's what
[12] the parties have agreed that I can tell you.
[13] And with regard to these two offenses, the age
[14] is described the same way for both of them.
[15] The defendant has to be eighteen years of age
[16] or older and the victim has to be under the
[17] age of eighteen.  So if you find that the
[18] defendant is eighteen years of age or older,
[19] that's one of the elements, and if you find
[20] that the victim is under the age of eighteen
[21] at the time that these incidents take place,
[22] the corruption of morals, the interference
[23] with custody, then that element has been met.
[24]        Does anyone have anything
[25] additional?
                Carl G. Sokolski
            Official Court Reporter
                (215) 683-8060

Page 158

[1]
[2]        MR. STACKOW:  No, Your Honor.
[3]        THE COURT:  Before I excuse the
[4] jury?
[5]        THE DEFENDANT:  Yes.
[6]        THE COURT:  You do?
[7]        THE DEFENDANT:  No, no, I don't
[8] have anything.  You may excuse the jury.
[9]        THE COURT:  Okay.  Then you're
[10] excused to go back.
[11]        (The jury retired to resume its
[12] deliberations at 2:46 p.m.)
[13]        THE COURT:  Well, if everybody
[14] is going to be here, I'll just be back in the
[15] robing room.
[16]        COURT CRIER:  Take a brief
[17] recess to the call of the crier.
[18]        (A recess was taken pending the
[19] outcome of the jury's deliberations.)
[20]        COURT CRIER:  Court is
[21] reconvened.  Can we bring in the jury, Your
[22] Honor?
[23]        THE COURT:  Any reason not to
[24] bring in the jury?
[25]        MR. STACKOW:  No, Your Honor.
                Carl G. Sokolski
            Official Court Reporter
                (215) 683-8060

Page 159

[1]
[2]        THE DEFENDANT:  No.
[3]        THE COURT:  Okay.
[4]        COURT CRIER:  Please remain
[5] seated.  Please cease all conversations while
[6] the ladies and gentlemen of the jury enter the
[7] courtroom.
[8]        (The jury returned to the
[9] courtroom with its verdict at 2:58 p.m.)
[10]        COURT CRIER:  Your Honor, the
[11] jury and all parties are present.  May I take
[12] the verdict?
[13]        THE COURT:  Yes.
[14]        COURT CRIER:  Will the
[15] foreperson please rise.  Will the defendant
[16] please rise.
[17]        Mr. Foreperson, has the jury
[18] reached a verdict?
[19]        A JUROR:  Yes.
[20]        COURT CRIER:  Have all twelve
[21] of you agreed on the verdict?
[22]        A JUROR:  Yes.
[23]        COURT CRIER:  To this Common
[24] Pleas docket number CP-51-CR-0003430-2009,
[25] charging the defendant Johnathan Robins with
                Carl G. Sokolski
            Official Court Reporter
                (215) 683-8060

Page 160

[1]
[2] unlawful contact with minor, what is your
[3] verdict?  Guilty or not guilty?
[4]        A JUROR:  Guilty.
[5]        COURT CRIER:  To the same
[6] Common Pleas docket number, charging defendant
[7] Johnathan Robins with involuntary deviate
[8] sexual intercourse, what is your verdict?
[9] Guilty or not guilty?
[10]        A JUROR:  Guilty.
[11]        COURT CRIER:  To the same
[12] Common Pleas docket number, charging defendant
[13] Johnathan Robins with statutory sexual
[14] assault, what is your verdict?  Guilty or not
[15] guilty?
[16]        A JUROR:  Guilty.
[17]        COURT CRIER:  To the same
[18] Common Pleas docket number, charging defendant
[19] Johnathan Robins with interference with
[20] custody of children, what your verdict?
[21] Guilty or not guilty?
[22]        A JUROR:  Guilty.
[23]        COURT CRIER:  To the same
[24] Common Pleas docket number, charging the
[25] defendant Johnathan Robins with corruption of
                Carl G. Sokolski
            Official Court Reporter
                (215) 683-8060

51CR00034302009
Johnathan Robins

Page 161

[2] minor, what is your verdict?  Guilty or not
[3] guilty?
[4]        A JUROR:  Guilty.
[5]        COURT CRIER:  Your Honor, the
[6] jury has reached a verdict.  It's guilty of
[7] all charges.  May the verdict be recorded?
[8]        THE COURT:  Any reason why this
[9] verdict should not be recorded?
[10]        MR. STACKOW:  I have no
[11] objection, Your Honor.
[12]        THE DEFENDANT:  No.
[13]        THE COURT:  All right.  You can
[14] have a seat.
[15]        COURT CRIER:  Jurors, harken to
[16] your verdict as the Court has recorded it.
[17] You say you find Johnathan Robins guilty of
[18] all charges and you say you all?  We do?
[19]        JURY COLLECTIVELY:  We do.
[20]        THE COURT:  All right.  Ladies
[21] and gentlemen, if you will return for a few
[22] moments to the deliberation room, the court
[23] officer will give you a certificate of
[24] service.  When I say that it's the least that
[25] we could do, it is the least that we could do

