**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHNATHAN ROBINS,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:21-1474** |
| **v.** | : | **(JUDGE MANNION)** |
| **SECRETARY WETZEL, *et al.*,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Currently before the Court are Defendants' motion for judgment on the pleadings and *pro se* Plaintiff Johnathan Robins ("Robins")'s motion to substitute one of the Defendants in this case. For the reasons stated below, the Court will grant Robins's motion to substitute and grant in part and deny in part Defendants' motion for judgment on the pleadings.

## I. BACKGROUND

### A. The Complaint

Robins, a convicted state prisoner, commenced this action by filing a complaint, a handwritten application for leave to proceed *in forma pauperis* ("IFP Application"), and a certified prisoner trust fund account statement, all of which the Clerk of Court docketed on August 26, 2021. (Docs. 1–3.) Because the IFP Application did not contain the necessary information for the Court to determine whether to allow Robins leave to proceed *in forma*

*pauperis*, an Administrative Order was entered directing him to either remit the filing fee or file a proper application for leave to proceed *in forma pauperis*. (Doc. 5.) Approximately two weeks later, Robins remitted the filing fee. (Doc. 6.)

In the complaint, Robins named as Defendants: (1) the Commonwealth of Pennsylvania Department of Corrections ("DOC"); (2) John Wetzel ("Wetzel"), former Secretary of the DOC; (3) Bobbi Salamon ("Salamon"), Superintendent of Pennsylvania State Correctional Institution Rockview ("SCI Rockview"); (4) Supervisor of SCI Rockview's Sex Program Tice ("Tice"); (5) SCI Rockview Unit Manager Condo ("Condo"); (6) SCI Rockview Counselor Williams ("Williams"); (7) SCI Rockview Program Coordinator Damico ("Damico"); (8) the Pennsylvania Board of Probation and Parole ("Parole Board"); (9) Philadelphia District Attorney Larry Krasner ("Krasner"); and (10) the Philadelphia District Attorney's Office ("DA Office"). *See* (Doc. 1 at 1–2). Robins purported to sue all Defendants in their "professional capacit[ies]," as well as Salamon, Condo, Williams, and Damico, in their individual capacities. (*Id.* at 2.)

Regarding his factual allegations, Robins alleged that he was incarcerated at SCI Rockview following his criminal convictions in the Court of Common Pleas of Philadelphia County. *See* (*id.* at 3). Because those

convictions are interwoven with Robins's other factual allegations, the Court will preliminarily discuss them here for contextual purposes.

The factual background for Robins's convictions is as follows:

> The complaining witness, E.J., testified that as of the date of trial, she was seventeen years old. She stated her date of birth as July 30, 1992[.] She also testified that she had a two[-]year[-]old child born on February 20, 2008, identifying Robins as the father of the child.
>
> E.J. testified that she met Robins in early January 2007 through a telephone chat line. Although the chat line was restricted to parties eighteen years or older, she told Robins, during their initial conversation, that she was fourteen years old. At this time, [Robins] refused to divulge his age, but indicated that E.J.'s age presented no problem for him saying, "it wouldn't mater [sic] how old you were, if I find a woman I will treat them the same because they all get, they all should be treated the same."
>
> Shortly after this initial conversation, E.J. and Robins met and had dinner together, after which they went to a movie. E.J. testified that at the end of this first dinner together, Robins reluctantly told her he was thirty[-]nine year[s] old. E.J. testified that she and Robins communicated frequently, that she spent time in Robin[s]'s home, and that they went shopping for clothes for her.
>
> E.J. testified that she and [Robins] first engaged in sexual intercourse in Robin[s]'s home in March 2007. After this initial encounter, she and Robins had sexual relations "a couple times out of a month." In addition to vaginal sex, E.J. testified [t]hat she and Robins also engaged in oral sex, describing these sexual acts in detail.
>
> E.J. testified that she became pregnant on Mother's Day of 2007 as a result of her relationship with Robins. She stated that she was scared and was afraid to tell her mother. In addition, she considered having an abortion but Robins talked her out of it

saying there's "no need for that if I'm going to be here helping you." E.J. moved into Robin[s]'s home in October or November of 2007, after it was confirmed that she was nineteen weeks pregnant.

In early July of 2007, E.J. testified that Robins took her to Florida to celebrate her fifteenth birthday. E.J. testified that, prior to going to Florida, Robins took her to his sister's wedding reception in Atlantic City in June of 2007 to meet his family.

On January 15, 2008, Robins told E.J. they were flying to St. Louis, Missouri to get married. When she asked him why not wait until she was sixteen or eighteen, Robins responded "we can do it now to stop your mom from getting in between, like, what we trying to do." In applying for the marriage license in Missouri, E.J. testified that he used a fake South Carolina driver's license, indicating that she was twenty[-]three years old. She testified that at sometime [sic] prior to January of 2008, Robins took her to a check cashing establishment in Philadelphia to obtain this false identification.

. . .

Robin[s]'s testimony essentially mirrored that of E.J. Robins testified that he met E.J. on a dating phone line for adults over the age of eighteen. After talking on the phone, they met for dinner and talked about having a family. Robins admitted that sometime after their meeting that "yes we did have intercourse." Robins testified on cross examination that he also engaged in oral sex with E.J. Attempting to down play [sic] this aspect of their relationship, he testified that they were [t]hen trying to have a baby.

Robins testified that after E.J. became pregnant, he wanted to marry her before the child was born. Robins testified that he researched the marriage laws of both Pennsylvania and Missouri before deciding to take E.J. to Missouri to get married. Robins testified that he chose to marry E.J. in Missouri because it does not require a three[-]day waiting period and "I could do it in one

> day." Robins testified that it wasn't until January of 2008, after they returned from Missouri that he learned E.J.'s true age.

*Robins v. Superintendent of Rockview SCI*, No. 18-cv-1385, 2020 WL 12863472, at *1–2 (E.D. Pa. Jan. 14, 2020) ("*Robins II*") (citations to record and original alterations omitted), *report and recommendation adopted*, 2021 WL 6335804 (E.D. Pa. Feb. 22, 2021).

Based on these facts, a jury convicted Robins of unlawful contact with a minor (18 Pa. C.S. §6318), statutory sexual assault (18 Pa. C.S. §3122.1), interference with the custody of a child (18 Pa. C.S. §2904(a)), and corruption of minors (18 Pa. C.S. §6301(a)(1)) on March 12, 2010. *See* (Doc. 1 ¶14.); *Commonwealth v. Robins*, No. 2047 EDA 2016, 2017 WL 4276084, at *1 (Pa. Super. Ct. Sept. 27, 2017) ("*Robins I*"); *Robins II*, 2020 WL 12863472, at *1. Robins alleges that the jury found him not guilty of involuntary deviate sexual intercourse ("IDSI") – forcible compulsion (18 Pa. C.S. §3123(a)(1)), even though his sentencing sheet shows him as being found guilty. *See* (Doc. 1 ¶¶ 14, 21). According to Robins, the jury instead found him guilty of IDSI under a different subsection, namely, subsection (a)(7), which requires that the victim be less than sixteen (16) years of age, the defendant four (4) or more years older than the victim, and the victim and the defendant to not be married to each other. *See* (*id.* ¶21 (citing 18 Pa.