        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 162

[2] to thank you for your service in this case.
[3] And if you'd like, I'll be back in a few
[4] minutes if you'd like to wait in order to
[5] answer any questions you might have.  That's
[6] up to you.  But thank you and you're excused.
[7]        COURT CRIER:  Please remain
[8] seated while the ladies and gentlemen of the
[9] jury exit the courtroom.
[10]        (Jury discharged.)
[11]        THE COURT:  All right.  We have
[12] to pick a date for sentencing and we'll order
[13] a presentence investigation.  Do you want a
[14] mental health evaluation?
[15]        MR. STACKOW:  Well, Your Honor,
[16] I'm going to be requesting a Megan's Law
[17] assessment by the Sex Offenders Assessment
[18] Board.
[19]        THE COURT:  Okay.
[20]        MR. STACKOW:  So I don't know
[21] if you think that's necessary.
[22]        THE COURT:  I don't think a
[23] mental health evaluation is necessary if
[24] you're doing Megan's Law.
[25]        MR. STACKOW:  With the Megan's

        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 163

[2] Law assessment, they ask us to request ninety
[3] days as well for the completion of that.
[4]        THE COURT:  So we're looking at
[5] a date sometime the end of June; is that
[6] right?
[7]        COURT CRIER:  How's June
[8] twenty-fifth?
[9]        MR. McGILL:  Judge, will you do
[10] it the following week?
[11]        THE COURT:  Sure.  What day do
[12] you have in mind?
[13]        MR. McGILL:  Twenty-ninth of
[14] June, if that's available.
[15]        THE COURT:  We could probably
[16] do it that day.  What happens on a Tuesday, if
[17] we're doing a jury, we'll do it over
[18] lunchtime.
[19]        MR. McGILL:  That's fine.
[20]        THE COURT:  All right.
[21]        COURT CRIER:  That would be
[22] June twenty-ninth?
[23]        THE COURT:  June twenty ninth
[24] for sentencing.
[25]        MR. STACKOW:  I do have a

        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

Page 164

[2] motion too, Your Honor.
[3]        THE COURT:  And that motion is?
[4]        MR. STACKOW:  To revoke the
[5] defendant's bail pending sentencing.  Would
[6] you like me to?
[7]        THE COURT:  Well, is there any
[8] reason why your bail should not be revoked?
[9]        THE DEFENDANT:  I really, I've
[10] been going through a issue with my dad at the
[11] house and when I was locked up the first time
[12] he stole some stuff out of the house.  I just
[13] was wondering if I could just have like just a
[14] week or something just to get everything out
[15] the house.
[16]        I understand.  I've showed up
[17] every sentencing, like, you know.  If I wanted
[18] to leave while they was doing the verdict, I
[19] could have done that.  I understood.  I'll
[20] come back for sentencing, you know, because I
[21] actually, you know, want to get through this
[22] and hopefully I'll be asking if I can get the
[23] Megan's Law from him, from you, because in the
[24] end of everything I still want to try to file
[25] for custody of my son and I don't want

        Carl G. Sokolski
        Official Court Reporter
        (215) 683-8060

51CR00034302009
Johnathan Robins

Trial (Jury) Volume 4
March 12, 2010

Page 165

[1]
[2] anything in the way of that. So if I actually
[3] ran, that would be in the way and it's still
[4] my son regardless.
[5]        THE COURT: Is there a
[6] mandatory sentence for any of these?
[7]        MR. STACKOW: There is for the
[8] involuntary deviate sexual intercourse, Your
[9] Honor. It's ten years.
[10]        THE COURT: Bail is revoked.
[11] Anything else, gentlemen, before we recess
[12] court or actually adjourn for the week?
[13]        MR. STACKOW: Only may I
[14] present that order for the Megan's Law
[15] assessment on Monday morning, Your Honor?
[16]        THE COURT: It's all right with
[17] me if it's all right with the clerk.
[18]        MR. STACKOW: Is that okay? Or
[19] I could bring it back over this afternoon.
[20]        THE COURT: If you just give it
[21] to me, I sign it and I give it back to you?
[22]        MR. STACKOW: Right.
[23]        COURT CLERK: I don't have
[24] anything to do with that.
[25]        THE COURT: I can do it on

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 166

[1]
[2] Monday.
[3]        MR. STACKOW: All right.
[4]        THE COURT: Court's adjourned.
[5]          - - -
[6]        (Trial concluded.)
[7]          - - -
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Carl G. Sokolski
Official Court Reporter
(215) 683-8060

Page 167

[1]
[2]        C E R T I F I C A T I O N.
[3]        I HEREBY CERTIFY that the
[4] proceedings and evidence are contained fully
[5] and accurately in the stenographic notes taken
[6] by me upon the foregoing matter on March 12,
[7] 2010, and that this is a correct transcript of
[8] same.
[9]
[10]
[11]        _____
[12]        Carl G. Sokolski.
[13]        Official Court Reporter.
[14]
[15]        The foregoing certification of
[16] this transcript does not apply to any
[17] reproduction of the same by any means unless
[18] under the direct control and/or supervision of
[19] the certifying reporter.
[20]          - - -
[21]
[22]
[23]
[24]
[25]

Carl G. Sokolski
Official Court Reporter
(215) 683-806