C.S. §3123(a)(7))). Robins asserts that despite this conviction, he was never charged with this offense. *See* (*id.*).

Following these convictions, Robins was sentenced to state confinement and was incarcerated at SCI Rockview. *See* (*id.* ¶15). While at SCI Rockview, Robins was enrolled in a "sex program" (the "Program") run by a coordinator, non-party Ms. Miller ("Miller"). *See* (*id.*) The requirements of the Program were "to give honest feedback and take responsibility for [your] actions." (*Id.*) Robins completed all paperwork in the booklet given to him as part of the Program, and he "admitted to all actions testified to at trial by witnesses, but said they are not criminal offenses." (*Id.*) He also stated that he "would not lie and agree with false information in the record." (*Id.*)

Robins alleged that he legally married the victim in his criminal case on January 16, 2008, despite her status as a minor. *See* (*id.* ¶17). He indicates that the victim lied to him, his family, and others about her age, and the victim's mother knew that the victim lied to others about her age to gain employment. *See* (*id.* ¶¶17–18). He also avers that the victim testified that "she presented him with a ring first[,] they were married by a Judge on January 16, 2008[, and he] was arrested in February 2009." (*Id.* ¶19.) He asserts that the prosecution did not want him to introduce evidence about his

marriage to the victim during the trial, and the trial court precluded him from introducing this evidence. *See* (*id.* ¶20).

Overall, Robins believes that he is innocent; as such, he provided Miller with documents in support of his belief. *See* (*id.* ¶16). After reviewing these documents, Miller determined that there was no purpose in Robins continuing with the Program. *See* (*id.* ¶22). She then issued a letter dated December 22, 2020, removing Robins from the Program and stating that "he would not be listed as a refusal[,] and it would not be disciplinary." (*Id.*) Miller also "provided documents to [the] Parole Board for review." (*Id.*)

Thereafter, Robins had a meeting with Williams and Condo in which they informed him that the prison would not recommend him for parole because he did not complete the Program. *See* (*id.* ¶23). Robins alleges that "[s]taff tried to coerce [him] into agreeing with false information that he was guilty of IDSI 'by forcible compulsion' and that him having sex with his wife was a criminal offense." (*Id.*)

On March 18, 2021, "[s]omeone" placed Robins back into the Program. (*Id.* ¶24). A non-party, "Ms. Ace," initially ran the Program, but Damico later replaced her. (*Id.*)

Robins finished all his "written work," and he asked Williams, his parole agent, as well as Damico, "if participants were allowed to lie to satisfy [sic]"

the Program. (*Id.*) Neither Williams nor Damico answered Robins's question. *See* (*id.*). However, Williams apparently told Robins that they were "not debating [Robins's] marital status because it was not relevant in the [DOC]," Damico stated that Robins "having sex with his wife was an offense," and Salamon told Robins he "must . . . take[] up" "any errors in [his] sentencing documents" with the Philadelphia justice system. (*Id.*)

On April 2, 2018, March 18, 2019, February 12, 2020, and September 7, 2020, Robins contacted the Integrity Unit of the Philadelphia District Attorney's Office about the "false information in his record." (*Id.* ¶26). Despite these communications, "Krasner's office has yet [sic] refused to correct it." (*Id.*)

In mid-May 2021, Robins was involuntarily removed from the Program. *See* (*id.* ¶27). Tice stated that Robins was removed for "lack of progress." (*Id.*) Robins was supposed to "see parole in July 2021," but the Parole Board canceled this meeting via a letter dated May 28, 2021, because Robins "had not attended and participated in [the P]rogram." (*Id.*) In response, Robins informed the Parole Board on June 7, 2021, "that he was involuntarily removed from [the P]rogram[,] and he did attend and participate as the Pa [sic] law requires to see parole." (*Id.*) Robins averred that "[h]e has yet to see [the] Parole Board." (*Id.*)

Robins alleged that Salamon stated that his "belief in his innocense [sic] makes [P]rogram completion impossible," and both Williams and Tice told him that the Parole Board "will not see him" unless he is in the Program. (*Id.* ¶28.) Robins notes that he has never refused to participate in the Program. *See* (*id.*).

On April 11, 2021, Robins filed a grievance (No. 922994) because the DOC "would not honor" Miller's assessment, he continued receiving "disrespectful statements about [his] marriage," he was coerced "to disrespect and demonize his marriage," and he was "forced . . . to lie and agree with false facts to complete [the P]rogram." (*Id.* ¶29.) This grievance was initially denied and upheld on appeal. *See* (*id.*).

Based on these factual allegations, Robins asserted claims under 42 U.S.C. §1983 for (1) violations of his equal protection rights under the Fourteenth Amendment to the United States Constitution, (2) age discrimination, (3) a "religious violation," and (4) a Fourteenth Amendment due process violation. *See* (*id.* at 8–13). For relief, Robins sought, *inter alia*: (1) injunctive relief in the nature of an order prohibiting DOC staff "from making any negative comments about [his] marital relationship" and from "coercing [him] into making false statements"; (2) injunctive relief directing the DOC to "correct policy [sic] which discriminates against persons

convicted of sex crimes to have equal opportunity to see [the] Parole Board as other convictions [sic]"; (3) injunctive relief directing the DA's Office to "try to correct [the] 'clerical error' saying [he] was convicted of IDSI §3123(a)(1)"; (4) injunctive relief directing the Parole Board to conduct a parole hearing for him; (5) injunctive relief directing SCI Rockview to allow him to complete the Program; and (6) punitive damages. (*Id.* at 13–14).

After screening the complaint pursuant to 28 U.S.C. §1915A, the Court issued a Memorandum and Order on December 9, 2021. (Docs. 12, 13.) The Court construed the complaint as containing claims under Section 1983 for violations of (1) Robins's Eighth Amendment right to be free from cruel and unusual punishment, (2) his procedural and substantive due process rights under the Fourteenth Amendment, and (3) his equal protection rights under the Fourteenth Amendment. *See* (Doc. 12 at 12–20). The Court also construed the complaint as including a challenge to the denial of Robins's parole and a claim for verbal harassment. *See* (*id.* at 10–11, 20–21). After construing the complaint as such, the Court dismissed all claims for the failure to state a claim upon which relief could be granted, did not give Robins

leave to file an amended complaint, and directed the Clerk of Court to close the case. *See* (Doc. 12 at 21–22; Doc. 13 at 1).[1]

On September 21, 2021, Robins filed a timely appeal from the dismissal of his complaint to the Third Circuit Court of Appeals. (Doc. 15.) Approximately a year later, on September 28, 2022, the Third Circuit affirmed in part and vacated in part the judgment, and it remanded the action here for further proceedings. *See* (Doc. 17); *Robins v. Wetzel*, No. 22-1006, 2022 WL 4533850 (3d Cir. Sept. 28, 2022) (unpublished). The Third Circuit essentially affirmed the dismissals of the claims the Court identified in the complaint, but vacated the dismissal to the extent that Robins raised claims regarding the "acceptance-of-responsibility" component of a sex-offender treatment program under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") and the Religious Freedom Restoration Act of 1993 ("RFRA") because those claims were not addressed as part of the Court's decision. *See Robins*, 2022 WL 4533850, at *2–3.

### B. The Amended Complaint

Upon remand, the Court entered an Order on September 28, 2022, which, *inter alia*, allowed Robins to file an amended complaint relating to only

[1] Although the Court's Order referenced 28 U.S.C. §1915(e)(2)(B)(i), *see* (Doc. 13 ¶1), the dismissal was entered pursuant to Section 1915A(b)(1) because Robins paid the fee and was not proceeding *in forma pauperis*.

the RLUIPA and RFRA claims the Third Circuit referenced in its decision. *See* (Doc. 18 at 1–2). Robins timely filed an amended complaint, which the Clerk of Court docketed on October 21, 2022. (Doc. 19.) On the same date, Robins also filed a motion to amend the complaint a second time and a supporting brief. (Docs. 20, 21.)

After reviewing Robins' submissions, the Court determined that they failed to comport with the Third Circuit's mandate limiting the complaint to only the acceptance-of-responsibility component of a sex-offender treatment program in the context of RLUIPA or RFRA and instead attempted to reraise the same claims that the Court previously dismissed and which the Third Circuit had affirmed on appeal. *See* (Doc. 22 at 1–2). As such, the Court issued an Order on January 31, 2023, which, *inter alia*, denied Robins's motion to amend as moot, struck his amended complaint and proposed amended complaint, and directed him to file an amended complaint limited to the impact of his acceptance of responsibility in the sex-offender treatment program on his constitutional and statutory rights to the free exercise of religion. *See* (*id.* at 2).

Robins then timely filed an amended complaint, which the Clerk of Court docketed on February 24, 2023. (Doc. 24.) In his amended complaint, Robins names as Defendants: (1) Wetzel; (2) Salamon; (3) Tice; (4) Damico;

(5) Durst, a Supervisor of the Program at SCI Rockview; (6) Collins, a Program Coordinator at SCI Rockview; and (7) Ace, also a Program Coordinator at SCI Rockview. *See* (*id.* at 1–2). Robins's allegations relate to his criminal convictions in Philadelphia County as well as his participation in the Program at SCI Rockview. *See* (*id.* at 2–10).

Robins again alleges that after a trial in the Philadelphia County Court of Common Pleas, a jury convicted him of unlawful contact with a minor, statutory sexual assault, interference with the custody of a child, and corruption of minors, and he continues to assert that his record falsely shows that he was also convicted of IDSI – forcible compulsion. (Doc. 24 ¶12.) Robins asserts that during the trial, he wanted to present his marriage license as well as his "marriage laws" to show the jury that he did not commit a crime due to spouses being exempted from the charged offenses, but the trial judge refused to allow him to show his "marriage evidence" or "explain marriage [sic] laws to [the] jury" after the prosecutor objected. (*Id.* ¶13.) Then, after preventing Robins from telling the jury about his "marriage evidence" or using "a marriage defense," the trial judge "told [the] jury [that] no one presented any marriage evidence." (*Id.*)

Following his convictions, Robins was confined at SCI Rockview. *See* (*id.* ¶14). While there, he enrolled in the Program, which was coordinated by

Miller. *See* (*id.*). Robins completed all paperwork for the Program, and even though he admitted to “all actions testified to at trial,” he asserted that those actions did not constitute crimes because they involved his wife. (*Id.*) Robins also provided Miller with copies of his trial transcripts, the “Judge’s Opinion,” his marriage certificate, “marriage laws, and other documents.” (*Id.* ¶15.) Based on the information provided by Robins, Miller “assessed there was no purpose in furtherance of any government interest to have [him] continue [the P]rogram,” removed him from the Program, and told him that his removal would not be considered as a refusal and “it would not be listed as disciplinary.” (*Id.*)

Presumably at some point thereafter, Salamon stated that Robins’s marriage had to be “evaluated” and that “his marital relationship was deviate behavior.” (*Id.* ¶16.) As a result, Robins returned to the Program, which was now coordinated by Damico. *See* (*id.*). However, in mid-May 2021, Robins was involuntarily removed from the Program “because he refused to disavow and slander his religious tenet of his marriage.” (*Id.*) Tice stated that Robins was removed due to a “lack of progress.” (*Id.*)

Because Robins was removed from the Program, the Parole Board informed him via a letter dated May 28, 2021, that the members would not see him because the DOC reported that he “had refused to attend and

participate in [the P]rogram." (*Id.*) Additionally, Salamon stated that because Robins was asserting his innocence, and "following his religious tenets of marriage," it was "impossible" for him to complete the Program. *See* (*id.*). Robins submitted a grievance (No. 922994) about this issue, which was initially denied and then upheld on appeal to final decision. *See* (*id.*).

Robins alleges that he was placed into the Program for a third time on November 2, 2021. *See* (*id.* ¶17). At this time, Ace was running the Program. *See* (*id.*). Robins notes that the Program requires its participants to be honest, and he would have violated this requirement if he lied. *See* (*id.*). Thus, because he believed he was innocent based on his "religious tenets on [sic] his marriage and refused to lie, make false statements, slander, demonize, or disavow the sanctity of his marriage," he was removed from the Program. (*Id.*) Following his removal, Robins filed another grievance (No. 955415), which he appealed to final decision. *See* (*id.*).

On an unknown date, Robins was placed into the Program for a fourth time, this time while Collins was coordinating the Program. *See* (*id.* ¶18). Robins tried to show Collins his "marriage evidence" in support of his claim that he did not commit a crime, but she refused to review it. *See* (*id.*). Durst then told Robins that "because he would not disavow, slander, and demonize his marriage[,] the [DOC] was going to max [out] his sentence . . . and Durst

was going to record him as refusing to take [the P]rogram." (*Id.*) Robins asserts that he never refused to take the Program, and he filed another grievance (No. 972323), which he appealed to final decision. *See* (*id.*).

On yet another unknown date, Robins was again put in the Program while Ace was coordinating it. *See* (*id.* ¶19). Robins alleges that "Ace always [told] the group that the age of consent in [Pennsylvania] is eighteen[,] even though [he] tells her its [sic] sixteen." (*Id.*) In addition, although Robins "admitted to the facts in [the] case and admitted to what the law clearly says," Ace wanted him "to make false statements that [did] not align with the facts of the case or the law" insofar as she wanted him to "disavow, slander, and demonize his marriage against his religious tenets as well as give false witness against his marriage." (*Id.*) Robins refused to make such statements. *See* (*id.*).

Ace also required him and the other inmates in the Program "to state thinking errors for offense [sic], how they were stressed out to make them offend, and what was triggering them to do offense [sic]." (*Id.* ¶20.) In response, Robins and other inmates told Ace that "some of these things did not apply to them." (*Id.*) Nevertheless, Ace told them that they needed to agree that those "things" did apply for them to stay in the Program. *See* (*id.*). Robins refused to "make false statements to continue" in the Program. (*Id.*)

Robins alleges that Ace also required him to "discuss his most intimate marital affairs with [the] group." (*Id.*) Robins refused to discuss his marital affairs because it "was against his religious tenets." (*Id.*) Due to his refusals, Robins was removed from the Program for a fifth time. *See* (*id.*).[2]

As for the Program, Robins avers that it is governed by a Pennsylvania statute, 42 Pa. C.S. §9718.1, which requires only "attendance and participation in [a] sex program" and does not state that "one must complete it." (*Id.* ¶22.) Robins points out that "[t]he [P]rogram is mandatory to see [sic] parole," and he believes that he "has satisfied [its] requirements . . . multiple times" by "admitt[ing] to all actions shown by the facts of his case and . . . accept[ing] responsibility for his actions." (*Id.* ¶¶21–22.) Robins contends that "[t]his should satisfy the 'acceptance-of-responsibility' component of the sex-offender program." (*Id.* ¶21.) However, "because the law states [that his] actions were legal[, DOC staff] wants [him] to make up false statements and fake complexes to pass" the Program. (*Id.*)

Based on these allegations, Robins asserts that Defendants violated his "[r]eligious [r]ights" under RLUIPA, RFRA, and Article I, Section 3 of the Pennsylvania Constitution because the DOC's "application of the

[2] It is unclear whether Ace was the individual who removed him from the Program.

'acceptance-of-responsibility' component of the sex-offender program infringes upon [his] religious practices as it pertains to his martial religious tenets." (*Id.* ¶23.) He alleges that DOC staff are substantially burdening his "religious practices concerning marriage . . . by using coercion to deny him his liberty interest in being seen by parole." (*Id.* ¶24.) He also alleges that DOC staff are:

> abus[ing] their use of the "admission-of-responsibility" requirement in the sex program [by n]ot only . . . requir[ing] participants to admit the facts in their cases, [but] . . . requir[ing] them to admit to psychological complexes that the participants disagree that they have. Forcing participants to state what ever [sic] staff tells them to say whether the participants agree with it or not negates the honesty requirement in the [P]rogram[, and] what is the compelling government interest in that. [sic]

(*Id.* ¶25.) If a participant does not say what the DOC staff want them to say, they are removed from the Program. *See* (*id.* ¶26).

Robins also alleges the following about his marriage and Defendants' actions:

> Plaintiff's marriage is part of his recognition of his religion and has spiritual significance. His faith is exercised through is commitment and dedication to his marriage as it is a solemn vow made in connection to his faith. Plaintiff's religious beliefs require him not to lie and give false witness about his marriage, not to disavow or slander it, to hold private the intimate relationship between husband and wife, and to defend it against attack.
>
> . . . [DOC] staff's attack on Plaintiff's religious marital vows also include his wife and son; as staff's disrespect flows to them as well. Staff acts as if Plaintiff's family is subhuman without the

> rights as others who have marital vows under their religion and the family values that flow from such tenets. This is a hurtful message that is a terrible irreparable harm against Plaintiff and his family.

(*Id.* ¶¶27–28.)

Robins indicates that he is asserting his claims against Defendants in their official capacities, *see* (*id.* ¶¶29–30), and he seeks an injunction requiring "a procedure be put in place by the [DOC] which would allow [him] to have a parole hearing that does not require [him] to disregard his religious practices and disavow, slander, and make false statements about his marriage." (*Id.* ¶31.) Robins does not seek any monetary relief in this version of his complaint.

**C. Proceedings Following Robins's Amended Complaint**

On February 28, 2023, the Court issued an Order which, *inter alia*, directed the Clerk of Court to reopen this case and send copies of the amended complaint as well as waiver of service forms to Defendants. (Doc. 26.)[3] Defendants waived service (Doc. 31), and they filed a motion to dismiss

---

[3] On the same date Robins filed his amended complaint, he filed another notice of appeal to the Third Circuit from the Court's January 31, 2023 Order striking his October 21, 2022 amended complaint and dismissing as moot his motion to amend his complaint for a second time. (Doc. 25.) The Third Circuit dismissed Robins's appeal on July 3, 2023, after he failed to pay the filing fee for the notice of appeal. *See* (Doc. 54); *see also Robins v. Wetzel, et al.*, No. 23-1359 (3d Cir.), ECF No. 14.

Robins's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), along with a supporting brief, on April 28, 2023 (Docs. 34, 35). Robins filed a brief in opposition to Defendants' motion on May 30, 2023. (Doc. 38.)

While Defendants' motion to dismiss remained pending, Robins filed three motions to compel discovery along with supporting briefs on June 20, 2023, October 18, 2023, and December 26, 2023. (Docs. 41, 42, 47, 48, 51, 52.) The Court issued an Order on November 8, 2023, which denied the second of those motions as moot. (Doc. 50.) Then, on March 21, 2025, the Court entered a Memorandum and Order which, *inter alia*, denied Defendants' motion to dismiss Robins's amended complaint and directed Defendants to file responses to Robins's other motions to compel discovery. (Docs. 55, 56.)

Defendants filed an answer and affirmative defenses to Robins's amended complaint on April 4, 2025 (Doc. 57), to which Robins filed a response and supporting exhibits (Docs. 59, 60). The parties also filed additional briefs relating to Robins's motions to compel. (Docs. 58, 61.)

On May 30, 2025, Defendants filed the instant motion for judgment on the pleadings and a supporting brief. (Docs. 62, 63.) On June 12, 2025, the

Court issued a Memorandum and Order denying Robins's remaining motions to compel discovery. (Docs. 64, 65.)

Robins filed a brief in opposition to Defendants' motion for judgment on the pleadings on July 8, 2025. (Doc. 66.) Approximately three weeks later, on July 28, 2025, Robins filed a motion to substitute the current DOC Secretary, Dr. Laurel R. Harry ("Harry"), for Wetzel as a Defendant, along with a supporting brief. (Docs. 67, 68.) Defendants never filed a response to this motion. As such, Robins's motion to substitute and Defendants' motion for judgment on the pleadings are ripe for disposition.

## II. LEGAL STANDARDS

### A. Motions for Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure 12(c)

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "A motion for judgment on the pleadings is a procedural hybrid of a motion to dismiss and a motion for summary judgment." *Gaughen v. United States*, No. 09-cv-2488, 2011 WL 292019, at *1 (M.D. Pa. Jan. 27, 2011). In considering such a motion, a district court ordinarily considers "the pleadings and attached exhibits, undisputedly authentic documents attached to the motion for judgment on the pleadings if plaintiffs' claims are based on the documents, and matters of public record." *Tristate Antiques v. Fed. Ins. Co.*,

No. 17-cv-1823, 2017 WL 4539287, at *1 (E.D. Pa. Oct. 11, 2017). Judgment on the pleadings is only warranted where "the plaintiff[] would not be entitled to relief under any set of facts that could be proved." *Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 214, 220 (3d Cir. 2001).

"A motion for judgment on the pleadings based on the defense that the plaintiff has failed to state a claim is analyzed under the same standards that apply to a Rule 12(b)(6) motion." *Zimmerman v. Corbett*, 873 F.3d 414, 417 (3d Cir. 2017) (quoting *Revell v. Port Auth. of N.Y., N.J.*, 598 F.3d 128, 134 (3d Cir. 2010)); *see also Spruill v. Gillis*, 372 F.3d 218, 223 n.2 (3d Cir. 2004) (explaining that there is "no material difference in the applicable legal standards" for 12(b)(6) motions and 12(c) motions for judgment on the pleadings). As with a Rule 12(b)(6) motion, the court must therefore "view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party," and cannot grant the motion "unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Wolfington v. Reconstructive Orthopaedic Assocs. II PC*, 935 F.3d 187, 195 (3d Cir. 2019) (quoting *In re Asbestos Prods. Liability Litig. (No. VI)*, 822 F.3d 125, 133 n.6 (3d Cir. 2016)).

In addition, in the specific context of *pro se* prisoner litigation, the Court must be mindful that a document filed *pro se* is "to be liberally construed." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Higgs v. Att'y Gen.*, 655 F.3d 333, 339–40 (3d Cir. 2011) (explaining that "when presented with a *pro se* litigant, we have a special obligation to construe [their] complaint liberally" (citation and internal quotation marks omitted)). Therefore, a *pro se* operative complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks omitted) (quoting *Estelle*, 429 U.S. at 106). This means the Court must always "remain flexible, especially 'when dealing with imprisoned pro se litigants . . . .'" *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (quoting *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244–45 (3d Cir. 2013)).

## B. RLUIPA

"Congress passed RLUIPA to grant heightened protection to prisoners from burdens imposed by the government." *Washington v. Klem*, 497 F.3d 272, 276 (3d Cir. 2007); *see also Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005) (explaining that RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their

religion"). To accomplish this protection, Section 3 of RLUIPA provides in pertinent part that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. §2000cc–1(a). RLUIPA also has an "expansive[]" definition of "religious exercise," which includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Nunez v. Wolf*, 117 F.4th 137, 146 (3d Cir. 2024) (quoting 42 U.S.C. §2000cc-5(7)(A)).

In addition, "Congress mandated that [RLUIPA] 'shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by . . . the Constitution.'" *Holt v. Hobbs*, 574 U.S. 352, 358 (2015) (quoting 42 U.S.C. §2000cc-3(c)). Overall,

> RLUIPA . . . affords inmates even "greater protection" than that provided by the First Amendment. *Holt*[, 574 U.S. at 357]. Under the latter, a prison regulation that substantially burdens religious exercise is subject to intermediate scrutiny and thus must be "reasonably related to legitimate penological interests," *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); under RLUIPA, however, that regulation is subject to strict scrutiny, requiring the government to prove that it "is the least restrictive means of furthering [a] compelling governmental

> interest," 42 U.S.C. §2000cc-1(a)(2). . . . [T]hat burden is a heavy one and carries unique implications in the prison context for both the interests recognized as compelling and the acceptable means to accomplish them.

*Nunez*, 117 F.4th at 146 (first and second alterations added).

RLUIPA establishes a private right of action through which an aggrieved individual may "obtain appropriate relief against a government." *Id.* §2000cc-2(a). It defines the "government" to include: "(i) a State, county, municipality, or other governmental entity created under the authority of a State; (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and (iii) any other person acting under color of State law . . . ." *Id.* §2000cc-5(4)(A); *Sharp v. Johnson*, 669 F.3d 144, 153 (3d Cir. 2012) (identifying RLUIPA's definition of "government" (citing 42 U.S.C. §2000cc-5(4)(A))).

"To state a plausible claim under RLUIPA, a [prisoner-]plaintiff must allege that the prison placed a 'substantial burden' on the plaintiff's sincerely held religious belief." *Lapp v. Nye*, No. 1:23-cv-419, 2024 WL 53017, at *7 (M.D. Pa. Jan. 4, 2024) (citing *Washington*, 497 F.3d at 277–78). A plaintiff can demonstrate that a substantial burden exists if:

> 1) a follower is forced to choose between following the precepts of [their] religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of [their] religion in order to receive a benefit; OR (2) the

> government puts substantial pressure on an adherent to substantially modify [their] behavior to violate [their] beliefs.

*Washington*, 497 F.3d at 280 (capitalization of "OR" in original) (footnote omitted). "If a prisoner-plaintiff establishes a substantial burden on a sincerely held religious belief, the burden shifts to the defendant to show that the policy or practice furthers a compelling government interest and is the least restrictive means of doing so." *Lapp*, 2024 WL 53017, at *7 (citing *Holt*, 574 U.S. at 361–62); *see also Holt*, 574 U.S. at 355 (explaining that RLUIPA "prohibits a state or local government from taking any action that substantially burdens the religious exercise of an institutionalized person unless the government demonstrates that the action constitutes the least restrictive means of furthering a compelling governmental interest").

**C. RFRA**

"RFRA prohibits the 'Government from substantially burdening a person's exercise of religion even if the burden results from a rule of general applicability' unless the Government 'demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 705 (2014) (cleaned up) (quoting 42 U.S.C. §2000bb-1). To state a prima facie RFRA claim, a plaintiff "must allege that the government (1)

substantially burdened (2) a sincere (3) religious exercise." *Davis v. Wigen*, 82 F.4th 204, 211 (3d Cir. 2023) (quoting *Mack*, 839 F.3d at 304).

At the pleadings stage, a district court must only inquire whether plaintiff has alleged these elements. *See id.* Once the case moves to summary judgment or a trial, however, "if the plaintiff makes an initial showing that the defendant substantially burdened his sincere religious exercise, then the burden shifts to the defendant to show that the offending policy is the least restrictive means of achieving a compelling government interest." *Id.* A substantial burden occurs when "1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *Id.* (quoting *Washington v. Klem*, 497 F.3d 272, 280 (3d Cir. 2007)). "A burden can be 'substantial,' triggering heightened scrutiny under RFRA, 'even if it involves indirect coercion to betray one's religious beliefs.'" *Mack II*, 839 F.3d at 291. The question of whether a burden is 'substantial' is a question of law, not a question of fact. *Real Alternatives, Inc. v. Sec'y of HHS*, 867 F.3d 338, 356 (3d Cir. 2017). RFRA provides relief only if the burden on religious exercise is indeed substantial; it does not

provide relief "from all government burdens." *Id.* at 357. "There is no substantial burden if the governmental action does not coerce the individuals to violate their religious beliefs or deny them the 'rights, benefits, and privileges enjoyed by other citizens – even if 'the challenged Government action would interfere significantly with private persons' ability to pursue spiritual fulfillment according to their own religious beliefs." *Id.* (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988)).

## III. DISCUSSION

### A. Robins's Motion to Substitute

Robins moves for an Order substituting Harry for Wetzel as a Defendant in this action under Federal Rule of Civil Procedure 25. (Docs. 67, 68.) The Court will grant his motion as unopposed because Defendants did not file a response to the motion and the time for them to do so has passed. *See* M.D. Pa. L.R. 7.6 ("Any party opposing any motion, other than a motion for summary judgment, shall file a brief in opposition within fourteen (14) days after service of the movant's brief . . . . Any party who fails to comply with this rule shall be deemed not to oppose such motion."). Furthermore, even if the Court did not grant the motion as unopposed, the Court would grant Robins's motion because substitution is warranted under the Federal Rules of Civil Procedure insofar as Robins asserts only official-capacity

claims for injunctive relief against Wetzel in his amended complaint. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. . . . The court may order substitution at any time, but the absence of such an order does not affect the substitution."). Accordingly, the Court will grant Robins's motion to substitute and substitute Harry for Wetzel as a Defendant in this action.

**B. Defendants' Motion for Judgment on the Pleadings**

Defendants argue that they are entitled to judgment on the pleadings on Robins's RLUIPA claim because (1) they are entitled to qualified immunity, (2) his religious beliefs are insincere, (3) he has not established that the admission-of-guilt requirement substantially burdened his religious beliefs, and (4) the admission-of-guilt requirement furthers a compelling governmental interest and is the least restrictive means of doing so. *See* (Doc. 63 at 4–11, 12–15). Defendants also argue that they have sovereign immunity from Robins's claim under the Pennsylvania Constitution. *See* (*id.* at 11–12). The Court will address each of Defendants' arguments in turn after first discussing certain aspects of the parties' submissions.

### 1. Preliminary Notes

#### a. Robins's RFRA Claim

When the Third Circuit remanded the instant case, it did so "for the District Court to address the RLUIPA ***and RFRA*** claims in the first instance." *Robins*, 2022 WL 4533850, at *3 (emphasis added). On March 21, 2025, the Court complied with the Third Circuit's directive by addressing Robins's RFRA claim and determining that it must be dismissed because RFRA is inapplicable in this case because Defendants are state, and not federal, officials. *See* (Doc. 55 at 7 ("RFRA applies to the federal government, and RLUIPA applies to the states. Because [Robins] is a state inmate bringing his claims against state officials, RFRA is inapplicable in this case and any claim under RFRA will be dismissed.")). However, the Court did not reference dismissal of Robins's RFRA claim in the Order accompanying the March 21, 2025 Memorandum. *See* (Doc. 56 at 1–2). To remedy this administrative discrepancy, the Court will include language dismissing Robins's RFRA claim for the reasons set forth in the March 21, 2025 Memorandum in the Order accompanying the instant Memorandum.[4]

---

[4] Even if the Court had not dismissed the RFRA claim on March 21, 2025, the Court could still do so today because it retains authority to *sua sponte* dismiss the claim for failure to state a claim under the Prisoner Litigation Reform Act. *See* 42 U.S.C. §1997e(c) ("The court shall on its own

*(footnote continued on next page)*

**b. Robins's Reply to Defendants' Answer and Affirmative Defenses to His Amended Complaint**

After Defendants filed their answer and affirmative defenses to Robins's amended complaint, Robins filed a "Response to Defendants' Answer with Affirmative Defenses to [His] Second Amended Complaint" along with separately docketed exhibits. (Docs. 59, 60.) Robins asserts that he filed these documents because there was "a need to provide documentation to the Court to clarify the facts" insofar as Defendants "misinterpret[ed] the details of events of [his] underlying [criminal] case to present a false narrative remixing fact into fiction." (Doc. 59 at 1.) As such, he "provid[ed] trial transcripts [and] direct witness testimony, where all facts are supposed to flow from." (*Id.*) More specifically, he attaches copies of: (1) his State of Missouri marriage license, *see* (Doc. 60 at 2); (2) a transcript of a December 31, 2008 proceeding in *Lucille Freeman v. Jonathan Robins*, No. 08-2157, in the Court of Common Pleas of Delaware County, *see* (Doc. 60-1); (3) transcripts from proceedings on March 11–12, 2010, in his criminal trial in the Court of Common Pleas of Philadelphia County, *see* (Docs. 60-2–

---

motion or on the motion of a party dismiss any action brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility if the court is satisfied that the action . . . fails to state a claim upon which relief can be granted . . . .").

60-3); (4) portions of a booklet from the DOC's Program, *see* (Doc. 60-4); (5) portions of the DOC's Access to Mental Health Care Procedures Manual 13.8.1, *see* (Doc. 60-5); and (6) an Inmate's Request to Staff Member dated February 9, 2025, *see* (Doc. 60-6).

The Court notes that the Federal Rules of Civil Procedure specifically delineate the permissible pleadings in a civil action, which include: "(1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer." Fed. R. Civ. P. 7(a). Here, the Court construes Robins's "Response to Defendants' Answer with Affirmative Defenses to [His] Second Amended Complaint" as a "reply to an answer." Fed. R. Civ. P. 7(a)(7). However, Robins did not seek leave of Court to file his reply, and the Court did not order him to file a reply. Thus, Robins filed an unauthorized and improper reply to Defendants' answer to his amended complaint.

Although the Court must liberally construe *pro se* filings, *see Vogt*, 8 F.4th at 185, it does not mean that *pro se* litigants such as Robins may "flout procedural rules[; instead, they must abide by the same rules that apply to all other litigants." *Id.* Accordingly, the Court will not consider Robins's reply

to Defendants' answer, as well as his separately filed exhibits, in resolving Defendants' motion for judgment on the pleadings.[5]

Assuming, *arguendo*, that the Court construed Robins's filings as a motion for leave to file a reply to Defendants' answer, the Court would deny the motion because, contrary to his assertion in his reply, no such reply was needed in this case. There was nothing improper about Defendants' answer; they merely admitted or substantively denied Robins's allegations as required by the Federal Rules. *See* (Doc. 57 at 1–6); Fed. R. Civ. P.

[5] Some courts would strike Robins's reply as an unauthorized pleading, primarily relying on Federal Rule of Civil Procedure 12(f) to do so. *See* Fed. R. Civ. P. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act: (1) on its own; or (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading."); *see, e.g.*, *Smith v. Richardson*, No. 24-cv-13000, 2026 WL 715818, at *1 (E.D. Mich. Mar. 13, 2026) (striking plaintiff's reply to defendant's answer to his complaint filed without leave of court); *Mitchell v. Williams*, No. 23-cv-141, 2023 WL 8275895, at *1 n.1 (W.D. Wis. Nov. 30, 2023) (same); *Williams-Evans v. Advance Auto Parts*, No. 18-cv-148, 2019 WL 2426443, at *1 (S.D. Ga. June 7, 2019) (same); *Kaimowitz v. Supervisor of Elections*, No. 16-cv-257, 2016 WL 6594110, at *1 (N.D. Fla. Oct. 25, 2016) (same), *report and recommendation adopted sub nom. Hillel Kaimowitz v. Supervisor of Elections*, 2016 WL 6573973 (N.D. Fla. Nov. 4, 2016); *Crosky v. Ohio Dep't of Rehab. & Corr.*, No. 09-cv-400, 2010 WL 3061816, at *2 (S.D. Ohio Aug. 3, 2010) (same). However, at least one district court has cast doubt as to whether Rule 12(f) permits striking an entire pleading. *See Ortiz v. Cooper Tire & Rubber Co.*, No. 13-cv-32, 2013 WL 2151674, at *1 (W.D. Okla. May 16, 2013) (declining to strike entire complaint under Rule 12(f) and pointing out that "Defendant provides no legal authority for the proposition that Rule 12(f) permits a court to strike an entire pleading").

8(b)(1)(B) ("In responding to a pleading, a party must: . . . admit or deny the allegations asserted against it by an opposing party."); Fed. R. Civ. P. 8(b)(2) ("A denial must fairly respond to the substance of the allegation."). Moreover, Robins's reply consists of various legal arguments and provides additional allegations and evidence in support of the allegations and claims in his amended complaint, which would have been proper if he was responding to a motion for summary judgment, but not to an answer and affirmative defenses to his amended complaint. Accordingly, even if the Court construed Robins's reply as a motion for leave to file a reply, the Court would deny it. *See, e.g.*, *Stephens v. Alliant Techsystems Corp.*, 714 F. App'x 841, 844 (10th Cir. 2017) (unpublished) (concluding that "the district court did not abuse its discretion by refusing to allow Stephens to file a reply" where the defendant's answer did not contain a counterclaim).

**c. Robins's IDSI Conviction**

Robins has repeatedly asserted in his submissions in this case that there is a clerical error on his criminal record from his Philadelphia County case because the jury did not convict him of IDSI by forcible compulsion under 18 Pa. C.S. §3123(a)(1). *See, e.g.*, (Doc. 24 ¶12). It appears that Robins's assertion is accurate.

The docket for Robins's criminal case, which is available on the Unified Judicial System of Pennsylvania's Web Portal (https://ujsportal.pacourts.us/CaseSearch), shows that the jury found him guilty of IDSI by forcible compulsion. *See* Docket, *Commonwealth v. Robins*, No. CP-51-CR-3430-2009 (Phila. Cnty. Ct. Com. Pl.).[6] In addition, the Philadelphia County Court of Common Pleas' sentencing order indicates that the jury found Robins guilty of IDSI by forcible compulsion, *see* (Doc. 57 at 26), and the Court of Common Pleas's Pennsylvania Rule of Appellate Procedure 1925(a) memorandum opinion addressing Robins's appeal from the denial of his PCRA petition acknowledges that the jury's "verdict sheet indicate[d] §3123(a)(1)." (*Id.* at 17.) On the other hand, in the same memorandum opinion, the Court of Common Pleas explained that it had instructed the jury on IDSI under Section 3123(a)(7), which requires only that the Commonwealth prove that he had deviate sexual intercourse with a complainant who was less than 16 years of age and to whom he was not married at the time, and expressed that "it is clear that the jury found [Robins]

[6] The Court takes judicial notice of these public records. *See Commonwealth of Pennsylvania v. Brown*, 373 F.2d 771, 778 (3d Cir. 1967) ("[A] federal court may take judicial notice of matters of record in state courts within its jurisdiction."); *Zedonis v. Lynch*, 233 F. Supp. 3d 417, 422 (M.D. Pa. 2017) ("Pennsylvania's Unified Judicial System provides online access to the docket sheets for criminal cases, and this Court may take judicial notice of those public dockets." (citations omitted)).

guilty of IDSI pursuant to [Section 3123(a)(7) even though] the verdict sheet indicates [Section] 3123(a)(1)." (*Id.* at 16–17.) Moreover, the Pennsylvania Superior Court's decision affirming the dismissal of Robins's PCRA petition explains that the jury convicted him of IDSI under Section 3123(a)(7). *See Robins I*, 2017 WL 4276084, at *2 (discussing Robins's IDSI conviction).

Although there appears to be an administrative mistake relating to the subsection of the IDSI statute under which the jury convicted Robins, it remains unclear from Robins's amended complaint why the mistake is relevant in this case. He does not allege in his amended complaint that the DOC or the Parole Board attempted to coerce him into admitting that he committed IDSI by forcible compulsion as part of the Program, and he does not explain therein why this mistake is relevant to his claims for injunctive relief. *See* (Doc. 24 at 2–10). He does, however, state in his unauthorized reply to Defendants' answer that the DOC wants him to admit to IDSI by forcible compulsion as part of the Program. *See* (Doc. 59 at 12).

Since Robins does not allege that Defendants (or any DOC officials) attempted to coerce him into admitting that he committed IDSI by forcible compulsion in his operative complaint, the Court has not considered such an allegation in addressing Defendants' motion. Additionally, even if Robins included this allegation in his amended complaint, the Court is skeptical that

the DOC is seeking such an admission or, more importantly, that it would alter the outcome of Defendants' motion for judgment on the pleadings considering the nature of Robins's remaining claims under RLUIPA and the Pennsylvania Constitution.

### D. Robins's Brief in Opposition to Defendants' Motion

In his brief in opposition to Defendants' motion, Robins asserts that Defendants are violating his rights under Article I, Section 3 of the Pennsylvania Constitution, RLUIPA, and the First Amendment. *See* (Doc. 66 at 4). Despite mentioning the First Amendment in his brief, Robins did not expressly include such a claim in his amended complaint. *See* (Doc. 24 at 1, 7–10). Moreover, although this Court did not construe Robins's original complaint as containing a First Amendment claim, *see* (Doc. 12 at 1–2, 9–22), the Third Circuit already concluded that such a claim "is facially meritless." *Robins*, 2022 WL 4533850, at *3. It explained that:

> This Court has recognized that states "have a vital interest in rehabilitating convicted sex offenders and acceptance of responsibility for past offenses is a critical first step in a prison's rehabilitation program for such offenders," and, on that basis, has declined to find First Amendment violations where sex offenders are required to admit guilt, even where the offender believes such an admission is false.

*Id.* (citing *Newman v. Beard*, 617 F.3d 775, 781 (3d Cir. 2010) (cleaned up)). Accordingly, the Court has not, and will not, address any First Amendment

claim as part of these proceedings, and Robins cannot attempt to assert such a claim by referencing it in an opposition brief.

### 2. Qualified Immunity

The Court will now address the substance of Defendants' arguments in their motion for judgment on the pleadings. Defendants contend that they are entitled to qualified immunity on Robins's RLUIPA claim because there is a "lack of controlling precedent regarding whether the acceptance-of-responsibility component of the sex offender treatment program violates an inmate's RLUIPA rights." (*Id.* at 12–15). However, even if they are correct about the lack of controlling precedent, Defendants are not entitled to qualified immunity on Robins's RLUIPA claim in this case.

"Qualified immunity shields federal and state officials from ***money damages*** unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (emphasis added) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether a right was clearly established, the Court must ask "whether it would be clear to a reasonable officer that [their] conduct was unlawful in the situation [they] confronted." *Schmidt v. Creedon*, 639 F.3d 587, 598 (3d Cir. 2011) (internal quotation marks omitted) (quoting

*Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "If it would not have been clear to a reasonable officer what the law required under the facts alleged, then [they are] entitled to qualified immunity." *Id.* In other words, for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Accordingly, "there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." *Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016) (quoting *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001)). In making this determination, the Court looks to applicable Supreme Court precedent, but if none exists, "a 'robust consensus of cases of persuasive authority' in the Court[s] of Appeals could clearly establish a right for purposes of qualified immunity." *Id.* (quoting *Taylor v. Barkes*, 575 U.S. 822, 826 (2015)).

The inquiry into whether a right is clearly established "do[es] not require a case directly on point," instead, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v.*

*Pauly*, 580 U.S. 73, 79 (2017) (internal quotation marks omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). The clearly established law "must be 'particularized' to the facts of the case," and the presentation of a unique set of facts by a case is an "important indication" that a defendant's conduct at issue did not violate a "clearly established" right. *Id*. at 79–80 (internal quotation marks omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). However, a constitutional deprivation that occurs under unique factual circumstances does not necessarily warrant an automatic grant of qualified immunity. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (holding that "officials can still be on notice that their conduct violates established law even in novel factual circumstances"). There may be the rare "obvious case," where "a body of relevant case law" is not necessary, *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004), especially when the case in question presents "extreme circumstances" to which "a general constitutional rule already identified in the decisional law may apply with obvious clarity." *Taylor v. Riojas*, 592 U.S. 7, 8–9 (2020) (internal quotation marks omitted) (quoting *Hope*, 536 U.S. at 741).

Here, Robins does not seek monetary damages against Defendants; rather, he asserts only claims for injunctive relief against them in their official capacities. *See* (Doc. 24 ¶¶29–31). As such, Defendants are not entitled to

qualified immunity on Robins's RLUIPA claims for injunctive relief because qualified immunity is a defense to claims for damages but not for injunctive or declaratory relief. *See Harper v. Cnty. of Delaware*, 779 F. App'x 143, 147 (3d Cir. 2019) (unpublished) ("Qualified immunity is a defense to claims for damages but not for injunctive or declaratory relief." (citing *Panzella v. Sposato*, 863 F.3d 210, 216 (2d Cir. 2017) and *Montanez v. Sec'y Pa. Dep't of Corr.*, 773 F.3d 472, 488 (3d Cir. 2014))). Accordingly, the Court will deny Defendants' motion for judgment on the pleadings to the extent they seek qualified immunity from Robins's RLUIPA claim for injunctive relief against them.

**3. Alleged Violation of the Pennsylvania Constitution**

Robins asserts that Defendants violated his right to religious freedom under Article I, Section 3 of the Pennsylvania Constitution. *See* (Doc. 24 ¶23); *see also* Pa. Const. art. I, §3 ("All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience, and no preference shall ever be given by law to any religious establishments or modes of worship."). Defendants contend that they are

entitled to judgment on this claim because of sovereign immunity. *See* (Doc. 63 at 11–12).

The Court concludes that Robins waived his claim for a violation of the Pennsylvania Constitution by failing to address Defendants' arguments for dismissal in his opposition brief. *See* (Doc. 66 at 1–10). "Courts have consistently found that the filing of a brief in opposition . . . that fails to respond to a substantive argument to dismiss a particular claim results in the waiver or abandonment of that claim." *McDonough v. Scranton Sch. Dist.*, No. 25-cv-2442, 2026 WL 1663013, at *2 (M.D. Pa. June 9, 2026) (citing cases); *see also Dribelbis v. Scholton*, 274 Fed. App'x 183, 185 (3d Cir. 2008) (affirming district court's finding of waiver as to an argument where plaintiff had opportunity to address it in his opposition brief but failed to do so); *Coit v. Wynder*, No. 22-cv-1277, 2025 WL 2656069, at *9 (M.D. Pa. Sept. 16, 2025) (stating that *pro se* plaintiff's failure to specifically address Defendants' motion to dismiss his general cruel-and-unusual claim in his opposition brief constitutes a waiver or abandonment of this claim"). Thus, since Robins failed to address Defendants' argument seeking dismissal of his claim for violation of the Pennsylvania Constitution, the Court deems him to have waived this claim and will grant Defendants' motion as to this claim.

### 4. RLUIPA

Defendants contend that the Court should enter judgment on the pleadings on Robins's RLUIPA claim because he fails to establish that the acceptance-of-responsibility component of the DOC's sex-offender treatment program substantially burdens his religious rights insofar as crimes occurred before his marriage to the victim. *See* (Doc. 63 at 4–11). Although Defendants raise persuasive arguments in their supporting brief, particularly regarding the fact that Robins's crimes occurred prior to his marriage to the minor victim, the standard of review applicable to motions for judgment on the pleadings constrains the Court's ability to appropriately address their arguments because the Court's review is limited to the pleadings.

For instance, Defendants argue that Robins's religious belief is insincere, and they point out that there are various factors that the Court must consider when determining whether a plaintiff maintains a sincere religious belief. *See* (*id.* at 7 (identifying factors)). The Court cannot analyze those factors based solely on the pleadings, even with the benefit of the facts of Robins's criminal case. Overall, the Court lacks the necessary information pertaining to what transpires during the program for the Court to appropriately assess whether the acceptance-of-responsibility part of the program substantially interferes with his sincerely held religious beliefs. As

such, the Court will deny this part of Defendants' motion without prejudice to them addressing it in a motion for summary judgment based on the record established during discovery.

## IV. CONCLUSION

For the reasons stated above, the Court will: (1) grant Robins's motion to substitute and substitute Harry for Wetzel as a Defendant in this action; (2) grant Defendants' motion for judgment on the pleadings to the extent that they seek dismissal of Robins's claims for violations of the Pennsylvania Constitution; and (3) deny Defendants' motion for judgment on the pleadings in all other respects. The Court will also direct the parties to file a report detailing the status of discovery on or before September 4, 2026 so the Court may issue an Order establishing deadlines for discovery (if needed) and for the filing of any motions for summary judgment. An appropriate Order follows.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: August 17, 2026**
21-1474-04